## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In Re:<br><br>PACIFIC ENERGY RESOURCES LTD., *et al*,<br><br>                         Debtors. | ) <br> ) Chapter 11 <br> ) <br> ) Case No. 09-10785 (KJC) <br> ) Jointly Administered <br> ) <br> ) <br> ) |
| UNION OIL COMPANY OF CALIFORNIA,<br><br>                    Plaintiff,<br><br>       v.<br><br>PACIFIC ENERGY ALASKA OPERATING, LLC,<br>and SILVER POINT FINANCE, LLC<br><br>                  Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) Adv. Proc. No. 09-51066 <br> ) <br> ) <br> ) <br> ) <br> ) |

## UNION OIL COMPANY OF CALIFORNIA'S OPENING BRIEF
## IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

| | |
|---|---|
| Norman M. Monhait (ID No. 1040) | Richard L. Epling |
| Rosenthal, Monhait & Goddess, P.A. | David A. Crichlow |
| 919 Market Street, Suite 1401 | Roger Elder |
| Citizens Bank Center | Pillsbury Winthrop Shaw Pittman LLP |
| Wilmington, Delaware 19801 | 1540 Broadway |
| Telephone: (302) 656-4433 | New York, NY 10036 |
| Facsimile: (302) 658-7567 | Telephone: (212) 858-1000 |
| | Facsimile: (212) 858-1500 |

*COUNSEL TO UNION OIL COMPANY OF CALIFORNIA*

# TABLE OF CONTENTS

Page

NATURE AND STAGE OF PROCEEDING ............................................................................. 1

PRELIMINARY STATEMENT .............................................................................................. 1

SUMMARY OF ARGUMENT ................................................................................................ 3

STATEMENT OF UNDISPUTED MATERIAL FACTS ........................................................ 4

ARGUMENT ........................................................................................................................... 10

I.   ALASKA LAW GOVERNS THIS DISPUTE .................................................................. 10

   A.  The Relevant Contracts Require Application of Alaska Law .................................... 10

   B.  Alaska Law Applies Under the Appropriate Choice-of-Law Analysis ..................... 11

   C.  A UCC Analysis Also Requires Application of Alaska Law ...................................... 13

II.  UNION HAS A STATUTORY, FIRST PRIORITY OPERATOR'S LIEN IN PEAO'S
     WORKING INTEREST AND THE LIFT PROCEEDS FROM THE TRADING BAY
     UNIT ........................................................................................................................................ 13

III. UNION HAS A PROPERLY FILED, FIRST-PRIORITY INTEREST IN THE LIFT
     PROCEEDS UNDER ALASKA REAL PROPERTY LAW ........................................... 16

IV.  UNION HAS A PROPERLY PERFECTED, FIRST PRIORITY SECURITY
     INTEREST IN TBF LIFT PROCEEDS UNDER ALASKA SECURED
     TRANSACTIONS LAW ...................................................................................................... 20

   A.  Union Has Properly Perfected Its Liens Under Alaska Law ...................................... 20

      1.  Union Filed the Appropriate Financing Statements Under Alaska Law ............ 20
      2.  Union's Filings Satisfy Alaska State Law Requirements with Respect to
          "As Extracted Collateral" .......................................................................................... 21

   B.  Union's Lien Is Prior and Superior to Silver Point's Interests .................................. 22

CONCLUSION ....................................................................................................................... 25

# TABLE OF AUTHORITIES

Case                                                                                                                    Page

*Aleut Corp. v. Stewart Petroleum Co. (In re Stewart Petroleum Co.)*,
    5 ABR 376 (Bankr. D. Alaska 1998).......................................................................................... 10, 19

*Arrow Oil & Gas, Inc. v. SemCrude, L.P. (In re SemCrude, L.P.)*,
    470 B.R. 112 (Bankr. D. Del. 2009) ................................................................................................ 17

*Grode v. Mutual Fire, Marine and Inland Ins. Co.*,
    8 F.3d 953 (3d Cir. 1993).................................................................................................................. 12

*Hanley v. Notinger (In re Charlie's Quality Carpentry, LLC)*,
    No. 02-1133-JMD, 2003 Bankr. LEXIS 1053 (Bankr. D. N.H. 2003) ............................. 16

*Jafari v. Wynn Las Vegas, LLC (In re Jafari)*,
    569 F.3d 644 (7th Cir. 2009) ........................................................................................................... 11

*Jiminez v. Quarterman*,
    129 S. Ct. 681 (2009)......................................................................................................................... 15

*Jones v. Salem National Bank (In re Fullop)*,
    6 F.3d 422 (7th Cir. 1993) ............................................................................................................... 19

*Northwest Central Pipeline Corp. v. State Corp. Commission of Kansas*,
    489 U.S. 493 (1989)........................................................................................................................... 12

*PCT v. Authentic Specialty Foods, Inc. (In re Fleming Companies, Inc.)*,
    347 B.R. 163 (Bankr. D. Del. 2006) ......................................................................................... 11, 12

*Rosenmiller v. Bordes*,
    607 A.2d 465 (Del. Ch. 1991).......................................................................................................... 10

*TCINA, Inc. v. NOCO Investment Co., Inc.*,
    95 P.3d 193 (Okla. Civ. App. 2004) ............................................................................................... 15

*Travelers Life and Annuity Co. v. Ritz-Carlton of D.C., Inc. (In re Ritz-Carlton of D.C., Inc.)*,
    98 B.R. 170 (S.D.N.Y. 1989)........................................................................................................... 16

Statute                                                                                                                Page

11 U.S.C. § 546(b)(2) ...................................................................................................................... 19

ALASKA STAT. § 31.05.110........................................................................................................ 14, 15, 16

ALASKA STAT. § 31.05.110(a)...................................................................................................... 3, 14, 15

ALASKA STAT. § 31.05.110(h)......................................................................................................... 13, 16

ALASKA STAT. § 40.17.020(a) ................................................................................................ 20

ALASKA STAT. § 40.17.030(a) ................................................................................................ 18

ALASKA STAT. § 40.17.080(a) ................................................................................................ 18

ALASKA STAT. § 40.17.080(b) ......................................................................................... 18, 23

ALASKA STAT. § 45.29.102(a)(7) ..................................................................................... 13, 21

ALASKA STAT. § 45.29.102(a)(47) ................................................................................... 20, 21

ALASKA STAT. § 45.29.102(a)(68) ................................................................................... 20, 21

ALASKA STAT. § 45.29.109(c)(2) ........................................................................................... 16

ALASKA STAT. § 45.29.109(d)(11) ......................................................................................... 17

ALASKA STAT. § 45.29.301(4) ......................................................................................... 13, 20

ALASKA STAT. § 45.29.308(a) ................................................................................................ 22

ALASKA STAT. § 45.29.310(a) ................................................................................................ 20

ALASKA STAT. § 45.29.322(a)(1) ........................................................................................... 22

ALASKA STAT. § 45.29.325(a)(1) ........................................................................................... 23

ALASKA STAT. § 45.29.502(a) ................................................................................................ 21

ALASKA STAT. § 45.29.502(b) ................................................................................................ 21

ALASKA STAT. § 45.29.502(c) ................................................................................................ 22

ALASKA STAT. § 45.29.507(a) ................................................................................................ 23

ALASKA STAT. § 45.29.515(a) ................................................................................................ 22

ALASKA STAT. § 45.29.515(g) ................................................................................................ 22

DEL. CODE ANN. tit. 6, § 9-102(a)(6) (2009) ....................................................................... 13

DEL. CODE ANN. tit. 6, § 9-301(4) (2009) ............................................................................. 13

U.C.C. § 9-102 official cmt. 4(c) ........................................................................................... 17

<u>Secondary Sources</u>                                                                                                    <u>Page</u>

BLACK'S LAW DICTIONARY 664 ............................................................................................. 20

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 187 (1971) ..................................................... 10

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 188 (1971) ............................................. 11, 12

## NATURE AND STAGE OF PROCEEDING

Plaintiff Union Oil Company of California ("**Union**") brought this adversary action to obtain an order finding that Union's security interests in certain escrowed proceeds of the sale of crude oil are prior and superior to any interests of defendants Pacific Energy Alaska Operating LLC ("**PEAO**") or Silver Point Finance, LLC ("**Silver Point**," and with PEAO, collectively, the "**Defendants**"). Defendants have answered the complaint. Because no material facts are in dispute, discovery is unnecessary and Union has moved for summary judgment on its claim and an order that such proceeds should be immediately released to Union. Union respectfully submits this opening brief in support of its motion.

## PRELIMINARY STATEMENT

Union is a joint interest owner in the Trading Bay Unit ("**TBU**") and Trading Bay Field ("**TBF**") oil production facilities in the Cook Inlet area of Alaska. Union and PEAO are parties to operating agreements that reflect the parties' rights with respect to the operation of the respective oil production facilities. Operation of the TBU is governed by the Trading Bay Unit Operating Agreement ("**TBUOA**"), and operation of the TBF is governed by the Trading Bay Field Joint Operating Agreement ("**TBFJOA**"). These documents have all been recorded in the appropriate real estate records.

Since the TBUOA and the TBFJOA (collectively, the "**Operating Agreements**") were first executed, all working interest owners have been subject to a lien in favor of Union as the operator. As operator under the TBUOA and TBFJOA, Union prepares monthly invoices, or joint interest billings ("**JIBs**"), which it sends to the working interest owners, setting forth the Trading Bay operating expenses which are to be paid by each party on a timely basis in proportion to each party's respective ownership interest.

Between October 24, 2008, and the March 9, 2009 (the "**Petition Date**"), PEAO's share of the Trading Bay production was paid directly to Union pursuant to Union's statutory and contractual lien rights.    All parties honored that arrangement through the Petition Date. However, as a result of the precipitous drop in the price of oil in late 2008 and early 2009, the TBU and the TBF were operating at a loss and the payments were less than PEAO's ongoing JIBs.    As a consequence, PEAO's unpaid JIB balance increased to $29,631,322.13 by the Petition Date.

Because PEAO was not making any of the post-petition JIB payments necessary to maintain its assets, Union filed a motion for relief from the automatic stay to allow Union to assert its lien rights in any production proceeds that accrued after the Petition Date.    On April 28, 2009 this Court entered an order providing that the lift proceeds from TBU and TBF will be held by the Debtors in escrow pending further order from this court, and that the order was without prejudice to any rights or claims of any Interested Party regarding the proceeds.

In the meantime, Union's losses have continued to mount, as Union paid PEAO's share of post-petition operating expenses, while all post-petition revenues were escrowed.    These losses were compounded by the production stoppage resulting from Mt. Redoubt's volcanic eruption shortly after the Petition Date, which shut in the oil fields, halted production, and resulted in Union paying both its operating expenses and PEAO's at a time when there could be no oil production to offset expenses.

Nevertheless, between the Petition Date and September 2, 2009 (the "**Abandonment Date**"), PEAO and its lenders sought to sell PEAO's TBU and TBF assets, relying on Union to maintain these lenders' collateral at no expense to PEAO and with no compensation to Union—in effect, forcing Union to finance PEAO's assets for the benefit of Silver Point and the

Debtors' other secured lenders. Silver Point cynically refused to grant the Debtors any authority to use DIP loan proceeds to pay current and accruing JIB amounts.

Since well before PEAO and its affiliates filed for bankruptcy protection, Union has been the only entity paying any of the cost of production and maintenance of the TBU and TBF. Nonetheless, in spite of Union's superior and prior liens, and the fact that neither PEAO nor Silverpoint has paid any of the costs associated with the proceeds in issue, they still assert that they are entitled to the first proceeds from the production at TBU and TBF even before Union has recouped the more than $50 million it has involuntarily expended on PEAO's and the lenders' behalf. For the reasons that follow, such a result is unsupported by Alaska law, and would be inequitable and unconscionable under the facts at issue. Emphatically, Union has statutory and contractual liens that are superior to the Defendants' as a matter of law and, accordingly, it files this motion for summary judgment on its declaratory judgment action.

## SUMMARY OF ARGUMENT

Alaska law, which governs this dispute, accords an oil or gas production unit[1] a statutory first and prior lien upon all oil and gas rights to secure payment of the amount of any unit expenses charged to and assessed against the unit. As the undisputed unit operator of the TBU, Union, by statute, has a first and prior lien superior to those of all other lien holders – except the State of Alaska – in the proceeds of the production of the TBU to secure payment of operating and maintenance expenses from working interest owners – in this case, PEAO. The governing Alaska statute is unequivocal, and provides the basis for this Court to grant Union judgment as a matter of law with respect to its prior rights in the proceeds of the sale of crude oil from TBU, which have been escrowed pursuant to prior order of this Court.

---

[1] A "unit" is an integration of oil and/or gas interests in tracts of land for the purpose of "provid[ing] for unitized management, development, and operation of such tracts of land." *See* ALASKA STAT. § 31.05.110(a) (2009).

In addition to the state statutory lien priority rights provided to Union as the unit operator, the Operating Agreements give Union identical lien rights superior to those of the Defendants in both the TBU and the and the TBF. As set forth in detail below, Union has also properly perfected both real property and UCC liens and security interests under Alaska law, prior to Silver Point's purported perfection of its security interests. Accordingly, in light of Union's liens' priority and superiority to Silver Point's as a matter of law, the Court should release to Union the escrowed proceeds of the sale of crude oil.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

Union has been the operator of the TBU and the TBF at all relevant times for the purposes of this motion.[2] Since the Operating Agreements were first executed, all working interest owners have been subject to a lien in favor of the operator. The lien is set forth in each of the Operating Agreements. Section 19.5 of the TBUOA provides:

Each Party grants to Unit Operator and the Sub-Operators a lien upon its oil and gas rights in each Tract, its share of Production, and its interest in all Unit property, as security for payment of its share of Costs, together with interest thereon at the rate of six per cent (6%) per annum. Unit Operator and each Sub-Operator shall have the right to bring suit to enforce collection of such indebtedness with or without seeking foreclosure of the lien. In addition, upon default by any Party in the payment of its share of Costs, Unit Operator and each Sub-Operator shall have the right to collect from the purchaser the proceeds from the sale of such Party's share of Production until the amount owed by such Party, plus interest as aforesaid, has been paid.

Similarly, Section 11.4 of the TBFJOA provides:

Each Party grants to the Operator a lien upon its Working Interests in the Area, and its interest in all property, as security for payment of its share of Costs, together with interest thereon at the rate of twelve per cent (12%) per annum or, if

---

[2]  TBUOA section 7.1; TBFJOA section 6.1. A true and correct copy of the TBUOA is attached to the Affidavit of Shannon Martin (the "**Martin Affidavit**") as Exhibit A. A true and correct copy of the TBFJOA is attached to the Martin Affidavit as Exhibit B. The history by which PEAO became a working interest owner in the TBU and the TBF is detailed in a number of pleadings filed with the Court, including the Motion of Union Oil Company for Relief from Automatic Stay (Bankr. Dkt. No. 100) at ¶¶ 2-10, the Complaint for Declaratory Judgment Determining Validity and Priority of Liens (Dkt. No. 1) at ¶¶ 6-27, and the Amended and Supplemental Complaint for Declaratory Judgment Determining Validity and Priority of Liens (Dkt. No. 9) at ¶¶ 6-27.

lower, at the highest rate allowed by law. Operator shall have the right to bring suit to enforce collection of such indebtedness with or without seeking foreclosure of the lien. In addition, upon default by any Party in the payment of its share of Costs, Operator shall have the right to collect from the purchaser the proceeds from the sale of such Party's share of Production until the amount owed by such Party, plus interest as aforesaid, has been paid. Each purchaser shall be entitled to rely upon Operator's written statement concerning the amount of any amount due hereunder.

In addition to the descriptions of the collateral cited above, the TBUOA and the TBFJOA contain legal descriptions of the TBU and TBF respectively and note that they are to be recorded in the real property records. Thus, Union currently holds a first priority lien in each of PEAO's Alaska assets which Union Operates.[3]

The TBUOA was negotiated and entered into in both Alaska and California.[4] The TBUOA was recorded January 26, 1999 in the real property records of the Anchorage Recording District at Book 3412 Page 1.[5] The TBUOA also was recorded in the fixture filing records of the Anchorage Recording District, at Book 3412 page 211 on January 26, 1999.[6] These filings provide lenders and purchasers notice of Union's superior lien in TBU working interests.

The TBFJOA was negotiated and entered into in Alaska.[7] The TBFJOA was recorded January 26, 1999 in the real property records of the Anchorage Recording District at Book 3412, Page 421.[8] The TBFJOA was also recorded in the fixture filing records of the Anchorage Recording District, at Book 3412 page 469 on January 26, 1999.[9] These filings provide lenders and purchasers notice of Union's superior lien in TBF working interests.

---

[3] Affidavit of Gerald A. Tywoniuk, Chief Financial Officer of Pacific Energy Resources Ltd., in Support of First Day Motions (the "**Tywoniuk Affidavit**") (Bankr. Dkt. No. 2) ¶ 13 and p. 8 n.9.

[4] Martin Affidavit ¶ 3.

[5] Martin Affidavit ¶ 4.

[6] *Id.*

[7] Martin Affidavit ¶ 3.

[8] Martin Affidavit ¶ 4.

[9] *Id.*

5

On March 15, 2002, Union caused a notice of lien on Forest's interests in the TBU to be filed in the records of the Anchorage Recording District at No. 2002-017742-0 (the "**TBU Lien Notice**").[10]   Among other things, the TBU Lien Notice sets out Forest as the owner of the real and personal property in which Union holds a lien, and provides the 1999 recording information for the TBUOA; it also contains a legal description of the TBU and describes the collateral covered by the lien.[11]

Also on March 15, 2002, Union caused a notice of lien in Forest's interests in the TBF to be filed in the records of the Anchorage Recording District at No. 2002-017741-0 (the "**TBF Lien Notice**").[12]   Among other things, the TBF Lien Notice names Forest as the owner of the real and personal property in which Union holds a lien, provides the 1999 recording information for the TBFJOA, contains a legal description of the TBF, and also describes the collateral covered by the lien.[13]

In connection with its acquisition of rights in the TBU and the TBF, PEAO, as Borrower, entered into a certain First Lien Credit Agreement dated as of August 24, 2007, among PEAO, Pacific Energy Alaska Holdings, LLC as Holdings, certain lenders from time to time party thereto, Silver Point as Administrative Agent, Collateral Agent, Sole Lead Arranger, Sole Bookrunner, and Syndication Agent, and J. Aron & Company as Documentation Agent (the "**Credit Agreement**").[14]   Schedule 6.02 of the Credit Agreement, entitled "Existing Liens," acknowledges Union's superior operator's liens under the TBUOA and the TBFJOA.

---

[10] Martin Affidavit ¶ 4.  A true and correct copy of the TBU Lien Notice is attached to the Martin Affidavit as Exhibit C.

[11] Martin Affidavit ¶ 4.

[12] Martin Affidavit ¶ 5.  A true and correct copy of the TBF Lien Notice is attached to the Martin Affidavit as Exhibit D.

[13] Martin Affidavit ¶ 5.

[14] A true and correct copy of the Credit Agreement is attached to the Affidavit of Roger Elder (the "**Elder Affidavit**") as Exhibit A.

6

Also in connection with the Pacific Energy Resources Ltd. ("**PERL**") acquisition of Forest Oil's interests in TBU/TBF, PERL and PEAO executed a Deed of Trust, Security Agreement, Financing Statement and Fixture Filing [First Lien] in favor of Silver Point, as administrative and collateral agent (the "**Deed of Trust**"), which deed of trust was recorded August 27, 2007 at No. 2007-054468-0 in the Anchorage Recording District.[15] As noted in schedule 6.02 of the Credit Agreement, at that time Silver Point had actual knowledge of Union's prior liens. Indeed, in its answer to Union's adversary complaint (the "**Answer**"), Silver Point admits it had actual knowledge of Union's prior liens. Answer ¶¶ 23-25.

PERL and PEAO also executed a Deed of Trust, Security Agreement, Financing Statement and Fixture Filing [Second Lien] in favor of Silver Point, as administrative and collateral agent, which deed of trust was recorded on August 27, 2007 at No. 2007-054469-0 in the Anchorage Recording District.[16] Finally, PEAO executed two overriding royalty interest conveyances, one to SPCP Group Alaska LLC and the other to SPCP Group III Alaska LLC (the "**Overriding Royalty Holders**"). These overriding royalty interests were recorded August 27, 2007 at Nos. 2007-054466-0 and 2007-054467-0, respectively, in the Anchorage Recording District.

On June 5, 2008, Union filed a financing statement ("**2008 Fixture Filing**") as a fixture filing in the records of the Anchorage Recording District, at No. 2008-032974-0.[17] The 2008 Fixture Filing identifies PEAO as the debtor and Union as the secured party, contains maps and legal descriptions of TBU/TBF, states that it is to be filed for record in the real property records,

---

[15] *See* Tywoniuk Affidavit ¶ 19, 107 (acknowledging that the lien established in the Credit Agreement is subordinate to Union's first priority lien). A true and correct copy of the Deed of Trust is attached to the Elder Affidavit as Exhibit B.

[16] *See* Tywoniuk Affidavit ¶ 20, 108-109.

[17] Martin Affidavit ¶6. A true and correct copy of the 2008 Fixture Filing is attached to the Martin Affidavit as Exhibit E.

701836870v8

and describes the collateral as, "Interest in, and all oil or gas before or after extraction from, the Trading Bay Field or Trading Bay Unit, in the Cook Inlet Area of Alaska, as set forth in the attachment hereto."[18]

Union's Pre-Petition Lien Enforcement

As Operator under the TBUOA and TBFJOA, Union prepares JIBs, which it sends to the working interest owners, setting forth the Trading Bay operating expenses and other expenditures which the working interest owners are obligated under those agreements to pay on a timely basis.[19]

In spring 2008, PEAO began falling behind on its JIB payments.[20] On October 24, 2008, Union exercised its lien rights under state law and the Operating Agreements and served notice upon Tesoro Alaska Company ("**Tesoro**"), the purchaser of all TBU and TBF oil production, that Tesoro should pay, directly to Union, payments otherwise due from Tesoro to PEAO on account of proceeds from the sale of PEAO's share of production from TBU/TBF.

Between October 24, 2008, and the Petition Date, Tesoro paid the PEAO share of the Trading Bay production directly to Union pursuant to Union's statutory and contractual lien rights. This arrangement was honored by all parties in interest through the Petition Date. However, as a result in the sudden, precipitous drop in the price of oil, the TBU and the TBF were operating at a loss, and the payments were less than PEAO's ongoing Trading Bay JIBs. As a consequence, the outstanding JIB balance was $29,631,322.13 as of the Petition Date. In

---

[18]  Martin Affidavit ¶6.

[19]  Affidavit of Kim Smith (the "**Smith Affidavit**") (Bankr. Dkt. No. 103) ¶ 2; Tywoniuk Affidavit ¶ 13.

[20]  *Id.* at ¶ 5.

8

the months leading up to and since the Petition Date, no party other than Union has paid any of the operating expenses of the TBF or the TBU oil assets.[21]

Post-Petition Events

On or about March 11, 2009, the Debtors entered into a Senior Secured Super Priority Priming Debtor in Possession Credit and Guarantee Agreement (the "**DIP Agreement**") (Dkt. No. 19). The DIP Agreement provided financing for the Debtors while they marketed their assets and granted the secured lenders, including Silver Point, a lien in all the Debtors' assets. Dip Agreement ¶ 7.1. At the same time, the DIP Agreement specifically contemplated PEAO making no JIB payments. DIP Agreement ¶ 5.7.

On March 23, 2009, because PEAO was not making the post-petition JIB payments necessary to maintain its assets, Union filed a motion for relief from the automatic stay (the "**Motion**") (Bankr. Dkt. No. 100) to allow Union to assert its lien rights in any production proceeds that accrued after the Petition Date (collectively, the "**Lift Proceeds**"). On April 15, 2009, the Court held a preliminary hearing on the Motion. The final hearing on the Motion has been continued without date pending the outcome of this adversary action.

On April 28, 2009, this Court entered an order (Bankr. Dkt. No. 230) which provides that the Lift Proceeds will be held by the Debtors in a segregated, interest-bearing account pending further order from this Court, and that the order is without prejudice to any rights or claims of any Interested party regarding the proceeds. The Lift Proceeds, exclusive of interest, currently total $12,272,757.61.

Between the Petition Date and September 2, 2009 (the "**Abandonment Date**"), PEAO and its lenders sought to sell PEAO's TBU and TBF assets. On the Abandonment Date, this

---

[21] Marathon Oil Company holds gas interests in the TBU and is current on its related JIBs.

Court entered an order (Bankr. Dkt. No. 832) authorizing the Debtors to abandon certain of PEAO's assets, including its interests in the TBU and the TBF and to reject related executory contracts. That order was not appealed and has since become final. Through the Abandonment Date, PEAO accrued over $50,000,000 in unpaid expenses. Union has filed proofs of claim for the recovery of these amounts.

## ARGUMENT

## I.   ALASKA LAW GOVERNS THIS DISPUTE

### A.   The Relevant Contracts Require Application of Alaska Law

In Delaware, courts will uphold a contractual choice of law unless the state whose law would control in the absence of a choice has a materially greater interest in the subject matter. *Rosenmiller v. Bordes*, 607 A.2d 465, 468 (Del. Ch. 1991). Both the TBUOA and the TBFJOA, the interpretation of which is essential to a determination of this lien priority dispute, expressly adopt Alaska law.[22] *See* TBUOA section 31.2; TBFJOA section 23.8. Therefore, unless another state's law would control in absence of a choice and that state has a materially greater interest in the subject matter, Alaska law will apply. *Rosenmiller*, 607 A.2d at 468; RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 187 (1971); *see also Aleut Corp. v. Stewart Petroleum Co. (In re Stewart Petroleum Co.)*, 5 ABR 376, 389-96 (Bankr. D. Alaska 1998)[23] (copy attached as Exhibit A) (applying Alaska law to the issue of perfection of a security interest in oil and gas working interests in Alaska). The contracts here deal with property in, and indeed land leased from, the State of Alaska. No other state conceivably could have a greater interest in the matters

---

[22] The State of Alaska's Competitive Oil and Gas Leases, which underlie all of the agreements at issue in this dispute, effectively incorporates ALASKA STAT. § 31.05.110. *See* Affidavit of Kevin Tabler (Bankr. Dkt. No. 101) Exhibit A ¶ 32.

[23] "ABR" stands for Alaska Bankruptcy Reporter, a compilation of cases decided by the United States Bankruptcy Court for the District of Alaska. The reporter, which is maintained by that court, may be accessed online at www.akb.uscourts.gov.

in dispute between Union and Silver Point.  Consequently, Alaska law governs the determination of the issues in this action.

### B.    Alaska Law Applies Under the Appropriate Choice-of-Law Analysis

In absence of a contractual choice of law, a federal court sitting in diversity will generally apply the choice-of-law rules of the state in which it sits.  *Jafari v. Wynn Las Vegas, LLC (In re Jafari)*, 569 F.3d 644, 648 (7th Cir. 2009).  However, because a bankruptcy court's jurisdiction does not arise from diversity, but from bankruptcy law, which has a goal of national uniformity, there is a tension as to whether bankruptcy courts follow federal common law choice-of law principles or the forum state's choice-of-law principles.  *Id.*

Although the Third Circuit does not appear to have decided whether a bankruptcy court should apply federal or forum state choice-of-law principles, the question is moot in this case because "both Delaware and federal choice of law principles apply the 'most significant relationship test' found in section 188 of the Restatement Second of Conflict of Laws to determine which jurisdiction's laws will apply to a written or unwritten contract claim." *PCT v. Authentic Specialty Foods, Inc. (In re Fleming Companies, Inc.)*, 347 B.R. 163, 168 (Bankr. D. Del. 2006).

In the absence of an effective choice of law by the parties, section 188 employs a five-factor test to determine the most significant relationship: (a) the place of contracting; (b) the place of negotiating the contract; (c) the place of performance; (d) the location of the subject matter of the contract; and (e) the domicile, residence, nationality, place of incorporation and place of business of the parties to the contract.  RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 188; *Fleming Companies*, 347 B.R. at 648.

The TBUOA was negotiated and entered into in Alaska and California.[24]  The TBFJOA was negotiated and entered into in Alaska.[25]  The principal duties of the operator and the working interest owners, including producing and selling oil and paying costs, occur in Alaska.[26]  The subject matter of the contracts, the TBU and the TBF, is located in Cook Inlet, near Anchorage, Alaska.[27]  Although Union is incorporated in California[28] and PEAO is formed in Delaware[29] and both have their principal places of business in California,[30] Union's relevant place of business for purposes of the TBUOA and the TBFJOA is in Alaska, as is PEAO's.[31]  Moreover, the commercial actions giving rise to this dispute occurred in Alaska and the property for which the interests are asserted is maintained in Alaska.  The overwhelming majority of the choice-of-law factors point to Alaska law.  There can be no question that the only state with a significant relationship to the matters in controversy in this case is Alaska.  Indeed, Alaska has a unique interest in that this case involves questions regarding the regulation of natural resources, which is a traditional state power.  *Northwest Central Pipeline Corp. v. State Corp. Commission of Kansas*, 489 U.S. 493, 511 (1989).  The Third Circuit has recognized a strong state interest in the regulation of natural resources.  *Grode v. Mutual Fire, Marine and Inland Ins. Co.*, 8 F.3d 953, 956 (3d Cir. 1993).  Accordingly, Alaska law should govern the resolution of this dispute.  RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 188; *Fleming Companies*, 347 B.R. at 648.

---

[24]  Martin Affidavit ¶ 3.

[25]  *Id.*

[26]  *See* Tywoniuk Objection Affidavit ¶ 6, Smith Affidavit ¶ 3.

[27]  Tywoniuk Objection Affidavit ¶ 6.

[28]  Martin Affidavit ¶ 2.

[29]  Tywoniuk Affidavit, Corporate Structure attachment.

[30]  Martin Affidavit ¶ 2.

[31]  Martin Affidavit ¶ 2.

### C.   A UCC Analysis Also Requires Application of Alaska Law

This dispute centers on the Lift Proceeds, which, as of the petition date, under the laws of both Delaware and Alaska was, in part, "as-extracted collateral." As-extracted collateral is:

> (A) oil, gas, or other minerals that are subject to a security interest that:
>
>> (i) is created by a debtor having an interest in the minerals before extraction; and
>>
>> (ii) attaches to the minerals as extracted; or
>
> (B) accounts arising out of the sale at the wellhead or minehead of oil, gas, or other minerals in which the debtor had an interest before extraction.

DEL. CODE ANN. tit. 6, § 9-102(a)(6) (2009); ALASKA STAT. § 45.29.102(a)(7) (2009).   In both Delaware and Alaska, "The local law of the jurisdiction in which the wellhead or minehead is located governs perfection, the effect of perfection or nonperfection, and the priority of a security interest in as-extracted collateral."   DEL. CODE ANN. tit. 6, § 9-301(4) (2009); ALASKA STAT. § 45.29.301(4) (2009).   Because the wellheads in this case are all located in the TBU and the TBF, both of which are in Alaska, Union's UCC security interest in the Lift Proceeds is governed by Alaska law.   *Id.*

## II.   UNION HAS A STATUTORY, FIRST PRIORITY OPERATOR'S LIEN IN PEAO'S WORKING INTEREST AND THE LIFT PROCEEDS FROM THE TRADING BAY UNIT

Under Alaska law:

> [T]he unit has a first and prior lien upon the leasehold estate and ***all other oil and gas rights*** (exclusive of a landowner's royalty interest) in and to each separately owned tract, the interest of the owners in and to the unit production and all equipment in the possession of the unit, ***to secure the payment of the amount of the unit expense charged to and assessed against such separately owned tract . . .*** and resort may be had to overriding royalties, oil and gas payments, or other interests, except royalty interests, which otherwise are not chargeable with these costs, only in the event the owner of interest primarily responsible fails to pay the assessment of the production to the credit thereof, or production is insufficient for that purpose.

ALASKA STAT. § 31.05.110(h) (2009) (emphasis added). This lien is an important part of the Alaska statutory scheme regulating the production of oil and gas, with the aim of "prevent[ing], or . . . assist[ing] in preventing waste, . . . insur[ing] a greater ultimate recovery of oil and gas, and . . . protect[ing] the correlative rights of persons owning interests in the tracts of land affected." ALASKA STAT. § 31.05.110(a). This statutory scheme furthers important Alaska interests, specifically, facilitating unitization. *Id.* The lien provided in § 31.05.110(h) is designed to prevent precisely the outcome Silver Point seeks in this case: the unit operator advances the costs of production, but a working interest owner's bank receives the revenue. Obviously, this is not a sensible outcome in a state that wants to promote efficient and effective recovery of oil.

It is undisputed that under the TBUOA Union is the unit operator. As unit operator, Union represents the unit and initially pays the costs of production and maintenance in the TBU, to be reimbursed by the other working interest owners, according to their *pro rata* share. TBUOA sections 8.1, 19.1. It is also undisputed that since the spring of 2008, PEAO had not been paying its share of production and maintenance costs, and that Union exercised its lien rights under ALASKA STAT. § 31.05.110 by directing Tesoro to pay PEAO's share of Lift Proceeds directly to Union from October 24, 2008 through the Petition Date.

Between the Petition Date and the Abandonment Date, costs of production and maintenance in the TBU continued to accrue, and PEAO was responsible for 46.8% of those costs. Of PEAO's share of those costs still outstanding at the Abandonment Date, it has paid nothing. Rather, PEAO and Silver Point have acted as if it were appropriate for Union to finance PEAO's ownership of the TBU and the TBF as PEAO marketed its assets, all the while

14

expecting that the proceeds of any sale would belong to the secured lenders. Such an incredible proposition cannot be allowed to stand.

"It is well established that, when the statutory language is plain, [a court] must enforce it according to its terms." *Jiminez v. Quarterman*, 129 S. Ct. 681, 685 (2009). The plain language of ALASKA STAT. § 31.05.110 grants Union a "first and prior lien," superior to all but the State of Alaska's right to royalty payments, in all of PEAO's working interest and its rights in the unit production. Although no Alaska court has interpreted the lien provision portion of this statute, an Oklahoma court has held that a nearly identical Oklahoma statute gave priority to a unit operator over a delinquent working interest owner's mortgagee. *See TCINA, Inc. v. NOCO Investment Co., Inc.*, 95 P.3d 193, 195 (Okla. Civ. App. 2004) (relying on OKLA. STAT. tit. 52 § 287.8). In TCINA, the court, interpreting a statute almost identical to ALASKA STAT. § 31.05.110, found that a unit operator had a superior lien interest to that of a working interest owner's mortgagee, even though the mortgagee had properly filed its mortgage against the working interest owner *before* the unit operator commenced as operator and although the unit operator had never filed a lien statement of any kind. *Id.* at 194. The court noted that "[A] lien declared by positive statute is not dependent for its existence upon subsequent acts requisite to its enforcement." *Id.* at 195.

In this case, the State of Alaska has not asserted that PEAO is in arrears for any royalties for TBU production, and there is no entity under Alaska state law that can have a superior right to Union's in the Lift Proceeds from the TBU. Thus, as a matter of law, Union is entitled to the Lift Proceeds from the TBU. This result is consistent with the State of Alaska's intent to "protect the correlative rights of" Union and PEAO and to promote the efficient and effective recovery of oil. ALASKA STAT. § 31.05.110(a). To force Union to advance the costs of

production and then allow the proceeds of production to go to PEAO's secured lender would fly in the face of the State of Alaska's public policy and lead to a result that the legislature expressly intended to prevent by enacting ALASKA STAT. § 31.05.110. Therefore, the Court should respect Alaska's carefully considered public policy and enforce ALASKA STAT. § 31.05.110(h) according to its terms, granting Union a first priority security interest in the TBU portion of the Lift Proceeds and requiring such amounts to be paid to Union immediately.

Further, the affirmative defenses asserted by Silver Point with respect to its alleged security interests are all based in Alaska's version of Article 9 of the Uniform Commercial Code, which, by its very terms, does not apply with respect to the TBU. ALASKA STAT. § 45.29.109(c)(2) states that "[t]his chapter does not apply to the extent that another statute of this state expressly governs the creation, perfection, priority, or enforcement of a security interest created by this state or a governmental unit of this state." Alaska has created a security interest in favor of unit operators, and the statute granting that security interest expressly governs its creation, perfection, priority, and enforcement. Therefore, although Union's lien is superior to Silver Point's under any standard, the inquiry into the validity and priority of Union's lien in the TBU Lift Proceeds begins and ends with ALASKA STAT. § 31.05.110 rather than under Alaska's version of the Uniform Commercial Code.

## III.   UNION HAS A PROPERLY FILED, FIRST-PRIORITY INTEREST IN THE LIFT PROCEEDS UNDER ALASKA REAL PROPERTY LAW

In general, the estate's rights in property are limited to the "legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1) (2009). Similarly, the general rule is that a secured creditor is entitled to adequate protection of its position as of the petition date. *See, e.g., Travelers Life and Annuity Co. v. Ritz-Carlton of D.C., Inc. (In re Ritz-Carlton of D.C., Inc.)*, 98 B.R. 170, 173 (S.D.N.Y. 1989); *Hanley v. Notinger (In*

16

re Charlie's Quality Carpentry, LLC), No. 02-1133-JMD 2003 Bankr. LEXIS 1053 at *10-11 (Bankr. D.N.H. 2003) (copy attached as Exhibit B) (determining the relative interests of a debtor and another with an interest in property as of the petition date). Further, the final order approving the DIP Agreement (the "**DIP Order**") (Bankr. Dkt. No. 415) expressly preserves the parties' rights, including the rights of parties such as Union with Prior Permitted Liens,[32] as of the Petition Date. Dip Order p. 13. As of the Petition Date, much of the oil which was sold to generate the Lift Proceeds had not yet been severed from the ground and was therefore still real property. *See, e.g., Arrow Oil & Gas, Inc. v. SemCrude, L.P. (In re SemCrude, L.P.)*, 407 B.R. 112, 120 (Bankr. D. Del. 2009) ("Before extraction, oil and gas are treated as real property."). Therefore, the relative rights of PEAO, Silver Point, and Union in the Lift Proceeds generated by oil severed after the Petition Date should be determined according to their relative rights in the oil, rather than the proceeds, as of the Petition Date, which rights are governed by Alaska real property law.

For these reasons, adequate protection of Union's security interests in the oil extracted from the TBU and the TBF post-petition requires attaching those interests to the proceeds of the oil to the same extent and in the same order of priority as they existed in the oil itself on the Petition Date.

Under the Uniform Commercial Code, interests in oil or gas that has not been extracted from the ground are treated as real property and are not subject to Article 9. U.C.C. § 9-102 official cmt. 4(c); ALASKA STAT. § 45.29.109(d)(11) (2009); *see also Arrow Oil & Gas*, 470 B.R. at 120. In Alaska, in order to be eligible for recording, a document evidencing a conveyance of rights in real property must:

---

[32] As defined in the DIP Order.

(1) contain original signatures;

(2) be legible or capable of being converted into legible form by a machine or device used in the recording office;

(3) be capable of being copied by the method used in the recording office;

(4) contain a title reflecting the overall intent of the document;

(5) contain the information needed to index the document under regulations of the department;

(6) contain a book and page reference or serial number reference if the document amends, corrects, extends, modifies, assigns, or releases a document previously recorded in this state;

(7) contain the name and address of a person to whom the document may be returned after recording;

(8) if it is a deed, contain the mailing addresses of all persons named in the document who grant or acquire an interest under the document;

(9) contain the name of the recording district in which it is to be recorded; and

(10) be accompanied by the applicable recording fee set by regulation; if the document is to be recorded for multiple purposes, it must be accompanied by the applicable fee for each of the multiple purposes.

ALASKA STAT. § 40.17.030(a) (2009).   The recorded Operating Agreements meet each of the applicable criteria for filing and were each, in fact, filed and recorded.[33]

"[F]rom the time a document is recorded in the records of the recording district in which the land affected by it is located, the recorded document is constructive notice of the contents of the document to subsequent purchasers and holders of a security interest in the same property or a part of the property. ALASKA STAT. § 40.17.080(a) (2009). Thus, because they were recorded in 1999, the TBUOA and TBFJOA served as notice to both PEAO and Silver Point at the time each took its interests in the TBU and the TBF in 2007 that Union had a prior lien. Further, even if Union had not recorded its interests, in Alaska, "An unrecorded conveyance is valid as

---

[33] *See* TBUOA p. 65 and TBFJOA p. 30 for signatures; TBUOA and TBFJOA generally for legibility and capability of being copied; TBUOA p. 1 and TBFJOA p. 1 for titles and names and addresses of persons to whom the documents were to be returned after recording; TBUOA p. 1 and TBFJOA p. 30 for mailing addresses of grantors and grantees; and TBUOA p. 65 and TBFJOA p. 1 for names of recording districts. *See also* Martin Affidavit ¶ 4.

between the parties to it and as against one who has actual notice of it." ALASKA STAT. § 40.17.080(b) (2009). Both PEAO and Silver Point were well aware of Union's prior lien at the time they took their interests in the TBU and the TBF. Tywoniuk Affidavit ¶ 13 and p. 8 n.9; Credit Agreement Schedule 6.02. Thus, under Alaska's real property recording laws, Union had an interest in PEAO's working interest which was superior to PEAO's and Silver Point's as of the Petition Date.[34]

Under the TBUOA and the TBFJOA, Union is entitled to PEAO's share of production in the event of PEAO's default in payment of its share of costs. TBUOA section 19.5; TBFJOA section 11.4. Prior to the Petition Date and since the Abandonment Date, Union foreclosed on this security interest by having Tesoro pay PEAO's share of proceeds directly to Union. Although there does not appear to be any relevant Alaska law on this point, states with similar laws allow secured parties to levy on rents and profits directly in this manner, so long as such action is allowed under the relevant security agreements. *See, e.g., Jones v. Salem National Bank (In re Fullop)*, 6 F.3d 422, 427-30 (7th Cir. 1993) (affirming the right of a pre-petition secured party to levy on extracted oil under rights provided by real property filings). Such levy rights are enforceable even if a subsequent or intervening creditor takes a lien in the rental or profit income. *Id.* at 430. Further, Union was entitled to perfect its interest in post-petition, pre-abandonment Lift Proceeds by giving notice that it intended to assert its rights in such proceeds. 11 U.S.C. § 546(b)(2). Such notice is sufficient to protect a creditor's lien rights if it informs the court or the possessor of the property that the creditor intends to enforce its lien, and may be in

---

[34] In *Aleut Corp.*, the Alaska bankruptcy court held that a financing statement recorded in the real property records provided sufficient notice to the world of a security interest in a working interest to preclude the bankruptcy estate from avoiding the interest under 11 U.S.C. § 544(b)(3)'s strong-arm clause, even though the proper method of perfecting that interest would have been a real property mortgage. *Aleut Corp.*, 1 ABR at 393. This holding illustrates that perfection of security interests in Alaska working interests may be accomplished with less than punctilious observance of all formalities, as the important element is notice. In the case at bar, in contrast, Union's extensive real property recordings do comply with all formalities.

19

the form of a motion for relief from the automatic stay so that its lien may be enforced. *Jones*, 6 F.3d at 430. Union has moved for relief from the automatic stay in order to enforce its lien rights, and, for the reasons set forth in detail herein, is entitled to the Lift Proceeds.

## IV.   UNION HAS A PROPERLY PERFECTED, FIRST PRIORITY SECURITY INTEREST IN TBF LIFT PROCEEDS UNDER ALASKA SECURED TRANSACTIONS LAW

### A.   Union Has Properly Perfected Its Liens Under Alaska Law

In Alaska, "the local law of the jurisdiction in which the wellhead or minehead is located governs perfection, the effect of perfection or nonperfection, and the priority of a security interest in as-extracted collateral." ALASKA STAT. § 45.29.301(4). The local law in Trading Bay is Alaska law. Under Alaska law, with certain exceptions not applicable in this case, "a financing statement must be filed to perfect all security interests and agricultural liens." ALASKA STAT. § 45.29.310(a) (2009). The appropriate documents must be filed "in the recording district in which land affected by the conveyance is located." ALASKA STAT. § 40.17.020(a) (2009). Union has filed each of the TBUOA, the TBFJOA, the TBU Lien Notice, the TBF Lien Notice, and the 2008 Fixture Filing in the Anchorage Recording District, where Trading Bay is located.

#### 1.   Union Filed the Appropriate Financing Statements Under Alaska Law

Under Alaska law, the TBUOA the TBFJOA, the TBU Lien Notice, the TBF Lien Notice, and the 2008 Fixture Filing (collectively, the "**Filings**") are each mortgages in that they are each "a consensual interest in real property, including fixtures, that secures payment or performance of an obligation." ALASKA STAT. § 45.29.102(a)(68) (2009). A financing statement[35] is "[a] document filed in the public records to notify third parties, usually prospective

---

[35] The State of Alaska defines a financing statement as "a record or records composed of an initial financing statement and any filed record relating to the initial financing statement." ALASKA STAT. § 45.29.102(a)(47) (2009).

buyers and lenders, of a secured party's interest in goods or real property." BLACK'S LAW DICTIONARY 664 (8th ed. 2004). The Filings also are financing statements because each was intended to serve as notice to prospective buyers and lenders of Union's security interest. The TBUOA, the TBFJOA, and the 2008 Fixture Filing were each filed as fixture filings. Therefore, the TBUOA, the TBFJOA, and the 2008 Fixture Filing are mortgages that are effective as financing statements filed as fixture filings. ALASKA STAT. §§ 45.29.102(a)(47), (68).

In order for a financing statement or a mortgage that is effective as a financing statement filed as a fixture filing to be sufficient, it must: (1) provide the name of the debtor; (2) provide the name of the secured party; and (3) indicate the collateral covered by the financing statement. ALASKA STAT. § 45.29.502(a) (2009). Each of the Filings contains these elements.[36]

### 2.    Union's Filings Satisfy Alaska State Law Requirements with Respect to "As Extracted Collateral"

Under the Alaska law of secured transactions, oil, gas or other minerals that are subject to a security interest that is created by a debtor having an interest in the minerals before extraction and attaches to the minerals as extracted is known as "as-extracted collateral." ALASKA STAT. § 45.29.102(a)(7). A financing statement that covers as-extracted collateral must not only be sufficient under ALASKA STAT. § 45.29.502(a), but it also must indicate that it covers as-extracted collateral, indicate that the financing statement is to be filed for record in the real property records, provide a description of the real property to which the collateral is related, and, if the debtor does not have an interest of record in the real property, the statement must provide

---

[36] *See* TBUOA appx. B (naming working interest owners and percentage interests), section 7.1 (naming Union as operator), section 19.5 (describing lien and collateral); TBFJOA p. 30 (naming Forcenergy as debtor), section 6.1 (naming Union as operator), section 11.4 (describing lien and collateral); TBU Lien Notice pp. 1-2, TBF Lien Notice p. 1, 2008 Fixture Filing p. 1.

21

the name of a record owner.[37] ALASKA STAT. § 45.29.502(b) (2009). The Filings meet each of these requirements.[38] A mortgage that is effective as a financing statement filed as a fixture filing is effective from the date of filing if (i) it indicates the goods it covers; (ii) the as-extracted collateral is related to the real property described in the mortgage; and (iii) the mortgage is recorded. ALASKA STAT. § 45.29.502(c) (2009).

Each of the Filings states that it covers production and its proceeds. Further, the production is related to the real property in that it is severed therefrom, and, finally, each of the Filings was recorded. Because Union first filed the TBUOA and the TBFJOA on January 26, 1999, its perfected interest in severed minerals also begins from that date. ALASKA STAT. § 45.29.308(a) (2009). A mortgage that is effective as a financing statement filed as a fixture filing remains effective until the mortgage is released or satisfied of record or its effectiveness otherwise terminates as to the real property. ALASKA STAT. § 45.29.515(g) (2009). In other words, unlike other types of financing statements, a mortgage filing satisfying the requirements set forth above does not need to be renewed every five years in order to remain effective. ALASKA STAT. § 45.29.515(a), (g). Union has not released its security interest because its mortgages have not been satisfied, and its effectiveness has not otherwise terminated. Thus, Union's Filings remain effective against subsequent purchasers and lienholders.

## B. Union's Lien Is Prior and Superior to Silver Point's Interests

For reasons set forth above, Union's statutory lien is superior to Silver Point's by statutory mandate. Even if it were not, however, in Alaska, priority among conflicting security

---

[37] Both the TBU Lien Notice and the TBF Lien Notice say on their faces, "PLEASE RECORD IN THE ANCHORAGE RECORDING DISTRICT."

[38] *See* TBUOA section 19.5 (describing collateral), pp. 1, 64 (recording), appx. A (description of the real property); TBFJOA section 11.4 (describing collateral), p. 1 (indicating the document was to be filed), ex. A (description of the real property). Each of the other three Filings contains the collateral description and indication of filing on their faces, and describe the real property by way of attached maps).

22

interests is determined according to the time of filing or perfection. ALASKA STAT. § 45.29.322(a)(1) (2009). Here, Union's security interest was perfected no later than January 26, 1999, and Silver Point did not record its security interest against PEAO until August 27, 2007. *See* Deed of Trust cover sheet. Therefore, as the first to perfect, Union's rights in all the Lift Proceeds are superior to Silver Point's. ALASKA STAT. § 45.29.322(a)(1).

The fact that PEAO did not own the interests in question when Union filed in 1999 and 2002 is irrelevant. Under Alaska law, a filed financing statement remains effective with respect to collateral that is sold, exchanged, leased, licensed, or otherwise disposed of, and a security interest or agricultural lien in such collateral continues even if the secured party knows of or consents to the disposition. ALASKA STAT. § 45.29.507(a) (2009). In Alaska, a security interest created by a debtor is subordinate to an earlier security interest in the same collateral created by another person when the debtor acquires the collateral subject to the earlier security interest. ALASKA STAT. § 45.29.325(a)(1) (2009). Here, the security interest had been created by PEAO's predecessors in interest, and was still effective when PEAO acquired its interests in the TBU and the TBF. Union's many filings also provided constructive notice of its security interests; consequently, Silver Point's later security interest is subject to Union's. Additionally, even if Union had not recorded its mortgages and fixture filings, an unrecorded conveyance is valid as between the parties to it and one who has actual notice of it. ALASKA STAT. § 40.17.080(b). There is no question that Silver Point was actually aware of Union's lien rights under the TBUOA and the TBFJOA. Indeed, in the Credit Agreement, dated three days before Silver Point first filed its security interests, Schedule 6.02 acknowledges both the TBUOA and the TBFJOA as existing liens against PEAO's oil and gas rights. Further, Silver Point has admitted to actual knowledge in its Answer at paragraphs 23-25. Because Union was first to file its security

interest, which remained valid at the time Silver Point filed its security interest, and because Silver Point had both actual and constructive knowledge of Union's interests, Union has priority in all the Lift Proceeds and is entitled to them.

.

## CONCLUSION

For the foregoing reasons, Union's motion for summary judgment should be granted, and judgment should be entered declaring as follows:

1.     that Union holds a valid, perfected, first priority security interest in PEAO's interests in the TBU and the TBF.

2.     that Union's security interest in PEAO's interest in the TBU and the TBF is senior and prior to the security interests of Silver Point in that same collateral.

3.     that Union holds a valid, perfected, first priority security interest in PEAO's share of Lift Proceeds.

4.     that Union's security interest in the Lift Proceeds is senior and prior to the security interests of Silver Point or of the Overriding Royalty Holders.

5.     that Union is entitled to immediate receipt of the Lift Proceeds.

Dated: December 4, 2009
      Wilmington, DE

Respectfully submitted,

By:

Norman M. Monhait (ID No. 1040)
Rosenthal, Monhait & Goddess, P.A.
919 Market Street, Suite 1401
Wilmington, Delaware 19801
(302) 656-4433
nmonhait@rmgglaw.com

and

Richard L. Epling
David A. Crichlow
Roger Elder
Pillsbury Winthrop Shaw Pittman LLP
1540 Broadway
New York, NY 10036
(212) 858-1000

*Counsel for Union Oil Company of California*

25