# Exhibit A

# of

# Affidavit of Roger Elder

EXECUTION COPY

## FIRST LIEN CREDIT AGREEMENT

dated as of August 24, 2007,

### PACIFIC ENERGY ALASKA OPERATING LLC,
as the Borrower,

### PACIFIC ENERGY ALASKA HOLDINGS, LLC,
as Holdings,

the LENDERS from time to time party hereto,

### SILVER POINT FINANCE, LLC,
as Administrative Agent, Collateral Agent, Sole Lead Arranger, Sole Bookrunner and
Syndication Agent

and

### J. ARON & COMPANY,
as Documentation Agent

# TABLE OF CONTENTS

Page

## ARTICLE I

### Definitions

| | | |
|---|---|---|
| SECTION 1.01 | *Defined Terms* | 1 |
| SECTION 1.02 | *Terms Generally* | 25 |
| SECTION 1.03 | *Classification of Loans and Borrowings* | 26 |

## ARTICLE II

### The Credits

| | | |
|---|---|---|
| SECTION 2.01 | *Commitments* | 26 |
| SECTION 2.02 | *Loans* | 27 |
| SECTION 2.03 | *Evidence of Debt; Repayment of Loans* | 27 |
| SECTION 2.04 | *Requests for Borrowings* | 28 |
| SECTION 2.05 | *Fees; Interest on Loans* | 29 |
| SECTION 2.06 | *Default Interest* | 29 |
| SECTION 2.07 | *Alternate Rate of Interest* | 30 |
| SECTION 2.08 | *Termination of Commitments* | 30 |
| SECTION 2.09 | *Conversion and Continuation of Borrowings* | 30 |
| SECTION 2.10 | *Repayment of Borrowings* | 31 |
| SECTION 2.11 | *Optional Prepayments; Optional Termination and Reduction of Aggregate Maximum Credit Amounts* | 31 |
| SECTION 2.12 | *Mandatory Prepayments* | 32 |
| SECTION 2.13 | *Reserve Requirements; Change in Circumstances* | 33 |
| SECTION 2.14 | *Change in Legality* | 34 |
| SECTION 2.15 | *Indemnity* | 34 |
| SECTION 2.16 | *Pro rata Treatment* | 35 |
| SECTION 2.17 | *Sharing of Setoffs* | 35 |
| SECTION 2.18 | *Payments* | 36 |
| SECTION 2.19 | *Taxes, Withholdings, etc.* | 36 |
| SECTION 2.20 | *Assignment of Commitments Under Certain Circumstances; Duty to Mitigate* | 38 |
| SECTION 2.21 | *Borrowing Base* | 40 |

## ARTICLE III

### Representations and Warranties

| | | |
|---|---|---|
| SECTION 3.01 | *Organization; Powers* | 42 |
| SECTION 3.02 | *Authorization* | 43 |
| SECTION 3.03 | *Enforceability* | 43 |

| SECTION 3.04 | *Approvals* | 43 |
| SECTION 3.05 | *Financial Statements; Absence of Undisclosed Liabilities; Reserve Reports* | 43 |
| SECTION 3.06 | *No Material Adverse Change* | 44 |
| SECTION 3.07 | *Title to Properties; Possession Under Leases* | 44 |
| SECTION 3.08 | *Subsidiaries* | 44 |
| SECTION 3.09 | *Litigation; Compliance with Laws* | 45 |
| SECTION 3.10 | *Agreements* | 45 |
| SECTION 3.11 | *Federal Reserve Regulations* | 45 |
| SECTION 3.12 | *Investment Company Act* | 46 |
| SECTION 3.13 | *Use of Proceeds* | 46 |
| SECTION 3.14 | *Tax Returns* | 46 |
| SECTION 3.15 | *No Material Misstatements* | 46 |
| SECTION 3.16 | *Employee Benefit Plans* | 46 |
| SECTION 3.17 | *Environmental Matters* | 47 |
| SECTION 3.18 | *Insurance* | 47 |
| SECTION 3.19 | *Security Documents* | 47 |
| SECTION 3.20 | *Location of Real Property and Leased Premises* | 48 |
| SECTION 3.21 | *Labor Matters* | 48 |
| SECTION 3.22 | *Solvency* | 49 |
| SECTION 3.23 | *Sanctioned Persons* | 49 |
| SECTION 3.24 | *Material Contracts* | 49 |
| SECTION 3.25 | *Related Agreements* | 49 |
| SECTION 3.26 | *Employment Agreements* | 50 |
| SECTION 3.27 | *Intellectual Property* | 50 |
| SECTION 3.28 | *Gas Imbalances; Prepayments* | 50 |
| SECTION 3.29 | *Marketing Arrangement* | 51 |
| SECTION 3.30 | *Right to Receive Payments for Future Production* | 51 |
| SECTION 3.31 | *Operation of Oil and Gas Properties* | 51 |
| SECTION 3.32 | *Ad Valorem and Severance Taxes, Litigation* | 52 |
| SECTION 3.33 | *Insider Interests* | 52 |

## ARTICLE IV

### Conditions of Lending

| SECTION 4.01 | *Closing Date* | 52 |
| SECTION 4.02 | *Conditions to Each Credit Extension* | 56 |

## ARTICLE V

### Affirmative Covenants

| SECTION 5.01 | *Existence; Compliance with Laws; Businesses and Properties* | 57 |
| SECTION 5.02 | *Insurance* | 57 |
| SECTION 5.03 | *Obligations and Taxes* | 57 |
| SECTION 5.04 | *Financial Statements* | 58 |

| SECTION 5.05 | *Litigation and Other Notices* | 60 |
|---|---|---|
| SECTION 5.06 | *Information Regarding Collateral* | 61 |
| SECTION 5.07 | *Maintaining Records; Access to Properties and Inspections* | 61 |
| SECTION 5.08 | *Use of Proceeds* | 61 |
| SECTION 5.09 | *Employee Benefits* | 61 |
| SECTION 5.10 | *Compliance with Environmental Laws* | 62 |
| SECTION 5.11 | *Preparation of Environmental Reports* | 62 |
| SECTION 5.12 | *Further Assurances* | 62 |
| SECTION 5.13 | *Compliance with Leases* | 63 |
| SECTION 5.14 | *Interest Rate Protection Agreements* | 63 |
| SECTION 5.15 | *Intentionally Omitted* | 63 |
| SECTION 5.16 | *Delivery of Reserve Reports* | 63 |
| SECTION 5.17 | *Title Information* | 65 |
| SECTION 5.18 | *Title* | 65 |
| SECTION 5.19 | *Evidence of Compliance* | 65 |
| SECTION 5.20 | *Lenders' Meetings* | 65 |
| SECTION 5.21 | *Hedging Agreements* | 66 |
| SECTION 5.22 | *Post-Closing Matters* | 66 |

## ARTICLE VI

### Negative Covenants

| SECTION 6.01 | *Indebtedness* | 66 |
|---|---|---|
| SECTION 6.02 | *Liens* | 67 |
| SECTION 6.03 | *Sale and Lease-Back Transactions* | 68 |
| SECTION 6.04 | *Investments, Loans and Advances* | 68 |
| SECTION 6.05 | *Mergers, Consolidations, Sales of Assets and Acquisitions* | 70 |
| SECTION 6.06 | *Restricted Payments; Payment of Certain Indebtedness; Restrictive Agreements* | 70 |
| SECTION 6.07 | *Transactions with Affiliates* | 72 |
| SECTION 6.08 | *Business of Holdings, Borrower and Subsidiaries; No Foreign Subsidiaries* | 72 |
| SECTION 6.09 | *Amendment of Certain Indebtedness and Agreements* | 72 |
| SECTION 6.10 | *Material Contracts* | 73 |
| SECTION 6.11 | *Leverage Ratio* | 73 |
| SECTION 6.12 | *Current Ratio* | 73 |
| SECTION 6.13 | *Fiscal Year* | 73 |
| SECTION 6.14 | *Certain Equity Interests* | 73 |
| SECTION 6.15 | *Hedging Agreements* | 73 |
| SECTION 6.16 | *Take-or-Pay or Other Prepayments; Gas Imbalances* | 74 |
| SECTION 6.17 | *Leases* | 74 |

ARTICLE VII

*Events of Default*

ARTICLE VIII

*The Agent*

ARTICLE IX

*Miscellaneous*

| SECTION 9.01 | *Notices* | 79 |
|---|---|---|
| SECTION 9.02 | *Survival of Agreement* | 80 |
| SECTION 9.03 | *Binding Effect* | 80 |
| SECTION 9.04 | *Successors and Assigns* | 80 |
| SECTION 9.05 | *The Register* | 83 |
| SECTION 9.06 | *Expenses; Indemnity* | 84 |
| SECTION 9.07 | *Right of Setoff* | 85 |
| SECTION 9.08 | *Applicable Law* | 85 |
| SECTION 9.09 | *Waivers; Amendment* | 85 |
| SECTION 9.10 | *Interest Rate Limitation* | 86 |
| SECTION 9.11 | *Entire Agreement* | 87 |
| SECTION 9.12 | *WAIVER OF JURY TRIAL* | 87 |
| SECTION 9.13 | *Severability* | 87 |
| SECTION 9.14 | *Counterparts* | 87 |
| SECTION 9.15 | *Headings* | 88 |
| SECTION 9.16 | *Jurisdiction; Consent to Service of Process* | 88 |
| SECTION 9.17 | *Confidentiality* | 88 |
| SECTION 9.18 | *Termination or Release* | 89 |
| SECTION 9.19 | *USA PATRIOT Act Notice* | 89 |
| SECTION 9.20 | *No Fiduciary Relationship; Non-Reliance* | 89 |
| SECTION 9.21 | *Intercreditor Agreement* | 90 |
| SECTION 9.22 | *Security Documents* | 90 |
| SECTION 9.23 | *Personal Obligations* | 90 |

*ARTICLE X*

*HEDGING*

| SECTION 10.01 | *Voting* | 90 |
|---|---|---|
| SECTION 10.02 | *Acknowledgement relating to Hedging Agreements with First Lien Hedge Counterparties* | 91 |
| SECTION 10.03 | *Amendment to Intercreditor Provisions* | 91 |

Schedules

| | |
|---|---|
| Schedule 1.01(a) | Existing Hedging Agreements |
| Schedule 1.01(b) | Closing Date Mortgaged Real Property |
| Schedule 1.01(c) | Additional Acquisition Agreements |
| Schedule 2.01 | Lenders and Commitments |
| Schedule 3.04 | Government Approvals |
| Schedule 3.08 | Subsidiaries |
| Schedule 3.09 | Litigation |
| Schedule 3.17 | Environmental Matters |
| Schedule 3.19(a) | UCC Filing Offices |
| Schedule 3.19(b) | Intellectual Property Filing Offices |
| Schedule 3.19(c) | Mortgage Filing Offices |
| Schedule 3.20(a) | Owned Real Property |
| Schedule 3.20(b) | Leased Real Property |
| Schedule 3.24 | Material Contracts |
| Schedule 3.25(c) | Consents and Approvals Not Obtained |
| Schedule 3.26 | Employment Agreements |
| Schedule 3.27 | Intellectual Property |
| Schedule 3.28 | Gas Imbalances |
| Schedule 3.29 | Marketing Arrangements |
| Schedule 3.30 | Rights to Receive Payments for Future Production |
| Schedule 3.33 | Insider Interests |
| Schedule 5.22 | Post-Closing Matters |
| Schedule 6.01 | Existing Indebtedness |
| Schedule 6.02 | Existing Liens |

**Exhibits**

| | |
|---|---|
| Exhibit A | Form of Administrative Questionnaire |
| Exhibit B | Form of Assignment and Acceptance |
| Exhibit C | Form of Guarantee and Collateral Agreement |
| Exhibit D | Form of Intercreditor Agreement |
| Exhibit E | Form of Mortgage |
| Exhibit F | Form of Opinion |
| Exhibit G | Form of Borrowing Request |
| Exhibit H | Form of Solvency Certificate |
| Exhibit I | Form of Compliance Certificate |
| Exhibit J | Form of Engineer's Certificate |
| Exhibit K | Form of Responsible Officer's Certificate |
| Exhibit L | Form of Promissory Note |

FIRST LIEN CREDIT AGREEMENT dated as of August 24, 2007 (this *"Agreement"*), among PACIFIC ENERGY ALASKA OPERATING LLC, a limited liability company organized under the laws of the State of Delaware (the *"Borrower"*); PACIFIC ENERGY ALASKA HOLDINGS, LLC, a limited liability company organized under the laws of the State of Delaware (*"Holdings"*); the LENDERS from time to time party hereto; SILVER POINT FINANCE, LLC (*"Silver Point"*), as Administrative Agent, Collateral Agent and Sole Lead Arranger; and J. ARON & COMPANY, as Documentation Agent (the *"Documentation Agent"*).

The Borrower has requested the Lenders to extend credit to the Borrower in the form of Loans (such term and each other capitalized term used but not defined in this recital having the meaning given it in Article I) during the Availability Period in an aggregate principal amount not in excess of $200,000,000.

The Borrower has also entered into the Second Lien Loan Documents, pursuant to which the Borrower has requested the Second Lien Lenders to extend credit in the form of the Second Lien Loans on the Closing Date in an aggregate principal amount not in excess of $317,000,000.

On the Closing Date, (a) $115,786,154.92 of the proceeds of the Loans and the Second Lien Loans will be used by Holdings to purchase the membership interests of the Borrower pursuant to the Membership Interest Purchase Agreement, dated as of May 24, 2007, by and among Pacific Energy Resources Ltd., a Delaware corporation (*"Pacific Energy"*), Forest Alaska Holding LLC, a Delaware limited liability company, and Forest Oil Corporation, a New York corporation, as amended by the Amendment No. 1 to Membership Interest Purchase Agreement, dated as of July 31, 2007 (the *"Membership Interest Purchase Agreement"*), (b) $9,869,384.00 of the proceeds of the Loans and the Second Lien Loans will be used by Borrower to purchase certain assets pursuant to the Asset Sales Agreement, dated as of May 24, 2007, by and between Forest Oil Corporation, a New York corporation, and Pacific Energy, as amended by the Amendment No. 1 to Asset Sales Agreement, dated as of July 31, 2007 (the *"Asset Sales Agreement"*), (c) $269,007,890.13 of the proceeds of the Loans and the Second Lien Loans will be used to refinance certain existing debt of the Borrower, and (d) $30,336,570.95 of the proceeds of the Loans and the Second Lien Loans will be retained by the Borrower to be used for general corporate purposes of the Borrower and the Subsidiaries, including the payment of fees and expenses related to the Transactions.

The Lenders are willing to extend such credit to the Borrower on the terms and subject to the conditions set forth herein. Accordingly, the parties hereto agree as follows:

## ARTICLE I

## DEFINITIONS

SECTION 1.01 *Defined Terms.* As used in this Agreement, the following terms have the meanings specified below:*"2006 PERL Credit Agreement"* shall mean that certain Credit and Guaranty Agreement, dated as of November 30, 2006, among Pacific Energy Resources Ltd., certain of its subsidiaries party thereto, the lenders from time to time party thereto and Documentation Agent as lead arranger, syndication agent and administrative agent, as amended, supplemented or otherwise modified from time to time.

"*ABR*", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Alternate Base Rate.

"*Account Control Agreement*" shall mean an account control agreement, in form and substance reasonably satisfactory to the Agent and the Borrower, designating the Agent as secured party.

"*Acquisition*" shall mean the consummation of the transactions contemplated by the Acquisition Agreements.

"*Acquisition Agreements*" shall mean, collectively (a) the Membership Interest Purchase Agreement, (b) the Asset Sales Agreement and (c) all other documents and agreements set forth on Schedule 1.01(c).

"*Acquisition Closing Date*" shall mean the date on which the closing of the Acquisition occurs under the Acquisition Documents.

"*Acquisition Documents*" shall mean (a) the Acquisition Agreements, (b) the transfers, assignments and conveyances executed and delivered pursuant thereto, and (c) all other agreements, assignments, deeds, conveyances, certificates and other documents and instruments now or hereafter executed and delivered pursuant to the Acquisition Agreements or in connection with the Acquisition.

"*ADL Leases*" shall mean those oil and gas leases in respect of Real Property located on State of Alaska lands and over which DNR has jurisdiction.

"*Adjusted LIBO Rate*" shall mean, with respect to any Eurodollar Borrowing for any Interest Period, an interest rate per annum equal to the product of (a) the LIBO Rate in effect for such Interest Period and (b) Statutory Reserves.

"*Administrative Questionnaire*" shall mean an Administrative Questionnaire in the form of Exhibit A, or such other form as may be supplied from time to time by the Agent.

"*Affiliate*" shall mean, when used with respect to a specified person, another person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the person specified; *provided, however*, that, for purposes of Section 6.07, the term "*Affiliate*" shall also include any person that directly or indirectly owns 10% or more of any class of Equity Interests of the person specified or that is an officer or director of the person specified.

"*Agency Fee Letter*" shall mean the letter agreement dated the Closing Date among Pacific Energy, the Documentation Agent and the Agent.

"*Agent*" shall mean Silver Point, in its capacity as administrative agent for the Lenders and collateral agent for the Secured Parties.

"*Aggregate Maximum Credit Amounts*" at any time shall equal the sum of the Maximum Credit Amounts, as the same may be reduced or terminated pursuant to Section 2.11. As of the Closing Date, the Aggregate Maximum Credit Amount is $120,000,000, and the

Aggregate Maximum Credit Amount may be increased to up to $200,000,000 with the consent of each Lender.

"*Agreement*" shall have the meaning assigned to such term in the introductory paragraph.

"*Alternate Base Rate*" shall mean, for any day, a rate per annum equal to the greater of (a) the Prime Rate in effect on such day and (b) the Federal Funds Effective Rate in effect on such day plus 1/2 of 1%. If the Agent shall have determined (which determination shall be conclusive absent manifest error) that it is unable to ascertain the Federal Funds Effective Rate for any reason, including the inability or failure of the Agent to obtain sufficient quotations in accordance with the terms of the definition thereof, the Alternate Base Rate shall be determined without regard to clause (b) of the preceding sentence until the circumstances giving rise to such inability no longer exist. Any change in the Alternate Base Rate due to a change in the Prime Rate or the Federal Funds Effective Rate shall be effective on the effective date of such change in the Prime Rate or the Federal Funds Effective Rate, as the case may be.

"*Annualized Consolidated EBITDA*" shall mean (a) for the four fiscal quarter period ended on September 30, 2007, Consolidated EBITDA for the one-fiscal quarter period ending on such date multiplied by 4, (b) for the four fiscal quarter period ended on December 31, 2007, Consolidated EBITDA for the two-fiscal quarter period ending on such date multiplied by 2, and (c) for the four fiscal quarter period ended on March 31, 2008, Consolidated EBITDA for the three-fiscal quarter period ending on such date multiplied by 1.333.

"*Annualized Consolidated Interest Expense*" shall mean (a) for the four fiscal quarter period ended on September 30, 2007, Consolidated Interest Expense for the one-fiscal quarter period ending on such date multiplied by 4, (b) for the four fiscal quarter period ended on December 31, 2007, Consolidated Interest Expense for the two-fiscal quarter period ending on such date multiplied by 2, and (c) for the four fiscal quarter period ended on March 31, 2008, Consolidated Interest Expense for the three-fiscal quarter period ending on such date multiplied by 1.333.

"*Anticipated Production*" shall mean, for any month, the reasonably anticipated production of crude oil and natural gas (calculated separately) from the Borrower's and the Subsidiaries' proved developed producing reserves.

"*Anticipated Non-PDP Production*" shall mean, for any month, the reasonably anticipated production of crude oil and natural gas (calculated separately) from the Borrower's and the Subsidiaries' reserves which are not proved developed producing reserves.

"*Applicable Margin*" shall mean, for any day with respect to any ABR Loan or Eurodollar Loan, as the case may be, the rate per annum set forth in the Borrowing Base Utilization Grid below based upon the Borrowing Base Utilization Percentage then in effect:

|         | Borrowing Base Utilization Percentage              | Eurodollar Loans | ABR Loans | Commitment Fee |
|---------|----------------------------------------------------|------------------|-----------|----------------|
| Level 1 | less than 50%                                      | 1.50%            | 0.0%      | 0.30%          |
| Level 2 | greater than or equal to 50%, but less than 75%    | 1.75%            | 0.25%     | 0.30%          |
| Level 3 | greater than or equal to 75%, but less than 90%    | 2.00%            | 0.50%     | 0.375%         |
| Level 4 | greater than or equal to 90%                       | 2.25%            | 0.75%     | 0.375%         |

"*Asset Sale*" shall mean the sale, transfer or other disposition (by way of merger, casualty, condemnation or otherwise) by Holdings, the Borrower or any of the Subsidiaries to any person other than the Borrower or any Subsidiary Loan Party of (a) any Equity Interests in the Borrower or any of the Subsidiaries (including any such sale by the issuer of such Equity Interests but excluding directors' qualifying shares) or (b) any other assets of Holdings, the Borrower or any of the Subsidiaries (other than (i) inventory (including Hydrocarbons), damaged, obsolete or worn out assets, scrap and Permitted Investments, in each case disposed of in the ordinary course of business and (ii) any sale, transfer or other disposition that, together with all related sales, transfers or other dispositions from and after the Closing Date, has a value not in excess of $1,250,000).

"*Asset Sales Agreement*" shall have the meaning assigned to such term in the recitals to this Agreement.

"*Assignment and Acceptance*" shall mean an assignment and acceptance entered into by a Lender and an assignee, and accepted by the Agent, in the form of Exhibit B or such other form as shall be approved by the Agent.

"*Availability Period*" shall mean the period from and including the Effective Date to but excluding the Termination Date.

"*BLM*" shall mean the Bureau of Land Management, United States Department of the Interior.

"*Board*" shall mean the Board of Governors of the Federal Reserve System of the United States of America.

"*Borrower*" shall have the meaning assigned to such term in the introductory paragraph to this Agreement.

"*Borrowing*" shall mean Loans of the same Type made, converted or continued on the same date and, in the case of Eurodollar Loans, as to which a single Interest Period is in effect.

"*Borrowing Base*" shall mean at any time the loan value to be assigned to the proved oil and gas reserves attributable to the Oil and Gas Properties of the Borrower and its Subsidiaries evaluated in the Reserve Report in an amount equal to the amount determined in accordance with Section 2.21, as the same may be adjusted from time to time pursuant to Section 5.17(c) or Section 6.05(b).

"*Borrowing Base Deficiency*" occurs if at any time the total Revolving Credit Exposures exceeds the Borrowing Base then in effect.

"*Borrowing Base Utilization Percentage*" shall mean, as of any day, the fraction expressed as a percentage, the numerator of which is the sum of the Revolving Credit Exposures of the Lenders on such day, and the denominator of which is the Borrowing Base in effect on such day.

"*Borrowing Request*" shall have the meaning assigned to such term in Section 2.04.

"*Business Day*" shall mean any day other than a Saturday, Sunday or day on which banks in New York City are authorized or required by law to close; *provided, however*, that when used in connection with a Eurodollar Loan, the term "*Business Day*" shall also exclude any day on which banks are not open for dealings in dollar deposits in the London interbank market.

"*Capital Expenditures*" shall mean, for any period, (a) the additions to property, plant and equipment and other capital expenditures (including maintenance capital expenditures) of Holdings and its subsidiaries that are (or should be) set forth in a consolidated statement of cash flows of Holdings for such period prepared in accordance with GAAP and (b) Capital Lease Obligations or Synthetic Lease Obligations incurred by Holdings and its subsidiaries during such period, but excluding in each case any such expenditure made to restore, replace or rebuild property to the condition of such property immediately prior to any damage, loss, destruction or condemnation of such property, to the extent such expenditure is made with insurance proceeds, condemnation awards or damage recovery proceeds relating to any such damage, loss, destruction or condemnation.

"*Capital Leases*" shall mean, in respect of any person, all leases which shall have been, or should have been, in accordance with GAAP, recorded as capital leases on the balance sheet of the person liable (whether contingent or otherwise) for the payment of rent thereunder.

"*Capital Lease Obligations*" of any person shall mean the obligations of such person to pay rent or other amounts under any Capital Lease.

A "*Change in Control*" shall be deemed to have occurred if (a) at any time Pacific Energy shall not beneficially own, directly or indirectly, at least 75% of the issued and outstanding Equity Interests in Holdings or (b) at any time Holdings shall fail to directly own, beneficially and of record, at least 75% of the issued and outstanding Equity Interests in the Borrower or (c) any "Change of Control" (or any comparable term) shall have occured under the Subordinated Seller Note.

"*Change in Law*" shall mean (a) the adoption of any law, rule or regulation after the Closing Date, (b) any change in any law, rule or regulation or in the interpretation or application thereof by any Governmental Authority after the Closing Date or (c) compliance by any Lender (or, for purposes of Section 2.13, by any lending office of such Lender or by such Lender's holding company, if any) with any request, guideline or directive (whether or not having the force of law) of any Governmental Authority made or issued after the Closing Date.

"*Closing Date*" shall mean the date upon which the initial Loans are made pursuant to Article II.

"*Code*" shall mean the Internal Revenue Code of 1986, as amended from time to time.

"*Collateral*" shall mean all the "Collateral", as defined in any Security Document and shall also include the Mortgaged Properties.

"*Collateral Agreement*" shall mean the First Lien Guarantee and Collateral Agreement, substantially in the form of Exhibit C, among the Borrower, Holdings, the Subsidiaries party thereto and the Agent for the benefit of the Secured Parties.

"*Collateral and Guarantee Requirement*" shall mean, at any time, the requirement that:

(a)   the Agent shall have received from each of Holdings and its subsidiaries either (i) a counterpart of the Collateral Agreement duly executed and delivered on behalf of such person or (ii) in the case of any person that becomes a Subsidiary after the Closing Date, a supplement to the Collateral Agreement, in the form specified therein, duly executed and delivered on behalf of such person within the period required by Section 5.12;

(b)   subject to Section 4.01(d)(C) of the Collateral Agreement, all outstanding Equity Interests in the Borrower and each Domestic Subsidiary and all other Equity Interests owned by or on behalf of any Loan Party shall have been pledged pursuant to the Collateral Agreement and the Agent shall have received (to the extent such Equity Interests are certificated securities) certificates or other instruments representing all such Equity Interests, together with undated stock powers or other instruments of transfer with respect thereto endorsed in blank;

(c)   all Indebtedness of Holdings, the Borrower and each Subsidiary that is owing to any Loan Party shall have been pledged pursuant to the Collateral Agreement and, to the extent such Indebtedness is evidenced by a promissory note, the Agent shall have received all such promissory notes, together with undated instruments of transfer with respect thereto endorsed in blank;

(d)   the Agent shall have received (i) counterparts of a Mortgage with respect to each Mortgaged Property duly executed and delivered by the record owner of such Mortgaged Property, (ii) tax Lien searches at the applicable State's central filing system and Uniform Commercial Code searches in form and substance reasonably satisfactory to the Agent, (iii) opinions of counsel in the jurisdictions in which the Mortgaged Properties owned by the Borrower or any Subsidiary on the Closing Date are located, addressed to the Agent and each Lender, with respect to title to Leases included in the Oil and Gas Properties on the Closing Date that represent 80% of the Proved PV-10% (as determined by reference to the Reserve Report as of June 30, 2006 delivered to the Agent prior to the Closing Date), in form and substance reasonably satisfactory to the Agent, (iv) on the Closing Date and on the date of any acquisition of a Mortgaged Property, opinions of counsel in the jurisdictions in which such Mortgaged Property is located, addressed to the Agent and each Lender, with respect to the enforceability and validity of the Mortgages thereon and any related fixture filings, in form and substance reasonably satisfactory to the Agent and (v) all such other items as shall be reasonably necessary in the opinion of counsel to the Agent to create and evidence a valid and perfected first priority mortgage Lien and provide appropriate notice and filing of such Lien on such Mortgaged Property, subject only to Liens permitted pursuant to Section 6.02;

(e)   the Agent shall have received from each applicable Loan Party and each applicable depository bank or securities intermediary, an executed counterpart of an Account

Control Agreement in respect of each deposit account and securities account of any Loan Party
that is required to be subject to an Account Control Agreement by Section 4.04(b) of the
Collateral Agreement;

(f)     all documents and instruments, including Uniform Commercial Code financing
statements and filings with the MMS, BLM and DNR, required by law or reasonably requested
by the Agent to be filed, registered or recorded to create the Liens intended to be created by the
Security Documents and perfect such Liens to the extent required by, and with the priority
required by, the Security Documents, shall have been filed, registered or recorded or delivered to
the Agent for filing, registration or recording, and all filing, recording and similar fees and Taxes
payable in connection with the foregoing shall have been paid or provided for in a manner
reasonably satisfactory to the Agent; and

(g)     each Loan Party shall have obtained all consents and approvals required to be
obtained by it in connection with the execution and delivery of all Security Documents to which
it is a party, the performance of its obligations thereunder and the granting by it of the Liens
thereunder.

"*Commitment*" shall mean, with respect to each Lender, the commitment of such Lender
to make Loans hereunder, as such commitment may be (a) modified from time to time pursuant
to Section 2.11 and (b) modified from time to time pursuant to assignments by or to such Lender
pursuant to Section 9.04. The amount representing each Lender's Commitment shall at any time
be the lesser of such Lender's Maximum Credit Amount and such Lender's Applicable
Percentage of the then effective Borrowing Base, subject to Section 2.21(c)(iv).

"*Consolidated EBITDA*" shall mean, for each trailing four fiscal quarter period, the sum
of (i) the Consolidated Net Income of Holdings and its subsidiaries during such period, plus (ii)
all interest paid during such period on Indebtedness (including amortization of original issue
discount and the interest component of any deferred payment obligations and capital lease
obligations) which was deducted in determining such Consolidated Net Income, plus (iii) all
income or franchise taxes, if any, payable by Holdings or its subsidiaries which were deducted in
determining, such Consolidated Net Income, plus (iv) all depreciation, amortization (including
amortization of good will and debt issuance costs), depletion, and other non-cash charges
(including any provision for the reduction in the carrying value of assets recorded in accordance
with GAAP and including those resulting from the mark to market of Hedging Agreement)
which were deducted in determining such Consolidated Net Income, minus (v) all non-cash
items of income or gain (including those resulting from the mark to market of Hedging
Agreement) which were included in determining such Consolidated Net Income.
Notwithstanding any other provision in this Agreement, "*Consolidated EBITDA*" determined at
the end of any fiscal quarter ending on or prior to March 31, 2008 shall be deemed to be the
Annualized Consolidated EBITDA for the four fiscal quarter period ending on such date.

"*Consolidated Interest Expense*" shall mean, for any period, the sum (determined
without duplication) of the aggregate gross interest expense of Holdings and its subsidiaries for
such period, including to the extent included in interest expense under GAAP: (a) amortization
of debt discount, (b) capitalized interest, (c) the portion of any payments or accruals under
Capital Leases allocable to interest expense, plus the portion of any payments or accruals under
Synthetic Leases allocable to interest expense, whether or not the same constitutes interest
expense under GAAP and (d) dividends on Disqualified Stock.

551425.10B- Server 1a - MSW          7

"*Consolidated Net Income*" shall mean, as to any Person or Persons for any period, the gross revenues of such Person or Persons for such period, plus any cash dividends or distributions actually received by such Person or Persons from any other business entity, minus all expenses and other proper charges (including taxes on income, to the extent imposed upon such Person or Persons but excluding charges for accrued unpaid dividends on preferred stock of such Person or Persons for such period), determined on a consolidated basis after eliminating earnings or losses attributable to outstanding minority interests, but excluding the net earnings of any other business entity in which such Person or Persons has an ownership interest.

"*Contracts*" shall mean all contracts, agreements, operating agreements, farm-out or farm-in agreements, sharing agreements, mineral purchase agreements, contracts for the purchase, exchange, transportation, processing or sale of Hydrocarbons, rights-of-way, easements, surface leases, equipment leases, permits, franchises, licenses, pooling or unitization agreements, and unit or pooling designations and orders now or hereafter affecting any of the Oil and Gas Properties, Operating Equipment, Fixture Operating Equipment or Hydrocarbons now or hereafter covered hereby, or which are useful or appropriate in drilling for, producing, treating, handling, storing, transporting or marketing oil, gas or other minerals produced from any of the Oil and Gas Properties, and all as such contracts and agreements as they may be amended, supplemented or otherwise modified from time to time.

"*Control*" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a person, whether through the ownership of voting securities, by contract or otherwise, and the terms "*Controlling*" and "*Controlled*" shall have meanings correlative thereto.

"*Cook Inlet*" shall mean Cook Inlet Pipe Line Company, a Delaware corporation.

"*Credit Date*" shall mean the date of a Credit Extension.

"*Credit Extension*" shall mean the making, conversion or continuance of a Loan.

"*Current Assets*" shall mean, at any time, the consolidated current assets (other than cash, Permitted Investments and FAS 133 assets) of Holdings and its subsidiaries in accordance with GAAP.

"*Current Liabilities*" shall mean, at any time, the consolidated current liabilities of Holdings and its subsidiaries at such time (excluding, without duplication, the current portion of any long-term Indebtedness not yet due and FAS 133 liabilities) in accordance with GAAP.

"*DNR*" shall mean the State of Alaska Department of Natural Resources.

"*Default*" shall mean any event or condition which upon notice, lapse of time or both would constitute an Event of Default.

"*Disqualified Stock*" shall mean any Equity Interest that, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable), or upon the happening of any event, (a) matures (excluding any maturity as the result of an optional redemption by the issuer thereof) or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof, in whole or in part, or requires the payment of any cash dividend or any other scheduled payment constituting a return of capital, in each case

at any time on or prior to the first anniversary of the Termination Date (determined without regard to the proviso of the definition thereof unless the Agent and the Borrower shall have agreed the Termination Date is February 24, 2009), or (b) is convertible into or exchangeable (unless at the sole option of the issuer thereof) for (i) debt securities or (ii) any Equity Interest referred to in clause (a) above, in each case at any time prior to the first anniversary of the Termination Date (determined without regard to the proviso of the definition thereof unless the Agent and the Borrower shall have agreed the Termination Date is February 24, 2009).

"***Documentation Agent***" shall have the meaning assigned to such term in the introductory paragraph.

"***dollars***" or "***$***" shall mean lawful money of the United States of America.

"***Domestic Subsidiary***" shall mean a Subsidiary incorporated or organized under the laws of the United States of America, any State thereof or the District of Columbia.

"***Effective Date***" shall mean the first date on which the conditions specified in Article IV are satisfied (or waived in accordance with Section 9.09).

"***Engineering Reports***" shall have the meaning assigned to such term in Section 2.21(c)(i).

"***Environmental Laws***" shall mean all former, current and future Federal, state, local and foreign laws (including common law), treaties, regulations, rules, ordinances, codes, decrees, judgments, directives, orders (including consent orders), and agreements in each case, relating to protection of the environment, natural resources, human health and safety or the presence, Release of, or exposure to, Hazardous Materials, or the generation, manufacture, processing, distribution, use, treatment, storage, transport, recycling or handling of, or the arrangement for such activities with respect to, Hazardous Materials.

"***Environmental Liability***" shall mean all liabilities, obligations, damages, losses, claims, actions, suits, judgments, orders, fines, penalties, fees, expenses and costs (including administrative oversight costs, natural resource damages and remediation costs), whether contingent or otherwise, arising out of or relating to (a) compliance or non-compliance with any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the Release of any Hazardous Materials or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"***Equity Interests***" shall mean shares of capital stock, partnership interests, and membership interests in a limited liability company, beneficial interests in a trust or other equity interests in any person, and any option, warrant or other right entitling the holder thereof to purchase or otherwise acquire any such equity interest.

"***ERISA***" shall mean the Employee Retirement Income Security Act of 1974, as the same may be amended from time to time.

"***ERISA Affiliate***" shall mean any trade or business (whether or not incorporated) that, together with the Borrower, is treated as a single employer under Section 414(b) or (c) of the

Code, or solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.

"*ERISA Event*" shall mean (a) any "reportable event", as defined in Section 4043 of ERISA or the regulations issued thereunder, with respect to a Plan (other than an event for which the 30-day notice period is waived), (b) the existence with respect to any Plan of an "accumulated funding deficiency" (as defined in Section 412 of the Code or Section 302 of ERISA) and, on and after the effectiveness of the Pension Act, any failure by any Plan to satisfy the minimum funding standards (within the meaning of Section 412 of the Code or Section 302 of ERISA) applicable to such Plan, whether or not waived, (c) the filing pursuant to Section 412 of the Code or Section 303 of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan, (d) the incurrence by the Borrower or any of its ERISA Affiliates of any liability under Title IV of ERISA with respect to the termination of any Plan or the withdrawal or partial withdrawal of the Borrower or any of its ERISA Affiliates from any Plan or Multiemployer Plan, (e) the receipt by the Borrower or any of its ERISA Affiliates from the PBGC or a plan administrator of any notice relating to the intention to terminate any Plan or Plans or to appoint a trustee to administer any Plan, (f) the adoption of any amendment to a Plan that would require the provision of security pursuant to Section 401(a)(29) of the Code or Section 307 of ERISA, (g) on an after the effectiveness of the Pension Act, a determination that any Plan is, or is expected to be, in "at risk" status (within the meaning of Section 303(i)(4)(a) of ERISA or Section 430(i)(4)(A) of the Code), (h) the receipt by the Borrower or any of its ERISA Affiliates of any notice, or the receipt by any Multiemployer Plan from the Borrower or any of its ERISA Affiliates of any notice, concerning the imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent or in reorganization, within the meaning of Title IV of ERISA (or, after the effectiveness of the Pension Act, that a Multiemployer Plan is endangered or in critical status within the meaning of Section 305 of ERISA) or (i) the occurrence of a "prohibited transaction" with respect to which the Borrower or any of the Subsidiaries is a "disqualified person" (within the meaning of Section 4975 of the Code) or with respect to which the Borrower or any such Subsidiary could otherwise be liable.

"*Eurodollar*", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Adjusted LIBO Rate.

"*Event of Default*" shall have the meaning assigned to such term in Article VII.

"*Extraordinary Receipts*" shall mean the receipt by Holdings, the Borrower or any of the Subsidiaries of any non-ordinary course tax refunds, pension plan reversions, judgments, litigation settlements or non-casualty insurance proceeds.

"*Federal Funds Effective Rate*" shall mean, for any day, the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average of the quotations for the day for such transactions received by the Agent from three Federal funds brokers of recognized standing selected by it.

"*Financial Officer*" of any person shall mean the chief financial officer, principal accounting officer, treasurer or controller of such person.

"*First Lien Hedge Counterparty*" shall mean a counterparty to any Hedging Agreement in respect of which the obligations of any Loan Party constitute "*Obligations*".

"*Fixture Operating Equipment*" shall mean any of the items described in the first sentence of the definition of "Operating Equipment" which as a result of being incorporated into realty or structures or improvements located therein or thereon, with the intent that they remain there permanently, constitute fixtures under the laws of the state in which such equipment is located.

"*Foreign Subsidiary*" shall mean any Subsidiary that is not a Domestic Subsidiary.

"*GAAP*" shall mean:

(a)     Prior to registration of Holdings's capital stock pursuant to the Securities Act, generally accepted accounting principles consistently applied which are in effect from time to time in Canada, as set out in the "CICA Handbook" published by the Canadian Institute of Chartered Accountants, as amended, replaced or republished from time to time and which, in the case of Holdings and its subsidiaries, are applied for all periods after the date hereof in a manner consistent with the manner in which such principles and practices are applied to Holdings's audited consolidated financial statements as of December 31, 2006. If any change in any accounting principle or practice is required by the Canadian Institute of Chartered Accountants (or any such successor) in order for such principle or practice to continue as a generally accepted accounting principle or practice, all reports and financial statements required hereunder with respect to Holdings or with respect to Holdings and its subsidiaries may be prepared in accordance with such change, but all calculations and determinations to be made hereunder may be made in accordance with such change only after notice of such change is given to each Lender and Required Lenders agree to such change insofar as it affects the accounting of Holdings or of Holdings and its subsidiaries.

(b)     Upon and following the registration of Holdings's capital stock pursuant to the Securities Act, generally accepted accounting principles and practices which are recognized as such by the Financial Accounting Standards Board (or any generally recognized successor) and which, in the case of Holdings and its subsidiaries, are applied in a consistent manner. Upon any such registration, all reports and financial statements required hereunder with respect to Holdings or with respect to Holdings and its subsidiaries may be prepared in accordance with such principles and practices, but all calculations and determinations to be made hereunder may be made in accordance with such principles and practices only after notice of such registration is given to each Lender and Required Lenders agree to such principles and practices insofar as it affects the accounting of Holdings or of Holdings and its subsidiaries. If any change in any accounting principle or practice is required by the Financial Accounting Standards Board (or any such successor) in order for such principle or practice to continue as a generally accepted accounting principle or practice, all reports and financial statements required hereunder with respect to Holdings or with respect to Holdings and its subsidiaries may be prepared in accordance with such change, but all calculations and determinations to be made hereunder may be made in accordance with such change only after notice of such change is given to each Lender and Required Lenders agree to such change insofar as it affects the accounting of Holdings or of Holdings and its subsidiaries.

"*Governmental Authority*" shall mean any Federal, state, local or foreign court or governmental agency, authority, instrumentality or regulatory body.

"*Governmental Requirement*" shall mean any law, statute, code, ordinance, order, determination, rule, regulation, judgment, decree, injunction, franchise, permit, certificate, license, authorization or other directive or requirement, whether now or hereinafter in effect, including, without limitation, Environmental Laws, energy regulations and occupational, safety and health standards or controls, of any Governmental Authority.

"*Granting Lender*" shall have the meaning assigned to such term in Section 9.04(h).

"*Guarantee*" of or by any person shall mean any obligation, contingent or otherwise, of such person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other person (the "*primary obligor*") in any manner, whether directly or indirectly, and including any obligation of such person, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment of such Indebtedness or other obligation, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment of such Indebtedness or other obligation or (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation; *provided, however*, that the term "Guarantee" shall not include endorsements for collection or deposit in the ordinary course of business.

"*Hazardous Materials*" shall mean (a) petroleum and any petroleum products or Hydrocarbons, coal ash, radon gas, asbestos, urea formaldehyde foam insulation, polychlorinated biphenyls, chlorofluorocarbons and all other ozone-depleting substances and (b) any chemical, material, substance or waste that is prohibited, limited or regulated by or pursuant to any Environmental Law.

"*Hedging Agreement*" shall mean any interest rate protection agreement, foreign currency exchange agreement, commodity price protection agreement or other interest or currency exchange rate or commodity price hedging arrangement. The "*principal amount*" of the obligations of any person in respect of any Hedging Agreement at any time shall be the maximum aggregate amount (after giving effect to any netting agreements) that such person would be required to pay if such Hedging Agreement were terminated at such time.

"*Hedging Obligations*" shall mean the due and punctual payment and performance of all obligations of each Loan Party under each Hedging Agreement (a) that is in effect on the Closing Date and set forth in Schedule 1.01(a) hereto, (b) that is in effect on the Closing Date with a counterparty that is (i) the Agent, the Syndication Agent or the Documentation Agent, (ii) a Lender as of the Closing Date or (iii) an Affiliate of the Agent, the Syndication Agent, the Documentation Agent or any such Lender or (c) that is entered into after the Closing Date with a counterparty that is (i) the Agent, the Syndication Agent or the Documentation Agent, (ii) a Lender as of the date on which the Hedging Agreement is entered into or (iii) an Affiliate of the Agent, the Syndication Agent, the Documentation Agent or any such Lender.

551425.10E- Server 1a - MSW                    12

"*Holdings*" shall have the meaning assigned to such term in the introductory paragraph to this Agreement.

"*Hydrocarbon Interests*" shall mean all rights, titles, interests and estates now owned or hereafter acquired in and to oil and gas leases, leasehold interests and licenses, oil, gas and mineral leases or other liquid or gaseous hydrocarbon licenses, leases, fee mineral interests, term mineral interests, subleases, mineral servitudes, farm-outs, royalties, overriding royalty and royalty interests, non-consent interests arising out of or pursuant to Contracts, net profit interests, net revenue and profit interests, oil payments, production payments, production payment interests and similar interests and estates, including all reserved or residual interests of whatever nature and all reversionary or carried interests relating to any of the foregoing. Unless otherwise indicated herein, each reference to the term "*Hydrocarbon Interests*" shall mean Hydrocarbon Interests of the Borrower and the Subsidiaries.

"*Hydrocarbons*" shall mean oil, gas, casinghead gas, drip gasoline, natural gasoline, condensate, distillate, liquid hydrocarbons, gaseous hydrocarbons, kerosene, liquefied petroleum gas, refined lubricating oils, diesel fuel and all products refined, separated, settled or dehydrated therefrom.

"*Indebtedness*" of any person shall mean, without duplication, (a) all obligations of such person for borrowed money or with respect to deposits or advances of any kind, (b) all obligations of such person evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such person under conditional sale or other title retention agreements relating to property or assets acquired by such person, (d) all obligations of such person in respect of the deferred purchase price of property or services (excluding accounts payable incurred in the ordinary course of business and paid within 90 days of the incurrence thereof (or if earlier, when due)), (e) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such person, whether or not the Indebtedness secured thereby has been assumed, (f) all Guarantees by such person of Indebtedness of others, (g) all Capital Lease Obligations and Synthetic Lease Obligations of such person, (h) all obligations, contingent or otherwise, of such person as an account party in respect of letters of credit and letters of guaranty, (i) all obligations, contingent or otherwise, in respect of bankers' acceptances, (j) all obligations of such person with respect to any arrangement, directly or indirectly, whereby such person or its subsidiaries shall sell or transfer any material asset, and whereby such person or any of its subsidiaries shall then or immediately thereafter rent or lease as lessee such asset or any part thereof, (k) all obligations with respect to payments received in consideration of oil, gas or other minerals yet to be acquired or produced at the time of payment (including obligations under "take-or-pay" contracts and the undischarged balance of any production payment), and (l) all net payments that such person would have to make in the event of an early termination under any Hedging Agreement if, on the date Indebtedness of such person is being determined, such Hedging Agreement became subject to an early termination as of such date. The Indebtedness of any person shall include the Indebtedness of any other person (including any partnership in which such person is a general partner) to the extent such person is liable therefor as a result of such person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such person is not liable therefor.

"*Indemnitee*" has the meaning ascribed to such term in Section 9.06(b).

13

"*Independent Engineer*" shall mean (a) DeGolyer and MacNaughton, (b) Ryder Scott Company Petroleum Engineers, (c) Netherland, Sewell & Associates, Inc., or (d) another independent petroleum engineer acceptable to the Agent.

"*Intercompany Services Agreement*" shall mean (a) the Transition Services Agreement or (b) one or more service agreements, in form and substance acceptable to the Agent, pursuant to which the services provided for under the agreement described in the Transition Services Agreement are performed by an entity of established reputation in the oil and gas industry on terms (including pricing) and conditions then consistent with standard industry practice for such services.

"*Intercreditor Agreement*" shall mean the Intercreditor Agreement, substantially in the form of Exhibit D, among the Agent, the Second Lien Agent, Holdings and the Borrower.

"*Interest Payment Date*" shall mean (a) with respect to any ABR Loan, (i) the last day of each month, commencing on the first such date to occur after the Closing Date and (ii) the Termination Date, and (b) with respect to any Eurodollar Loan, the last day of the Interest Period applicable to the Borrowing of which such Loan is a party.

"*Interest Period*" shall mean, with respect to any Eurodollar Borrowing, the period commencing on the date of such Borrowing and ending on the numerically corresponding day (or, if there is no numerically corresponding day, on the last day) in the calendar month that is three months thereafter; *provided, however*, that if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day. Interest shall accrue from and including the first day of an Interest Period to but excluding the last day of such Interest Period. For purposes hereof, the date of a Borrowing initially shall be the date on which such Borrowing is made and thereafter shall be the effective date of the most recent conversion or continuation of such Borrowing.

"*Interim Redetermination*" shall have the meaning assigned to such term in Section 2.21(b).

"*Leases*" shall mean all oil and gas leases in respect of Real Property containing proved, probable or possible oil or gas reserves to which the Borrower or any Subsidiary is a party.

"*Lenders*" shall mean the persons listed on Schedule 2.01 and any other person that has become a party hereto pursuant to an Assignment and Acceptance, other than any such person that ceases to be a party hereto pursuant to an Assignment and Acceptance.

"*Leverage Ratio*" shall mean, on any date, the ratio of (a) Total Debt on such date to (b) Consolidated EBITDA for the period of four consecutive fiscal quarters most recently ended on or prior to such date.

"*LIBO Rate*" shall mean, with respect to any Eurodollar Borrowing for any Interest Period, the rate per annum determined by the Agent at approximately 11:00 a.m. (London time) on the date that is two Business Days prior to the commencement of such Interest Period by reference to the British Bankers' Association Interest Settlement Rates for deposits in dollars (as set forth by any service selected by the Agent that has been nominated by the British Bankers'

Association as an authorized information vendor for the purpose of displaying such rates) for a period equal to such Interest Period; *provided* that, to the extent that an interest rate is not ascertainable pursuant to the foregoing provisions of this definition, the *"LIBO Rate"* shall be the interest rate per annum determined by the Agent to be the average of the rates per annum at which deposits in dollars are offered for such relevant Interest Period to major banks in the London interbank market in London, England at approximately 11:00 a.m. (London time) on the date that is two Business Days prior to the beginning of such Interest Period.

*"Lien"* shall mean, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, encumbrance, charge or security interest in or on such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, Capital Lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

*"Loan Documents"* shall mean this Agreement, the Security Documents, the Agency Fee Letter, and the promissory notes, if any, executed and delivered pursuant to Section 2.03(e), and all other certificates, instruments or agreements executed and delivered by a Loan Party in connection with any of the foregoing.

*"Loan Document Obligations"* shall mean (a) the due and punctual payment by the Borrower of (i) the principal of and interest (including interest accruing during the pendency of, or which would have accrued but for, any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding) on the Loans, when and as due, whether at maturity, by acceleration, upon one or more dates set for prepayment or otherwise and (ii) all other monetary obligations of the Borrower to any of the Secured Parties under this Agreement and each of the other Loan Documents, including obligations to pay fees, expense reimbursement obligations and indemnification obligations, whether primary, secondary, direct, contingent, fixed or otherwise (including monetary obligations incurred during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding), (b) the due and punctual performance of all other obligations of the Borrower under or pursuant to this Agreement and each of the other Loan Documents to which it is a party and (c) the due and punctual payment and performance of all the obligations of each other Loan Party under or pursuant to the Security Documents and each of the other Loan Documents to which it is a party.

*"Loan Parties"* shall mean Holdings, the Borrower and the Subsidiary Loan Parties.

*"Loans"* shall mean Loans made by a Lender to the Borrower pursuant to Section 2.01.

*"Margin Stock"* shall have the meaning assigned to such term in Regulation U.

*"Master Conveyance"* shall mean (a) the Master Conveyance dated effective as of January 1, 2007, between Forest Oil Corporation, a corporation organized under the laws of the State of New York and the Borrower.

*"Material Adverse Effect"* shall mean (a) a materially adverse effect on the business, assets, liabilities, operations, condition (financial or otherwise) or operating results of Holdings and its subsidiaries, taken as a whole, (b) a material impairment of the ability of the Borrower or any other Loan Party to perform any of its obligations under any Loan Document to which it is

or will be a party or (c) a material impairment of the rights and remedies of or benefits available to the Lenders under any Loan Document.

*"Material Contract"* shall mean, collectively, (i) any contract or other arrangement to which Holdings, the Borrower or any of the Subsidiaries is a party (other than the Loan Documents) for which breach, nonperformance, cancellation or failure to renew (in the case of contracts or arrangements that are, by their terms, renewable at the option of the Borrower or a Subsidiary) could reasonably be expected to have a Material Adverse Effect and (ii) any agreement or instrument evidencing or governing Indebtedness.

*"Material Indebtedness"* shall mean Indebtedness (other than the Loans), or obligations in respect of one or more Hedging Agreements, of any one or more of Holdings or any of its subsidiaries in an aggregate principal amount exceeding $2,500,000.

*"Maximum Credit Amount"* shall mean, as to each Lender, the amount set forth opposite such Lender's name on Schedule 2.01 under the caption "Maximum Credit Amounts", as the same may be (a) reduced or terminated from time to time in connection with a reduction or termination of the Aggregate Maximum Credit Amounts pursuant to Section 2.11 or (b) modified from time to time pursuant to any assignment permitted by Section 9.04; *provided*, that with respect to any Lender that does not approve an increased Borrowing Base pursuant to Section 2.21, such Lender's Maximum Credit Amount shall be the amount of such Lender's Commitment.

*"Membership Interest Assignment"* shall mean the Assignment of Right, Title and Interest to Membership Interest dated effective as of January 1, 2007 by and between Forest Alaska Holding LLC, as Assignor, and Holdings, as Assignee.

*"Membership Interest Purchase Agreement"* shall have the meaning assigned to such term in the recitals to this Agreement.

*"MMS"* shall mean the United States Department of Interior Minerals Management Service.

*"MMS Leases"* shall mean the oil and gas leases in respect of Real Property located on offshore Outer Continental Shelf lands over which the MMS has jurisdiction.

*"Moody's"* shall mean Moody's Investors Service, Inc., or any successor thereto.

*"Mortgaged Properties"* shall mean (a) all Real Property of any Loan Party on the Closing Date and listed on Schedule 1.01(b) and (b) any after acquired Real Property of any Loan Party having a gross purchase price of $1,000,000 or more at the time of the acquisition thereof.

*"Mortgages"* shall mean the mortgages, deeds of trust, leasehold mortgages, assignments of leases and rents, modifications and other security documents substantially in the form of Exhibit E or in other forms reasonably acceptable to the Agent and the Borrower.

*"Multiemployer Plan"* shall mean a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"*New Borrowing Base Notice*" shall have the meaning assigned to such term in Section 2.21(d).

"*NYMEX*" shall mean the New York Mercantile Exchange.

"*Obligations*" shall mean (a) the Loan Document Obligations and (b) the Hedging Obligations.

"*Oil and Gas Properties*" shall mean (a) Hydrocarbon Interests, (b) properties and assets now or hereafter pooled or unitized with Hydrocarbon Interests, (c) all currently existing or future unitization, pooling agreements and declarations of pooled units and the units created thereby (including all units created under orders, regulations and rules of any Governmental Authority) which may affect all or any portion of the Hydrocarbon Interests, (d) all operating agreements, contracts and other Contracts, including production sharing contracts and agreements, which relate to any of the Hydrocarbon Interests or the production, sale, purchase, exchange or processing of Hydrocarbons from or attributable to such Hydrocarbon Interests, (e) all Hydrocarbons in and under and which may be produced and saved or attributable to the Hydrocarbon Interests, including all oil in tanks, and all rents, issues, profits, proceeds, products, revenues and other incomes from or attributable to the Hydrocarbon Interests, (f) all tenements, hereditaments, appurtenances and properties and assets in any manner appertaining, belonging, affixed or incidental to the Hydrocarbon Interests and (g) all properties and assets, rights, titles, interests and estates described or referred to above, including any and all properties and assets, real or personal, now owned or hereinafter acquired and situated upon, used, held for use or useful in connection with the operating, working or development of any of such Hydrocarbon Interests or properties and assets (excluding drilling rigs, automotive equipment, rental equipment or other personal property or assets which may be on such premises for the purpose of drilling a well or for other similar temporary uses) and including any and all oil wells, gas wells, injection wells or other wells, buildings, structures, fuel separators, liquid extraction plants, plant compressors, pumps, pumping units, field gathering systems, tanks and tank batteries, fixtures, valves, fittings, machinery and parts, engines, boilers, meters, apparatus, equipment, appliances, tools, implements, cables, wires, towers, casing, tubing and rods, surface leases, rights-of-way, easements and servitudes together with all additions, substitutions, replacements, accessions and attachments to any and all of the foregoing. Unless otherwise indicated herein, each reference to the term "*Oil and Gas Properties*" shall mean Oil and Gas Properties of the Borrower and the Subsidiaries.

"*Operating Equipment*" shall mean all surface or subsurface machinery, equipment, facilities, supplies or other properties and assets of whatsoever kind or nature now or hereafter located on any of the properties or assets affected by the Oil and Gas Properties which are useful for the production, treatment, storage or transportation of Hydrocarbons, including all oil wells, gas wells, water wells, injection wells, casing, tubing, rods, pumping units and engines, Christmas trees, derricks, separators, gun barrels, flow lines, pipelines, tanks, gas systems (for gathering, treating and compression), water systems (for treating, disposal and injection), supplies, derricks, wells, power plants, poles, cables, wires, meters, processing plants, compressors, dehydration units, lines, transformers, starters and controllers, machine shops, tools, storage yards and equipment stored therein, buildings and camps, telegraph, telephone and other communication systems, roads, loading racks, shipping facilities and all additions, substitutes and replacements for, and accessories and attachments to, any of the foregoing. "*Operating Equipment*" shall not include any items incorporated into realty or structures or improvements

located therein or thereon in such a manner that they no longer remain personal property under the laws of the State in which such equipment is located.

"*ORRI Conveyance*" has the meaning ascribed to such term in the Second Lien Credit Agreement.

"*Other Taxes*" shall mean any and all present or future stamp, registration, recording, filing, transfer, documentary, excise or property Taxes, charges or similar levies arising from any payment made hereunder or from the execution, delivery or enforcement of, or otherwise with respect to or in connection with, any Loan Document.

"*Pacific Energy*" shall have the meaning assigned to such term in the recitals to this Agreement.

"*PBGC*" shall mean the Pension Benefit Guaranty Corporation referred to and defined in ERISA.

"*PDP PV-10%*" shall mean, on any date, 100% of the present value of future revenues less severance and ad valorem taxes, operating expenses and capital expenditures of the proved developed producing oil and gas reserves attributable to the Oil and Gas Properties, as evaluated in the most recently delivered Reserve Report in respect of proved developed producing oil and gas reserves attributable to the Oil and Gas Properties, discounted at a rate of 10% and utilizing the monthly crude oil (WTI) and natural gas (Henry Hub) prices, in each case based upon (i) the actual monthly price quoted on NYMEX on such date for the corresponding month through the 60th month from such date and (ii) the arithmetic monthly average for months 49 through 60 for each month after the 60th month. The amount of the PDP PV-10% then in effect shall be (a) calculated on a *pro forma* basis for dispositions and acquisitions consummated since the date of the most recently delivered Reserve Report in respect of proved developed producing oil and gas reserves attributable to the Oil and Gas Properties to the extent that a reserve report reasonably acceptable to the Agent in respect of proved developed producing oil and gas reserves attributable to such disposition or acquisition is available and (b) adjusted to give effect to the Borrower's and the Subsidiaries' commodity hedges then in effect.

"*Pension Act*" shall mean the Pension Protection Act of 2006.

"*Perfection Certificate*" shall mean the Perfection Certificate substantially in the form of Exhibit B to the Collateral Agreement.

"*Permitted Acquisition*" shall mean the acquisition by the Borrower or any Subsidiary of all or substantially all of the assets of a person or a line of business of such person, or not less than 100% of the Equity Interests (other than directors' qualifying shares) in a person (referred to herein as the "*Acquired Entity*"); *provided* that (i) such acquisition was not preceded by an unsolicited tender offer for such Equity Interests by, or proxy contest initiated by, Pacific Energy, Holdings, the Borrower or any of their respective Subsidiaries, (ii) the Acquired Entity shall be in a similar line of business as that of the Borrower and the Subsidiaries as conducted during the current and most recent calendar year and (iii) at the time of such transaction (A) both before and after giving effect thereto, no Default or Event of Default shall have occurred and be continuing, (B) the Borrower would be in compliance with the covenants set forth in Sections 6.11 and 6.12 as of the most recently completed period of four consecutive fiscal quarters ending prior to such transaction for which the financial statements and certificates required by Section 5.04(a) or

5.04(b), as the case may be, have been delivered, after giving *pro forma* effect to such transaction, any related incurrences of Indebtedness and any other event occurring after such period as to which *pro forma* recalculation is appropriate (including any other transaction described in this definition occurring after such period) as if such transaction had occurred as of the first day of such period, (C) (I) the total consideration paid in connection with such acquisition and any other acquisitions pursuant to Section 6.04(g) (including any Indebtedness of the Acquired Entity that is assumed by the Borrower or any Subsidiary following such acquisition and any payments following such acquisition pursuant to earn-out provisions or similar obligations) made in the same fiscal year, together with all investments in Oil and Gas Properties made pursuant to Section 6.04(k) in such fiscal year, shall not in the aggregate exceed $7,500,000 and (II) the total consideration paid in connection with such acquisition and any other acquisitions pursuant to Section 6.04(g) (including any Indebtedness of the Acquired Entity that is assumed by the Borrower or any Subsidiary following such acquisition and any payments following such acquisition pursuant to earn-out provisions or similar obligations) during the term of this Agreement, together with all investments in Oil and Gas Properties made pursuant to Section 6.04(k) during the term of this Agreement, shall not in the aggregate exceed $25,000,000, (D) the Borrower shall have delivered a certificate of a Financial Officer of the Borrower, certifying as to the foregoing and containing reasonably detailed calculations in support thereof, in form and substance satisfactory to the Agent and (E) the Borrower shall comply, and shall cause the Acquired Entity to comply, with the applicable provisions of Section 5.12 and the Security Documents.

"*Permitted Investments*" shall mean with respect to any Person, any direct or indirect advance, loan, guarantee of liabilities (including all indebtedness, liabilities and obligations of such Person, whether matured or unmatured, liquidated or unliquidated, primary or secondary, direct or indirect, absolute, fixed or contingent, and whether or not required to be considered pursuant to GAAP or other extension of credit or capital contribution to (by means of any transfer of cash or other property to others or any payment for property or services for the account or use of others), or any purchase or acquisition by such Person of any capital stock, bonds, notes, debentures or other securities or evidences of Indebtedness issued by, any other Person:

(a)    in open market commercial paper, maturing within 270 days after acquisition thereof, which is rated at least A 1 by S&P or P 1 by Moody's.

(b)    in marketable obligations, maturing within 12 months after acquisition thereof, issued or unconditionally guaranteed by the United States of America or an instrumentality or agency thereof and entitled to the full faith and credit of the United States of America.

(c)    in demand deposits, and time deposits (including certificates of deposit) maturing within 12 months from the date of deposit thereof, with any office of any national or state bank or trust company which is organized under the Laws of the United States of America or any state therein, which has capital, surplus and undivided profits of at least $500,000,000, and whose certificates of deposit are rated at least Aa3 by Moody's or AA- by S&P.

(d)    in repurchase obligations with a term of not more than seven days for underlying securities of the types described in clause (b) above entered into with any commercial bank meeting the specifications of clause (c) above.

(e)     in money market or other mutual funds substantially all of whose assets comprise securities of the types described in clauses (a) through (d) above.

"*Permitted Refinancing Indebtedness*" shall mean any Indebtedness (other than obligations under Hedging Agreements) issued in exchange for, or the net proceeds of which are used to extend, refinance, renew, defease or refund (collectively, to "*Refinance*") the Indebtedness (other than obligations under Hedging Agreements) being Refinanced (or previous refinancings thereof constituting Permitted Refinancing Indebtedness); *provided* that (a) the principal amount (or accreted value, if applicable) of such Permitted Refinancing Indebtedness does not exceed the principal amount (or accreted value, if applicable) of the Indebtedness so Refinanced (plus unpaid accrued interest, underwriting discounts, origination fees and premium thereon), (b) the average life to maturity of such Permitted Refinancing Indebtedness is greater than or equal to that of the Indebtedness being Refinanced, (c) if the Indebtedness being Refinanced is subordinated in right of payment to the Obligations under this Agreement, such Permitted Refinancing Indebtedness shall be subordinated in right of payment to such Obligations on terms at least as favorable to the Lenders as those contained in the documentation governing the Indebtedness being Refinanced, (d) no Permitted Refinancing Indebtedness shall have different obligors, or greater guarantees or security, than the Indebtedness being Refinanced and (e) if the Indebtedness being Refinanced is secured by any collateral (whether equally and ratably with, or junior to, the Secured Parties or otherwise), such Permitted Refinancing Indebtedness may be secured by such collateral on terms (including Lien subordination terms) no less favorable to the Secured Parties than those contained in the documentation governing the Indebtedness being Refinanced.

"*person*" shall mean any natural person, corporation, business trust, joint venture, association, company, limited liability company, partnership, Governmental Authority or other entity.

"*Plan*" shall mean any employee pension benefit plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 307 of ERISA, and in respect of which the Borrower or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"*Prime Rate*" shall mean the rate of interest quoted in *The Wall Street Journal*, Money Rates Section as the Prime Rate (currently defined as the base rate on corporate loans posted by at least seventy five percent (75%) of the nation's thirty (30) largest banks), as in effect from time to time. The Prime Rate is a reference rate and does not necessarily represent the lowest or best rate actually charged to any customer. Any Agent or any other Lender may make commercial loans or other loans at rates of interest at, above or below the Prime Rate.

"*Proposed Borrowing Base*" shall have the meaning assigned to such term in Section 2.21(c)(i).

"*Proved PV-10%*" shall mean, on any date, 100% of the present value of future revenues less severance and ad valorem taxes, operating expenses and capital expenditures of the proved oil and gas reserves attributable to the Oil and Gas Properties, as evaluated in the most recently delivered Reserve Report in respect of proved oil and gas reserves attributable to the Oil and Gas Properties, discounted at a rate of 10% and utilizing the monthly crude oil (WTI) and natural gas

(Henry Hub) prices, in each case based upon (i) the actual monthly price quoted on NYMEX on such date for the corresponding month through the 60th month from such date and (ii) the arithmetic monthly average for months 49 through 60 for each month after the 60th month. The amount of the Proved PV-10% then in effect shall be (a) calculated on a *pro forma* basis for dispositions and acquisitions consummated since the date of the most recently delivered Reserve Report in respect of proved oil and gas reserves attributable to the Oil and Gas Properties to the extent that a reserve report reasonably acceptable to the Agent in respect of proved oil and gas reserves attributable to such disposition or acquisition is available and (b) adjusted to give effect to the Borrower's and the Subsidiaries' commodity hedges then in effect.

"*Purchase Date*" shall have the meaning assigned to such term in Section 2.21.

"*Real Property*" shall mean, collectively, all right, title and interest of the Borrower or any Subsidiary in and to any and all parcels of real property owned, leased or operated by the Borrower or any Subsidiary together with all improvements and appurtenant fixtures, equipment, personal property, easements and other property and rights incidental to the ownership, lease or operation thereof, including all Oil and Gas Properties that constitute real property.

"*Register*" shall have the meaning assigned to such term in Section 9.05(a).

"*Regulation T*" shall mean Regulation T of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"*Regulation U*" shall mean Regulation U of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"*Regulation X*" shall mean Regulation X of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof

"*Related Agreements*" shall mean, collectively, (i) the Acquisition Agreements and (ii) the Intercompany Services Agreement.

"*Related Fund*" shall mean, with respect to any Lender that is a fund or commingled investment vehicle that invests in bank loans, any other fund that invests in bank loans and is managed or advised by the same investment advisor as such Lender or by an Affiliate of such investment advisor. With respect to Silver Point, "*Related Fund*" shall also include any swap, special purpose vehicles purchasing or acquiring security interests in collateralized loan obligations or any other vehicle through which Silver Point may leverage its investments from time to time.

"*Related Parties*" shall mean, with respect to any specified person, such person's Affiliates and the directors, trustees, officers, employees, agents and advisors of such person and such person's Affiliates.

"*Release*" shall mean any release, spill, emission, leaking, dumping, injection, pouring, deposit, disposal, discharge, dispersal, leaching or migration into or through the environment or within or upon any building, structure, facility or fixture.

"*Required Lenders*" shall mean, at any time, Lenders having Loans representing more than 66 2/3% of the sum of all Loans outstanding at such time.

"*Reserve Report*" shall mean (a) each of the reserve reports referred to in Section 3.05(c) and (b) any other reserve report, in form and substance reasonably satisfactory to the Agent, setting forth, as of each January 1st or July 1st (or such other date in the event of an Interim Redetermination) the oil and gas reserves attributable to the Oil and Gas Properties of the Borrower and its Subsidiaries, together with a projection of the rate of production and future net income, taxes, operating expenses and capital expenditures with respect thereto as of such date, based upon the pricing assumptions consistent with the Agent's lending requirements at the time.

"*Responsible Officer*" of any person shall mean any executive officer or Financial Officer of such person and any other officer or similar official thereof responsible for the administration of the obligations of such person in respect of this Agreement, including a reserve engineer of seniority reasonably acceptable to the Agent.

"*Restricted Indebtedness*" shall mean Indebtedness of Holdings, the Borrower or any Subsidiary, the payment, prepayment, repurchase or defeasance of which is restricted under Section 6.06(b).

"*Restricted Payment*" shall mean any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interests in Holdings, the Borrower or any Subsidiary, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any Equity Interests in Holdings, the Borrower or any Subsidiary.

"*Revolving Credit Exposure*" shall mean, with respect to any Lender at any time, the outstanding principal amount of such Lender's Loans at such time.

"*Scheduled Redetermination*" shall have the meaning assigned to such term in Section 2.21(b).

"*Second Lien Agent*" shall mean the "Agent", as defined in the Second Lien Credit Agreement.

"*Second Lien Credit Agreement*" shall mean the Second Lien Credit Agreement dated as of the date hereof, among the Borrower, Holdings, the lenders from time to time party thereto and Silver Point, as administrative agent and collateral agent, as amended, supplemented or otherwise modified from time to time.

"*Second Lien Lenders*" shall mean "Lenders", as defined in the Second Lien Credit Agreement.

"*Second Lien Loan Documents*" shall mean "Loan Documents", as defined in the Second Lien Credit Agreement.

"*Second Lien Loan Parties*" shall mean "Loan Parties", as defined in the Second Lien Credit Agreement.

"*Second Lien Loan Repayment Date*" shall mean such time as the Second Lien Loans have been repaid in full.

"*Second Lien Loans*" shall mean "Loans", as defined in the Second Lien Credit Agreement.

"*Second Lien Obligations*" shall mean "Loan Document Obligations", as defined in the Second Lien Credit Agreement.

"*Second Lien Secured Party*" shall mean "Secured Party", as defined in the Second Lien Credit Agreement.

"*Secured Parties*" shall mean (a) the Lenders, (b) the Agent, (c) each counterparty to any Hedging Agreement entered into with a Loan Party the obligations under which constitute Obligations, (d) the beneficiaries of each indemnification obligation undertaken by any Loan Party under any Loan Document, and (e) the successors and permitted assigns of each of the foregoing.

"*Security Documents*" shall mean the Mortgages, the Collateral Agreement, the Account Control Agreements, the Intercreditor Agreement and each of the security agreements, mortgages and other instruments and documents executed and delivered pursuant to any of the foregoing or pursuant to Section 5.12.

"*Silver Point*" shall have the meaning assigned to such term in the introductory paragraph.

"*SPC*" shall have the meaning assigned to such term in Section 9.04(h).

"*S&P*" shall mean Standard & Poor's Ratings Service, a division of the McGraw-Hill Companies, Inc., or any successor thereto.

"*Statutory Reserves*" shall mean a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one minus the aggregate of the maximum reserve percentages (including any marginal, special, emergency or supplemental reserves) expressed as a decimal established by the Board and any other banking authority, domestic or foreign, to which the Agent or any Lender (including any branch, Affiliate or other fronting office making or holding a Loan) is subject for Eurocurrency Liabilities (as defined in Regulation D of the Board). Eurodollar Loans shall be deemed to constitute Eurocurrency Liabilities as defined in Regulation D of the Board) and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Lender under such Regulation D. Statutory Reserves shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

"*Subordinated Indebtedness*" of a person means any Indebtedness of such person the payment of which is subordinated to payment of the Obligations, and shall include, in any event, Indebtedness of the Loan Parties under the Subordinated Seller Note.

"*Subordinated Seller Note*" shall mean that certain Subordinated Accreting Note, dated as of August 24, 2007, made by Pacific Energy in favor of Forest Oil Corporation in the original principal amount of $29,250,000.

"*subsidiary*" shall mean, with respect to any person (herein referred to as the "*parent*"), any corporation, partnership, limited liability company, association or other business entity (a) of

which securities or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power or more than 50% of the general partnership interests are, at the time any determination is being made, owned, Controlled or held or (b) that is, at the time any determination is made, otherwise Controlled, by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent.

"*Subsidiary*" shall mean any subsidiary of the Borrower.

"*Subsidiary Loan Party*" shall mean each Subsidiary that has executed the Collateral Agreement or a supplement thereto and a Mortgage in respect of each Mortgaged Property which is owned by it.

"*Successful Syndication*" shall mean the acquisition by a bank or other financial institution acceptable to the Agent and the Documentation Agent of all outstanding Commitments and Loans hereunder pursuant to Section 9.04.

"*Syndication Agent*" shall mean Silver Point, in its capacity as syndication agent for the Lenders.

"*Synthetic Leases*" shall mean, in respect of any person, all leases which shall have been, or should have been, in accordance with GAAP, treated as operating leases on the financial statements of the person liable (whether contingently or otherwise) for the payment of rent thereunder and which were properly treated as indebtedness for borrowed money for purposes of U.S. federal income taxes, if the lessee in respect thereof is obligated to either purchase for an amount in excess of, or pay upon early termination an amount in excess of, 80% of the residual value of the Property subject to such operating lease upon expiration or early termination of such lease.

"*Synthetic Lease Obligations*" shall mean all monetary obligations under a Synthetic Lease.

"*Synthetic Purchase Agreement*" shall mean any swap, derivative or other agreement or combination of agreements pursuant to which Holdings, the Borrower or any Subsidiary is or may become obligated to make (a) any payment in connection with a purchase by any third party from a person other than Holdings, the Borrower or any Subsidiary of any Equity Interest or Restricted Indebtedness or (b) any payment (other than on account of a permitted purchase by it of any Equity Interest or Restricted Indebtedness) the amount of which is determined by reference to the price or value at any time of any Equity Interest or Restricted Indebtedness; *provided* that no phantom stock or similar plan providing for payments only to current or former directors, officers or employees of Holdings, the Borrower or any Subsidiary (or to their heirs or estates) shall be deemed to be a Synthetic Purchase Agreement.

"*Taxes*" shall mean any present or future tax, levy, impost, duty, assessment, charge, fee, deduction or withholding of any nature and whatever called, by whomever, on whomever and wherever imposed, levied, collected, withheld or assessed; provided, "Tax on the overall net income" of a person shall be construed as a reference to a tax imposed by the jurisdiction in which that person is organized or in which that person's applicable principal office (and/or, in the case of a Lender, its lending office) is located or in which that person (and/or, in the case of a Lender, its lending office) is deemed to be doing business (other than a jurisdiction in which such person is treated as doing business as a result of its entering into this Agreement or any

Security Document or its participation in the transactions governed thereby) on all or part of the net income, profits or gains (whether worldwide, or only insofar as such income, profits or gains are considered to arise in or to relate to a particular jurisdiction, or otherwise) of that person (and/or, in the case of a Lender, its applicable lending office).

"*Termination Date*" shall mean August 24, 2011; *provided* that if a Successful Syndication has not occurred on or before September 30, 2007, "*Termination Date*" shall mean February 24, 2009.

"*Total Debt*" shall mean, at any time, the Indebtedness of Holdings and its subsidiaries on a consolidated basis at such time described under clauses (a), (b), (c), (d), (e), (f), (g), (h), (i) and (j) of the definition of Indebtedness; *provided* that "Total Debt" shall exclude any Indebtedness of Holdings and its subsidiaries composed of (i) outstanding but undrawn letters of credit or outstanding but undrawn performance bonds, (ii) Guarantees of Indebtedness under the 2006 PERL Credit Agreement and (iii) Indebtedness under the Subordinated Seller Note.

"*Transactions*" shall mean, collectively, (a) the execution, delivery and performance by the Loan Parties of the Loan Documents to which they are a party, including the borrowing of Loans hereunder, (b) the execution, delivery and performance by the Second Lien Loan Parties of the Second Lien Loan Documents to which they are party and the borrowing of Second Lien Loans thereunder, (c) the Acquisition and (d) the payment of fees and expenses in connection with the foregoing.

"*Transition Services Agreement*" shall mean the Intercompany Services Agreement dated November 1, 2006 between Forest Oil Corporation and the Borrower and referred to in Section 10.1 of the Membership Interest Purchase Agreement.

"*Type*", when used in respect of any Loan or Borrowing, shall refer to the Rate by reference to which interest on such Loan or on the Loans comprising such Borrowing is determined. For purposes hereof, the term "*Rate*" shall mean the Adjusted LIBO Rate and the Alternate Base Rate.

"*USA PATRIOT Act*" shall mean The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title III of Pub. L. No. 107-56 (signed into law October 26, 2001)).

"*wholly owned subsidiary*" of any person shall mean a subsidiary of such person of which securities (except for directors' qualifying shares) or other ownership interests representing 100% of the Equity Interests are, at the time any determination is being made, owned, Controlled or held by such person or one or more wholly owned subsidiaries of such person or by such person and one or more wholly owned subsidiaries of such person.

"*Withdrawal Liability*" shall mean liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

SECTION 1.02      *Terms Generally*.  The definitions in Section 1.01 shall apply equally to both the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include", "includes" and "including" shall be deemed to be followed by the phrase

551425.10B- Server la - MSW                           25

"without limitation". The word "will" shall be construed to have the same meaning and effect as the word "shall"; and the words "asset" and "property" shall be construed as having the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights. All references herein to Articles, Sections, Exhibits and Schedules shall be deemed references to Articles and Sections of, and Exhibits and Schedules to, this Agreement unless the context shall otherwise require. Except as otherwise expressly provided herein, (a) any reference in this Agreement to any Loan Document shall mean such document as amended, restated, supplemented, waived or otherwise modified from time to time and (b) all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect from time to time; *provided, however*, that if Holdings notifies the Agent that Holdings wishes to amend any covenant in Article VI or any related definition to eliminate the effect of any change in GAAP occurring after the date of this Agreement on the operation of such covenant (or if the Agent notifies Holdings that the Required Lenders wish to amend Article VI or any related definition for such purpose), then Holding's compliance with such covenant shall be determined on the basis of GAAP in effect immediately before the relevant change in GAAP became effective, until either such notice is withdrawn or such covenant is amended in a manner satisfactory to Holdings and the Required Lenders. Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented, waived or otherwise modified (subject to any restrictions on such amendments, supplements, waivers or modifications set forth herein), (b) any definition of or reference to any statute, regulation or other law herein shall be construed (i) as referring to such statute, regulation or other law as from time to time amended, supplemented or otherwise modified (including by succession of comparable successor statutes, regulations or other laws) and (ii) to include all official rulings and interpretations thereunder, (c) any reference herein to any person shall be construed to include such person's successors and assigns and (d) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof.

SECTION 1.03    *Classification of Loans and Borrowings*. For purposes of this Agreement, Loans may be classified and referred to by Type (*e.g.,* a "Eurodollar Loan"). Borrowings also may be classified and referred to by Type (*e.g.*, a "Eurodollar Borrowing").

## ARTICLE II

## THE CREDITS

SECTION 2.01    *Commitments*. On the terms and subject to the conditions and relying upon the representations and warranties herein set forth, each Lender agrees, severally and not jointly, to make Loans to the Borrower during the Availability Period in an aggregate principal amount that will not result in (a) such Lender's Revolving Credit Exposure exceeding such Lender's Commitment or (b) the total Revolving Credit Exposures exceeding the total Commitments. The Loans made on the Closing Date shall be disbursed to the account designated by the Borrower in a writing delivered to the Agent prior to the time of the initial Borrowing hereunder. Within the foregoing limits and subject to the terms and conditions set forth herein, the Borrower may borrow, prepay and reborrow Loans.

SECTION 2.02 *Loans.* (a) Each Loan shall be made as part of a Borrowing consisting of Loans made by the Lenders ratably in accordance with their Commitments; *provided, however,* that the failure of any Lender to make any Loan shall not in itself relieve any other Lender of its obligation to lend hereunder (it being understood, however, that no Lender shall be responsible for the failure of any other Lender to make any Loan required to be made by such other Lender). The Loans comprising any Borrowing shall be in an aggregate principal amount that is an integral multiple of $500,000 and not less than $1,000,000.

(b) Subject to Sections 2.07 and 2.14, each Borrowing shall be comprised entirely of ABR Loans or Eurodollar Loans as the Borrower may request pursuant to Section 2.09. Each Lender may at its option make any Eurodollar Loan by causing any domestic or foreign branch or Affiliate of such Lender to make such Loan; *provided* that any exercise of such option shall not affect the obligation of the Borrower to repay such Loan in accordance with the terms of this Agreement. Borrowings of more than one Type may be outstanding at the same time; *provided, however,* that the Borrower shall not be entitled to request any Borrowing that, if made, would result in more than seven Eurodollar Borrowings outstanding hereunder at any time.

(c) Each Lender shall make each Loan to be made by it hereunder on the proposed date thereof by wire transfer of immediately available funds to such account in New York City as the Agent may designate not later than 1:00 p.m., New York City time, and the Agent shall promptly credit the amounts so received to the account designated by the Borrower pursuant to Section 2.01 or, if a Borrowing shall not occur on such date because any condition precedent herein specified shall not have been met, return the amounts so received to the Lenders.

(d) Unless the Agent shall have received notice from a Lender prior to the date of any Borrowing that such Lender will not make available to the Agent such Lender's portion of such Borrowing, the Agent may assume that such Lender has made such portion available to the Agent on the date of such Borrowing in accordance with paragraph (c) above and the Agent may, in reliance upon such assumption, make available to the Borrower on such date a corresponding amount. If the Agent shall have so made funds available then, to the extent that such Lender shall not have made such portion available to the Agent, such Lender and the Borrower severally agree to repay to the Agent forthwith on demand such corresponding amount together with interest thereon, for each day from the date such amount is made available to the Borrower to but excluding the date such amount is repaid to the Agent at (i) in the case of the Borrower, a rate per annum equal to the interest rate applicable at the time to the Loans comprising such Borrowing and (ii) in the case of such Lender, a rate determined by the Agent to represent its cost of overnight or short-term funds (which determination shall be conclusive absent manifest error). If such Lender shall repay to the Agent such corresponding amount, such amount shall constitute such Lender's Loan as part of such Borrowing for purposes of this Agreement.

(e) Nothing in this Section shall be deemed to relieve any Lender of its obligations in respect of its Commitment hereunder or to prejudice any rights that the Borrower may have against any Lender as a result of a default by such Lender under this Agreement.

SECTION 2.03 *Evidence of Debt; Repayment of Loans* The Borrower hereby unconditionally promises to pay to the Agent for the account of each Lender the principal amount of each Loan of such Lender as provided in Section 2.10.

(b)   Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to such Lender resulting from each Loan made by such Lender, including the amounts of principal and interest payable and paid to such Lender from time to time under this Agreement.

(c)   The Agent shall maintain accounts in which it will record (i) the amount of each Loan made hereunder, the Type thereof and, if applicable, the Interest Period applicable thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder and (iii) the amount of any sum received by the Agent hereunder from the Borrower or any Guarantor and each Lender's share thereof.

(d)   The entries made in the accounts maintained pursuant to paragraphs (b) and (c) above shall be *prima facie* evidence of the existence and amounts of the obligations therein recorded; *provided, however*, that the failure of any Lender or the Agent to maintain such accounts or any error therein shall not in any manner affect the obligations of the Borrower to repay the Loans in accordance with their terms.

(e)   Any Lender may request that Loans made by it hereunder be evidenced by a promissory note in the form of Exhibit L. In such event, the Borrower shall execute and deliver to such Lender a promissory note payable to such Lender and its registered assigns and in a form and substance reasonably acceptable to the Agent and the Borrower. Notwithstanding any other provision of this Agreement, in the event any Lender shall request and receive such a promissory note, the interests represented by such note shall at all times (including after any assignment of all or part of such interests pursuant to Section 9.04) be represented by one or more promissory notes payable to the payee named therein or its registered assigns.

SECTION 2.04    *Requests for Borrowings*. To request a Borrowing, the Borrower shall notify the Agent of such request by telephone (a) in the case of a Eurodollar Borrowing, not later than 12:00 noon, New York City time, on the date of the initial Borrowing hereunder, and not later than 12:00 noon, New York City time, three Business Days before the date of the proposed Borrowing for each Borrowing thereafter or (b) in the case of an ABR Borrowing, not later than 11:00 a.m., New York City time, on the date of the proposed Borrowing. Each such telephonic Borrowing Request shall be irrevocable and shall be confirmed promptly by hand delivery or telecopy to the Agent of a written Borrowing Request in substantially the form of Exhibit G (a "*Borrowing Request*") and signed by the Borrower. Each such telephonic and written Borrowing Request shall specify the following information:the aggregate amount of the requested Borrowing;

(ii)   the date of such Borrowing, which shall be a Business Day;

(iii)   whether such Borrowing is to be an ABR Borrowing or a Eurodollar Borrowing;

(iv)   the amount of the then effective Borrowing Base, the current total Revolving Credit Exposures (without regard to the requested

Borrowing) and the *pro forma* total Revolving Credit Exposures (giving effect to the requested Borrowing); and

(v)  the location and number of the account or accounts to which funds are to be disbursed.

If no election as to the Type of Borrowing is specified, then the requested Borrowing shall be an ABR Borrowing.

Promptly following receipt of a Borrowing Request in accordance with this Section 2.04, the Administrative Agent shall advise each Lender of the details thereof and of the amount of such Lender's Loan to be made as part of the requested Borrowing.

SECTION 2.05     *Fees; Interest on Loans.*

(a)  The Borrower agrees to pay to the Agent for the account of each Lender a commitment fee, which shall accrue at a rate per annum equal to the Applicable Margin for commitment fees on the average daily amount of the unused amount of the Commitment of such Lender during the period from and including the date of this Agreement to but excluding the Termination Date.  Accrued commitment fees shall be payable in arrears on the last day of March, June, September and December of each year and on the Termination Date, commencing on the first such date to occur after the date hereof.  All commitment fees shall be computed on the basis of a year of 365 days (or 366 days in a leap year), and shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

(b)  The Borrower agrees to pay to the Agent, for its own account, the fees set forth in the Agency Fee Letter at the times and in the amounts specified therein.

(c)  Subject to the provisions of Section 2.06, the Loans comprising each ABR Borrowing shall bear interest (computed on the basis of the actual number of days elapsed over a year of 365 or 366 days, as the case may be, when the Alternate Base Rate is determined by reference to the Prime Rate and over a year of 360 days at all other times and calculated from and including the date of such Borrowing to but excluding the date of repayment thereof) at a rate per annum equal to the Alternate Base Rate plus the Applicable Margin.

(d)  Subject to the provisions of Section 2.06, the Loans comprising each Eurodollar Borrowing shall bear interest (computed on the basis of the actual number of days elapsed over a year of 360 days and calculated from and including the date of such Borrowing to but excluding the date of repayment thereof) at a rate per annum equal to the Adjusted LIBO Rate for the Interest Period in effect for such Borrowing plus the Applicable Margin.

(e)  Interest on each Loan shall be payable in arrears on the Interest Payment Dates applicable to such Loan except as otherwise provided in this Agreement. The applicable Alternate Base Rate or Adjusted LIBO Rate for each day or each Interest Period, as the case may be, shall be determined by the Agent, and such determination shall be conclusive absent manifest error.

SECTION 2.06     *Default Interest.*  Upon the occurrence and during the continuance of an Event of Default or Borrowing Base Deficiency, all amounts outstanding under this Agreement and the other Loan Documents shall bear interest (after as well as before

judgment), payable on demand, (a) in the case of principal, at the rate otherwise applicable to such Loan pursuant to Section 2.05 plus 2.00% per annum and (b) in all other cases, at a rate per annum (computed on the basis of the actual number of days elapsed over a year of 365 or 366 days, as the case may be, when determined by reference to the Prime Rate and over a year of 360 days at all other times) equal to the rate that would be applicable to an ABR Loan plus 2.00% per annum.

SECTION 2.07 *Alternate Rate of Interest.* In the event, and on each occasion, that on the day two Business Days prior to the commencement of any Interest Period for a Eurodollar Borrowing the Agent shall have determined that dollar deposits in the principal amounts of the Loans comprising such Borrowing are not generally available in the London interbank market, or that the rates at which such dollar deposits are being offered will not adequately and fairly reflect the cost to Lenders representing the Required Lenders of making or maintaining Eurodollar Loans during such Interest Period, or that reasonable means do not exist for ascertaining the Adjusted LIBO Rate, the Agent shall, as soon as practicable thereafter, give written or fax notice of such determination to the Borrower and the Lenders. In the event of any such determination, until the Agent shall have advised the Borrower and the Lenders that the circumstances giving rise to such notice no longer exist, any request by the Borrower for a Eurodollar Borrowing pursuant to Section 2.09 shall be deemed to be a request for an ABR Borrowing. Each determination by the Agent under this Section shall be conclusive absent manifest error.

SECTION 2.08 *Termination of Commitments.* Unless previously terminated, the Commitments shall automatically terminate on the Termination Date. If at any time the Aggregate Maximum Credit Amounts or the Borrowing Base is terminated or reduced to zero, the Commitments shall terminate on the effective date of such termination or reduction.

SECTION 2.09 *Conversion and Continuation of Borrowings.* The Borrower shall have the right at any time upon prior irrevocable notice to the Agent (a) not later than 2:00 p.m., New York City time, one Business Day prior to conversion, to convert any Eurodollar Borrowing into an ABR Borrowing and (b) not later than 2:00 p.m., New York City time, three Business Days prior to conversion or continuation, to convert any ABR Borrowing into a Eurodollar Borrowing or to continue any Eurodollar Borrowing as a Eurodollar Borrowing for an additional Interest Period, subject in each case to the following:each conversion or continuation of Loans shall be made *pro rata* among the Lenders in accordance with the principal amounts of the Loans comprising the converted or continued Borrowing;

(ii) if less than all the outstanding principal amount of any Borrowing shall be converted or continued, then each resulting Borrowing shall satisfy the limitations specified in Sections 2.02(a) and 2.02(b) regarding the principal amount and maximum number of Borrowings of the relevant Type;

(iii) each conversion shall be effected by each Lender and the Agent by recording for the account of such Lender the new Loan of such Lender resulting from such conversion and reducing the Loan (or portion thereof) of such Lender being converted by an equivalent principal amount; accrued interest on any Eurodollar Loan (or portion thereof) being converted shall be paid by the Borrower at the time of conversion;

(iv) if any Eurodollar Borrowing is converted at a time other than the end of the Interest Period applicable thereto, the Borrower shall pay, upon demand, any amounts due to the Lenders pursuant to Section 2.15;

(v) any portion of a Borrowing maturing or required to be repaid in less than one month may not be converted into or continued as a Eurodollar Borrowing;

(vi) any portion of a Eurodollar Borrowing that cannot be converted into or continued as a Eurodollar Borrowing by reason of the immediately preceding clause shall be automatically converted at the end of the Interest Period in effect for such Borrowing into an ABR Borrowing;

(vii) no Interest Period may be selected for any Eurodollar Borrowing that would end later than a date on which a repayment of Loans pursuant to the applicable provision of Section 2.10 is due and which occurs on or after the first day of such Interest Period if, after giving effect to such selection, the aggregate outstanding amount of (A) the Eurodollar Borrowings with Interest Periods ending on or prior to such date and (B) the ABR Borrowings would not be at least equal to the principal amount of Borrowings to be paid on such date; and

(viii) after the occurrence and during the continuance of an Event of Default or Borrowing Base Deficiency, no outstanding Loan may be converted into, or continued as, a Eurodollar Loan.

Each notice pursuant to this Section 2.09 shall be irrevocable and shall refer to this Agreement and specify (i) the identity and amount of the Borrowing that the Borrower requests be converted or continued, (ii) whether such Borrowing is to be converted to or continued as a Eurodollar Borrowing or an ABR Borrowing, (iii) if such notice requests a conversion, the date of such conversion (which shall be a Business Day) and (iv) if such Borrowing is to be converted to or continued as a Eurodollar Borrowing, the Interest Period with respect thereto. The Agent shall advise the Lenders of any notice given pursuant to this Section and of each Lender's portion of any converted or continued Borrowing. If the Borrower shall not have given notice in accordance with this Section to continue any Borrowing into a subsequent Interest Period (and shall not otherwise have given notice not later than 2:00 p.m., New York City time, three Business Days prior to the end of such Interest Period, of its intent to convert such Borrowing or to prepay such Borrowing at the end of such Interest Period), such Borrowing shall, at the end of the Interest Period applicable thereto, automatically be converted as an ABR Borrowing.

SECTION 2.10    *Repayment of Borrowings*. To the extent not previously paid, all Loans shall be due and payable on the Termination Date, together with accrued and unpaid interest on the principal amount to be paid to but excluding the date of payment.

SECTION 2.11    *Optional Prepayments; Optional Termination and Reduction of Aggregate Maximum Credit Amounts*.

(a) The Borrower shall have the right at any time and from time to time to prepay any Borrowing, in whole or in part, upon at least three Business Days' prior written or fax notice (or telephone notice promptly confirmed by written or fax notice) in the case of Eurodollar Loans or upon at least one Business Day prior written or fax notice (or telephone notice promptly confirmed by written or fax notice) in the case of ABR Loans, to the Agent

before 2:00 p.m., New York City time; *provided, however*, that each partial prepayment shall be in an amount that is an integral multiple of $500,000 and not less than $1,000,000.

(b)    The Borrower shall have the right to at any time terminate, or from time to time reduce, the Aggregate Maximum Credit Amounts upon at least three Business Days' prior written or fax notice; *provided* that (A) each reduction of the Aggregate Maximum Credit Amounts shall be in an amount that is an integral multiple of $500,000 and not less than $1,000,000 and (B) the Borrower shall not terminate or reduce the Aggregate Maximum Credit Amounts if, after giving effect to any concurrent prepayment of the Loans in accordance with Section 2.12, the total Revolving Credit Exposures would exceed the total Commitments.

(c)    Each notice of prepayment shall specify the prepayment date and the principal amount of each Borrowing (or portion thereof) to be prepaid, shall be irrevocable and shall commit the Borrower to prepay such Borrowing by the amount stated therein on the date stated therein. Each notice of reduction or termination shall specify such election and the effective date thereof, shall be irrevocable and shall commit the Borrower to prepay such the Borrowings as required by Section 2.12 on the date stated therein; *provided* that a notice of termination may state that such notice is conditioned upon the effectiveness of other credit facilities, in which case such notice may be revoked by the Borrower (by notice to the Agent on or prior to the specified effective date) if such condition is not satisfied.

(d)    All prepayments under this Section 2.11 shall be subject to Section 2.15, but shall otherwise be without premium or penalty. All prepayments under this Section 2.11 shall be accompanied by accrued and unpaid interest on the principal amount to be prepaid to but excluding the date of payment.

SECTION 2.12    *Mandatory Prepayments.*

(a)    If, after giving effect to any termination or reduction of the Aggregate Maximum Credit Amounts pursuant to Section 2.11, the total Revolving Credit Exposures exceeds the total Commitments, then the Borrower, simultaneously with such termination or reduction, shall prepay the Borrowings on the date of such termination or reduction in an aggregate principal amount equal to such excess in accordance with Section 2.12(c).

(b)    Upon any redetermination of or adjustment to the amount of the Borrowing Base in accordance with Section 2.21 or Section 5.17(c), if the total Revolving Credit Exposures exceeds the redetermined or adjusted Borrowing Base, then the Borrower shall prepay the Borrowings in an aggregate principal amount equal to such excess in accordance with Sections 2.12(c), which prepayment shall be made on or prior to the earlier of (i) the date which is ninety (90) days following receipt by the Borrower of the New Borrowing Base Notice in accordance with Section 2.21 and (ii) the date the adjustment occurs; *provided* that all payments required to be made pursuant to this Section 2.12(b) must be made on or prior to the Termination Date.

(c)    All prepayments of Borrowings under this Section 2.12 shall be subject to Section 2.15, but shall otherwise be without premium or penalty, and shall be accompanied by accrued and unpaid interest on the principal amount to be prepaid to but excluding the date of payment.

(i) In connection with any optional prepayments by the Borrower of the Loans pursuant to Section 2.11, any optional prepayment thereof shall be applied to Revolving Borrowings until paid in full and shall be applied first to ABR Borrowings to the full extent thereof before application to Eurodollar Borrowings, in each case in a manner that minimizes the amount of any payments required to be made by the Borrower pursuant to Section 2.15.

(ii) In connection with any mandatory prepayments by the Borrower of the Loans pursuant to this Section 2.12, such prepayments shall be applied on a *pro rata* basis to the Revolving Borrowings being prepaid irrespective of whether such Borrowings are ABR Borrowings or Eurodollar Borrowings.

SECTION 2.13    ***Reserve Requirements; Change in Circumstances***.

(a) Notwithstanding any other provision of this Agreement, if any Change in Law shall impose, modify or deem applicable any reserve, special deposit or similar requirement against assets of, deposits with or for the account of or credit extended by any Lender (except any such reserve requirement which is reflected in the Adjusted LIBO Rate) or shall impose on such Lender or the London interbank market any other condition affecting this Agreement or Eurodollar Loans made by such Lender, and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any Eurodollar Loan or to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or otherwise) by an amount deemed by such Lender to be material, then the Borrower will pay to such Lender at the time the additional costs are incurred or reduction suffered such additional amount or amounts as will compensate such Lender therefor.

(b) If any Lender shall have determined that any Change in Law regarding capital adequacy has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement or the Loans made by such Lender pursuant hereto to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy) by an amount deemed by such Lender to be material, then from time to time the Borrower shall pay to such Lender, such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c) A certificate of a Lender setting forth (i) the amount or amounts necessary to compensate such Lender or its holding company, as applicable, as specified in Section 2.13(a) or (b) and (ii) in reasonable detail, the manner in which the amount claimed was determined shall be delivered to the Borrower and shall be conclusive absent manifest error. The Borrower shall pay such Lender the amount shown as due on any such certificate delivered by it within 10 days after its receipt of the same.

(d) Failure or delay on the part of any Lender to demand compensation for any increased costs or reduction in amounts received or receivable or reduction in return on capital shall not constitute a waiver of such Lender's right to demand such compensation; *provided* that the Borrower shall not be under any obligation to compensate any Lender under Section 2.13(a) or (b) with respect to increased costs or reductions with respect to any period

prior to the date that is 180 days prior to such request if such Lender knew of the circumstances giving rise to such increased costs or reductions and of the fact that such circumstances would result in a claim for increased compensation by reason of such increased costs or reductions; *provided further* that the foregoing limitation shall not apply to any increased costs or reductions arising out of the retroactive application of any Change in Law within such 180-day period. The protection of this Section shall be available to each Lender regardless of any possible contention of the invalidity or inapplicability of the Change in Law that shall have occurred or been imposed; provided, however, that any amounts paid by the Borrower hereunder shall be promptly reimbursed if the Change in Law is challenged and the challenge upheld.

SECTION 2.14    *Change in Legality.*

(a)    Notwithstanding any other provision of this Agreement, if any Change in Law shall make it unlawful for any Lender to make or maintain any Eurodollar Loan or to give effect to its obligations as contemplated hereby with respect to any Eurodollar Loan, then, by written notice to the Borrower and to the Agent:

(i) such Lender may declare that Eurodollar Loans will not thereafter (for the duration of such unlawfulness) be made by such Lender hereunder (or be continued for additional Interest Periods) and ABR Loans will not thereafter (for such duration) be converted into Eurodollar Loans, whereupon any request for a Eurodollar Borrowing (or to convert an ABR Borrowing to a Eurodollar Borrowing or to continue a Eurodollar Borrowing for an additional Interest Period) shall, as to such Lender only, be deemed a request for an ABR Loan (or a request to continue an ABR Loan as such for an additional Interest Period or to convert a Eurodollar Loan into an ABR Loan, as the case may be), unless such declaration shall be subsequently withdrawn; and

(ii) such Lender may require that all outstanding Eurodollar Loans made by it be converted to ABR Loans, in which event all such Eurodollar Loans shall be automatically converted to ABR Loans as of the effective date of such notice as provided in paragraph (b) below.

In the event any Lender shall exercise its rights under (i) or (ii) above, all payments and prepayments of principal that would otherwise have been applied to repay the Eurodollar Loans that would have been made by such Lender or the converted Eurodollar Loans of such Lender shall instead be applied to repay the ABR Loans made by such Lender in lieu of, or resulting from the conversion of, such Eurodollar Loans.

(b)    For purposes of this Section, a notice to the Borrower by any Lender shall be effective as to each Eurodollar Loan made by such Lender, if lawful, on the last day of the Interest Period then applicable to such Eurodollar Loan; in all other cases such notice shall be effective on the date of receipt by the Borrower.

SECTION 2.15    *Indemnity.*    The Borrower shall indemnify each Lender against any loss or expense that such Lender may sustain or incur as a consequence of (a) any event, other than a default by such Lender in the performance of its obligations hereunder, which results in (i) such Lender receiving or being deemed to receive any amount on account of the principal of any Eurodollar Loan prior to the end of the Interest Period in effect therefor (including any Interest Period for which a Borrowing is automatically continued pursuant to

Section 2.09), (ii) the conversion of any Eurodollar Loan to an ABR Loan, or the conversion of the Interest Period with respect to any Eurodollar Loan, in each case other than on the last day of the Interest Period in effect therefor or (iii) any Eurodollar Loan to be made by such Lender (including any Eurodollar Loan to be made pursuant to a conversion or continuation under Section 2.09) not being made after notice of such Loan shall have been given by the Borrower hereunder (any of the events referred to in this clause (a) being called a *"Breakage Event"*) or (b) any default in the making of any payment or prepayment required to be made hereunder. In the case of any Breakage Event, such loss shall include an amount equal to the excess, as reasonably determined by such Lender, of (i) its cost of obtaining funds for the Eurodollar Loan that is the subject of such Breakage Event for the period from the date of such Breakage Event to the last day of the Interest Period in effect (or that would have been in effect) for such Loan over (ii) the amount of interest likely to be realized by such Lender in redeploying the funds released or not utilized by reason of such Breakage Event for such period. A certificate of any Lender setting forth any amount or amounts which such Lender is entitled to receive pursuant to this Section shall be delivered to the Borrower and shall be conclusive absent manifest error.

SECTION 2.16     *Pro rata Treatment.* Except as required under Section 2.12 and 2.14, (a) each payment or prepayment of principal of any Borrowing and each payment of interest on the Loans shall be allocated among the Lenders on a *pro rata* basis in accordance with the principal amounts of their outstanding Loans, and (b) each conversion of any Borrowing to or continuation of any Borrowing as a Borrowing of any Type shall be allocated among the Lenders on a *pro rata* basis in accordance with the principal amounts of their outstanding Loans. Each Lender agrees that in computing such Lender's portion of any Borrowing to be made hereunder, the Agent may, in its discretion, round each Lender's percentage of such Borrowing to the next higher or lower whole dollar amount.

SECTION 2.17     *Sharing of Setoffs.*

(a)     Each Lender agrees that if it shall, through the exercise of a right of banker's lien, setoff or counterclaim against the Borrower or any other Loan Party, or pursuant to a secured claim under Section 506 of Title 11 of the United States Code or other security or interest arising from, or in lieu of, such secured claim, received by such Lender under any applicable bankruptcy, insolvency or other similar law or otherwise, or by any other means, obtain payment (voluntary or involuntary) in respect of any Loan or Loans as a result of which the unpaid principal portion of its Loans shall be proportionately less than the unpaid principal portion of the Loans of any other Lender, it shall be deemed simultaneously to have purchased from such other Lender at face value, and shall promptly pay to such other Lender the purchase price for, a participation in the Loans of such other Lender, so that the aggregate unpaid principal amount of the Loans and participations in Loans held by each Lender shall be in the same proportion to the aggregate unpaid principal amount of all Loans then outstanding as the principal amount of its Loans prior to such exercise of banker's lien, setoff or counterclaim or other event was to the principal amount of all Loans outstanding prior to such exercise of banker's lien, setoff or counterclaim or other event.

(b)     Notwithstanding the foregoing Sections 2.17(a), if any such purchase or purchases or adjustments shall be made pursuant to this Section 2.17 and the payment giving rise thereto shall thereafter be recovered, such purchase or purchases or adjustments shall be rescinded to the extent of such recovery and the purchase price or prices or adjustment restored without interest.

(c)     The Borrower and Holdings expressly consent to the foregoing arrangements and agree that any Lender holding a participation in a Loan deemed to have been so purchased may exercise any and all rights of banker's lien, setoff or counterclaim with respect to any and all moneys owing by the Borrower and Holdings to such Lender by reason thereof as fully as if such Lender had made a Loan directly to the Borrower in the amount of such participation.

SECTION 2.18      *Payments.*

(a)     The Borrower shall make each payment (including principal of or interest on any Borrowing or any fees or other amounts) hereunder and under any other Loan Document not later than 2:00 p.m., New York City time, on the date when due in immediately available dollars, without setoff, defense or counterclaim. Any amounts received after such time on any date may, in the discretion of the Agent, be deemed to have been received on the next succeeding Business Day. Each such payment shall be made to the Agent at its offices at Two Greenwich Plaza, Greenwich, Connecticut 06830. The Agent shall promptly distribute to each Lender any payments received by the Agent on behalf of such Lender.

(b)     Except as otherwise expressly provided herein, whenever any payment (including principal of or interest on any Borrowing or any fees or other amounts) hereunder or under any other Loan Document shall become due, or otherwise would occur, on a day that is not a Business Day, such payment may be made on the next succeeding Business Day, and such extension of time shall in such case be included in the computation of interest or fees, if applicable.

SECTION 2.19      *Taxes, Withholdings, etc.*

(a)     Payments to Be Free and Clear. All sums payable by any Loan Party hereunder and under the other Security Documents shall (except to the extent required by law) be paid free and clear of, and without any deduction or withholding on account of, any Tax (other than a Tax on the overall income of the Lender) imposed, levied, collected, withheld or assessed by or within the United States of America or any political subdivision in or of the United States of America or any other jurisdiction from or to which a payment is made (or deemed made) by or on behalf of any Loan Party or by any federation or organization of which the United States of America or any such jurisdiction is a member at the time of payment.

(b)     Withholding of Taxes. If any Loan Party or any other person is required by law to make any deduction or withholding on account of any Tax (other than a Tax on the overall income of the Lender) from any sum paid or payable under any of the Security Documents: (i) the Borrower shall notify the Agent of any such requirement or any change in any such requirement as soon as the Borrower becomes aware of it; (ii) the Borrower shall pay any such Tax before the date on which penalties attach thereto, such payment to be made (if the liability to pay is imposed on any Loan Party) for its own account or (if that liability is imposed on the Agent or such Lender, as the case may be) on behalf of and in the name of the Agent or such Lender; (iii) the sum payable by such Loan Party in respect of which the relevant deduction, withholding or payment, is required shall be increased to the extent necessary to ensure that, after any such deduction, withholding or payment of all Taxes, the Agent or such Lender, as the case may be, receives on the due date an amount equal to what it would have received had no such deduction, withholding or payment been required or made; and (iv) within thirty (30) days

551425.10E- Server 1a - MSW                    36

after the due date of payment of any Tax which it is required by clause (ii) above to pay, the Borrower shall deliver to the Agent evidence satisfactory to the other affected parties of such deduction, withholding and payment and of the remittance thereof to the relevant taxing or other authority; provided, no such additional amount shall be required to be paid to any Lender under clause (iii) above except to the extent that any change after the date hereof (in the case of each Lender listed on the signature pages hereof on the Closing Date) or after the effective date of the Assignment and Acceptance pursuant to which such Lender became a Lender (in the case of each other Lender) in any such requirement for a deduction, withholding or payment as is mentioned therein shall result in the imposition of or the increase in the rate of such deduction, withholding or payment from that in effect at the date hereof or at the date of such Assignment and Acceptance, as the case may be, in respect of payments to such Lender.

(c)    Other Taxes. In addition, the Loan Parties shall pay all Other Taxes to the relevant Governmental Authorities in accordance with applicable law. The Loan Parties shall deliver to the Agent official receipts or other evidence of such payment reasonably satisfactory to the Agent in respect of any Taxes or Other Taxes payable hereunder promptly after payment of such Taxes or Other Taxes.

(d)    Indemnification. Without duplication of its obligations under clauses (b)(iii) and (c) hereunder, the Loan Parties shall indemnify the Agent and each Lender, within ten (10) days after written demand therefor, for the full amount of any Taxes (other than any Tax on the overall net income of the Agent or any Lenders) paid or incurred by the Agent or such Lender relating to, arising out of, or in connection with any Transaction Document or any payment or transaction contemplated hereby or thereby, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority and all reasonable expenses and costs incurred in enforcing the provisions of this Section 2.19; provided, however, that the Loan Parties shall not be required to indemnify the Agent, the Lenders and participants for any Taxes that would be excluded from a gross-up under Section 2.17(b) or to the extent such Taxes are covered by Sections 2.17(b) or (c). Such indemnification shall be made on an after-Tax basis, such that after all required deductions and payments of all Taxes (excluding any Tax on the overall net income of the Agent or any Lenders except for Taxes and deductions applicable to amounts payable under this Section 2.17(d) and payment of all reasonable expenses), the Agent or such Lender receives and retains an amount equal to the sum it would have received and retained had it not paid or incurred or been subject to such Taxes or expenses and costs. A certificate from the relevant Lender or the Agent, setting forth in reasonable detail the basis and calculation of such Taxes shall be conclusive, absent manifest error.

(e)    Evidence of Exemption From U.S. Withholding Tax. Each Lender that is not a United States person (as such term is defined in Section 7701(a)(30) of the Code) for U.S. federal income tax purposes (a "*Foreign Lender*") shall deliver to the Agent for transmission to the Borrower, on or prior to the Closing Date (in the case of each Lender listed on the signature pages hereof on the Closing Date) or on or prior to the date of the Assignment and Acceptance pursuant to which it becomes a Lender (in the case of each other Lender), and at such other times as may be necessary in the determination of the Borrower or the Agent (each in the reasonable exercise of its discretion), (i) two original copies of Internal Revenue Service ("*IRS*") Form W-8BEN, W-8IMY or W-8ECI (or any successor forms), properly completed and duly executed by such Lender, and such other documentation required under the Code and reasonably requested by the Borrower to establish that such Lender is not subject to deduction or

551425.10E- Server 1a - MSW                    37

withholding of United States federal income tax with respect to any payments to such Lender of principal, interest, fees or other amounts payable hereunder or under any of the Security Documents or is subject to deduction or withholding at a reduced rate, or (ii) if such Lender is not a "bank" or other person described in Section 881(c)(3) of the Code and cannot deliver IRS Form W-8ECI pursuant to clause (i) above, a Certificate Regarding Non Bank Status together with two original copies of IRS Form W-8BEN (or any successor form), properly completed and duly executed by such Lender, and such other documentation required under the Code and reasonably requested by the Borrower to establish that such Lender is not subject to deduction or withholding of United States federal income tax with respect to any payments to such Lender of interest payable hereunder or under any of the Security Documents. Each Lender required to deliver any forms, certificates or other evidence with respect to United States federal income tax withholding matters pursuant to this Section 2.19(e) hereby agrees, from time to time after the initial delivery by such Lender of such forms, certificates or other evidence, whenever a lapse in time or change in circumstances renders such forms, certificates or other evidence obsolete or inaccurate in any material respect, that such Lender shall promptly deliver to the Agent for transmission to the Borrower two new original copies of IRS Form W-8BEN, W-8IMY or W-8ECI, or a Certificate Regarding Non Bank Status and two original copies of IRS Form W-8BEN (or any successor form), as the case may be, properly completed and duly executed by such Lender, and such other documentation required under the Code and reasonably requested by the Borrower to confirm or establish that such Lender is not subject to deduction or withholding of United States federal income tax with respect to payments to such Lender hereunder or under the Security Documents or is subject to deduction or withholding at a reduced rate, or notify the Agent and the Borrower of its inability to deliver any such forms, certificates or other evidence. The Borrower shall not be required to pay any additional amount to any Foreign Lender under Section 2.19(b)(iii) if such Lender shall have failed to deliver the forms, certificates or other evidence referred to in the second sentence of this Section 2.19(e) that it is legally entitled to deliver; provided, if such Lender shall have satisfied the requirements of the first sentence of this Section 2.19(e) on the Closing Date or on the date of the Assignment and Acceptance pursuant to which it became a Lender, as applicable, nothing in this last sentence of Section 2.19(e) shall relieve the Borrower of its obligation to pay any additional amounts pursuant to this Section 2.19 in the event that, as a result of any change in any applicable law, treaty or governmental rule, regulation or order, or any change in the interpretation, administration or application thereof, such Lender is no longer properly entitled to deliver forms, certificates or other evidence at a subsequent date establishing the fact that such Lender is not subject to withholding as described herein. Nothing in this Section 2.19 shall be construed to require a Lender, the Agent or participant to provide any forms or documentation that it is not legally entitled to provide.

SECTION 2.20 *Assignment of Commitments Under Certain Circumstances; Duty to Mitigate.*

(a) In the event (i) any Lender delivers a certificate requesting compensation pursuant to Section 2.13, (ii) any Lender delivers a notice described in Section 2.14, (iii) the Borrower is required to pay any additional amount to any Lender or any Governmental Authority on account of any Lender pursuant to Section 2.19, (iv) any Lender defaults in its obligations to fund Loans hereunder or (v) any Lender refuses to consent to any amendment, waiver or other modification of any Loan Document requested by the Borrower, the Borrower may, with the written consent of the Agent and at its sole expense and effort (including with respect to the processing and recordation fee referred to in Section 9.04(b)), upon notice to such Lender, require such Lender to transfer and assign, without recourse (in accordance with

and subject to the restrictions contained in Section 9.04), all of its interests, rights and obligations under this Agreement and the other Loan Documents to an assignee that shall assume such assigned obligations and, with respect to clause (iv) above, shall consent to such requested amendment, waiver or other modification of any Loan Documents (which assignee may be another Lender, if a Lender accepts such assignment); *provided* that (x) such assignment shall not conflict with any law, rule or regulation or order of any court or other Governmental Authority having jurisdiction, (y) the Borrower shall have received the prior written consent of the Agent, which consent shall not unreasonably be withheld or delayed and (z) the Borrower or such assignee shall have paid to the affected Lender in immediately available funds an amount equal to the sum of the principal of and interest accrued to the date of such payment on the outstanding Loans of such Lender plus all fees and other amounts accrued for the account of such Lender hereunder with respect thereto (including any amounts under Sections 2.14 and 2.16); *provided further* that, if prior to any such transfer and assignment the circumstances or event that resulted in such Lender's claim for compensation under Section 2.13, notice under Section 2.14 or the amounts paid pursuant to Section 2.19, as the case may be, cease to cause such Lender to suffer increased costs or reductions in amounts received or receivable or reduction in return on capital, or cease to have the consequences specified in Section 2.14, or cease to result in amounts being payable under Section 2.19, as the case may be (including as a result of any action taken by such Lender pursuant to Section 2.20(b)), or if such Lender shall waive its right to claim further compensation under Section 2.13 in respect of such circumstances or event or shall withdraw its notice under Section 2.14 or shall waive its right to further payments under Section 2.19 in respect of such circumstances or event or shall consent to the proposed amendment, waiver, consent or other modification, as the case may be, then such Lender shall not thereafter be required to make any such transfer and assignment hereunder. Each Lender hereby grants to the Agent an irrevocable power of attorney (which power is coupled with an interest) to execute and deliver, on behalf of such Lender as assignor, any Assignment and Acceptance necessary to effectuate any assignment of such Lender's interests hereunder in the circumstances contemplated by this paragraph or by paragraph (c) below.

(b)    If (i) any Lender shall request compensation under Section 2.13, (ii) any Lender delivers a notice described in Section 2.14 or (iii) the Borrower is required to pay any additional amount to any Lender or any Governmental Authority on account of any Lender, pursuant to Section 2.19, then such Lender shall use reasonable efforts (which shall not require such Lender to incur an unreimbursed loss or unreimbursed cost or expense or otherwise take any action inconsistent with its internal policies or legal or regulatory restrictions or suffer any disadvantage or burden deemed by it to be significant) (x) to file any certificate or document reasonably requested in writing by the Borrower or (y) to assign its rights and delegate and transfer its obligations hereunder to another of its offices, branches or affiliates, if such filing or assignment would reduce its claims for compensation under Section 2.13 or enable it to withdraw its notice pursuant to Section 2.14 or would reduce amounts payable pursuant to Section 2.19, as the case may be, in the future. The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such filing or assignment, delegation and transfer.

(c)    After the occurrence of a Successful Syndication, each of Silver Point, J. Aron & Company and any Affiliate of Silver Point or J. Aron & Company may, at its sole expense and effort (including with respect to the processing and recordation fee referred to in Section 9.04(b)), upon notice to any Lender, require such Lender to transfer and assign, without recourse (in accordance with and subject to the restrictions contained in Section 9.04),

all of its interests, rights and obligations under this Agreement and the other Loan Documents to an assignee that shall assume such assigned obligations (which assignee may be another Lender, if a Lender accepts such assignment); *provided* that (x) such assignment shall not conflict with any law, rule or regulation or order of any court or other Governmental Authority having jurisdiction, (y) the Borrower or such assignee shall have paid to the affected Lender in immediately available funds an amount equal to the sum of the principal of and interest accrued to the date of such payment on the outstanding Loans of such Lender plus all fees and other amounts accrued for the account of such Lender hereunder with respect thereto (including any amounts under Sections 2.14 and 2.16) and (z) so long as the notice required by this Section 2.20(c) has been given and amounts required by this Section 2.20(c) have been paid, such assignment shall be effective regardless of whether has executed an Assignment and Acceptance.

(d)     After the occurrence of a Successful Syndication, Silver Point, J. Aron & Company and any Affiliate of Silver Point or J. Aron & Company may, at their sole expense and effort (including with respect to the processing and recordation fee referred to in Section 9.04(b)), upon notice to the Agent, require the Agent to retire and appoint Silver Point, J. Aron & Company, any Affiliate of Silver Point or J. Aron & Company or another person acceptable to Silver Point and J. Aron & Company as successor Agent hereunder in accordance with the provisions of Article VIII and otherwise on terms and conditions satisfactory to the successor Agent.

SECTION 2.21     ***Borrowing Base.***

(a)     Initial Borrowing Base. For the period from and including the Effective Date to but excluding the first Redetermination Date, the amount of the Borrowing Base shall be one hundred twenty million dollars ($120,000,000). Notwithstanding the foregoing, the Borrowing Base is subject to further adjustments from time to time pursuant to Section 5.17(c) and Section 6.05(b).

(b)     Scheduled and Interim Redeterminations. The Borrowing Base shall be redetermined semi-annually in accordance with this Section 2.21 (a *"Scheduled Redetermination"*), and, subject to Section 2.21(d), such redetermined Borrowing Base shall become effective and applicable to the Borrower, the Agent and the Lenders on April 1st and October 1st of each year, commencing on April 1, 2008. In addition, (i) the Borrower may, by notifying the Agent thereof, and the Agent may, at the direction of the Required Lenders, by notifying the Borrower thereof, one time during any calendar year, each elect to cause the Borrowing Base to be redetermined between Scheduled Redeterminations in accordance with this Section 2.21 and (ii) the Agent may, by notifying the Borrower thereof, one time during the fiscal quarter ending September 30, 2007, elect to cause the Borrowing Base to be redetermined in accordance with this Section 2.21 (each such redetermination, an *"Interim Redetermination"*).

(c)     Scheduled and Interim Redetermination Procedure.

(i)     Each     Scheduled     Redetermination     and     each     Interim Redetermination shall be effectuated as follows: Upon receipt by the Agent of (A) the Reserve Report and the certificate required to be delivered by the Borrower to the Agent, in the case of a Scheduled Redetermination, pursuant to Section 5.16(a) or (b), and, in the case of an Interim Redetermination, pursuant to Section 5.16(c), and (B) such other reports, data and supplemental information as

may, from time to time, be reasonably requested by the Required Lenders (the Reserve Report, such certificate and such other reports, data and supplemental information being the "**Engineering Reports**"), the Agent shall evaluate the information contained in the Engineering Reports and shall, in good faith, propose a new Borrowing Base (the "**Proposed Borrowing Base**") based upon such information and such other information (including, without limitation, the status of title information with respect to the Oil and Gas Properties as described in the Engineering Reports and the existence of any other Indebtedness) as the Agent deems appropriate in its sole discretion and consistent with its normal oil and gas lending criteria as it exists at the particular time. In no event shall the Proposed Borrowing Base exceed the Aggregate Maximum Credit Amounts.

(ii)     The Administrative Agent shall notify the Borrower and the Lenders of the Proposed Borrowing Base (the "**Proposed Borrowing Base Notice**"):

(1)    in the case of a Scheduled Redetermination (1) if the Agent shall have received the Engineering Reports required to be delivered by the Borrower pursuant to Section 5.16(a) or (b) in a timely and complete manner, then on or before the March 15th and September 15th of such year following the date of delivery of the Engineering Reports or (2) if the Agent shall not have received the Engineering Reports required to be delivered by the Borrower pursuant to Section 5.16(a) or (b) in a timely and complete manner, then promptly after the Agent has received complete Engineering Reports from the Borrower and has had a reasonable opportunity to determine the Proposed Borrowing Base in accordance with Section 2.21(c)(i) and in any event, within fifteen (15) days after the Agent has received the required Engineering Reports; and

(2)    in the case of an Interim Redetermination, promptly, and in any event, within fifteen (15) days after the Agent has received the required Engineering Reports.

(iii)     Any Proposed Borrowing Base must be approved or be deemed to have been approved by the Required Lenders as provided in this Section 2.21(c)(iii). Upon receipt of the Proposed Borrowing Base Notice, each Lender shall have fifteen (15) days to agree with the Proposed Borrowing Base or disagree with the Proposed Borrowing Base by proposing an alternate Borrowing Base. If at the end of such fifteen (15) days, any Lender has not communicated its approval or disapproval in writing to the Agent, such silence shall be deemed to be an approval of the Proposed Borrowing Base. If, at the end of such 15-day period, the Required Lenders have approved or deemed to have approved, as aforesaid, then the Proposed Borrowing Base shall become the new Borrowing Base, effective on the date specified in Section 2.21(d). If, however, at the end of such 15-day period, the Required Lenders have not approved or been deemed to have approved, as aforesaid, of such Proposed Borrowing Base, then the Agent shall poll the Lenders to ascertain the highest Borrowing Base then acceptable to a number of Lenders sufficient to constitute the Required Lenders and such

amount shall become the new Borrowing Base, effective on the date specified in Section 2.21(d).

(iv)    Notwithstanding the foregoing, the Commitment of any Lender that disapproves of a Proposed Borrowing Base that increases the Borrowing Base then in effect shall not be increased in connection with such Proposed Borrowing Base even if such Proposed Borrowing Base becomes the new Borrowing Base pursuant to Section 2.21(c)(iii).

(d)    Effectiveness of a Redetermined Borrowing Base.    After a redetermined Borrowing Base is approved or is deemed to have been approved by the Required Lenders pursuant to Section 2.21(c)(iii), the Agent shall notify the Borrower and the Lenders of the amount of the redetermined Borrowing Base (the "*New Borrowing Base Notice*"), and such amount shall become the new Borrowing Base, effective and applicable to the Borrower, the Agent and the Lenders:

> (i)    in the case of a Scheduled Redetermination, (A) if the Agent shall have received the Engineering Reports required to be delivered by the Borrower pursuant to Section 5.16(a) or (b) in a timely and complete manner, then on the April 1st or October 1st, as applicable, following such notice, or (B) if the Agent shall not have received the Engineering Reports required to be delivered by the Borrower pursuant to Section 5.16(a) or (b) in a timely and complete manner, then on the Business Day next succeeding delivery of such notice; and

> (ii)    in the case of an Interim Redetermination, on the Business Day next succeeding delivery of such notice.

Such amount shall then become the Borrowing Base until the next Scheduled Redetermination Date, the next Interim Redetermination pursuant to this Section 2.21(d) or the next adjustment to the Borrowing Base under Section 5.17(c) or Section 6.05(b), whichever occurs first. Notwithstanding the foregoing, no Scheduled Redetermination or Interim Redetermination shall become effective until the New Borrowing Base Notice related thereto is received by the Borrower. Notwithstanding anything in this Section 2.21 to the contrary, until a Successful Syndication has occurred, the Borrowing Base will not be redetermined except in the sole and absolute discretion of the Agent and Documentation Agent.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES

Each of Holdings and the Borrower represents and warrants as of the Closing Date and each Credit Date to the Agent and each of the Lenders that:

SECTION 3.01    *Organization; Powers.*  Holdings, the Borrower and each of the Subsidiaries (a) is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, (b) has all requisite power and authority to own its property and assets and to carry on its business as now conducted and as proposed to be conducted, (c) is qualified to do business, and is in good standing, in every jurisdiction where such qualification is required, except where the failure so to qualify could not reasonably be expected to result in a Material Adverse Effect and (d) has the power and authority to execute, deliver and perform its

obligations under each of the Loan Documents to which it is a party and each other agreement or instrument contemplated thereby to which it is or will be a party and, in the case of the Borrower, to borrow hereunder.

SECTION 3.02    *Authorization.*    The Transactions (a) have been duly authorized by all requisite corporate and, if required, member action and (b) will not (i) violate (A) any law, statute, rule or regulation, or of the certificate or articles of incorporation or other constitutive documents or by-laws of Holdings, the Borrower or any Subsidiary, (B) any order of any Governmental Authority or (C) any provision of any indenture, agreement or other instrument to which Holdings, the Borrower or any Subsidiary is a party or by which any of them or any of their property is or may be bound, (ii) be in conflict with, result in a breach of or constitute (alone or with notice or lapse of time or both) a default under, or give rise to any right to accelerate or to require the prepayment, repurchase or redemption of any obligation under, any such indenture, agreement or other instrument or (iii) result in the creation or imposition of any Lien upon or with respect to any property or assets now owned or hereafter acquired by Holdings, the Borrower or any Subsidiary (other than any Lien permitted by Section 6.02).

SECTION 3.03    *Enforceability.*    This Agreement has been duly executed and delivered by Holdings and the Borrower and constitutes, and each other Loan Document when executed and delivered by each Loan Party party thereto will constitute, a legal, valid and binding obligation of such Loan Party enforceable against such Loan Party in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

SECTION 3.04    *Approvals.*    No action, consent or approval of, registration or filing with or any other action by any Governmental Authority or any other person is or will be required in connection with the Transactions, except for (a) the filing of Uniform Commercial Code financing statements, (b) recordation of the Mortgages, (c) those listed on Schedule 3.04, and (d) such as have been made or obtained and are in full force and effect.

SECTION 3.05    *Financial Statements; Absence of Undisclosed Liabilities; Reserve Reports.*

(a)    The Borrower has heretofore furnished to the Lenders (a) the Borrower's statements of revenue and direct operating expenses for the period ended December 31, 2006 and (b) the Borrower's pro forma statements of revenue and direct operating expenses for the three-month period ended on June 30, 2007, in all cases giving effect to the Transactions to occur on or prior to the Closing Date as if they had occurred at the beginning of the period presented therein. Such pro forma statements have been prepared in good faith by the Borrower based on assumptions that are believed by Holdings and the Borrower on the Closing Date to be reasonable, are based on the best information available to the Borrower as of the date of delivery thereof, accurately reflect all adjustments required to be made to give effect to the Transactions and present fairly, in all material respects, on a pro forma basis, the estimated consolidated results of operations of the Borrower and its consolidated subsidiaries for such periods.

(b)    Except for (i) unrealized losses in respect of Hedging Agreements set forth on Schedule 1.01(a), (ii) any plugging and abandonment liabilities, after giving effect to

the Transactions to occur on or prior to the Closing Date, (iii) Indebtedness under this Agreement, (iv) Indebtedness under the Second Lien Loan Documents and (v) Guarantees of Indebtedness under the Subordinated Seller Note, none of Holdings, the Borrower or the Subsidiaries will have, as of the Closing Date, any material contingent liabilities, other undisclosed liabilities, unusual long-term commitments or unrealized losses.

(c)    The Borrower has heretofore furnished to the Lenders a reserve report prepared by DeGolyer & MacNaughton setting forth as of December 31, 2006, proved developed producing reserves and proved reserves of not less than $152 million and $436 million, respectively, together with a projection of the rate of production and future revenues less severance and ad valorem taxes, operating expenses and capital expenditures with respect thereto as of such date.

SECTION 3.06       *No Material Adverse Change.*  Since December 31, 2006, no event, change or condition has occurred that has had, or could reasonably be expected to have, a Material Adverse Effect.

SECTION 3.07       *Title to Properties; Possession Under Leases.*

(a)    Each of the Borrower and the Subsidiaries has good and marketable title to, or valid leasehold interests, rights of way or easement interests (where indicated) in, all of the properties and assets set forth on Schedules A-1 and A-5 (as amended) to the Membership Interest Purchase Agreement and Exhibit A-1 (as amended) to the Asset Sales Agreement, and all its other material properties and assets (including all Mortgaged Property), free and clear of any Lien, except for (i) minor defects in title that do not interfere with its ability to conduct its business as currently conducted or to utilize such properties and assets for their intended purposes, (ii) Liens in favor of the Collateral Agent, (iii) Liens permitted under Section 6.02 and (iv) as follows:

(i)     no representation respecting good or marketable title can be made in connection with ADL-47567 and ADL-47562;

(ii)    only exploration rights, not any rights to produce or market oil or gas, have been granted under any exploration license; only if and when one or more oil and gas leases have been issued will Borrower have any rights to produce oil and gas.

(b)    Each of the Borrower and the Subsidiaries has complied in all material respects with all obligations under all material leases to which it is a party and all such leases are in full force and effect. Each of the Borrower and the Subsidiaries enjoys peaceful and undisturbed possession under all such material leases.

(c)    As of the Effective Date, neither Holdings nor the Borrower has received any notice or has any knowledge of any pending or contemplated condemnation proceeding affecting the Leases or the Mortgaged Properties or any sale or disposition thereof in lieu of condemnation.

SECTION 3.08       *Subsidiaries.*  Schedule 3.08 sets forth as of the Effective Date a list of all Subsidiaries and the percentage ownership interest of Holdings, the Borrower and any Subsidiary therein. The shares of capital stock or other Equity Interests so indicated on

Schedule 3.08 are fully paid and, except as indicated on Schedule 3.08, are owned by Holdings or the Borrower, directly or indirectly, free and clear of all Liens (other than Liens created under the Loan Documents or the Second Lien Loan Documents). None of Holdings, the Borrower or any of their Subsidiaries own any Foreign Subsidiary or conduct any international operations.

SECTION 3.09    *Litigation; Compliance with Laws.*

(a)    Except as set forth on Schedule 3.09, there are no actions, suits or proceedings at law or in equity or by or before any Governmental Authority now pending or, to the knowledge of Holdings or the Borrower, threatened against or affecting Holdings or the Borrower or any Subsidiary or any business, property or rights of any such person (i) that involve any Loan Document or the Transactions or (ii) as to which there is a reasonable possibility of an adverse determination and that, if adversely determined, could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

(b)    Since December 31, 2006, there has been no change in the status of the matters disclosed on Schedule 3.09 that, individually or in the aggregate, has resulted in, or materially increased the likelihood of, a Material Adverse Effect.

(c)    None of Holdings, the Borrower or any of the Subsidiaries or any of their material properties or assets is in violation of, nor will the continued operation of their material properties and assets as currently conducted violate, any law, rule or regulation (including any zoning, building, Environmental Law, ordinance, code or approval or any building permits) or any restrictions of record or agreements affecting any Lease or Mortgaged Property, or is in default with respect to any judgment, writ, injunction, decree or order of any Governmental Authority, where such violation or default could reasonably be expected to result in a Material Adverse Effect.

SECTION 3.10    *Agreements.*

(a)    None of Holdings, the Borrower or any of the Subsidiaries is a party to any agreement or instrument or subject to any corporate or other restriction that has resulted or could reasonably be expected to result in a Material Adverse Effect.

(b)    None of the Borrower or any of the Subsidiaries is in default in any manner under any provision of any indenture or other agreement or instrument evidencing Indebtedness, or any other material agreement or instrument to which it is a party or by which it or any of its properties or assets are or may be bound, where such default could reasonably be expected to result in a Material Adverse Effect. None of the Borrower or any of the Subsidiaries is in material default under any Lease.

SECTION 3.11    *Federal Reserve Regulations.*

(a)    None of Holdings, the Borrower or any of the Subsidiaries is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of buying or carrying Margin Stock.

(b)    No part of the proceeds of any Loan will be used, whether directly or indirectly, and whether immediately, incidentally or ultimately, to purchase or carry Margin Stock, or to refinance Indebtedness originally incurred for such purpose, or for any purpose that

entails a violation of, or that is inconsistent with, the provisions of the Regulations of the Board, including Regulation T, U or X.

SECTION 3.12 ***Investment Company Act.*** None of Holdings, the Borrower or any Subsidiary is an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940.

SECTION 3.13 ***Use of Proceeds.*** The Borrower will use the proceeds of the Loans only for the purposes specified in the recitals to this Agreement and for general corporate purposes of the Borrower and the Subsidiaries, including a payment of fees in connection with the Transaction to Energy Capital Solutions, LP after the Closing Date in an amount not to exceed $3,315,272.

SECTION 3.14 ***Tax Returns.*** Each of Holdings and its subsidiaries has filed or caused to be filed all Federal, state, local and foreign tax returns or materials required to have been filed by it and has paid or caused to be paid all taxes due and payable by it and all assessments received by it, except taxes that are being contested in good faith by appropriate proceedings and for which Holdings, the Borrower or such Subsidiary, as applicable, shall have set aside on its books adequate reserves.

SECTION 3.15 ***No Material Misstatements.*** None of the information, reports, financial statements, exhibits or schedules furnished by or on behalf of Holdings or the Borrower to the Agent or any Lender in connection with the negotiation of any Loan Document or included therein or delivered pursuant thereto contains any untrue statement of a material fact or omits to state a material fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which they were made; *provided* that to the extent any such information, report, financial statement, exhibit or schedule was based upon or constitutes a forecast or projection, each of Holdings and the Borrower represents only that it was prepared in good faith based upon (i) assumptions that were reasonable at the time made and at the time such information, report, financial statement, exhibit or schedule was furnished to the Agent or such Lender and (ii) accounting principles consistent with the accounting principles used to prepare Holdings' historical audited financial statements (it being understood that projections concerning volumes attributable to the Oil and Gas Properties and production and cost estimates thereof are necessarily based upon professional opinions, estimates and projections). There is no fact known to any Loan Party (other than industry-wide risks normally associated with the types of businesses conducted by the Loan Parties) that has not been disclosed to each Lender in writing which is materially likely to cause a Material Adverse Effect. There are no statements or conclusions in any Reserve Report which are based upon or include misleading information or fail to take into account material information regarding the matters reported therein, it being understood that each Reserve Report is necessarily based upon professional opinions, estimates and projections and that no Loan Party warrants that such opinions, estimates and projections will ultimately prove to have been accurate. The Borrower has heretofore delivered to each Lender true, correct and complete copies of the initial Reserve Report.

SECTION 3.16 ***Employee Benefit Plans.*** Each Plan or Multiemployer Plan is in compliance in all material respects with the applicable provisions of ERISA and the Code and the regulations and published interpretations thereunder. No ERISA Event has occurred or is reasonably expected to occur that, when taken together with all other such ERISA

Events, could reasonably be expected to result in material liability of the Borrower or any of its ERISA Affiliates. The present value of all benefit liabilities under all Plans (based on the assumptions used for purposes of Statement of Financial Accounting Standards No. 87) did not, as of the last annual valuation date applicable thereto, exceed the fair market value of the assets of all Plans (based on the assumptions used for purposes of Statement of Financial Accounting Standards No. 87) by an amount which, if it constituted a direct liability of the Borrower, could reasonably be expected to result in a Material Adverse Effect.

SECTION 3.17     *Environmental Matters.*

(a)     Except as set forth in Schedule 3.17 and except with respect to any other matters that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, none of Holdings, the Borrower or any of the Subsidiaries (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (ii) has become subject to any Environmental Liability, (iii) has received notice of any claim with respect to any Environmental Liability or (iv) knows of any basis for any Environmental Liability.

(b)     Since December 31, 2006 (or, with respect to matters disclosed on Schedule 3.17 that occurred after December 31, 2006, since the date of the occurrence of such matters), there has been no change in the status of the matters disclosed on Schedule 3.17 that, individually or in the aggregate, has resulted in, or materially increased the likelihood of, a Material Adverse Effect.

SECTION 3.18     *Insurance.*     The Borrower has, and has caused all of the Subsidiaries to have, (a) all insurance policies sufficient for the compliance by each of them with all material Governmental Requirements and all material agreements and (b) insurance coverage in at least amounts and against such risk (including, without limitation, public liability) that are commercially reasonable and usually insured against by companies similarly situated and engaged in the same or a similar business for the assets and operations of the Borrower and the Subsidiaries. The Collateral Agent and the Lenders have been named as additional insureds in respect of such liability insurance policies and the Collateral Agent has been named as loss payee with respect to Property loss insurance.

SECTION 3.19     *Security Documents.*

(a)     The Collateral Agreement, upon execution and delivery thereof by the parties thereto, will create in favor of the Agent, for the ratable benefit of the Secured Parties, a legal, valid and enforceable security interest in the Collateral (as defined in the Collateral Agreement) and the proceeds thereof and (i) when control of the Pledged Collateral (as defined in the Collateral Agreement) is obtained by the Agent, the Lien created under Collateral Agreement shall constitute a perfected Lien on, and security interest in, all right, title and interest of the Loan Parties in such Pledged Collateral and (ii) when financing statements in appropriate form are filed in the offices specified on Schedule 3.19(a), the Lien created under the Collateral Agreement will constitute a perfected Lien on, and security interest in, all right, title and interest of the Loan Parties in such Collateral (other than Intellectual Property, as defined in the Collateral Agreement) to the extent perfection can be obtained by filing Uniform Commercial Code financing statements, in each case prior and superior in right to any other person (other than Liens expressly permitted by Section 6.02).

(b)    Upon the recordation of the Collateral Agreement (or a short-form security agreement in form and substance reasonably satisfactory to the Borrower and the Agent) with the United States Patent and Trademark Office and the United States Copyright Office, together with the financing statements in appropriate form filed in the offices specified on Schedule 3.19(b), the Lien created under the Collateral Agreement shall constitute a perfected Lien on, and security interest in, all right, title and interest of the Loan Parties in the Intellectual Property (as defined in the Collateral Agreement) in which a security interest may be perfected by filing in the United States and its territories and possessions, in each case prior and superior in right to any other person (other than Liens expressly permitted by Section 6.02), it being understood that subsequent recordings in the United States Patent and Trademark Office and the United States Copyright Office may be necessary to perfect a Lien on registered trademarks and patents, trademark and patent applications and registered copyrights acquired by the Loan Parties after the Closing Date.

(c)    The Mortgages are effective to create in favor of the Agent, for the ratable benefit of the Secured Parties, a legal, valid and enforceable Lien on all of the Loan Parties' right, title and interest in and to the Mortgaged Properties and the proceeds thereof, and when the Mortgages are filed in the offices specified on Schedule 3.19(c) the Mortgages shall constitute perfected Liens on, and security interests in, all right, title and interest of the Loan Parties in such Mortgaged Properties and the proceeds thereof, in each case prior and superior in right to any other person (other than Liens expressly permitted by Section 6.02).

(d)    When Account Control Agreements in respect of the deposit accounts specified on Schedule 5 to the Perfection Certificate and the securities accounts specified on Schedule 6 to the Perfection Certificate are executed and delivered by the applicable Loan Parties, the applicable depositary banks or securities intermediaries and the Agent, the Account Control Agreements will constitute fully perfected Liens on, and security interests in, all right, title and interest of the Loan Parties in all deposit accounts and securities accounts owned by any Loan Party, in each case prior and superior in right to any other person.

SECTION 3.20    *Location of Real Property and Leased Premises*.

(a)    Schedule 3.20(a) lists completely and correctly as of the Effective Date all Real Properties owned by the Borrower and the Subsidiaries. As of the Effective Date, the Borrower and the Subsidiaries own in fee all the Real Properties set forth on Schedule 3.20(a).

(b)    Schedule 3.20(b) lists completely and correctly all Real Properties leased by the Borrower and the Subsidiaries as of the Effective Date and the MMS Leases. As of the Effective Date, the Borrower and the Subsidiaries have valid leases in all the Real Properties set forth on Schedule 3.20(b).

SECTION 3.21    *Labor Matters*.

(a)    As of the Effective Date, there are no strikes, lockouts or slowdowns against Holdings, the Borrower or any Subsidiary pending or, to the knowledge of Holdings or the Borrower, threatened. The hours worked by and payments made to employees of Holdings and its subsidiaries have not been in violation of the Fair Labor Standards Act or any other applicable Federal, state, local or foreign law dealing with such matters. All payments due from

Holdings, the Borrower or any Subsidiary, or for which any claim may be made against Holdings, the Borrower or any Subsidiary, on account of wages and employee health and welfare insurance and other benefits, have been paid or accrued as a liability on the books of Holdings, the Borrower or such Subsidiary. The consummation of the Transactions will not give rise to any right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which Holdings, the Borrower or any Subsidiary is bound.

SECTION 3.22     *Solvency*.

(a)     Immediately after the consummation of the Transactions to occur on or prior to the Closing Date and immediately following the incurrence of any Credit Extension and after giving effect to the application of the proceeds of such Credit Extension, (a) the fair value of the assets of each Loan Party, at a fair valuation, will exceed its debts and liabilities, subordinated, contingent or otherwise, (b) the present fair saleable value of the property of each Loan Party will be greater than the amount that will be required to pay the probable liability of its debts and other liabilities, subordinated, contingent or otherwise, as such debts and other liabilities become absolute and matured, (c) each Loan Party will be able to pay its debts and liabilities, subordinated, contingent or otherwise, as such debts and liabilities become absolute and matured and (d) each Loan Party will not have unreasonably small capital with which to conduct the business in which it is engaged as such business is now conducted and is proposed to be conducted following the Closing Date.

SECTION 3.23     *Sanctioned Persons*. None of Holdings, the Borrower or any Subsidiary or, to the knowledge of the Borrower, any director, officer, agent, employee or Affiliate of Holdings, the Borrower or any Subsidiary is currently subject to any U.S. sanctions administered by the Office of Foreign Assets Control of the U.S. Treasury Department (*"OFAC"*); and the Borrower will not directly or indirectly use the proceeds of the Loans or otherwise make available such proceeds to any person for the purpose of financing the activities of any person currently subject to any U.S. sanctions administered by OFAC.

SECTION 3.24     *Material Contracts*. Schedule 3.24 contains a true, correct and complete list of all the Material Contracts in effect on the Effective Date. All such Material Contracts are in full force and effect and no defaults exist thereunder (other than as described in Schedule 3.24).

SECTION 3.25     *Related Agreements*.

(a)     Delivery. Holdings, the Borrower and each of the Subsidiaries have delivered to the Agent complete and correct copies of (i) each Related Agreement and of all exhibits and schedules thereto in effect on the date hereof, and (ii) copies of any material amendment, restatement, supplement or other modification to or waiver of each Related Agreement entered into after the date hereof.

(b)     Representations and Warranties. Except to the extent otherwise expressly set forth herein or in the schedules hereto, and subject to the qualifications set forth therein, each of the representations and warranties given by any Loan Party in each Related Agreement is true and correct in all material respects as of the Effective Date (or as of any earlier date to which such representation and warranty specifically relates). Notwithstanding anything in the Related Agreement to the contrary, the representations and warranties of each Loan Party

set forth in this Section 3.25 shall, solely for purposes hereof, survive the Closing Date and the Effective Date for the benefit of Lenders.

(c)     Governmental Approvals.   Except as set forth on Schedule 3.25(c), all Governmental Authorizations and all other authorizations, approvals and consents of any other Person required by the Related Agreements or to consummate the Transactions have been obtained and are in full force and effect.

(d)     Conditions Precedent.     On the Effective Date, (i) all of the conditions to effecting or consummating the Transactions set forth in the Related Agreements have been duly satisfied or, with the consent of the Agent, waived, and (ii) the Transactions have been consummated in accordance with the Related Agreements and all applicable laws.

SECTION 3.26     *Employment Agreements*.   Schedule 3.26 sets forth a true, correct and complete list of all employment contracts or agreements, agency, independent contractor and sales representative agreements, golden parachute agreements, change of control agreements and employee-related non-competition and non-solicitation agreements, in each case to which any Loan Party is a party. The Loan Parties have previously delivered true, correct and complete copies of all such agreements, including all amendments thereto. Each such agreement is in writing, is a valid and binding agreement enforceable against the respective parties thereto in accordance with its terms, and no Loan Party nor any other Person that is a party to any such agreement is in breach of, or in default with respect to, any of its obligations thereunder, nor is any Loan Party aware of any facts or circumstances which might give rise to any breach or default thereunder which could reasonably be expected to have a Material Adverse Effect.

SECTION 3.27     *Intellectual Property*.   Holdings, the Borrower and its Subsidiaries owns, or is licensed to use, all trademarks, tradenames, copyrights, patents and other intellectual property necessary to its business as currently conducted, a correct and complete list of which, as of the date of this Agreement, is set forth on Schedule 3.27, and the use thereof by the Loan Parties and its Subsidiaries does not infringe in any material respect upon the rights of any other Person, and the Loan Parties rights thereto are not subject to any licensing agreement or similar arrangement. Each Loan Party has taken reasonable measures to protect the secrecy, confidentiality and value of all trade secrets used in its business (collectively, the *"Business Trade Secrets"*). To the best knowledge of each Loan Party, none of the Business Trade Secrets have been disclosed to any Person other than employees or contractors of the Loan Parties who had a need to know and use such Business Trade Secrets in the ordinary course of employment or contract performance and who executed appropriate confidentiality agreements prohibiting the unauthorized use or disclosure of such Business Trade Secrets and containing other terms reasonably necessary or appropriate for the protection and maintenance of such Business Trade Secrets. To the best knowledge of each Loan Party, no unauthorized disclosure of any Business Trade Secrets has been made.

SECTION 3.28     *Gas Imbalances; Prepayments*.   Except as set forth in Schedule 3.28, on a net basis there are no gas imbalances, take-or-pay arrangements or other prepayments (including deferred production agreements or volumetric production payments) with respect to the Oil and Gas Properties or production therefrom that would require the Borrower or any Subsidiary to deliver Hydrocarbons either generally or produced from the Oil and Gas Properties at some future time without then or thereafter receiving full payment therefor.

SECTION 3.29 **_Marketing Arrangement._** Except as set forth in Schedule 3.29, no Oil and Gas Property is subject to any contractual or other arrangement (i) whereby payment for production is or can be deferred for a substantial period after the month in which such production is delivered (in the case of oil, not in excess of 60 days, and in the case of gas, not in excess of 90 days) or (ii) whereby payments are made to a Loan Party other than by checks, drafts, wire transfer advises or other similar writings, instruments or communications for the immediate payment of money. Except for production sales contracts, processing agreements, transportation agreements and other agreements relating to the marketing of production that are listed in Schedule 3.29 in connection with the Oil and Gas Properties to which such contract or agreement relates: (i) no Oil and Gas Property is subject to any contractual or other arrangement for the sale, processing or transportation of production (or otherwise related to the marketing of production) which cannot be canceled on 120 days' (or less) notice and (ii) all contractual or other arrangements for the sale, processing or transportation of production (or otherwise related to the marketing of production) are bona fide arm's length transactions made on the best terms reasonably available with third parties not affiliated with Loan Parties. Each Loan Party is presently receiving a price for all production from (or attributable to) each Oil and Gas Property covered by a production sales contract or marketing contract listed in Schedule 3.29 that is computed in accordance with the terms of such contract, and no Loan Party is having deliveries of production from such Oil and Gas Property curtailed by any purchaser or transporter of production substantially below such property's delivery capacity, except for curtailments caused (a) by an act or event of force majeure not reasonably within the control of and not caused by the fault or negligence of a Loan Party and which by the exercise of reasonable diligence such Loan Party is unable to prevent or overcome, and (b) by routine maintenance requirements in the ordinary course of business.

SECTION 3.30 **_Right to Receive Payments for Future Production._** Except as set forth in Schedule 3.30, no Loan Party, nor any Loan Party's predecessors in title, has received prepayments (including payments for gas not taken pursuant to "take or pay" or other similar arrangements) for any oil, gas or other hydrocarbons produced or to be produced from any Oil and Gas Properties after the date hereof. Except as set forth in Schedule 3.30, no Oil and Gas Property is subject to any "take or pay", gas imbalances or other similar arrangement (i) which can be satisfied in whole or in part by the production or transportation of gas from other properties or (ii) as a result of which production from any Oil and Gas Property may be required to be delivered to one or more third parties without payment (or without full payment) therefor as a result of payments made, or other actions taken, with respect to other properties. No Oil and Gas Property is subject to any regulatory refund obligation and, to the best of Loan Party's knowledge, no facts exist which might cause the same to be imposed.

SECTION 3.31 **_Operation of Oil and Gas Properties._** The Oil and Gas Properties (and all properties unitized therewith) are being (and, to the extent the same could adversely affect the ownership or operation of the Oil and Gas Properties after the date hereof, have in the past been) maintained, operated and developed in a good and workmanlike manner, in accordance with prudent industry standards and in conformity with all applicable Laws and in conformity with all oil, gas or other mineral leases and other contracts and agreements forming a part of the Oil and Gas Property and in conformity with the Liens permitted by Section 6.02. No Oil and Gas Property is subject to having allowable production after the date hereof reduced below the full and regular allowable (including the maximum permissible tolerance) because of any overproduction (whether or not the same was permissible at the time) prior to the date hereof and (ii) none of the wells located on the Oil and Gas Properties (or properties unitized therewith)

are or will be deviated from the vertical more than the maximum permitted by applicable laws, regulations, rules and orders, and such wells are bottomed under and producing from, with the well bores wholly within, the Oil and Gas Properties (or, in the case of wells located on properties unitized therewith, such unitized properties). Each Loan Party has all governmental licenses and permits necessary or appropriate to own and operate its Oil and Gas Property, and no Loan Party has received notice of any violations in respect of any such licenses or permits.

SECTION 3.32 *Ad Valorem and Severance Taxes, Litigation.* Each Loan Party has paid and discharged all ad valorem taxes assessed against its Oil and Gas Property or any part thereof and all production, severance and other taxes assessed against, or measured by, the production or the value, or proceeds, of the production therefrom. Except as set forth on Schedule 3.09, there are no suits, actions, claims, investigations, inquiries, proceedings or demands pending (or, to any Loan Party's knowledge, threatened) which might affect the Oil and Gas Property, including any which challenge or otherwise pertain to any Loan Party's title to any Oil and Gas Property or rights to produce and sell oil and gas therefrom , which could reasonably be expected to result in (i) liability of any Loan Party in an amount in excess of $2,500,000 or (ii) in injunctive relief against any Loan Party which could reasonably be expected to result in a Material Adverse Effect.

SECTION 3.33 *Insider Interests.* Except as disclosed on Schedule 3.33, no shareholder, director, officer, employee, or Affiliate of Holdings, the Borrower or any Subsidiary or any associate of any such shareholder, director, officer, employee, or Affiliate is presently, directly or indirectly, a party to any transaction with Holdings the Borrower or any Subsidiary, including any agreement, arrangement, or understanding, written or oral, providing for the employment of, furnishing of services by, rental of real or personal property from, or otherwise requiring payments to any such shareholder, director, officer, employee, or associate. For purposes of this Section only, an "associate" of any shareholder, director, officer, or employee means any member of the immediate family of such shareholder, director, officer, or employee or any corporation, partnership, trust, or other entity in which such shareholder, director, officer, or employee has a substantial ownership or beneficial interest (other than an interest in a public corporation which does not exceed three percent of its outstanding securities) or is a director, officer, partner, or trustee or person holding a similar position.

## ARTICLE IV

## CONDITIONS OF LENDING

SECTION 4.01 *Closing Date.* The obligations of the Lenders to make the Loans on the Effective Date are subject to the satisfaction of the following conditions:

(a) The Agent shall have received from (i) each party hereto (A) a counterpart of this Agreement signed on behalf of such party or (B) written evidence reasonably satisfactory to the Agent (which may include a facsimile or other electronic imaging transmission of a signed signature page of this Agreement) that such party has signed a counterpart of this Agreement, (ii) each party to the Intercreditor Agreement (A) a counterpart of the Intercreditor Agreement signed on behalf of such party or (B) written evidence reasonably satisfactory to the Agent (which may include a facsimile or other electronic imaging transmission of a signed signature page of the Intercreditor Agreement) that such party has

signed a counterpart of the Intercreditor Agreement and (iii) each party to each other Loan Document (A) a counterpart of such Loan Document signed on behalf of such party or (B) written evidence reasonably satisfactory to the Agent (which may include a facsimile or other electronic imaging transmission of a signed signature page of such Loan Document) that such party has signed a counterpart of such Loan Document.

(b) The representations and warranties set forth in Article III and in each other Loan Document shall be true and correct in all material respects on and as of the date of the Effective Date with the same effect as though made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date.

(c) At the time of and immediately after the making of the Loans, no Default or Event of Default shall have occurred and be continuing.

(d) The Agent shall have received written opinions of Rutan and Tucker, LLP, Patton Boggs LLP, Schully, Roberts, Slattery and Marino and Guess and Rudd, special counsel for Holdings and the Borrower, substantially to the effect set forth in Exhibit F, in each case (A) dated the Effective Date and (B) addressed to the Agent, the Documentation Agent, and the Lenders.

(e) All legal matters incidental to this Agreement, the Borrowings and extensions of credit hereunder and the other Loan Documents shall be reasonably satisfactory to the Lenders, the Agent, and the Documentation Agent.

(f) The Agent shall have received such documents and certificates as the Agent or its counsel may reasonably request relating to the organization, existence and good standing of each Loan Party, the authorization of the Transactions and any other legal matters relating to the Loan Parties, the Loan Documents or the Transactions, all in form and substance reasonably satisfactory to the Agent and the Documentation Agent and their respective counsel.

(g) The Agent shall have received a certificate, dated the Effective Date and signed by a Financial Officer of the Borrower, confirming compliance with the conditions precedent set forth in paragraphs (b), (c), (i), (n), (o), (p) and (x) of this Article.

(h) The Agent shall have received all fees and other amounts due and payable on or prior to the Effective Date, including, to the extent invoiced, reimbursement or payment of all out-of-pocket expenses required to be reimbursed or paid by the Borrower hereunder or under any other Loan Document.

(i) The Collateral and Guarantee Requirement shall have been satisfied (except for (i) the requirement that Account Control Agreements shall have been delivered, which requirement shall be satisfied in accordance with the requirements of the Collateral Agreement and Section 5.22 and (ii) with respect to consents and approvals set forth on Schedules 3.04 and 3.25, the requirement set forth in clause (i) of the definition of the Collateral and Guarantee Requirement) and the Agent shall have received a completed Perfection Certificate dated the Effective Date and signed by an executive officer or Financial Officer of the Borrower, together with all attachments contemplated thereby, including the results of searches of (A) Uniform Commercial Code financing statements on file with the Secretary of State of the State of Delaware and (B) real estate filings and Uniform Commercial Code financing statements on file with the various recording districts of the State of Alaska in which the Mortgaged

Properties are situated, copies of such financing statements and real estate filings disclosed by such searches and evidence reasonably satisfactory to the Agent and the Documentation Agent that the Liens indicated by such financing statements and real estate filings are permitted by Section 6.02 or have been or will be simultaneously released or terminated.

(j)     The Agent shall have received evidence that the Borrower and each applicable Subsidiary is qualified to own oil, gas and mineral leases and/or rights-of-way on Federal public lands and State lands in the State of Alaska, in accordance with all applicable laws, rules, regulations and orders of the Federal Bureau of Land Management and all applicable Governmental Authorities of the State of Alaska (including the Division of Oil and Gas with the State of Alaska Department of Natural Resources).

(k)     Except as set forth on Schedule 5.22, the Agent shall have received a copy of, or a certificate as to coverage under, the insurance policies required by Section 5.02, each of which shall be endorsed or otherwise amended to include a customary lender's loss payable endorsement and to name the Agent as additional insured, in form and substance reasonably satisfactory to the Agent and the Documentation Agent.

(l)     The Transition Services Agreement shall be in full force and effect in the form certified by a Responsible Officer.

(m)     The parties to the 2006 PERL Credit Agreement (and the documents and agreements executed in connection therewith), shall have entered into amendments in form and substance satisfactory to the Agent and the Lenders, which amendments shall, inter alia, permit the Transactions, including the transactions contemplated hereby and by the other Loan Documents.

(n)     The Agent shall have received a final version of the Environmental and Safety Audit dated as of July 17, 2007, prepared by Arctic Regulatory Compliance and Technical Oilfield Services, LLC and in form and substance satisfactory to the Agent and the Documentation Agent.

(o)     Except as set forth on Schedule 5.22, the Agent and the Documentation Agent shall each be satisfied, in its discretion, with the commodity and financial hedging arrangements to which the Borrower is a party and which will be effective from and after the Closing Date, such hedging arrangements to be at least as favorable to the Borrower as the hedging arrangements described on Schedule 4.28 to the Membership Interest Purchase Agreement and the Borrower, the Agent and J. Aron & Company shall have entered into a consent and agreement in form and substance acceptable to the Agent.

(p)     Immediately after giving effect to the Transactions to occur on or prior to the Closing Date, Holdings and its subsidiaries shall have outstanding no Indebtedness or preferred Equity Interests other than (a) Indebtedness outstanding under this Agreement, (b) Indebtedness outstanding under the Second Lien Credit Agreement, (c) Guarantees of Indebtedness outstanding under the 2006 PERL Credit Agreement, (d) Guarantees of Indebtedness under the Subordinated Seller Note, (e) Indebtedness set forth on Schedule 6.01 and (f) Hedging Agreements set forth on Schedule 1.01.

(q)     The Lenders shall have received the financial statements referred to in Section 3.05, none of which shall demonstrate a material adverse change in the financial

551425.10E- Server 1a - MSW                                    54

condition of Holdings and the Borrower from (and shall not otherwise be materially inconsistent with) the financial statements or forecasts previously provided to the Lenders.

(r)     The Lenders shall have received the Reserve Report referred to in Section 3.05, and such Reserve Report shall not be materially inconsistent with the versions thereof previously provided to the Lenders.

(s)     The Agent, the Documentation Agent, and the Lenders shall have received results of customary individual background checks, the results of which are satisfactory to the Agent, the Documentation Agent, and the Lenders.

(t)     The Agent shall have received a financial accounting review performed by FTI Consulting, Inc., the results of which shall be satisfactory to the Agent, the Documentation Agent, and the Lenders.

(u)     The Agent shall have received a solvency certificate from a Financial Officer of Holdings, substantially in the form set forth on Exhibit H, confirming the solvency of Holdings and its subsidiaries on a consolidated basis after giving the Transactions to occur on the Closing Date.

(v)     The Acquisition shall have been consummated in accordance with applicable law and the terms of the Acquisition Documents, without waiver or amendment (except as are not adverse to the Agent, the Documentation Agent or the Lenders) thereof unless consented to by the Agent and the Documentation Agent.

(w)     All material requisite Governmental Authorities and third parties shall have approved or consented to the Transactions and the other transactions contemplated hereby to the extent required (other than consents and approvals listed on Schedule 3.25(c)), all applicable appeal periods shall have expired and there shall not exist any pending or threatened action, suit, investigation, litigation or proceeding, governmental, administrative or judicial action or other legal or regulatory developments that could reasonably be expected to restrain, prevent or impose burdensome conditions on the Transactions or the other transactions contemplated hereby.

(x)     There shall not have been, since December 31, 2006, any material adverse change in, or affecting the general affairs, management, financial position, assets, properties, liabilities, stockholders equity or results of operations of Pacific Energy   or the Borrower or their respective Subsidiaries.

(y)     The Lenders shall have received, to the extent requested, all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act.

(a)     After giving effect to all Borrowings to be made on the Effective Date and payment of all fees and expenses due hereunder, and with all of the Loan Parties' indebtedness, liabilities, and obligations current, the Borrower shall have unused Borrowing Base availability hereunder of not less than $12,000,000.

(b)    The conditions precedent to the effectiveness of the Second Lien Credit Agreement shall have been satisfied.

The making of the Loans shall be deemed to constitute a representation and warranty by Holdings and the Borrower on the date of their making as to the matters specified in this Section 4.01.

SECTION 4.02    ***Conditions to Each Credit Extension.***  The obligations of the Lenders to make the Loans on the Effective Date are subject to the satisfaction of the following conditions:

(a)    Conditions Precedent.  The obligation of each Lender to make any Loan, to convert any Loan to, or continue any Loan as, a Eurodollar Loan on any Credit Date, including the Closing Date, are subject to the satisfaction, or waiver in accordance with Section 9.09, of the following conditions precedent:

(i)    Agent shall have received a Borrowing Request in accordance with Section 2.04;

(ii)    after making the Credit Extensions requested on such Credit Date, the total Revolving Credit Exposures shall not exceed the total Commitments (i.e., the lesser of the Aggregate Maximum Credit Amounts and the then effective Borrowing Base);

(iii)    as of such Credit Date, the representations and warranties contained herein and in the other Credit Documents shall be true and correct on and as of that Credit Date to the same extent as though made on and as of that date (or to the extent such representations and warranties specifically relate to an earlier date) on and as of such earlier date;

(iv)    as of such Credit Date, no event shall have occurred and be continuing or would result from the consummation of the applicable Credit Extension that would constitute an Event of Default or a Default;

(v)    if the making of any Loan is requested on such Credit Date and such Credit Date is not the Closing Date, the Agent and the Documentation Agent shall have approved the making of such Loan in their sole discretion; *provided* that such approval shall not be required after the occurrence of a Successful Syndication.

(b)    Additional Information.  The Agent or Required Lenders shall be entitled, but not obligated to, request and receive, prior to the making of any Credit Extension, additional information reasonably satisfactory to the requesting party confirming the satisfaction of any of the foregoing if, in the good faith judgment of such Agent or Required Lender such request is warranted under the circumstances.

(c)    Deemed Representations.  Each request for a Credit Extension shall be deemed to constitute a representation and warranty by the Borrower on the date thereof as to the matters specified in Section 4.02(a).

551425.10E-Server 1a-MSW                    56

## ARTICLE V

## AFFIRMATIVE COVENANTS

Each of Holdings and the Borrower covenants and agrees with each Lender that so long as this Agreement shall remain in effect and until the Commitments have been terminated and the principal of and interest on each Loan, all fees and all other expenses or amounts payable under any Loan Document shall have been paid in full, unless the Required Lenders shall otherwise consent in writing, each of Holdings and the Borrower will, and will cause each of the Subsidiaries to:

SECTION 5.01 *Existence; Compliance with Laws; Businesses and Properties* (a) Do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence, except as otherwise expressly permitted under Section 6.05.

(b) Do or cause to be done all things necessary to obtain, preserve, renew, extend and keep in full force and effect its rights, licenses, permits, franchises, authorizations, patents, copyrights, trademarks and trade names, except for failures to do so that, in the aggregate, could not reasonably be expected to result in a Material Adverse Effect; maintain and operate such business in substantially the manner in which it is presently conducted and operated; comply in all material respects with all applicable laws, rules, regulations and decrees and orders of any Governmental Authority (including the qualification and bonding requirements of MMS and the State of Alaska), whether now in effect or hereafter enacted; and at all times maintain and preserve all its property and keep such property in good repair, working order and condition and from time to time make, or cause to be made, all needful and proper repairs, renewals, additions, improvements and replacements thereto necessary in order that the business carried on in connection therewith may be properly conducted at all times, except for failures to do so that, in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

SECTION 5.02 *Insurance.* The Borrower will, and will cause each Subsidiary to, maintain, with financially sound and reputable insurance companies, insurance in such amounts and against such risks as are customarily maintained by companies engaged in the same or similar businesses operating in the same or similar locations. The loss payable clauses or provisions in said insurance policy or policies insuring any of the collateral for the Loans shall be endorsed in favor of and made payable to the Collateral Agent as its interests may appear and such liability policies shall name the Collateral Agent and the Lenders as "additional insureds" and provide that the insurer will give at least 30 days prior notice of any cancellation to the Collateral Agent.

SECTION 5.03 *Obligations and Taxes.* Pay its obligations (other than Indebtedness) promptly and in accordance with their terms, and pay and discharge promptly when due all taxes, assessments and governmental charges or levies imposed upon it or upon its income or profits or in respect of its property, before the same shall become delinquent or in default, as well as all lawful claims for labor, materials and supplies or otherwise that, if unpaid, might give rise to a Lien upon such properties or any part thereof; *provided, however*, that such payment and discharge shall not be required with respect to any such tax, assessment, charge, levy or claim so long as the validity or amount thereof shall be contested in good faith by

appropriate proceedings and Holdings, the Borrower or the applicable Subsidiary shall have set aside on its books adequate reserves with respect thereto in accordance with GAAP and such contest operates to suspend collection of the contested obligation, tax, assessment or charge and enforcement of a Lien and, in the case of a Mortgaged Property, there is no risk of forfeiture of such property. No Loan Party will, nor will it permit any of its Subsidiaries to, file or consent to the filing of any combined, consolidated, or unitary income tax return with any person (other than the Borrower or any of its Subsidiaries or Holdings).

SECTION 5.04    *Financial Statements and Reports.* In the case of Holdings, furnish to the Agent, which shall furnish to each Lender:as soon as available, but in any event in accordance with then applicable law and not later than 120 days after the end of each fiscal year, its consolidated balance sheet and related statements of income, members' equity and cash flows showing the financial condition of Holdings and its subsidiaries as of the close of such fiscal year and the results of its operations and the operations of such subsidiaries during such year, together with comparative figures for the immediately preceding fiscal year, all audited by independent public accountants of recognized national standing and accompanied by an opinion of such accountants (which opinion shall be without a "going concern" or like qualification or exception and without any qualification or exception as to the scope of such audit) to the effect that such consolidated financial statements fairly present, in all material respects, the financial condition and results of operations of Holdings and its subsidiaries on a consolidated basis in accordance with GAAP consistently applied;

(b)    as soon as available, but in any event in accordance with then applicable law and not later than 60 days after the end of each of the first three fiscal quarters of each fiscal year, its consolidated balance sheet and related statements of income, members' equity and cash flows showing the financial condition of Holdings and its subsidiaries as of the close of such fiscal quarter and the results of its operations and the operations of such Subsidiaries during such fiscal quarter and the then elapsed portion of the fiscal year, and comparative figures for the same periods in the immediately preceding fiscal year, all certified by one of its Financial Officers as fairly presenting, in all material respects, the financial condition and results of operations of Holdings and its subsidiaries on a consolidated basis in accordance with GAAP consistently applied, subject to normal year-end audit adjustments and the absence of footnotes;

(c)    concurrently with any delivery of financial statements under paragraph (a) or (b) above, a certificate of a Financial Officer of the Borrower, substantially in the form of Exhibit I hereto, (A) certifying that no Event of Default or Default has occurred or, if an Event of Default or Default has occurred, specifying the nature and extent thereof and any corrective action taken or proposed to be taken with respect thereto and (B) setting forth computations in reasonable detail satisfactory to the Agent demonstrating compliance with the covenants contained in Sections 6.11 and 6.12;

(d)    concurrently with any delivery of each Reserve Report hereunder, a certificate of a Financial Officer, in form and substance satisfactory to the Agent, setting forth as of a recent date, a true and complete list of all Hedging Agreements of the Borrower and the Subsidiaries, the material terms thereof (including the type, term, effective date, termination date and notional amounts or volumes), the net mark-to-market value therefor, any new credit support agreements relating thereto not previously disclosed in writing to the Agent, any margin required or supplied under any credit support document, and the counterparty to each such agreement;

(e)    promptly upon receipt thereof, a copy of each other report or letter submitted to the Borrower or any of the Subsidiaries by independent accountants in connection with any annual, interim or special audit made by them of the books of the Borrower or any such Subsidiary, and a copy of any response by the Borrower or any such Subsidiary to such letter or report;

(f)    promptly after the furnishing thereof, copies of any material financial statement, report or notice furnished to or by any person pursuant to the terms of any indenture, loan or credit or other similar agreement regarding or with respect to any Material Indebtedness (including with respect to the Second Lien Loan Documents and the 2006 PERL Credit Agreement) not otherwise furnished to the Lenders pursuant to any other provision of this Agreement;

(g)    if Holdings or any of its subsidiaries becomes a publicly traded company, then promptly after the same become publicly available, copies of all periodic and other reports, proxy statements and other materials filed by Holdings or such subsidiary with the SEC, or with any national securities exchange, or distributed by the Holdings or any of its subsidiaries to its shareholders generally, as the case may be;

(h)    concurrently with the delivery of any Reserve Report to the Agent delivered hereunder, a list of all persons purchasing Hydrocarbons from the Borrower or any Subsidiary;

(i)    prompt written notice (and in any event within thirty (30) days prior thereto) of any change (i) in the Borrower's or any other Loan Party's corporate name or in any trade name used to identify such person in the conduct of its business or in the ownership of its Properties, (ii) in the location of the Borrower's or any other Loan Party's chief executive office or principal place of business, (iii) in the Borrower's or any other Loan Party's identity or corporate structure or in the jurisdiction in which such person is incorporated or formed, (iv) in the Borrower's or any other Loan Party's jurisdiction of organization or such person's organizational identification number in such jurisdiction of organization, and (v) in the Borrower's or any other Loan Party's federal taxpayer identification number, if any;

(j)    within 60 days after the end of each fiscal quarter, a report setting forth, for each calendar month during the then current fiscal year to date, the volume of production and sales attributable to production (and the prices at which such sales were made and the revenues derived from such sales) for each such calendar month from the Oil and Gas Properties, and setting forth the related ad valorem, severance and production taxes and lease operating expenses attributable thereto and incurred for each such calendar month;

(k)    promptly, but in any event within five (5) Business Days after the execution thereof, copies of any amendment, modification or supplement to the certificate of incorporation, by-laws or other organizational documents of any Loan Party;

(l)    promptly after the request by any Lender, all documentation and other information that such Lender reasonably requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act;

(m) promptly following receipt thereof, on and after the effectiveness of the Pension Act, copies of (i) any documents described in Section 101(k)(1) of ERISA that the Borrower and any of its ERISA Affiliates has received following request thereof with respect to any Multiemployer Plan and (ii) any notices described in Section 101(1)(1) of ERISA that the Borrower or any of its ERISA Affiliates has received following request thereof with respect to any Multiemployer Plan;

(n) promptly after any such occurrence, written notice of any change in the board of directors (or similar governing body) of Holdings or the Borrower;

(o) promptly, from time to time, such other information regarding the operations, business affairs and financial condition of Holdings, the Borrower or any Subsidiary, or compliance with the terms of any Loan Document, as the Agent or any Lender may reasonably request; and

(p) concurrently with any delivery of financial statements under Section 5.04(a), a certificate of insurance coverage from each insurer with respect to the insurance required by Section 5.02, in form and substance satisfactory to the Collateral Agent, and, if requested by the Collateral Agent or any Lender, all copies of the applicable policies.

SECTION 5.05 *Litigation and Other Notices*. Furnish to the Agent and each Lender prompt written notice of the following:

(a) any Event of Default or Default, specifying the nature and extent thereof and the corrective action (if any) taken or proposed to be taken with respect thereto;

(b) the acceleration of the maturity of any Indebtedness owed by any Loan Party or of any default by any Loan Party under any indenture, mortgage, agreement, contract or other instrument to which any of them is a party or by which any of them or any of their properties is bound;

(c) the filing or commencement of, or any threat or notice of intention of any person to file or commence, any action, suit or proceeding, whether at law or in equity or by or before any Governmental Authority, against the Borrower or any Affiliate thereof that could reasonably be expected to result in a Material Adverse Effect;

(d) the occurrence of any ERISA Event that, alone or together with any other ERISA Events that have occurred, could reasonably be expected to result in liability of Holdings and its subsidiaries in an aggregate amount exceeding $2,500,000;

(e) the termination or amendment of any Material Contract of Holdings, the Borrower or any of its Subsidiaries in a manner that is materially adverse to Holdings, the Borrower or such Subsidiary, as the case may be;

(f) the entering into of any new Material Contract; and

(g) any development that has resulted in, or could reasonably be expected to result in, a Material Adverse Effect.

SECTION 5.06   *Information Regarding Collateral*   (a)   Furnish to the Agent prompt written notice of any change (i) in any Loan Party's legal name, as reflected in its organizational documents, (ii) in the jurisdiction of organization or formation of any Loan Party, (iii) if it is not a registered organization (as defined in the New York Uniform Commercial Code), in the location of its chief executive office or its principal place of business, (iv) in any Loan Party's organizational form or (v) in any Loan Party's Federal Taxpayer Identification Number or organizational identification number assigned by the jurisdiction of organization. Holdings and the Borrower agree to promptly provide the Agent with certified organizational documents reflecting any of the changes described in the first sentence of this paragraph. Holdings and the Borrower agree not to effect or permit any change referred to in the preceding sentence unless all filings have been made under the Uniform Commercial Code or otherwise that are required in order for the Agent to continue at all times following such change to have a valid, legal and perfected security interest in all the Collateral. Holdings and the Borrower also agree promptly to notify the Agent if any material portion of the Collateral is damaged or destroyed.

(b)   In the case of the Borrower, upon request by the Agent, at the time of delivery of annual financial statements pursuant to Section 5.04(a), deliver to the Agent a certificate of a Financial Officer of the Borrower setting forth the information required pursuant to Section 2 of the Perfection Certificate or confirming that there has been no change in such information since the date of the Perfection Certificate delivered on the Effective Date or the date of the most recent certificate delivered pursuant to this Section.

SECTION 5.07   *Maintaining Records; Access to Properties and Inspections*.   Keep proper books of record and account in which full, true and correct entries in conformity with GAAP and all requirements of law are made of all dealings and transactions in relation to its business and activities. Each Loan Party will, and will cause each of its subsidiaries to, permit any representatives designated by the Agent or any Lender, upon reasonable prior notice, to visit and inspect the financial records and the properties of such person at reasonable times and as often as reasonably requested and to make extracts from and copies of such financial records, and permit any representatives designated by the Agent or any Lender to discuss the affairs, finances and condition of such person with the officers thereof and independent accountants therefor, all at the reasonable cost and expense of the Borrower.

SECTION 5.08   *Use of Proceeds*   Use the proceeds of the Loans only for the purposes specified in the recitals to this Agreement and for general corporate purposes of the Borrower and the Subsidiaries, including a payment of fees in connection with the Transaction to Energy Capital Solutions, LP after the Closing Date in an amount not to exceed $3,315,272.

SECTION 5.09   *Employee Benefits*.   Furnish to the Agent as soon as possible after, and in any event within ten days after any responsible officer of Holdings, the Borrower or any ERISA Affiliate knows or has reason to know that, any ERISA Event has occurred that, alone or together with any other ERISA Event, could reasonably be expected to result in liability of Holdings, the Borrower or any ERISA Affiliate in an aggregate amount exceeding $5,000,000, a statement of a Financial Officer of Holdings or the Borrower setting forth details as to such ERISA Event and the action, if any, that Holdings or the Borrower proposes to take with respect thereto. Upon request by a Lender, promptly request (a) the documents described in Section 101(k)(1) of ERISA with respect to a Multiemployer Plan to which the Borrower or any of its ERISA Affiliates contributes and (b) notices described in

Section 101(1)(1) of ERISA with respect to a Multiemployer Plan to which the Borrower or any of its ERISA Affiliates contributes.

SECTION 5.10       *Compliance with Environmental Laws.* Except to the extent it could not reasonably be expected to cause a Material Adverse Effect, (a) comply, and cause all lessees and other persons occupying its properties to comply, in all material respects with all Environmental Laws applicable to its operations and properties; obtain and renew all material permits, licenses or other approvals necessary for its operations and properties pursuant to any Environmental Law and (b) undertake and conduct any remedial action necessary to remove or clean up any Hazardous Materials from any of its current and former properties in accordance with Environmental Laws; *provided, however*, that none of Holdings, the Borrower or any Subsidiary shall be required to undertake any remedial action required by Environmental Laws to the extent that its obligation to do so is being contested in good faith and by proper proceedings and appropriate reserves are being maintained with respect to such circumstances in accordance with GAAP.

SECTION 5.11       *Preparation of Environmental Reports.* If a Default caused by reason of a breach of Section 3.17 or Section 5.10 shall have occurred and be continuing for more than 20 days without Holdings, the Borrower or any Subsidiary commencing activities reasonably likely to remediate the condition giving rise to such Default, at the written request of the Required Lenders through the Agent, provide to the Lenders within 45 days after such request, at the expense of the Loan Parties, an environmental site assessment report regarding the matters which are the subject of such Default prepared by an environmental consulting firm reasonably acceptable to the Agent and indicating compliance or non-compliance with Environmental Laws and the presence or absence of Hazardous Materials and the estimated cost of any corrective or remedial action in connection with such Default.

SECTION 5.12       *Further Assurances* (a) Execute any and all further documents, financing statements, agreements and instruments, and take all further action (including filing and recording of Uniform Commercial Code and other financing statements, fixture filings, mortgages and deeds of trust) that may be required under applicable law, or that the Required Lenders or the Agent may reasonably request, to cause the Mortgages (including all exhibits thereto) to be in forms satisfactory to the Agent and to cause Collateral and Guarantee Requirement to be and remain satisfied at all times, all at the expense of the Loan Parties. If any additional Subsidiary is formed or acquired after the Closing Date, the Borrower will, within 20 days after such Subsidiary is formed or acquired, notify the Agent and the Lenders thereof and cause the Collateral and Guarantee Requirement to be satisfied with respect to such Subsidiary and with respect to any Equity Interest in or Indebtedness of such Subsidiary owned by or on behalf of any Loan Party. In addition, from time to time, each of Holdings and the Borrower will, at its cost and expense, promptly secure the Obligations by pledging or creating, or causing to be pledged or created, perfected Liens with respect to its and the Domestic Subsidiaries' assets and properties as is necessary to cause the Collateral and Guarantee Requirement to be and remain satisfied at all times. Such security interests and Liens will be created under the Security Documents and other security agreements, mortgages, deeds of trust and other instruments and documents in form and substance satisfactory to the Agent, and the Borrower shall deliver or cause to be delivered to the Lenders all such instruments and documents (including legal opinions and lien searches) as the Agent shall reasonably request to evidence compliance with this Section. The Borrower agrees to provide such evidence as the Agent shall reasonably request as to the perfection and priority status of each such security interest and Lien. In furtherance of

the foregoing, the Borrower will give prompt notice to the Agent of the acquisition by it or any of the Subsidiaries of any real property (or any interest in real property) having a value in excess of $500,000.

(b)     the Borrower agrees to deliver, whenever requested by the Agent in its sole and absolute discretion, provided that absent the continuance of an Event of Default, Agent will be limited to two such requests in any twelve month period, favorable title opinions or updates of title opinions from legal counsel acceptable to the Agent with respect to any Loan Party's properties and interests (sufficient to cause the Agent to have received the foregoing with respect to ninety percent (90%) of the Proved PV-10% of the Loan Parties) designated by the Agent, based upon abstract or record examinations to dates acceptable to the Agent and (a) stating that such Loan Party has good and defensible title to such properties and interests, free and clear of all Liens other than Liens permitted by Section 6.02, confirming that such properties and interests are subject to Security Documents securing the Loan Document Obligations that constitute and create legal, valid and duly perfected deed of trust or mortgage liens in such properties and interests and assignments of and security interests in the oil and gas attributable to such properties and interests and the proceeds thereof, and (c) covering such other matters as the Agent may reasonably request.

SECTION 5.13     *Compliance with Leases.*  Maintain all Leases in full force and effect (other than as a result of their expiration in accordance with their terms), free of any material default by the Borrower or the applicable Subsidiary.

SECTION 5.14     *Interest Rate Protection Agreements.*  As promptly as practicable and in any event within 120 days after the Closing Date, enter into, and for a period of not less than three years after the Closing Date maintain in effect, one or more Hedging Agreements, the effect of which is to fix or cap the interest rates applicable to at least 50% of the Indebtedness that is projected to be outstanding under the Loan Documents and the Second Lien Loan Documents, in each case on terms and conditions reasonably acceptable, taking into account current market conditions, to the Agent. Each such Hedging Agreement shall be entered into with a person that is reasonably acceptable to the Agent.

SECTION 5.15     *Intentionally Omitted*

SECTION 5.16     *Delivery of Reserve Reports.*

(a)     On or prior to September 1 of each year, commencing September 1, 2008, the Borrower shall furnish to the Agent and the Lenders reserve reports prepared by or under the supervision of a reserve engineer of seniority reasonably acceptable to the Agent acting on behalf of the Borrower setting forth as of July 1 of such year, the proved and probable oil and gas reserves attributable to the Oil and Gas Properties, together with (i) a projection of the rate of production and future revenues less severance and ad valorem taxes, operating expenses and capital expenditures with respect thereto as of such date and (ii) a writing from a Responsible Officer of the Borrower, substantially in the form of Exhibit J hereto, certifying that (A) there are no statements or conclusions in such reserve reports which are based upon or include materially misleading information or fail to take into account material information regarding the matters reported therein (it being understood that projections concerning volumes attributable to the Oil and Gas Properties and production and cost estimates contained in each reserve report are necessarily based upon professional opinions, estimates and projections), (B) such reserve

reports were prepared in accordance with the procedures used to prepare the reserve report as of July 1 of the immediately preceding year (or, in the case of the reserve report as of July 1, 2008, the reserve reports referred to in Section 3.05(c)) and (C) a writing from a Responsible Officer of the Borrower, substantially in the form of Exhibit K hereto, certifying that there are no gas imbalances, take-or-pay arrangements or other prepayments in excess of the volume specified in Schedule 3.24 or permitted by 6.16(b) with respect to the Oil and Gas Properties evaluated in such reserve reports which would require the Borrower or any Subsidiary to deliver Hydrocarbons either generally or produced from the Oil and Gas Properties at some future time without then or thereafter receiving full payment therefor.

(b)    On or prior to March 1 of each year, commencing March 1, 2008, the Borrower shall furnish to the Agent and the Lenders a reserve report prepared by an Independent Engineer setting forth as of January 1 of such year, the proved and probable oil and gas reserves attributable to the Oil and Gas Properties, together with (i) a projection of the rate of production and future revenues less severance and ad valorem taxes, operating expenses and capital expenditures with respect thereto as of such date, (ii) a writing from a Responsible Officer of the Borrower, substantially in the form of Exhibit J hereto, certifying that (x) there are no statements or conclusions in such reserve reports which are based upon or include materially misleading information or fail to take into account material information regarding the matters reported therein (it being understood that projections concerning volumes attributable to the Oil and Gas Properties and production and cost estimates contained in each reserve report are necessarily based upon professional opinions, estimates and projections) and (y) such reserve reports were prepared in accordance with the procedures used to prepare the reserve report as of January 1 of the immediately preceding year (or, in the case of the reserve report as of January 1, 2008, the reserve reports referred to in Section 3.05(c)) and (iii) a writing from a Responsible Officer of the Borrower, substantially in the form of Exhibit K hereto, certifying that there are no gas imbalances, take-or-pay arrangements or other prepayments in excess of the volume specified in Schedule 3.24 or permitted by 6.16(b) with respect to the Oil and Gas Properties evaluated in such reserve reports which would require the Borrower or any Subsidiary to deliver Hydrocarbons either generally or produced from the Oil and Gas Properties at some future time without then or thereafter receiving full payment therefor.

(c)    In the event of an Interim Redetermination, the Borrower shall furnish to the Agent and the Lenders as soon as reasonably practicable, a reserve report prepared by or under the supervision of a reserve engineer of seniority reasonably acceptable to the Agent acting on behalf of the Borrower and audited by an Independent Engineer setting forth as of the date required by the Agent, the proved and probable oil and gas reserves attributable to the Oil and Gas Properties, together with (i) a projection of the rate of production and future revenues less severance and ad valorem taxes, operating expenses and capital expenditures with respect thereto as of such date, (ii) a writing from a Responsible Officer of the Borrower, substantially in the form of Exhibit J hereto, certifying that (x) there are no statements or conclusions in such reserve reports which are based upon or include materially misleading information or fail to take into account material information regarding the matters reported therein (it being understood that projections concerning volumes attributable to the Oil and Gas Properties and production and cost estimates contained in each reserve report are necessarily based upon professional opinions, estimates and projections) and (y) such reserve reports were prepared in accordance with the procedures used to prepare the most recently delivered Reserve Report) and (iii) a writing from a Responsible Officer of the Borrower, substantially in the form of Exhibit K hereto, certifying that there are no gas imbalances, take-or-pay arrangements or other prepayments in excess of the

volume specified in Schedule 3.24 or permitted by 6.16(b) with respect to the Oil and Gas Properties evaluated in such reserve reports which would require the Borrower or any Subsidiary to deliver Hydrocarbons either generally or produced from the Oil and Gas Properties at some future time without then or thereafter receiving full payment therefor.

SECTION 5.17    *Title Information* (a) On or prior to the delivery to the Agent of each Reserve Report required to be delivered by Section 5.16, the Borrower will deliver to the Agent title information, in form and substance reasonably acceptable to the Agent, that, together with title information previously delivered to the Agent, constitutes title information with respect to Oil and Gas Properties representing at least 90% of Proved PV-10% as of the date of such Reserve Report.

(b)    Within 90 days after notice from the Agent that material title defects or exceptions exist with respect to any Oil and Gas Properties, the Borrower shall either (i) cure any such material title defects or exceptions, (ii) create a fully perfected Lien on substitute Oil and Gas Properties with no material title defects or exceptions theretofore not composing the Mortgaged Properties that are reasonably acceptable to the Agent or (iii) deliver title information, in form and substance reasonably acceptable to the Agent, that, together with the title information previously delivered to the Agent, constitutes title information with respect to Oil and Gas Properties representing at least 90% of Proved PV-10% as of the date of the most recently delivered Reserve Report (it being understood that any Oil and Gas Property with material title defects or exceptions that have not been cured within 90 days after notice from the Agent pursuant to this paragraph shall be excluded from the determination of such Proved PV-10%).

(c)    If the Borrower is unable to comply with paragraph (b) of this Section, such failure to comply shall not constitute a Default. Any Oil and Gas Property in respect of which paragraph (b) of this Section shall not have been complied with shall be excluded from the Oil and Gas Properties for purposes of calculating Proved PV-10% and PDP PV-10% to the extent of such title defect until such time as the Borrower has complied with the paragraph (b) of this Section in respect of such Oil and Gas Property, and the Agent may send a notice to the Borrower and the Lenders that the then outstanding Borrowing Base shall be reduced by an amount as determined by the Required Lenders to cause the Borrower to be in compliance with the requirement to provide acceptable title information with respect to Oil and Gas Properties representing at least 80% of Proved PV-10%. This new Borrowing Base shall become effective immediately after receipt of such notice.

SECTION 5.18    *Title.* Take such actions as are reasonably requested by the Agent in order to vest good and marketable title or leasehold interest in the Real Properties purported to be owned or leased by the Borrower and the Subsidiaries as of the Closing Date.

SECTION 5.19    *Evidence of Compliance.* Furnish to each Lender at such Loan Party's expense all evidence which Agent from time to time reasonably requests in writing as to the accuracy and validity of or compliance with all representations, warranties and covenants made by any Loan Party in the Transaction Documents, the satisfaction of all conditions contained therein, and all other matters pertaining thereto.

SECTION 5.20    *Lenders' Meetings.* Upon the request of Agent, participate in a meeting of Agent and Lenders once during each fiscal year to be held at Borrower's

corporate offices (or at such other location as may be agreed to by Borrower and Agent) at such time as may be agreed to by Borrower and Agent.

SECTION 5.21     *Hedging Agreements.*  At the request of the Agent, the Documentation Agent or the Required Lenders:

(a)     Maintain at any time one or more Hedging Agreements with persons reasonably acceptable to the Agent or fixed price contracts, the effect of which is to establish maximum fixed prices or caps on a notional volume of crude oil and natural gas, calculated separately, greater than 80% of Anticipated Production thereof for each month in the then ensuing 12 month period.

(b)     For purposes of this Section, a basis differential hedging agreement will not be considered to be a Hedging Agreement.

SECTION 5.22     *Post-Closing Matters.*  Within the time periods set forth on Schedule 5.22, do such things as are set forth on Schedule 5.22.

## ARTICLE VI

### *NEGATIVE COVENANTS*

Each of Holdings and the Borrower covenants and agrees with each Lender that, so long as this Agreement shall remain in effect and until the Commitments have been terminated and the principal of and interest on each Loan, all fees and all other expenses or amounts payable under any Loan Document have been paid in full, unless the Required Lenders shall otherwise consent in writing, neither Holdings nor the Borrower will, nor will they cause or permit any of the Subsidiaries to:

SECTION 6.01     *Indebtedness.*  Incur, create, assume or permit to exist any Indebtedness, except:

(a)     Indebtedness existing on the date hereof and set forth in Schedule 6.01 and any extensions or renewals of such Indebtedness to the extent the principal amount of such Indebtedness is not increased, neither the final maturity nor the weighted average life to maturity of such Indebtedness is decreased, such Indebtedness, if subordinated to the Obligations, remains so subordinated on terms no less favorable to the Lenders, and the original obligors in respect of such Indebtedness remain the only obligors thereon;

(b)     Indebtedness created under the Loan Documents;

(c)     Indebtedness created under the Second Lien Loan Documents and any Permitted Refinancing Indebtedness used to Refinance such Indebtedness;

(d)     Indebtedness of the Borrower or any Subsidiary to Pacific Energy or any of its subsidiaries; *provided* that (i) any such Indebtedness shall not have been transferred or pledged to an third party, (ii) such Indebtedness shall be unsecured, (iii) such Indebtedness shall be subordinated to the Obligations on terms and conditions satisfactory to the Agent and the Lenders in their sole discretion, (iv) such Indebtedness shall be permitted by Section 6.04(c) and

(v) the aggregate principal amount of all Indebtedness of the Borrower or any Subsidiary to Pacific Energy or to any subsidiary of Pacific Energy that is not a Loan Party shall not exceed $5,000,000 at any time outstanding;

(e)    Indebtedness of the Borrower or any Subsidiary incurred to finance the acquisition, construction or improvement of real property (other than Oil and Gas Properties), improvements thereto and equipment, and extensions, renewals and replacements of any such Indebtedness that do not increase the outstanding principal amount thereof; *provided* that (i) such Indebtedness is incurred prior to or within 90 days after such acquisition or the completion of such construction or improvement and (ii) the aggregate principal amount of Indebtedness permitted by this paragraph (e), when combined with the aggregate principal amount of all Capital Lease Obligations and Synthetic Lease Obligations incurred pursuant to Section 6.01(f) shall not exceed $7,500,000 at any time outstanding;

(f)    Capital Lease Obligations and Synthetic Lease Obligations in an aggregate principal amount, when combined with the aggregate principal amount of all Indebtedness incurred pursuant to Section 6.01(e), not in excess of $7,500,000 at any time outstanding;

(g)    Indebtedness under performance bonds or with respect to workers' compensation claims, in each case incurred in the ordinary course of business;

(h)    Guarantees permitted under Section 6.04;

(i)    Indebtedness constituting Hedging Agreements permitted by this Agreement;

(j)    other Indebtedness of the Borrower or the Subsidiaries in an aggregate outstanding principal amount not in excess $5,000,000 at any time.

SECTION 6.02    *Liens.* Create, incur, assume or permit to exist any Lien on any property or assets (including Equity Interests in or other securities of any person, including the Borrower or any Subsidiary) now owned or hereafter acquired by it, or assign or sell any income or revenues (including accounts receivable) or rights in respect of any thereof, except:Liens on property or assets of the Borrower and its Subsidiaries existing on the date hereof and set forth in Schedule 6.02; *provided* that such Liens shall secure only those obligations which they secure on the date hereof and extensions, renewals and replacements thereof permitted hereunder;

(b)    any Lien created under the Loan Documents;

(c)    any Lien created under the Second Lien Loan Documents and Liens securing Permitted Refinancing Indebtedness used to Refinance the Indebtedness under the Second Lien Loan Documents;

(d)    Liens for taxes not yet due or which are being contested in compliance with Section 5.03;

(e)    carriers', maritime, warehousemen's, mechanics', materialmen's, repairmen's or other like Liens arising in the ordinary course of business or Liens arising out of

551425.10E- Server 1a - MSW                67

unit or joint operating agreements, in each case securing obligations that are not due and payable or which are being contested in compliance with Section 5.03;

(f) pledges and deposits made in the ordinary course of business in compliance with workmen's compensation, unemployment insurance and other social security laws or regulations;

(g) deposits to secure the performance of bids, trade contracts (other than for Indebtedness), leases (other than Capital Lease Obligations and Synthetic Lease Obligations), statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business;

(h) zoning restrictions, easements, rights-of-way, restrictions on use of real property and other similar encumbrances incurred in the ordinary course of business which, in the aggregate, are not substantial in amount and do not materially detract from the value of the property subject thereto or interfere with the ordinary conduct of the business of the Borrower or any of its Subsidiaries;

(i) purchase money security interests in real property (other than Oil and Gas Properties), improvements thereto or equipment hereafter acquired (or, in the case of improvements, constructed) by the Borrower or any Subsidiary; *provided* that (i) such security interests secure Indebtedness permitted by Section 6.01(e), (ii) such security interests are incurred, and the Indebtedness secured thereby is created, within 90 days after such acquisition (or construction), (iii) the Indebtedness secured thereby does not exceed the lesser of the cost or the fair market value of such real property, improvements or equipment at the time of such acquisition (or construction) and (iv) such security interests do not apply to any other property or assets of the Borrower or any Subsidiary;

(j) Liens arising out of judgments or awards that do not constitute an Event of Default under clause (i) of Article VII; and

(k) other Liens securing obligations of the Borrower or the Subsidiaries in an aggregate principal amount not in excess of $2,500,000 at any time.

SECTION 6.03    *Sale and Lease-Back Transactions*.    Enter into any arrangement, directly or indirectly, with any person whereby it shall sell or transfer any property, real or personal, used or useful in its business, whether now owned or hereafter acquired, and thereafter rent or lease such property or other property which it intends to use for substantially the same purpose or purposes as the property being sold or transferred.

SECTION 6.04    *Investments, Loans and Advances*.    Purchase, hold or acquire any Equity Interests, evidences of indebtedness or other securities of, make or permit to exist any loans or advances to, or make or permit to exist any investment or any other interest in, any other person, except:(i) investments by Holdings and its subsidiaries existing on the Closing Date in the Equity Interests of the Borrower and the Subsidiaries, (ii) additional investments by Holdings and its subsidiaries in Equity Interests in the Borrower and the Subsidiaries and (iii) investments by Holdings in Equity Interests of Cook Inlet; *provided* that any such Equity Interests held by a Loan Party shall be pledged pursuant to the Collateral Agreement;

(b) Permitted Investments;

68

(c)  loans or advances made by Holdings or the Borrower to any Subsidiary and made by any Subsidiary to the Borrower or any other Subsidiary;

(d)  investments received in connection with the bankruptcy or reorganization of, or settlement of delinquent accounts and disputes with, customers and suppliers, in each case in the ordinary course of business;

(e)  loans and advances in the ordinary course of business to employees so long as the aggregate principal amount thereof at any time outstanding (determined without regard to any write-downs or write-offs of such loans and advances) shall not exceed $500,000;

(f)  Hedging Agreements permitted or required by this Agreement;

(g)  Permitted Acquisitions;

(h)  Investments in the form of non-cash consideration received as a result of asset sales permitted by Section 6.05(b);

(i)  Guarantees by the Borrower of Indebtedness and other obligations of any Subsidiary and Guarantees by any Subsidiary of Indebtedness and other obligations of the Borrower or any other Subsidiary; *provided* that a Subsidiary that has not Guaranteed the Obligations pursuant to the Collateral Agreement shall not Guarantee any Indebtedness or other obligations of any Loan Party;

(j)  investments in joint ventures for the purpose of exploration, development, gathering and processing Hydrocarbons in an amount not to exceed $5,000,000 in the aggregate during the term of this Agreement;

(k)  investments in Oil and Gas Properties (A) made during any fiscal year that, together with the total consideration paid in connection with any acquisitions pursuant to Section 6.04(g) (including any Indebtedness of the Acquired Entity that is assumed by the Borrower or any Subsidiary following such acquisition and any payments following such acquisition pursuant to earn-out provisions or similar obligations) made in such fiscal year, shall not in the aggregate exceed $7,500,000 and (B) made during the term of this Agreement that, together with the total consideration paid in connection with any acquisitions pursuant to Section 6.04(g) (including any Indebtedness of the Acquired Entity that is assumed by the Borrower or any Subsidiary following such acquisition and any payments following such acquisition pursuant to earn-out provisions or similar obligations) made during the term of this Agreement, shall not in the aggregate exceed $25,000,000;

(l)  in addition to investments permitted by paragraphs (a) through (g) above, additional investments, loans and advances by the Borrower and the Subsidiaries so long as the aggregate amount invested, loaned or advanced pursuant to this paragraph (h) (determined without regard to any write-downs or write-offs of such investments, loans and advances) does not exceed $5,000,000 in the aggregate;

(m)  Guarantees by Subsidiaries of the Borrower of Indebtedness under the Subordinated Seller Note; *provided* that such Guarantees shall be subordinated to the Obligations on the same terms as the Subordinated Seller Note is subordinated to the Obligations; and

(n)    Guarantees of Indebtedness under the 2006 PERL Credit Agreement.

SECTION 6.05    *Mergers, Consolidations, Sales of Assets and Acquisitions*
(a) Merge into or consolidate with any other person, or permit any other person to merge into or consolidate with it, or sell, transfer, lease or otherwise dispose of (in one transaction or in a series of transactions) all or substantially all the assets (whether now owned or hereafter acquired) of the Borrower or less than all the Equity Interests of any Subsidiary, or purchase, lease or otherwise acquire (in one transaction or a series of transactions) all or any substantial part of the assets of any other person, except that (i) the Borrower and any Subsidiary may purchase and sell inventory in the ordinary course of business and (ii) if at the time thereof and immediately after giving effect thereto no Event of Default or Default shall have occurred and be continuing (A) any wholly owned subsidiary may merge into the Borrower in a transaction in which the Borrower is the surviving corporation, (B) any wholly owned subsidiary may merge into or consolidate with any other wholly owned subsidiary in a transaction in which the surviving entity is a wholly owned subsidiary and no person other than the Borrower or a wholly owned subsidiary receives any consideration (*provided* that if any party to any such transaction is a Loan Party, the surviving entity of such transaction shall be a Loan Party) and (C) the Borrower and the Subsidiaries may make Permitted Acquisitions (including through mergers of Subsidiaries).

(b)    Make any Asset Sale otherwise permitted under paragraph (a) above unless (i) such Asset Sale is for consideration at least 75% of which is cash, (ii) such consideration is at least equal to the fair market value of the assets being sold, transferred, leased or disposed of and (iii) the fair market value of all assets sold, transferred, leased or disposed of pursuant to this paragraph (b) during any fiscal year shall not exceed an amount equal to 7.5% of the Proved PV-10% as of the end of the fiscal year most recently ended prior to the date of such sale, transfer, lease or disposition for which a Reserve Report has been delivered, calculated on a pro forma basis for acquisitions consummated since the end of such fiscal year in the manner specified in the definition of "Proved PV-10%"; *provided*, that if such sale or other disposition is of Oil and Gas Property or of a Subsidiary owning Oil and Gas Properties included in the most recently delivered Reserve Report during any period between two successive Scheduled Redetermination Dates having a fair market value (as determined by the Agent), individually or in the aggregate, in excess of 5% of the Borrowing Base, the Borrowing Base shall be reduced, effective immediately upon such sale or disposition, by an amount equal to the value, if any, assigned such Oil and Gas Property in the most recently determined Borrowing Base.

SECTION 6.06    *Restricted Payments; Payment of Certain Indebtedness; Restrictive Agreements* (a) Declare or make, or agree to declare or make, directly or indirectly, any Restricted Payment or enter into or be a party to any Synthetic Purchase Agreement, or incur any obligation (contingent or otherwise) to do so; *provided, however*, that:

(i)    any Subsidiary may declare and pay dividends or make other distributions ratably to its equity holders,

(ii)    so long as no Event of Default or Borrowing Base Deficiency has occurred and is continuing and the Borrower shall have unused Borrowing Base availability hereunder on a pro forma basis as of the date of the consummation of such Restricted Payments (after giving effect to all Loans to be funded as of such date) of not less than 10% of the Borrowing Base then in effect:

(1)   the Borrower may make Restricted Payments to Holdings, and Holdings may in turn make Restricted Payments to Pacific Energy (x) in an amount not to exceed $1,000,000 in any fiscal year, to the extent necessary to pay general corporate and overhead expenses incurred by Holdings and/or Pacific Energy in the ordinary course of business; *provided, however*, that all Restricted Payments made to Holdings and/or Pacific Energy pursuant to this clause (ii) are used by Holdings and/or Pacific Energy for the purposes specified herein within 20 days of the receipt thereof,

(2)   the Borrower may make distributions to Holdings and/or Pacific Energy to the extent necessary to permit Holdings and/or Pacific Energy to discharge any tax liability of Holdings and/or Pacific Energy attributable to the Borrower and its Subsidiaries, and

(3)   the Borrower may make distributions to Holdings and/or Pacific Energy pursuant to a management services agreement in an amount not to exceed $200,000 in any month, in each case so long as Holdings and/or Pacific Energy applies the amount of such distributions for such purpose.

(b)   Neither Holdings nor the Borrower will, nor will they permit any Subsidiary to, make or agree to pay or make, directly or indirectly, any payment or other distribution (whether in cash, securities or other property) of or in respect of principal of or interest on any Indebtedness, or any payment or other distribution (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any Indebtedness, except:

(i)   payment of Indebtedness created under the Loan Documents;

(ii)   payment of scheduled interest and principal payments as and when due in respect of any Indebtedness; *provided* that in no event shall any payment be made in respect of the Subordinated Seller Note in violation of the subordination provisions thereof;

(iii)   mandatory and voluntary prepayments of the Second Lien Loans in accordance with the terms of the Second Lien Loan Documents;

(iv)   payment when and as due of Indebtedness under Hedging Agreements permitted under this Agreement;

(v)   refinancings of Indebtedness to the extent permitted by Section 6.01; *provided* that in no event shall any refinancing of the Subordinated Seller Note be permitted; and

(vi)   payments of secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness.

(c)   Enter into, incur or permit to exist any agreement or other arrangement that prohibits, restricts or imposes any condition upon (i) the ability of Holdings, the Borrower or any Subsidiary to create, incur or permit to exist any Lien upon any of its property

or assets to secure Indebtedness under the Loan Documents or (ii) the ability of any Subsidiary to pay dividends or other distributions with respect to any of its Equity Interests or to make or repay loans or advances to the Borrower or any other Subsidiary; *provided* that (A) the foregoing shall not apply to restrictions and conditions imposed by law or by any Loan Document, any Second Lien Loan Document or the 2006 PERL Credit Agreement, (B) the foregoing shall not apply to customary restrictions and conditions contained in agreements relating to the sale of a Subsidiary pending such sale, provided such restrictions and conditions apply only to the Subsidiary that is to be sold and such sale is permitted hereunder, (C) clause (i) of the foregoing shall not apply to restrictions or conditions imposed by any agreement relating to secured Indebtedness permitted by this Agreement if such restrictions or conditions apply only to the property or assets securing such Indebtedness, (D) clause (i) of the foregoing shall not apply to customary provisions in leases and other contracts restricting the assignment thereof and (E) clause (ii) of the foregoing shall not apply to restrictions and conditions imposed by the Subordinated Seller Note.

SECTION 6.07 *Transactions with Affiliates.* Except for transactions between or among Loan Parties and transactions permitted by Section 6.01(d), 6.04(c) or 6.06, sell or transfer any property or assets to, or purchase or acquire any property or assets from, or otherwise engage in any other transactions with, any of its Affiliates, except that the Borrower or any Subsidiary (a) may engage in any of the foregoing transactions in the ordinary course of business at prices and on terms and conditions not less favorable to the Borrower or such Subsidiary than could be obtained on an arm's-length basis from unrelated third parties (including transactions on such terms and conditions with Cook Inlet) and (b) may make payments in accordance with the Intercompany Services Agreement in accordance with its terms.

SECTION 6.08 *Business of Holdings, Borrower and Subsidiaries; No Foreign Subsidiaries.*

(a) With respect to Holdings, engage in any business activities or have any assets or liabilities other than its ownership of the Equity Interests in the Borrower and other assets and liabilities incidental thereto, including its liabilities under the Loan Documents and the Second Lien Loan Documents and the Subordinated Seller Note and its Guaranty of Indebtedness under the 2006 PERL Credit Agreement.

(b) With respect to the Borrower and the Subsidiaries, engage at any time in any business or business activity other than the business currently conducted by it and business activities reasonably related thereto.

(c) Neither Holdings nor the Borrower shall acquire or own any Foreign Subsidiary or conduct any international operations.

SECTION 6.09 *Amendment of Certain Indebtedness and Agreements.* Neither Holdings nor the Borrower will, nor will they permit any Subsidiary to, amend, modify or waive any of its rights under (a) (i) the Intercompany Services Agreement, (ii) the Master Conveyance, (iii) the Membership Interest Assignment or (iv) its certificate of incorporation, by-laws or other organizational documents, except, in each case, for amendments, modifications or waivers to any of the foregoing documents that, when taken together will all prior amendments, modifications and waivers to such document, are not material and adverse to the Borrower or the Subsidiaries or to the rights or interests of the Lenders, (b) the Second Lien Loan Documents,

except to the extent permitted under the Intercreditor Agreement or (c) the Subordinated Seller Note.

SECTION 6.10    *Material Contracts*    (a) Cancel or terminate any Material Contract (or consent to or accept any cancellation or termination thereof), (b) amend or otherwise modify any Acquisition Document or give any consent, waiver or approval thereunder, or waive any breach of or default under any Acquisition Document, or (c) amend or otherwise modify any other Material Contract in any material respect or give any material consent, waiver or approval thereunder, or waive any material breach of or default under any such Material Contract. No Loan Party shall take any action (or omit to take any action) in connection with any Material Contract that would materially impair the value of the interests or rights of any Loan Party thereunder or that would impair the interest or rights of the Agent and/or Lenders hereunder or under any other Transaction Document.

SECTION 6.11    *Leverage Ratio*.    At the end of each fiscal quarter, beginning with the fiscal quarter ending December 31, 2007, the Leverage Ratio will not be greater than the ratio set out in such table opposite such fiscal quarter:

| **Fiscal Quarter** | **Maximum Ratio** |
|---|---|
| December 31, 2007 | 7.5 to 1.0 |
| 1st, 2nd, 3rd and 4th Fiscal Quarters of 2008 | 6.0 to 1.0 |
| 1st, 2nd, 3rd and 4th Fiscal Quarters of 2009 and thereafter | 4.0 to 1.0 |

SECTION 6.12    *Current Ratio*.    Permit, as of the last day of any fiscal quarter, commencing with the fiscal quarter ending on September 30, 2007, the ratio of (i) Current Assets to (ii) Current Liabilities to be less than 1.0 to 1.0.

SECTION 6.13    *Fiscal Year*.    With respect to Holdings and the Borrower, change their fiscal year-end to a date other than December 31.

SECTION 6.14    *Certain Equity Interests*    (a) In the case of Holdings, issue any Equity Interest to any person other than Pacific Energy.

(b)    In the case of the Borrower, issue any Equity Interests to any person other than Holdings.

(c)    In the case of any Subsidiary, issue any Equity Interests to any person other than the Borrower or another Subsidiary.

SECTION 6.15    *Hedging Agreements*    (a) Enter into any Hedging Agreement, other than (i) Hedging Agreements required by Sections 5.14 and 5.15 and (ii) subject to paragraph (b), Hedging Agreements entered into in the ordinary course of business (and not for speculative purposes) to hedge or mitigate risks to which the Borrower or any Subsidiary is exposed in the conduct of its business or the management of its liabilities.

(b) For purposes of this Section, a basis differential hedging agreement will not be considered to be a Hedging Agreement.

SECTION 6.16 *Take-or-Pay or Other Prepayments; Gas Imbalances*

(a) Except as set forth in Schedule 3.24, allow take-or-pay arrangements or prepayments (including deferred production agreements or volumetric production payments) with respect to the Oil and Gas Properties or production therefrom that could require the Borrower or any Subsidiary to deliver Hydrocarbons either generally or produced from the Oil and Gas Properties at some future time without then or thereafter receiving full payment therefor.

(b) Allow, on a net basis, any gas imbalances that would require the Borrower or any Subsidiary to deliver Hydrocarbons either generally or produced from the Oil and Gas Properties in excess of 200 MMcf at some future time without then or thereafter receiving full payment therefor.

(c) Allow gas imbalances, take-or-pay or other prepayments with respect to the Oil and Gas Properties that would require the Borrower or any of its subsidiaries to deliver Hydrocarbons at some future time without then or thereafter receiving full payment therefore to exceed one half bcf of gas (on an mcf equivalent basis) in the aggregate.

SECTION 6.17 *Leases*. Create, incur, assume or suffer to exist any obligation for the payment of rent or hire of property (whether real or personal), under leases or lease agreements (other than Capital Leases and oil and gas leases) which would cause the aggregate amount of all payments made by the Borrower and the Subsidiaries pursuant to all such leases or lease agreements, including, without limitation, any residual payments at the end of any lease, to exceed $1,000,000 in any period of twelve consecutive calendar months during the life of such leases.

## ARTICLE VII

## EVENTS OF DEFAULT

In case of the happening of any of the following events ("*Events of Default*"):

(a) any representation or warranty made or deemed made in or in connection with any Loan Document or the borrowings hereunder, or any representation, warranty, statement or information contained in any report, certificate, financial statement or other instrument furnished in connection with or pursuant to any Loan Document, any ORRI Conveyance or the Transactions, shall prove to have been false or misleading in any material respect when so made, deemed made or furnished;

(b) default shall be made in the payment of any principal of any Loan when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or by acceleration thereof or otherwise;

(c) default shall be made in the payment of any interest on any Loan or any fee or any other amount (other than an amount referred to in (b) above) due under any Loan

Document when and as the same shall become due and payable and such default shall continue unremedied for a period of three Business Days;

(d)    default shall be made in the due observance or performance by Holdings, the Borrower or any Subsidiary of any covenant, condition or agreement contained in Section 2.21, 5.01(a), 5.05 or 5.08 or in Article VI;

(e)    default shall be made in the due observance or performance by Holdings, the Borrower or any Subsidiary of any covenant, condition or agreement contained in any Loan Document (other than those specified in (b), (c) or (d) above) and such default shall continue unremedied for a period of 30 days after notice thereof from the Agent or any Lender to the Borrower;

(f)    (i) Holdings, the Borrower or any Subsidiary shall fail to pay any principal, interest or other amount due in respect of any Material Indebtedness (other than the Second Lien Obligations) when and as the same shall become due and payable or (ii) any other event or condition shall occur that results in any Material Indebtedness (other than the Second Lien Obligations) becoming due prior to its scheduled maturity or that enables or permits (with or without the giving of notice, the lapse of time or both) the holder or holders of any Material Indebtedness (other than the Second Lien Obligations) or any trustee or agent on its or their behalf to cause any Material Indebtedness (other than the Second Lien Obligations) to become due, or to require the prepayment, repurchase, redemption or defeasance thereof prior to its scheduled maturity or that results in the termination or permits any counterparty to terminate any Hedging Agreement the obligations under which constitute Material Indebtedness; *provided* that this clause (ii) shall not apply to (A) secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness and (B) Indebtedness that becomes due as a result of a condition described in clause (c) of the definition of "Change in Control" as long as the Borrower shall have advised the Lenders at the time of the Change in Control offer that such event constitutes an event of default under such Material Indebtedness;

(g)    an involuntary proceeding shall be commenced or an involuntary petition shall be filed in a court of competent jurisdiction seeking (i) relief in respect of Holdings, the Borrower or any Subsidiary, or of a substantial part of the property or assets of Holdings, the Borrower or a Subsidiary, under Title 11 of the United States Code, as now constituted or hereafter amended, or any other Federal, state or foreign bankruptcy, insolvency, receivership or similar law, (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for Holdings, the Borrower or any Subsidiary or for a substantial part of the property or assets of Holdings, the Borrower or a Subsidiary or (iii) the winding-up or liquidation of Holdings, the Borrower or any Subsidiary; and such proceeding or petition shall continue undismissed for 60 days or an order or decree approving or ordering any of the foregoing shall be entered;

(h)    Holdings, the Borrower or any Subsidiary shall (i) voluntarily commence any proceeding or file any petition seeking relief under Title 11 of the United States Code, as now constituted or hereafter amended, or any other Federal, state or foreign bankruptcy, insolvency, receivership or similar law, (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or the filing of any petition described in (g) above, (iii) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator,

conservator or similar official for Holdings, the Borrower or any Subsidiary or for a substantial part of the property or assets of Holdings, the Borrower or any Subsidiary, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding, (v) make a general assignment for the benefit of creditors, (vi) become unable, admit in writing its inability or fail generally to pay its debts as they become due or (vii) take any action for the purpose of effecting any of the foregoing;

(i) one or more judgments shall be rendered against Holdings, the Borrower, any Subsidiary or any combination thereof and the same shall remain undischarged for a period of 30 consecutive days during which execution shall not be effectively stayed, or any action shall be legally taken by a judgment creditor to levy upon assets or properties of Holdings, the Borrower or any Subsidiary to enforce any such judgment and such judgment either (i) is for the payment of money in an aggregate amount in excess of $2,500,000 or (ii) is for injunctive relief and could reasonably be expected to result in a Material Adverse Effect;

(j) an ERISA Event shall have occurred that, in the opinion of the Required Lenders, when taken together with all other such ERISA Events, could reasonably be expected to result in liability of the Borrower and its ERISA Affiliates in an aggregate amount exceeding $2,500,000;

(k) any Guarantee under the Collateral Agreement for any reason shall cease to be in full force and effect (other than in accordance with the terms of the Loan Documents), or any Guarantor shall deny in writing that it has any liability under the Collateral Agreement (other than as a result of the discharge of such Guarantor in accordance with the terms of the Loan Documents);

(l) any security interest purported to be created by any Security Document shall cease to be, or shall be asserted by the Borrower or any other Loan Party not to be, a valid, perfected, first priority (except as otherwise expressly provided in this Agreement or such Security Document) security interest in the securities, assets or properties covered thereby, except as a result of the sale, transfer or other disposition of such assets in a transaction permitted by the Loan Documents;

(m) any Loan Document, any ORRI Conveyance or, except during any period during which the Borrower and the Subsidiaries are capable of performing with their own employees and assets all the activities performed for them under the Transition Services Agreement, the Transition Services Agreement shall cease to be in full force and effect (other than pursuant to expiration by its terms) or any consent or approval of any Governmental Authority required in connection with the ORRI Conveyances shall not have been obtained within 60 days after the Closing Date;

(n) any "Event of Default" (or any comparable term) under, and as defined in, the Second Lien Loan Documents shall occur and be continuing;

(o) the subordination provisions of any agreement or instrument governing any Subordinated Indebtedness are for any reason revoked or invalidated, or otherwise cease to be in full force and effect, any person subject to the subordination provisions contained therein contests in any manner the validity or enforceability thereof, or the Indebtedness

551425.10E- Server 1a - MSW    76

hereunder is for any reason subordinated or does not have the priority contemplated by the Loan Documents or such subordination provisions;

(p)     a Change in Control shall occur; then, and in every such event (other than an event with respect to Holdings or the Borrower described in paragraph (g) or (h) above), and at any time thereafter during the continuance of such event, the Agent may, and at the request of the Required Lenders shall, by notice to the Borrower, take either or both of the following actions, at the same or different times: (i) terminate forthwith the Commitments and (ii) declare the Loans then outstanding to be forthwith due and payable in whole or in part, whereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and any unpaid accrued fees and all other liabilities of the Borrower accrued hereunder and under any other Loan Document, shall become forthwith due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by the Borrower, anything contained herein or in any other Loan Document to the contrary notwithstanding; and in any event with respect to Holdings or the Borrower described in paragraph (g) or (h) above, the Commitments shall automatically terminate and the principal of the Loans then outstanding, together with accrued interest thereon and any unpaid accrued fees and all other liabilities of the Borrower accrued hereunder and under any other Loan Document, shall automatically become due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by the Borrower, anything contained herein or in any other Loan Document to the contrary notwithstanding.

## ARTICLE VIII

## THE AGENT

Each of the Lenders hereby irrevocably appoints the Agent as its administrative agent and collateral agent and authorizes the Agent to take such actions on its behalf and to exercise such powers as are delegated to the Agent by the terms of the Loan Documents, together with such actions and powers as are reasonably incidental thereto. Without limiting the generality of the foregoing, the Agent is hereby expressly authorized to execute any and all documents (including releases) with respect to the Collateral and the rights of the Secured Parties with respect thereto, as contemplated by and in accordance with the provisions of this Agreement and the Security Documents.

The person serving as the Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Agent, and such bank and its Affiliates may accept deposits from, lend money to and generally engage in any kind of business with Holdings, the Borrower or any Subsidiary or other Affiliate thereof as if it were not the Agent hereunder.

The Agent shall not have any duties or obligations except those expressly set forth in the Loan Documents. Without limiting the generality of the foregoing, (a) the Agent shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing, (b) the Agent shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby that the Agent is instructed in writing to exercise by the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 9.09) and (c) except as expressly set forth in the Loan Documents, the Agent shall not

have any duty to disclose, nor shall it be liable for the failure to disclose, any information relating to Holdings, the Borrower or any of the Subsidiaries that is communicated to or obtained by the bank serving as the Agent or any of its Affiliates in any capacity. The Agent shall not be liable for any action taken or not taken by it with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 9.09) or in the absence of its own gross negligence or willful misconduct. The Agent shall not be deemed to have knowledge of any Default unless and until written notice thereof is given to the Agent by Holdings, the Borrower or a Lender, and the Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with any Loan Document, (ii) the contents of any certificate, report or other document delivered thereunder or in connection therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth in any Loan Document, (iv) the validity, enforceability, effectiveness or genuineness of any Loan Document or any other agreement, instrument or document, or (v) the satisfaction of any condition set forth in Article IV or elsewhere in any Loan Document, other than to confirm receipt of items expressly required to be delivered to the Agent.

The Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing believed by it to be genuine and to have been signed or sent by the proper person. The Agent may also rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper person, and shall not incur any liability for relying thereon. The Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

The Agent may perform any and all its duties and exercise its rights and powers by or through any one or more sub-agents appointed by it. The Agent and any such sub-agent may perform any and all its duties and exercise its rights and powers by or through their Related Parties. The exculpatory provisions of the preceding paragraphs shall apply to any such sub-agent and to the Related Parties of the Agent and any such sub-agent, and shall apply to their activities in connection with the syndication of the credit facilities contemplated hereby as well as activities as the Agent.

Subject to the appointment and acceptance of a successor Agent as provided below, the Agent may resign at any time by notifying the Lenders and the Borrower. Upon any such resignation, the Required Lenders shall have the right, in consultation with the Borrower, to appoint a successor. If no successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Agent gives notice of its resignation, then the retiring Agent may, on behalf of the Lenders, appoint a successor Agent which shall be a bank with an office in New York, New York, or an Affiliate of any such bank. Upon the acceptance of its appointment as Agent hereunder by a successor, such successor shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Agent, and the retiring Agent shall be discharged from its duties and obligations hereunder. The fees payable by the Borrower to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor. After an Agent's resignation hereunder, the provisions of this Article and Section 9.06 shall continue in effect for the benefit of such retiring Agent, its sub-agents and their Related Parties in respect of any actions taken or omitted to be taken by any of them while acting as Agent.

Each Lender acknowledges that it has, independently and without reliance upon the Agent or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender also acknowledges that it will, independently and without reliance upon the Agent or any other Lender and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement or any other Loan Document, any related agreement or any document furnished hereunder or thereunder.

Except as expressly set forth in this Agreement, neither the Syndication Agent nor any arranger, bookrunner or documentation agent listed on the cover page hereof shall have, in any such capacity, any duty or responsibility under any Loan Document.

## ARTICLE IX

### MISCELLANEOUS

SECTION 9.01     *Notices.* Notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by fax, as follows:if to the Borrower or Holdings, to it at 111 West Ocean Boulevard, Suite 1240, Long Beach, California 90802, Attention of Darren Katic, President (Fax No. (562) 628-1536; e-mail dkatic@pacenergy.com), with a copy to Rutan & Tucker, LLP, 611 Anton Boulevard, 14th Floor, Costa Mesa, California 92626, Attention of James B. O'Neal, Esq. (Fax No. (714) 546-9035; e-mail joneal@rutan.com);

(b)     if to the Agent, to Silver Point Finance, LLC, Silver Point Finance, LLC (Borrowings, Paydowns, Interest, Fees, Rate Settings) 2 Greenwich Plaza, Greenwich, Connecticut 06830, Attention Tim Skoufis (Fax No. (203) 286-2139; e-mail bladmin@silverpointcapital.com); with a copy to Silver Point Finance, LLC (Financials, Credit Agreements, Amendments, Waivers, Compliance) 2 Greenwich Plaza, Greenwich, Connecticut 06830, Attention Melanie Gargliardo (Fax No. (203) 542-4550; e-mail creditadmin@silverpoint capital.com); with a copy to Skadden, Arps, Slate, Meagher & Flom LLP, 333 West Wacker Drive, Suite 2100, Chicago, Illinois 60606, Attention Seth E. Jacobson (Fax No. (312) 407-8511; e-mail sejacobs@skadden.com);

(c)     if to the Documentation Agent, to J. Aron & Company, 85 Broad Street, New York, New York 10004, Attention Steven Bunkin (Fax No. (212) 428-3675; e-mail Steven.bunkin@gs.com); with a copy to J. Aron & Company, 1 New York Plaza, 38th Floor, New York, New York, 10004, Attention Margaret Vaden (Fax No. (212) 428-3675; e-mail Margaret.Vaden@gs.com); and

(d)     if to a Lender, to it at its address (or fax number or e-mail address) set forth on Schedule 2.01 or in the Assignment and Acceptance pursuant to which such Lender shall have become a party hereto.

All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt if delivered by hand or overnight courier service or sent by fax or on the date five Business Days

after dispatch by certified or registered mail if mailed, in each case delivered, sent or mailed (properly addressed) to such party as provided in this Section or in accordance with the latest unrevoked direction from such party given in accordance with this Section. As agreed to among Holdings, the Borrower, the Agent and the applicable Lenders from time to time, notices and other communications may also be delivered by e-mail to the e-mail address of a representative of the applicable person provided from time to time by such person, including those provided above.

SECTION 9.02    *Survival of Agreement.*    All covenants, agreements, representations and warranties made by the Borrower or Holdings herein and in the certificates or other instruments prepared or delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the Lenders and shall survive the making by the Lenders of the Loans, regardless of any investigation made by the Lenders or on their behalf, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any fee or any other amount payable under this Agreement or any other Loan Document is outstanding and unpaid and so long as the Commitments have not been terminated. The provisions of Sections 2.13, 2.15, 2.16, 2.19, 2.20, 9.06 and, until the first anniversary of the Termination Date, 9.17 shall remain operative and in full force and effect regardless of the expiration of the term of this Agreement, the consummation of the transactions contemplated hereby, the repayment of any of the Loans, the expiration of the Commitments, the invalidity or unenforceability of any term or provision of this Agreement or any other Loan Document or any investigation made by or on behalf of the Agent or any Lender.

SECTION 9.03    *Binding Effect.* This Agreement shall become effective when it shall have been executed by the Borrower, Holdings and the Agent and when the Agent shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto.

SECTION 9.04    *Successors and Assigns* (a) Whenever in this Agreement any of the parties hereto is referred to, such reference shall be deemed to include the permitted successors and assigns of such party; and all covenants, promises and agreements by or on behalf of the Borrower, Holdings, the Agent or the Lenders that are contained in this Agreement shall bind and inure to the benefit of their successors and assigns.

(b)    Each Lender may assign to one or more assignees all or a portion of its interests, rights and obligations under this Agreement (including all or a portion of the Loans at the time owing to it), with notice to the Borrower by the Agent and, except in the case of an assignment to a Lender, to an Affiliate of a Lender or to a Related Fund (which will require prior written notice to the Agent), the prior written consent of the Agent (not to be unreasonably withheld or delayed); *provided, however*, that (i) the amount of the Commitment or Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Acceptance with respect to such assignment is delivered to the Agent) shall be in an integral multiple of, and not less than, $1,000,000 (or, if less, the entire remaining amount of such Lender's Commitment or Loans); *provided* that the principal amount of concurrent assignments to any assignee and its Related Funds shall be aggregated for purposes of determining compliance with the foregoing minimum assignment amount, (ii) the parties to each such assignment shall execute and deliver to the Agent an Assignment and Acceptance via an electronic settlement system acceptable to the Agent (or, if previously agreed with the Agent, manually), and shall pay to the Agent a processing and recordation fee of $3,500 (which fee may

be waived or reduced in the sole discretion of the Agent), (iii) the assignee, if it shall not be a Lender, shall deliver to the Agent an Administrative Questionnaire and all applicable tax forms in accordance with Section 2.19(e) and (iv) failure to deliver notice to the Borrower shall not affect the effectiveness of such assignment. Upon acceptance and recording pursuant to paragraph (e) of this Section, from and after the effective date specified in each Assignment and Acceptance, (A) the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Acceptance, have the rights and obligations of a Lender under this Agreement and (B) the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Acceptance, be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all or the remaining portion of an assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.13, 2.15, 2.19 and 9.06, as well as to any fees accrued for its account and not yet paid).

(c)     By executing and delivering an Assignment and Acceptance, the assigning Lender thereunder and the assignee thereunder shall be deemed to confirm to and agree with each other and the other parties hereto as follows: (i) such assigning Lender warrants that it is the legal and beneficial owner of the interest being assigned thereby free and clear of any adverse claim and that its Commitment and the outstanding balances of its Loans, in each case without giving effect to assignments thereof which have not become effective, are as set forth in such Assignment and Acceptance, (ii) except as set forth in (i) above, such assigning Lender makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with this Agreement, or the execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement, any other Loan Document or any other instrument or document furnished pursuant hereto, or the financial condition of the Borrower or any Subsidiary or the performance or observance by the Borrower or any Subsidiary of any of its obligations under this Agreement, any other Loan Document or any other instrument or document furnished pursuant hereto; (iii) such assignee represents and warrants that it is legally authorized to enter into such Assignment and Acceptance; (iv) such assignee confirms that it has received a copy of this Agreement, together with copies of the most recent financial statements referred to in Section 3.05(a) or delivered pursuant to Section 5.04 and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into such Assignment and Acceptance; (v) such assignee will independently and without reliance upon the Agent, such assigning Lender or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement; (vi) such assignee appoints and authorizes the Agent to take such action as agent on its behalf and to exercise such powers under this Agreement as are delegated to the Agent by the terms hereof, together with such powers as are reasonably incidental thereto; and (vii) such assignee agrees that it will perform in accordance with their terms all the obligations which by the terms of this Agreement are required to be performed by it as a Lender.

(d)     Upon its receipt of, and consent to, a duly completed Assignment and Acceptance executed by an assigning Lender and an assignee, an Administrative Questionnaire completed in respect of the assignee (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in paragraph (b) above, if applicable, and the written consent of the Agent and any applicable tax forms, the Agent shall promptly (i) accept such Assignment and Acceptance and (ii) record the information contained therein in the

Register. No assignment shall be effective unless it has been recorded in the Register as provided in this paragraph (d).

(e)    Each Lender may without the consent of the Borrower or the Agent sell participations to one or more banks or other persons in all or a portion of its rights and obligations under this Agreement (including all or a portion of the Loans owing to it); *provided, however*, that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, (iii) the participating banks or other persons shall be entitled to the benefit of the cost protection provisions contained in Sections 2.13, 2.15, and 2.19 to the same extent as if they were Lenders (but, with respect to any particular participant, to no greater extent than the Lender that sold the participation to such participant unless the sale of the participation to such participant is made with the Borrower's prior written consent) and (iv) the Borrower, the Agent and the Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement, and such Lender shall retain the sole right to enforce the obligations of the Borrower relating to the Loans and to approve any amendment, modification or waiver of any provision of this Agreement (other than amendments, modifications or waivers decreasing any fees payable to such participating bank or person hereunder or the amount of principal of or the rate at which interest is payable on the Loans in which such participating bank or person has an interest, extending any scheduled principal payment date or date fixed for the payment of interest on the Loans in which such participating bank or person has an interest, increasing or extending the Commitments in which such participating bank or person has an interest or releasing any Guarantor (other than in connection with the sale of such Guarantor in a transaction permitted by Section 6.05) or all or substantially all of the Collateral). A participant that would be a Foreign Lender if it were a Lender shall not be entitled to the benefits of Section 2.19 unless the Borrower is notified of the participation sold to such participant and such participant agrees, for the benefit of the Borrower, to comply with Section 2.19(e) as though it were a Lender.

(f)    Any Lender or participant may, in connection with any assignment or participation or proposed assignment or participation pursuant to this Section, disclose to the assignee or participant or proposed assignee or participant any information relating to the Borrower furnished to such Lender by or on behalf of the Borrower; *provided* that, prior to any such disclosure of information designated by the Borrower as confidential, each such assignee or participant or proposed assignee or participant shall execute an agreement whereby such assignee or participant shall agree (subject to customary exceptions) to preserve the confidentiality of such confidential information on terms no less restrictive than those applicable to the Lenders pursuant to Section 9.17.

(g)    Any Lender may at any time assign all or any portion of its rights under this Agreement to secure extensions of credit to such Lender or in support of obligations owed by such Lender; *provided* that no such assignment shall release a Lender from any of its obligations hereunder or substitute any such assignee for such Lender as a party hereto.

(h)    Notwithstanding anything to the contrary contained herein, any Lender (a "***Granting Lender***") may grant to a special purpose funding vehicle (an "***SPC***"), identified as such in writing from time to time by the Granting Lender to the Agent and the Borrower, the option to provide to the Borrower all or any part of any Loan that such Granting Lender would otherwise be obligated to make to the Borrower pursuant to this Agreement;

*provided* that (i) nothing herein shall constitute a commitment by any SPC to make any Loan and (ii) if an SPC elects not to exercise such option or otherwise fails to provide all or any part of such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof. The making of a Loan by an SPC hereunder shall utilize the Commitment of the Granting Lender to the same extent, and as if, such Loan were made by such Granting Lender. Each party hereto hereby agrees that no SPC shall be liable for any indemnity or similar payment obligation under this Agreement (all liability for which shall remain with the Granting Lender). In furtherance of the foregoing, each party hereto hereby agrees (which agreement shall survive the termination of this Agreement) that, prior to the date that is one year and one day after the payment in full of all outstanding commercial paper or other senior indebtedness of any SPC, it will not institute against, or join any other person in instituting against, such SPC any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings under the laws of the United States or any State thereof In addition, notwithstanding anything to the contrary contained in this Section, any SPC may (i) with notice to, but without the prior written consent of, the Borrower and the Agent and without paying any processing fee therefor, assign all or a portion of its interests in any Loans to the Granting Lender or to any financial institutions (consented to by the Borrower and Agent) providing liquidity and/or credit support to or for the account of such SPC to support the funding or maintenance of Loans and (ii) disclose on a confidential basis any non-public information relating to its Loans to any rating agency, commercial paper dealer or provider of any surety, guarantee or credit or liquidity enhancement to such SPC.

(i)     Neither Holdings nor the Borrower shall assign or delegate any of its rights or duties hereunder without the prior written consent of the Agent and each Lender, and any attempted assignment without such consent shall be null and void.

SECTION 9.05    *The Register*  (a) The Agent, acting for this purpose as an agent of the Borrower, shall maintain at one of its offices a register for the recordation of the names and addresses of Lenders and the Maximum Credit Amount and Loans of each Lender from time to time (the *"Register"*). The Register shall be available for inspection by the Borrower or any Lender at any reasonable time and from time to time upon reasonable prior notice. The Agent shall record in the Register the Loans, each repayment or prepayment in respect of the principal amount of the Loans, and each payment of interest thereon, and any such recordation shall be conclusive and binding on the Borrower and each Lender, absent manifest error; provided, failure to make any such recordation, or any error in such recordation, shall not affect the Borrower's obligations in respect of any Loan. The Borrower hereby designates the entity serving as the Agent to serve as the Borrower's agent solely for purposes of maintaining the Register as provided in this Section, and the Borrower hereby agrees that, to the extent such entity serves in such capacity, the Agent and its officers, partners, directors, trustees, employees, representatives and agents shall constitute "Indemnitees" for purposes of Section 9.06.

(b)     The Borrower, the Agent and Lenders shall deem and treat the persons listed as Lenders in the Register as the holders and owners of the corresponding Commitments and Loans listed therein for all purposes hereof, and no assignment or transfer of any such Commitment or Loan shall be effective, in each case, unless and until an Assignment and Acceptance effecting the assignment or transfer thereof shall have been delivered to and accepted by the Agent and recorded in the Register. Prior to such recordation, all amounts owed with respect to the applicable Commitment or Loan shall be owed to the Lender listed in the Register as the owner thereof, and any request, authority or consent of any person who, at the time of making such request or giving such authority or consent, is listed in the Register as a

Lender shall be conclusive and binding on any subsequent holder, assignee or transferee of the corresponding Commitments and Loans.

SECTION 9.06    *Expenses; Indemnity* (a)    The Borrower and Holdings agree, jointly and severally, to pay all reasonable out-of-pocket expenses incurred by the Agent, the sole lead arranger listed on the cover page of this Agreement, the Syndication Agent, the Documentation Agent, or the Affiliates of the foregoing in connection with the arrangement and syndication of the credit facilities contemplated hereby and the preparation, negotiation, delivery and administration of this Agreement and the other Loan Documents or in connection with any amendments, modifications or waivers of the provisions hereof or thereof or incurred by the Agent or any Lender in connection with the enforcement or protection of its rights in connection with this Agreement and the other Loan Documents, including the fees, charges and disbursements of Skadden, Arps, Slate, Meagher & Flom LLP, counsel for the Agent, Latham & Watkins, LLP, counsel for the Documentation Agent, and, in connection with any such enforcement or protection, the fees, charges and disbursements of any other outside counsel for the Agent or any Lender.

(b)    The Borrower and Holdings agree, jointly and severally, to indemnify the Agent, each sole lead arranger listed on the cover page of this Agreement, the Syndication Agent, each Lender and each Related Party of any of the foregoing persons (each such person being called an "*Indemnitee*") against, and to hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses, including reasonable fees, charges and disbursements of any counsel for any Indemnitee, incurred by or asserted against any Indemnitee arising out of, in any way connected with, or as a result of (i) the execution or delivery of this Agreement or any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties thereto of their obligations thereunder or the consummation of the Transactions and the other transactions contemplated hereby or thereby (including the syndication of the credit facilities contemplated hereby), (ii) the use of the proceeds of the Loans, (iii) any claim, litigation, investigation or proceeding relating to any of the foregoing, whether or not any Indemnitee is a party thereto (and regardless of whether such matter is initiated by a third party or by the Borrower, any other Loan Party or any of their Affiliates) or (iv) any actual or alleged presence or Release of Hazardous Materials on, at, under or from any property currently or formerly owned or operated by the Borrower or any of the Subsidiaries, or any Environmental Liability related in any way to the Borrower or the Subsidiaries; *provided* that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted primarily from the gross negligence or willful misconduct of such Indemnitee.

(c)    To the extent that Holdings and the Borrower fail to pay any amount required to be paid by them to the Agent under paragraph (a) or (b) of this Section, each Lender severally agrees to pay to the Agent such Lender's *pro rata* share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount; *provided* that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Agent in its capacity as such. For purposes hereof, a Lender's "*pro rata share*" shall be determined based upon its share of the outstanding Loans and unused Commitments at the time.

(d)    To the extent permitted by applicable law, neither Holdings nor the Borrower shall assert, and each hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement or any agreement or instrument contemplated hereby, the Transactions, any Loan or the use of the proceeds thereof.

(e)    The provisions of this Section shall remain operative and in full force and effect regardless of the expiration of the term of this Agreement, the consummation of the transactions contemplated hereby, the repayment of any of the Loans, the expiration of the Commitments, the invalidity or unenforceability of any term or provision of this Agreement or any other Loan Document, or any investigation made by or on behalf of the Agent or any Lender. All amounts due under this Section shall be payable on written demand therefor.

SECTION 9.07    *Right of Setoff.*  If an Event of Default shall have occurred and be continuing, each Lender is hereby authorized at any time and from time to time, except to the extent prohibited by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness at any time owing by such Lender to or for the credit or the account of the Borrower or Holdings on any other Loan Party against any of and all the obligations of the Borrower or Holdings on any other Loan Party now or hereafter existing under this Agreement and other Loan Documents held by such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement or such other Loan Document and although such obligations may be unmatured. The rights of each Lender under this Section are in addition to other rights and remedies (including other rights of setoff) which such Lender may have.

SECTION 9.08    *Applicable Law.*  THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS (OTHER THAN AS EXPRESSLY SET FORTH IN OTHER LOAN DOCUMENTS) SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK

SECTION 9.09    *Waivers; Amendment*  (a)  No failure or delay of the Agent or any Lender in exercising any power or right hereunder or under any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  The rights and remedies of the Agent and the Lenders hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have. Subject to paragraph (c) below, no waiver of any provision of this Agreement or any other Loan Document or consent to any departure by the Borrower or any other Loan Party therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) below, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  No notice or demand on the Borrower or Holdings in any case shall entitle the Borrower or Holdings to any other or further notice or demand in similar or other circumstances.

(b)    Subject to paragraph (c) below, neither this Agreement nor any other Loan Document nor any provision hereof may be waived, amended or modified except, in the case of this Agreement, pursuant to an agreement or agreements in writing entered into by the Borrower, Holdings and the Required Lenders or, in the case of any other Loan Document,

pursuant to an agreement or agreements in writing entered into by the Agent and the Loan Parties that are parties thereto, in each case with the consent of the Required Lenders; *provided, however,* that no such agreement shall (i) decrease the principal amount of, or extend the maturity of or any scheduled principal payment date or date for the payment of any interest on any Loan, or waive or excuse any such payment or any part thereof, or decrease the rate of interest on any Loan, without the prior written consent of each Lender directly adversely affected thereby, (ii) increase or extend the Commitment or Maximum Credit Amount or decrease the amount, or extend the date for payment of, any fees of any Lender without the prior written consent of each Lender directly affected thereby, (iii) amend or modify the *pro rata* requirements of Section 2.16, any other provision of any Loan Document requiring that Loans be made by, or payments be allocated among, the Lenders on a *pro rata* basis, the provisions of Section 9.04(i) or the provisions of this Section without the prior written consent of each Lender, (iv) release substantially all the Guarantors (determined based on the fair market value of the Guarantors) (other than in connection with the sale of any Guarantor in a transaction permitted by Section 6.05) or all or substantially all of the Collateral without the prior written consent of each Lender and each beneficiary of Hedging Obligations, (iv) modify the protections afforded to an SPC pursuant to the provisions of Section 9.04(h) without the written consent of such SPC, (v) modify Section 2.21 in any manner without the consent of each Lender, (vi) reduce the percentage contained in the definition of the term "Required Lenders" or any other provision of any Loan Document specifying the number or percentage of Lenders required to waive, amend or modify any rights thereunder or make any determination or grant any consent thereunder, without the prior written consent of each Lender, or (vii) amend or modify the definition of the term "Obligations" or "Hedging Obligations", without the prior written consent of each Lender; *provided further* that no such agreement shall amend, modify or otherwise affect the rights or duties of the Agent or under any other Loan Document without the prior written consent of the Agent.

(c)     Notwithstanding any other provisions of this Agreement to the contrary, the Borrower covenants and agrees that after the Closing Date and prior to the date that is 180 days following the Closing Date, the Agent shall have the right to modify the terms, conditions, pricing and structure set forth in this Agreement and the other Loan Documents in order to ensure a successful syndication of the Commitments and Loans hereunder, including by way of assignment of all or a substantial portion of the Commitments and Loans to one or more banks or other financial institutions that, in turn, intend to further syndicate the Commitments and Loans; *provided* that no such modifications shall cause the Borrower to be in default under this Agreement (as so modified). Borrower shall execute and deliver such documents as shall reasonably be required by the Agent as promptly as possible under the circumstances in connection with this Section 9.09(c), all in form and substance reasonably satisfactory to the Agent. The Agent may demand specific performance of the provisions of this Section 9.09(c) and the Borrower hereby irrevocably waives any defense based on the adequacy of a remedy at law and any other defense that might be asserted to bar the remedy of specific performance in any action which may be brought by the Agent. In the event that any successor Agent is appointed pursuant to the provisions of Article VIII, the provisions of this Section 9.09(c) shall inure to the benefit of such successor Agent.

SECTION 9.10     *Interest Rate Limitation*. Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Loan, together with all fees, charges and other amounts which are treated as interest on such Loan under applicable law (collectively the "*Charges*"), shall exceed the maximum lawful rate (the "*Maximum Rate*")

which may be contracted for, charged, taken, received or reserved by the Lender holding such Loan in accordance with applicable law, the rate of interest payable in respect of such Loan, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Loan but were not payable as a result of the operation of this Section shall be cumulated and the interest and Charges payable to such Lender in respect of other Loans or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Effective Rate to the date of repayment, shall have been received by such Lender.

SECTION 9.11     *Entire Agreement.*   This Agreement and the other Loan Documents constitute the entire contract between the parties relative to the subject matter hereof. Any other previous agreement among the parties with respect to the subject matter hereof is superseded by this Agreement and the other Loan Documents. Nothing in this Agreement or in the other Loan Documents, expressed or implied, is intended to confer upon any person (other than the parties hereto and thereto, their successors and assigns permitted hereunder, the Indemnitees and, to the extent expressly contemplated hereby, the Related Parties of each of the Agent and the Lenders) any rights, remedies, obligations or liabilities under or by reason of this Agreement or the other Loan Documents.

SECTION 9.12     *WAIVER OF JURY TRIAL.*   EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS. EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

SECTION 9.13     *Severability.*   In the event any one or more of the provisions contained in this Agreement or in any other Loan Document should be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby (it being understood that the invalidity of a particular provision in a particular jurisdiction shall not in and of itself affect the validity of such provision in any other jurisdiction). The parties shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

SECTION 9.14     *Counterparts.*   This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original but all of which when taken together shall constitute a single contract, and shall become effective as provided in Section 9.03. Delivery of an executed signature page to this Agreement by facsimile transmission or other electronic imaging means shall be as effective as delivery of a manually signed counterpart of this Agreement.

SECTION 9.15 **Headings.** Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and are not to affect the construction of, or to be taken into consideration in interpreting, this Agreement.

SECTION 9.16 **Jurisdiction; Consent to Service of Process.** (a) Each of Holdings and the Borrower hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of any New York State court or Federal court of the United States of America sitting in New York City, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement or the other Loan Documents, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such Federal court. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Agreement shall affect any right that any party may otherwise have to bring any action or proceeding relating to this Agreement or the other Loan Documents against the any other party or their properties in the courts of any jurisdiction.

(b) Each of Holdings and the Borrower hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or the other Loan Documents in any New York State or Federal court (it being understood that such waiver shall not require any suit, action or proceeding initiated in any court to be remanded or removed to any New York State court or any Federal court of the United States of America sitting in New York City). Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(c) Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 9.01. Nothing in this Agreement will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

SECTION 9.17 **Confidentiality.** Each of the Agent and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its and its Affiliates' officers, directors, employees and agents, including accountants, legal counsel and other advisors (it being understood that the persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority or quasi-regulatory authority (such as the National Association of Insurance Commissioners), (c) to the extent required by applicable laws or regulations or by any subpocna or similar legal process, (d) in connection with the exercise of any remedies hereunder or under the other Loan Documents or any suit, action or proceeding relating to the enforcement of its rights hereunder or thereunder, (e) subject to an agreement containing provisions substantially the same as those of this Section, to (i) any actual or prospective assignee of or participant in any of its rights or obligations under this Agreement and the other Loan Documents or (ii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to the Borrower or any Subsidiary or any of their respective obligations, (f) with the consent of the Borrower or (g)

88

to the extent such Information becomes publicly available other than as a result of a breach of this Section. For the purposes of this Section, "*Information*" shall mean all information received from the Borrower or Holdings and related to the Borrower or Holdings or their business, other than any such information that was available to the Agent or any Lender on a nonconfidential basis prior to its disclosure by the Borrower or Holdings; *provided* that, in the case of Information received from the Borrower or Holdings after the date hereof, such information is clearly identified at the time of delivery as confidential. Any person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such person has exercised the same degree of care to maintain the confidentiality of such Information as such person would accord its own confidential information.

SECTION 9.18 *Termination or Release* (a) Each Security Document, the guarantees made therein and the security interests granted thereunder shall terminate when all the Loan Document Obligations have been indefeasibly paid in full in cash and the Commitments have expired or been terminated.

(b) A Subsidiary Loan Party shall automatically be released from its obligations under the Loan Documents, the guarantee of such Subsidiary Loan Party made under the Collateral Agreement shall automatically be released and the security interests granted in the Collateral of such Subsidiary Loan Party under the Security Documents shall automatically be released upon the consummation of any transaction permitted by this Agreement as a result of which such Subsidiary Loan Party ceases to be a Subsidiary pursuant to the terms of this Agreement.

(c) Upon any sale or other transfer by any Loan Party of any Collateral that is permitted under this Agreement to any person (other than a Loan Party or an Affiliate of a Loan Party), or upon the effectiveness of any written consent pursuant to Section 9.09 to the release of any security interest granted in any Collateral of such Loan Party under to the Security Documents, the security interests granted in such Collateral under the Security Documents shall be automatically released.

(d) In connection with any termination or release pursuant to this Section 9.18, the Agent shall execute and deliver to the applicable Loan Party, at such Loan Party's expense, all documents that such Loan Party shall reasonably request to evidence such release or termination. Any execution and delivery of documents pursuant to this Section 9.18 shall be without recourse to or warranty by the Agent.

SECTION 9.19 *USA PATRIOT Act Notice.* Each Lender and the Agent (for itself and not on behalf of any Lender) hereby notifies Holdings and the Borrower that pursuant to the requirements of the USA PATRIOT Act, it is required to obtain, verify and record information that identifies Holdings and the Borrower, which information includes the name and address of Holdings and the Borrower and other information that will allow such Lender or the Agent, as applicable, to identify Holdings and the Borrower in accordance with the USA PATRIOT Act.

SECTION 9.20 *No Fiduciary Relationship; Non-Reliance.* Each of Holdings and the Borrower, on behalf of itself and the Subsidiaries, agrees that in connection with all aspects of the transactions contemplated hereby or by the other Loan Documents and any communications in connection therewith, the Borrower, the Subsidiaries and their Affiliates, on

the one hand, and the Agent, the Lenders and their Affiliates, on the other hand, will have a business relationship that does not create, by implication or otherwise, any fiduciary duty on the part of the Agent the Lenders or their Affiliates, and no such duty will be deemed to have arisen in connection with any such transaction or communications. Each of Holdings and the Borrower, on behalf of itself and the Subsidiaries, acknowledges that it has been represented by counsel with respect to the Loan Documents and agrees that it has, independently and without reliance upon the Agent, Documentation Agent or any other Lenders, and based upon such documents, information and analyses as it has deemed appropriate, made its own decision to enter into this Agreement.

SECTION 9.21    *Intercreditor Agreement.*    Reference is made to the Intercreditor Agreement. Each Lender (a) acknowledges that it has received a copy of the Intercreditor Agreement, (b) acknowledges and agrees to Silver Point acting as the Agent and the Second Lien Agent, (c) agrees that it will be bound by and will take no actions contrary to the provisions of the Intercreditor Agreement and (d) authorizes and instructs Silver Point to enter into the Intercreditor Agreement as collateral agent for such Lender.

SECTION 9.22    *Security Documents.*    Reference is made to the Security Documents. Each Lender authorizes and instructs Silver Point to enter into the Security Documents as collateral agent for such Lender.

SECTION 9.23    *Personal Obligations.*    BORROWER IS PERSONALLY OBLIGATED AND FULLY LIABLE FOR THE AMOUNTS DUE UNDER THE LOAN DOCUMENTS. THE AGENT HAS THE RIGHT TO SUE ON EACH LOAN DOCUMENT AND TO OBTAIN A PERSONAL JUDGMENT AGAINST BORROWER FOR THE AMOUNT DUE UNDER EACH LOAN DOCUMENT EITHER BEFORE OR AFTER A JUDICIAL FORECLOSURE UNDER ALASKA STATUTES 09.45.170-09.45.220 OF ANY MORTGAGE GIVEN BY BORROWER TO SECURE PAYMENT OF THE AMOUNTS DUE UNDER THE LOAN DOCUMENTS.

## ARTICLE X

### HEDGING

SECTION 10.01    *Voting.* (a)    The counterparty under each Hedging Agreement which constitutes an Obligation hereunder, as well as each Lender, shall be entitled to vote on: (i) any remedies proposed to be taken by the holders of the Obligations, (ii) any matters relating to the Collateral and (iii) any proposed amendment to or modification of the definition of the term "Obligations" or "Hedging Obligations". The amount of Obligations to be voted by each Lender and each other counterparty under each such Hedging Agreement will equal

(i)    the aggregate principal amount of Indebtedness held by such person; provided that, (a) for purposes of this Article X, with respect to clause (l) of the definition of "Indebtedness" the amount of such Indebtedness in respect of any such Hedging Agreement at such time shall be the greater of (i) the termination amount that would be payable by the applicable Loan Party or Loan Parties thereunder (after giving effect to any legally enforceable netting agreements) if all such Hedging Agreements were closed out and terminated

(or the applicable termination amount then due, in respect of any Hedging Obligations thereunder that have been so closed out and terminated) and (ii) $10,000,000 and (b) the amount of Hedging Obligation in respect of any such Hedging Agreement at any time shall be the amount therof determined by the applicable counterparty consistent with prevailing market practices, *plus*

(ii)other than in connection with an exercise of remedies, the aggregate unfunded commitments to extend credit which, when funded, would constitute Indebtedness of such person.

(b)    Each Lender and any other counterparty under each Hedging Agreement shall be entitled to request a re-vote with respect to any remedies proposed to be taken or refrained from taking if it believes that (i) the voting percentages of the various persons entitled to vote have changed in any material respect or (ii) facts or circumstances with respect to the Borrower or the Collateral have changed sufficiently to make such a re-vote worthwhile.

SECTION 10.02    *Acknowledgement relating to Hedging Agreements with First Lien Hedge Counterparties.*    Lenders hereby acknowledge and agree that any Hedging Agreement with a First Lien Hedge Counterparty constitutes an Obligation hereunder, rather than a Second Lien Obligation.

SECTION 10.03    *Amendment to Intercreditor Provisions.*    Notwithstanding any other provision herein, Lenders acknowledge and agree that none of this Article X, the definition of the term "Obligations" or the definition of the term "Hedging Obligations" may be modified or amended without the consent each First Lien Hedge Counterparty, in its sole discretion.

IN WITNESS WHEREOF, the parties hereto have caused this First Lien Credit Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

PACIFIC ENERGY ALASKA OPERATING LLC,

by

Name: Darren Katic
Title: President

PACIFIC ENERGY ALASKA HOLDINGS, LLC,

by

Name: Darren Katic
Title: President

SILVER POINT FINANCE, LLC, as
Administrative Agent, Collateral Agent, Sole Lead
Arranger, Sole Bookrunner and Syndication Agent

by

Name:
Title:

IN WITNESS WHEREOF, the parties hereto have caused this First Lien Credit Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

PACIFIC ENERGY ALASKA OPERATING LLC,

by _____

Name:
Title:

PACIFIC ENERGY ALASKA HOLDINGS, LLC,

by _____

Name:
Title:

SILVER POINT FINANCE, LLC, as
Administrative Agent, Collateral Agent, Sole Lead
Arranger, Sole Bookrunner and Syndication Agent

by _____

Name:
Title:

Richard Petrilli
Authorized Signatory

First Lien Credit Agreement

J. ARON & COMPANY, as Lender

by

Name: Donna Mansfield
Title: Attorney In Fact

First Lien Credit Agreement