# Exhibit A

# of

# Affidavit of Shannon W. Martin



BOOK 0550 PAGE 485

UNIT OPERATING AGREEMENT
TRADING BAY UNIT
COOK INLET, ALASKA

STATE RECORDING DISTRICT:
PLEASE RETURN TO:

KEVIN A. TARLER, LAND MANAGER
UNION OIL COMPANY OF CALIFORNIA
PO BOX 196247
ANCHORAGE, AK  99519-6247

T A B L E   O F   C O N T E N T S

Preliminary Recitals                                              1

ARTICLE I--CONFIRMATION OF UNIT AGREEMENT

Section 1.1   Confirmation of Unit Agreement                     1

ARTICLE II-- EXHIBITS -- APPENDICES

Section 2.1   Exhibits                                           1
Section 2.2   Appendices                                         2
Section 2.3   Revision of Appendices                             3

ARTICLE III--DEFINITIONS

Section 3.1   Unit Agreement                                     3
Section 3.2   Acre-Feet of WIPA Pay                              3
Section 3.3   Basic Participating Interest                       3
Section 3.4   Costs                                              3
Section 3.5   Deepen or Plug Back                                4
Section 3.6   Development Well                                   4
Section 3.7   Drill, Drilled or Drilling                        4
Section 3.8   Drilling Party                                     4
Section 3.9   Effective Participating Interest                   4
Section 3.10  Exploratory Well                                   4
Section 3.11  Gross Working Interest                             4
Section 3.12  Injection Wells                                    5
Section 3.13  Lease Burdens                                      5
Section 3.14  Market Value                                       5
Section 3.15  Net Working Interest                               5
Section 3.16  Non-Drilling Party                                 5
Section 3.17  Party                                              5
Section 3.18  Pool                                               5
Section 3.19  Production                                         5
Section 3.20  Royalty Interest Participating Area                6
Section 3.21  Specified Redetermination                          6
Section 3.22  Sub-Operator                                       6
Section 3.23  Subsequent Redetermination                         6
Section 3.24  Surface Acreage                                    6
Section 3.25  Tract                                              6
Section 3.26  Unit Operator                                      6
Section 3.27  Working Interest                                   6
Section 3.28  Working Interest Participating Area                6

ARTICLE IV--SUPERVISION OF OPERATIONS BY PARTIES

Section 4.1   Over-all Supervision                               7
Section 4.2   Particular Powers and Duties                       7

ARTICLE V--MANNER OF EXERCISING SUPERVISION

Section 5.1   Designation of Representatives                     9
Section 5.2   Meetings                                           9

BOOK **0551** PAGE **002**      BOOK **0550** PAGE **486**

ARTICLE VI--INDIVIDUAL RIGHTS OF PARTIES

Section 6.1  Reservation of Rights                                    13
Section 6.2  Specific Rights                                         13

ARTICLE VII--UNIT OPERATOR AND SUB-OPERATORS

Section 7.1  Initial Unit Operator                                   13
Section 7.2  Initial Sub-Operators                                   13
Section 7.3  Resignation or Removal of Unit Operator and
             Selection of Successor                                  14
Section 7.4  Resignation or Removal of Sub-Operators and
             Selection of Successors                                 14

ARTICLE VIII--AUTHORITIES AND DUTIES OF
UNIT OPERATOR AND SUB-OPERATORS

Section 8.1  Unit Operator                                           15
Section 8.2  Sub-Operators                                           16
Section 8.3  Unit Operator and Sub-Operators                         17

ARTICLE IX--DETERMINATION OF WORKING INTEREST
PARTICIPATING AREAS AND BASIC
PARTICIPATING INTERESTS

Section 9.1  Hemlock WIPA and BPI                                    18
Section 9.2  Initial Determination of WIPA                           18
Section 9.3  Determination of Initial BPI                            19
Section 9.4  Redeterminations of WIPA and BPI                        19
Section 9.5  Effective Date                                          20
Section 9.6  Manner of Redetermination of WIPA and BPI               20
Section 9.7  Arbitration                                             21

ARTICLE X--APPORTIONMENT OF COSTS AND
OWNERSHIP OF PRODUCTION AND PROPERTY

Section 10.1 Apportionment and Allocation of Production
             for Royalty Purposes                                   22
Section 10.2 Apportionment and Ownership Within a WIPA               22

ARTICLE XI--INITIAL AND FUTURE ADJUSTMENTS
OF COSTS, PRODUCTION, AND PROPERTY

Section 11.1 Adjustments on Initial Determination and
             Specified Redeterminations of WIPA or BPI              24
Section 11.2 Adjustments on Subsequent Redeterminations              26

ARTICLE XII--PLANS OF DEVELOPMENT

Section 12.1 Wells and Projects Included                             28
Section 12.2 Notice of Proposed Plan                                 28
Section 12.3 Cessation of Operations under Plan                      28

ARTICLE XIII--DRILLING, DEEPENING, PLUGGING BACK
OR ABANDONMENT OF EXPLORATORY, DEVELOPMENT
AND INJECTION WELLS

Section 13.1 General Provisions for Exploratory,                    29

BOOK 0550 PAGE 487

BOOK 0551 PAGE 003

| | | |
|---|---|---|
| Section 13.3 | Development Wells | 33 |
| Section 13.4 | Relinquishment and Reversion of Interests | 33 |
| Section 13.5 | Abandonment of Producing Wells | 35 |
| Section 13.6 | Injection Wells | 36 |

ARTICLE XIV--REQUIRED WELLS

| | | |
|---|---|---|
| Section 14.1 | Definition | 36 |
| Section 14.2 | Election to Drill | 37 |
| Section 14.3 | Alternatives to Drilling | 37 |
| Section 14.4 | Required Drilling | 38 |

ARTICLE XV--ESTABLISHMENT, REVISIONS AND
CONSOLIDATION OF ROYALTY INTEREST
PARTICIPATING AREAS

| | | |
|---|---|---|
| Section 15.1 | General | 38 |
| Section 15.2 | Procedure | 38 |
| Section 15.3 | Revised Proposal | 39 |

ARTICLE XVI--PLATFORMS AND PRODUCTION FACILITIES

| | | |
|---|---|---|
| Section 16.1 | Prior Commitments | 39 |
| Section 16.2 | Costs | 40 |
| Section 16.3 | Use of Wells, Platforms, or Production Facilities | 40 |

ARTICLE XVII--CONSTRUCTION OF CERTAIN PLATFORMS,
PIPELINES AND OTHER FACILITIES

| | | |
|---|---|---|
| Section 17.1 | General | 40 |
| Section 17.2 | Sub-Operator to Conduct Operations | 41 |
| Section 17.3 | Notice of Proposed Construction | 41 |
| Section 17.4 | Response to Notice | 41 |
| Section 17.5 | Participation | 41 |
| Section 17.6 | Relinquishment and Reversion of Interests | 42 |

ARTICLE XVIII--RIGHT TO TAKE IN KIND AND
FAILURE TO TAKE IN KIND -- UNDERLIFTING

| | | |
|---|---|---|
| Section 18.1 | Taking in Kind | 44 |
| Section 18.2 | Underlifting of Liquid Production | 44 |
| Section 18.3 | Underlifting or Balancing of Gas Production | 48 |
| Section 18.4 | Indemnity | 51 |

ARTICLE XIX--UNIT EXPENSE

| | | |
|---|---|---|
| Section 19.1 | Basis of Charge to Parties | 51 |
| Section 19.2 | Budgets | 52 |
| Section 19.3 | Advance Billings | 52 |
| Section 19.4 | Commingling of Funds | 53 |
| Section 19.5 | Lien of Unit Operator and Sub-Operator | 53 |

ARTICLE XX--TITLES

BOOK 0550 PAGE 488

BOOK 0551 PAGE 004

### ARTICLE XXI--RENTALS AND LEASE BURDENS

| | | |
|---|---|---|
| Section 21.1 | Rentals | 54 |
| Section 21.2 | Lease Burdens | 54 |
| Section 21.3 | Payments to be Borne by Parties | 55 |

### ARTICLE XXII--TAXES

| | | |
|---|---|---|
| Section 22.1 | Taxes Upon Unit Property and Operations | 55 |
| Section 22.2 | Other Taxes | 55 |
| Section 22.3 | Transfer of Interests | 55 |
| Section 22.4 | Notices and Returns | 56 |

### ARTICLE XXIII--INSURANCE

| | | |
|---|---|---|
| Section 23.1 | Required Insurance | 56 |
| Section 23.2 | Individual Insurance | 57 |
| Section 23.3 | Contractors' Insurance | 57 |
| Section 23.4 | Notice of Losses and Claims | 58 |

### ARTICLE XXIV--RELEASE FROM OBLIGATIONS AND SURRENDER

| | | |
|---|---|---|
| Section 24.1 | Surrender or Release Within a WIPA | 58 |
| Section 24.2 | Procedure on Surrender Outside a WIPA | 58 |
| Section 24.3 | Accrued Obligations | 59 |

### ARTICLE XXV--FORCE MAJEURE

| | | |
|---|---|---|
| Section 25.1 | Force Majeure | 59 |

### ARTICLE XXVI--NOTICES

| | | |
|---|---|---|
| Section 26.1 | Giving and Receipt | 60 |
| Section 26.2 | Proper Addresses | 61 |

### ARTICLE XXVII--LIABILITY, CLAIMS, AND SUITS

| | | |
|---|---|---|
| Section 27.1 | Individual Liability | 61 |
| Section 27.2 | Settlements | 61 |

### ARTICLE XXVIII--INTERNAL REVENUE PROVISION

| | | |
|---|---|---|
| Section 28.1 | Internal Revenue Provision | 61 |

### ARTICLE XXIX--EFFECTIVE DATE AND TERM

| | | |
|---|---|---|
| Section 29.1 | Effective Date | 62 |
| Section 29.2 | Term | 62 |

### ARTICLE XXX--NON-DISCRIMINATION

| | | |
|---|---|---|
| Section 30.1 | Non-discrimination | 62 |

BOOK **0551** PAGE **005**

BOOK **0550** PAGE **489**

### ARTICLE XXXII--EXECUTION

Section 32.1   Counterparts                                    64
Section 32.2   Ratification                                    64

### EXHIBITS

A.   Methods of Calculation

B.   Hypothetical Example of the Calculations Described
     in Exhibit "A"

C.   Accounting Procedure

### APPENDICES

A.   Maps of Working Interest Participating Areas

B.   Schedules of Basic Participating Interests and
     Descriptions of Pools

\*          \*          \*

BOOK **0551** PAGE **006**

BOOK 0550 PAGE 490

UNIT OPERATING AGREEMENT

TRADING BAY UNIT

COOK INLET, ALASKA

1   THIS AGREEMENT, entered into as of the 27th day of Feb-
2   ruary, 1967, by and between the Parties who have signed the
3   original of this instrument, a counterpart thereof, or other
4   instrument agreeing to be bound by the provisions hereof;

W I T N E S S E T H :

THAT WHEREAS, the Parties hereto as Working Interest Owners
have executed or ratified an agreement entitled "UNIT AGREEMENT
FOR THE DEVELOPMENT AND OPERATION OF THE TRADING BAY UNIT AREA,
STATE OF ALASKA", herein referred to as "Unit Agreement", cov-
ering the lands described in Exhibit "B" attached thereto, which
lands are referred to in the Unit Agreement and in this Agreement
as the "Unit Area";

WHEREAS, said Unit Agreement was approved by the Commis-
sioner of the Department of Natural Resources of the State of
Alaska effective as of February 27, 1967;

WHEREAS, numbered Paragraph 7 of the Unit Agreement pro-
vides for the Working Interest Owners to enter into a separate
agreement in order to carry out the purposes of the Unit Agreement;

NOW, THEREFORE, in consideration of the mutual agreements
herein set forth, it is agreed as follows:

ARTICLE I

CONFIRMATION OF UNIT AGREEMENT

1.1   Confirmation of Unit Agreement.   The Unit Agreement,
together with all exhibits thereto, is hereby confirmed and
adopted in its entirety.   If there is any conflict between this
Agreement and the Unit Agreement, the Unit Agreement shall govern.

BOOK **0551** PAGE **007**

BOOK **0550** PAGE **491**

1    and by this reference are made a part hereof:

2         A.  Exhibit "A", which contains the methods of cal-

3    culation of Basic Participating Interest, Royalty Share,

4    Royalty Correction Factor, and Effective Participating

5    Interest.

6         B.  Exhibit "B", which contains a hypothetical example

7    of the calculations described in Exhibit "A".

8         C.  Exhibit "C", which is the Accounting Procedure

9    for the determination of costs and expenses incurred in

10   the conduct of operations under the Unit Agreement and

11   this Agreement.  If there is any conflict between this

12   Agreement and Exhibit "C", this Agreement shall govern.

13   2.2  Appendices.  The following appendices are or may

14   hereafter be attached hereto and by this reference are made a

15   part hereof:

16        A.  Appendix "A" (containing Sub-Appendices "A-1",

17   "A-2", et seq.), which contains maps of each Working

18   Interest Participating Area heretofore or hereafter

19   established by the Parties in accordance with this

20   Agreement.  Any reference in this Agreement to Appendix

21   "A", unless otherwise stated, shall mean that Sub-

22   Appendix of Appendix "A" applicable to the relevant

23   Working Interest Participating Area.

24        B.  Appendix "B" (containing Sub-Appendices "B-1",

25   "B-2", et seq.), which contains schedules of the Basic

26   Participating Interests of each Party within each Working

27   Interest Participating Area and descriptions of the Pools

28   for which such Working Interest Participating Areas are

29   established as heretofore or hereafter determined by the

     Parties in accordance with this Agreement.  Any reference

BOOK **0551** PAGE **008**   BOOK **0550** PAGE **492**

1   to the relevant Working Interest Participating Area.

2   2.3 Revision of Appendices. Appendix "A" and Appendix "B"
3   shall be revised from time to time as provided in this Agreement.
4   Unit Operator shall also revise said appendices as required to
5   conform to changes in ownership of which Unit Operator has been
6   notified as provided in the Unit Agreement.

7   ARTICLE III

8   DEFINITIONS

9   3.1 Unit Agreement. The definitions contained in the
10  Unit Agreement are adopted for all purposes of this Agreement.
11  In addition, each term listed below shall have the meaning
12  stated therefor whenever used in this Agreement.

13  3.2 "Acre-Feet of WIPA Pay" shall mean, as to any area
14  designated pursuant to this Agreement, the number of productive
15  acres multiplied by the thickness (in feet) of the Pool con-
16  taining Unitized Substances, determined in accordance with
17  sound engineering principles; provided further, if oil and
18  free gas are originally in place in the same Pool, then Acre-
19  Feet of WIPA Pay of free gas will be multiplied by a factor
20  which will equate Acre-Feet of WIPA Pay of free gas to Acre-
21  Feet of WIPA Pay of oil on a recoverable hydrocarbon value
22  basis.

23  3.3 "Basic Participating Interest" (herein sometimes
24  referred to as "BPI" and determined as set forth in Article
25  IX) shall mean that percentage upon which Costs and ownership
26  of property are allocated to the interest of each Party in
27  each individual Tract within a Working Interest Participating
28  Area.

29  3.4 "Costs" shall mean all costs and expenses, other

1   are herein made chargeable as Costs, determined in accordance

2   with the Accounting Procedure set forth in Exhibit "C" hereto.

3       3.5   "Deepen or Plug Back" shall mean to perform all

4   operations reasonably necessary and incident to Deepen or Plug

5   Back a well, including testing, and completing or recompleting

6   and equipping for production or injection, or plugging and

7   abandoning.

8       ·    3.6   "Development Well" shall mean any well other than

9   an Injection Well Drilled to a location within any Working

10   Interest Participating Area and projected to the Pool for

11   which such Working Interest Participating Area was established.

12       3.7   "Drill", "Drilled" or "Drilling" shall mean to

13   perform all operations reasonably necessary and incident to

14   the drilling of a well, including testing, and completing and

15   equipping for production or injection, or plugging and aban-

16   doning.

17       3.8   "Drilling Party" shall mean the Party or Parties

18   obligated to bear the Costs of Drilling, Deepening or Plugging

19   Back a well in accordance with this Agreement at the commence-

20   ment of such operations.

21       3.9   "Effective Participating Interest" (herein sometimes

22   referred to as "EPI") shall mean that percentage of Production from

23   a WIPA allocated to each Party's interest in a particular Tract by

24   this Agreement, less the Royalty Share (as defined in Exhibit "A")

25   of Production allocated to that Party's interest in that Tract

26   pursuant to Subsection 10.2B of this Agreement, and shall be

27   determined as provided in Exhibit "A".

28       3.10   "Exploratory Well" shall mean any well other than

29   a Development Well or an Injection Well.

BOOK **0551** PAGE **010**          BOOK **0550** PAGE **494**

Agreement.

3.12 "Injection Well" shall mean any well Drilled or taken over for the injection of substances for the purpose of disposal or conducting pressure maintenance or secondary recovery operations.

3.13 "Lease Burdens" shall mean the royalty reserved to the lessor in an oil and gas lease, an overriding royalty, a production payment and any other burden upon the Working Interests.

3.14 "Market Value" shall mean the arithmetical average price upon which the State of Alaska's royalty is paid and finally accepted on the Production during the relevant period from the applicable Working Interest Participating Area.

3.15 "Net Working Interest" (herein sometimes referred to as "NWI") shall mean that percentage figure obtained by deducting from 100% the basic royalty percentage for a particular Tract as shown on Exhibit "B" to the Unit Agreement.

3.16 "Non-Drilling Party" shall mean the Party or Parties who have had the right to participate in the Costs of Drilling, Deepening or Plugging Back a well in accordance with this Agreement at the commencement of such operation and who have elected not to participate therein.

3.17 "Party" shall mean a party to this Agreement, including a party acting as Unit Operator or Sub-Operator when acting as an owner of a Working Interest.

3.18 "Pool" shall mean an underground reservoir containing, or appearing to contain, a common accumulation of oil or gas. Each zone of a structure which is completely separated from any other zone in the same structure is a Pool.

3.19 "Production" shall mean, as to any area designated

BOOK **0551** PAGE **011**

BOOK **0550** PAGE **495**

1 Agreement within or for the benefit of such area.

2 3.20 "Royalty Interest Participating Area" (herein some-
3 times referred to as "RIPA") shall mean any participating area
4 established pursuant to numbered Paragraph 11 of the Unit
5 Agreement.

6 3.21 "Specified Redetermination" shall mean a redeter-
7 mination so designated in Section 9.1 and Subsection 9.4A.

8 3.22 "Sub-Operator" shall mean any Party herein or here-
9 after designated as a Sub-Operator by the Parties, and its
10 successors, acting in that capacity and not as Unit Operator
11 or as the owner of a Working Interest.

12 3.23 "Subsequent Redetermination" shall mean a redeter-
13 mination provided for in Subsection 9.4B.

14 3.24 "Surface Acreage" shall mean the number of surface
15 acres within any area designated pursuant to this Agreement
16 whether or not such area is deemed productive of oil and/or
17 gas.

18 3.25 "Tract" shall mean each parcel of land shown as
19 such and given a Tract number and described in Exhibits "A"
20 and "B" to the Unit Agreement.

21 3.26 "Unit Operator" shall mean Union Oil Company of
22 California and its successors, as the Unit Operator designated
23 in accordance with the Unit Agreement, acting in that capacity
24 and not as Sub-Operator or as the owner of a Working Interest.

25 3.27 "Working Interest" shall mean an interest in
26 Unitized Substances, whether held under an oil and gas lease
27 or otherwise, including a carried Working Interest, which
28 interest is chargeable with and obligated to pay or bear, wheth-
29 er in cash or out of Production or otherwise, all or a portion

BOOK **0551** PAGE **012**

BOOK **0550** PAGE **496**

times referred to as "WIPA") shall mean any such area and Pool
established by the Parties in accordance with Article IX of this
Agreement.   The Pool for which each such WIPA is established
shall be identified on Appendix "B" to this Agreement.

ARTICLE IV

SUPERVISION OF OPERATIONS BY PARTIES

4.1  Over-all Supervision.  The Parties shall exercise
over-all supervision and control of all matters pertaining
to the development and operation of the Unit Area pursuant
to this Agreement and the Unit Agreement.  In the exercise
of such power each Party shall act solely in its own behalf
in the capacity of an Individual Working Interest owner and
not on behalf of the Working Interest owners as an entirety.

4.2  Particular Powers and Duties.  The matters to be
passed upon and decided by the Parties as provided herein or
in the Unit Agreement shall include, but not be limited to,
the following:

> A.   The appointment, removal and selection of
> successor Unit Operators and Sub-Operators.

> B.   The enlargement or contraction of the Unit
> Area or a WIPA.

> C.   The determination of Basic Participating
> Interests.

> D.   The subsequent joinder of any Working Interest
> owner to this Agreement or to the Unit Agreement.

> E.   The appointment of committees or subcommittees
> and the designation of their duties, for any purpose
> in connection with operations hereunder; provided, how-
> ever, each Party shall have the right to representation

BOOK **0551** PAGE **013**      BOOK **0550** PAGE **497**

recovery program to be employed.

G.   The adoption or submission of any plan of
further development and operation of the Unit Area
to the Director, Commissioner, or any regulatory
body.

H.   Except as otherwise provided herein or in
the Unit Agreement, the drilling of any well within
the Unit Area either for production of Unitized Sub-
stances, for use as an injection well, or for other
purposes.

I.   The recompletion, workover, abandonment, or
change of status of any well in any WIPA or RIPA or
use of any such well for injection or other purposes.

J.   The making of any single expenditure in excess
of Twenty-Five Thousand Dollars ($25,000.00), except
in the case of an emergency involving the preservation
of life or property.

K.   The selling or otherwise disposing of any
major item of surplus material or equipment, the
current list price of new equipment similar thereto
being Five Thousand Dollars ($5,000.00) or more;
provided, however, surplus material or equipment
classified as junk may be disposed of by Unit Oper-
ator or the applicable Sub-Operator at prevailing
prices.

L.   The authorizing of charges to the joint
account for services by consultants or any Party's
technical personnel not covered by the charges set
forth in Exhibit "C"

BOOK **0551** PAGE **014**    BOOK **0550** PAGE **498**

1  before any court or regulatory body in matters pertaining
2  to operations hereunder; provided, however, that such
3  designation shall not prevent a Party from appearing in
4  person or from designating another representative in its
5  behalf and at its own expense.

6  ARTICLE V

7  MANNER OF EXERCISING SUPERVISION

8  5.1  Designation of Representatives.  Each Party shall
9  advise the Unit Operator in writing of the names and addresses
10  of its representative and alternate authorized to represent
11  and bind it in respect to any matter pertaining to the develop-
12  ment and operation of the Unit Area.  Such representative or
13  alternate may be changed from time to time by written notice
14  to Unit Operator.  Unit Operator shall promptly advise all
15  Parties of the names and addresses of each such representative
16  and alternate.  In addition, any corporate Party may vote
17  through its President, or any of its Vice Presidents.

18  5.2.  Meetings.  All meetings of the Parties for the
19  purpose of considering and acting upon any matter pertaining
20  to the development and operation of the Unit Area shall be
21  called by Unit Operator upon its own motion or at the request
22  of one or more Parties.  Except in case of a bona fide emergency,
23  no meeting shall be called on less than fourteen (14) days'
24  advance written or telegraphic notice; with agenda for the
25  meeting attached.  The Parties attending such meeting may
26  amend such items included in the agenda by unanimous vote
27  of the Parties present.  Unless otherwise agreed, all meetings
28  shall be held in Anchorage, Alaska.  The representative of
29  Unit Operator shall be Chairman of each meeting.

BOOK 0551 PAGE 015      BOOK 0550 PAGE 499

1   chargeable with the Costs of such operation shall have

2   the right to vote thereon in proportion to their respec-

3   tive obligations for such Costs.  The Parties having

4   the right to vote on any other matter shall vote thereon

5   on the basis of their respective BPI in the applicable

6   WIPA as herein provided.  In the event such other matter

7   does not involve any WIPA, the Parties shall vote there-

8   on on the basis of their voting power in the Hemlock

9   WIPA.  Except as provided in the Unit Agreement and ex-

10  cept as otherwise specified herein the voting requirements

11  are as hereinafter provided in this Section 5.3.

12       B.   Determination of a WIPA.  The unanimous approval

13  of the Parties to this Agreement shall be required for

14  the determination of a WIPA.

15       C.   Determination of Acre-Feet of WIPA Pay.  The

16  unanimous approval of the Parties in the WIPA shall be re-

17  quired for the determination of Acre-Feet of WIPA Pay therein.

18       D.   Use of Wells, Platforms or Production Facilities

19  Pursuant to Section 16.3.  The affirmative vote of the

20  Parties having eighty-five per cent (85%) or more of

21  the voting power as to any well, platform, or production

22  facility shall be required for the approvals set forth

23  in Section 16.3; provided, however, if any Party entitled to

24  vote thereon has fifteen per cent (15%) or more of the voting

25  power, its negative vote or failure to vote shall not defeat

26  the matter being voted on unless such Party is supported by

27  one or more of the other Parties entitled to vote thereon.

28       E.   Major Expenditures.  The affirmative vote of

29  the Parties having eighty-five per cent (85%) or more

BOOK **0551** PAGE **016**          BOOK **0550** PAGE **500**

1    In the event that more than one WIPA is to be served

2    by such proposed expenditure, the affirmative vote of

3    the Parties having eighty-five per cent (85%) or more

4    of the voting power in each WIPA to be served shall be

5    required for such approval.

6    Notwithstanding the provisions of this Subsection

7    5.3 E, if any Party entitled to vote thereon has fifteen

8    per cent (15%) or more of the voting power as to any

9    such WIPA, its negative vote, or failure to vote, shall

10    not defeat the matter being voted on unless such Party

11    is supported by one or more of the other Parties entitled

12    to vote thereon as to that WIPA.

13    F.  Secondary Recovery and Pressure Maintenance

14    Programs.  The affirmative vote of the Parties having

15    eighty-five per cent (85%) or more of the voting power

16    as above provided shall be required for the approval

17    of secondary recovery and pressure maintenance projects;

18    provided, however, if any Party entitled to vote thereon

19    has fifteen per cent (15%) or more of the voting power,

20    its negative vote or failure to vote shall not defeat

21    the matter being voted on unless such Party is supported

22    by one or more of the other Parties entitled to vote

23    thereon.

24    G.  All Other Matters.  Except as provided in Sub-

25    sections 5.3B, 5.3C, 5.3D, 5.3E and 5.3F and except as

26    to matters specifically delegated to Unit Operator or

27    Sub-Operators by the Unit Agreement or this Agreement,

28    the affirmative vote of Parties having eighty per cent

9    (80%) or more of the voting power shall be required for

BOOK **0551** PAGE **017**

BOOK **0550** PAGE **501**

2      per cent (95%) on such matter, their affirmative vote
3      must be supported by one or more other Parties having
4      a combined voting power of at least five per cent (5%)
5      on such matter; and provided further, if any Party entitled
6      to vote thereon has twenty per cent (20%) or more of the
7      voting power, its negative vote, or failure to vote, shall
8      not defeat the matter being voted on unless such Party
9      is supported by one or more of the other Parties entitled
10      to vote thereon.

11      5.4  Additional Voting Provisions.  A Party failing to
12      vote shall be deemed to have voted in the negative.  In all
13      cases, if only two Parties are entitled to vote, the vote of
14      the one with the greater relevant BPI shall prevail.

15      5.5  Absentee Voting.  Any Party not represented at a
16      meeting may vote on any item included in the agenda upon which
17      that Party is entitled to vote.  Such absentee vote shall be
18      by letter or telegram addressed to the Chairman of the meeting
19      provided such vote is received prior to the submission of such
20      item to vote.  Such vote shall not be counted with respect to
21      any item on the agenda which is amended at the meeting.

22      5.6  Poll Votes.  The Parties may decide any matter by
23      vote taken by letter or telegram, provided the matter is first
24      submitted to each Party entitled to vote thereon and no meeting
25      on the matter is called as provided in Section 5.2 within ten
26      (10) days after such proposal is dispatched to such Parties.
27      Unit Operator will give prompt notice of the results of such
28      voting to all such Parties.  Any such Party failing to vote
29      within the time stated in such letter or telegram shall be

BOOK **0551** PAGE **018**

BOOK **0550** PAGE **502**

1  designation or other decision of the Parties provided for in
2  this Agreement which receives the affirmative vote herein spec-
3  ified shall be deemed given by and shall be binding upon all
4  Parties to this Agreement, except as otherwise specified herein.

5                          ARTICLE VI

6                  INDIVIDUAL RIGHTS OF PARTIES

7       6.1  Reservation of Rights.  The Parties severally reserve
8  to themselves all their rights, except as otherwise provided in
9  this Agreement and the Unit Agreement.

10      6.2  Specific Rights.  Each Party owning a Working Inter-
11 est in a WIPA shall have, among others, the following specific
12 rights:

13          A.  Access to WIPA.  Access to such WIPA and oper-
14      ations being conducted for the benefit thereof at all
15      reasonable times to inspect such operations, wells, and
16      the records and data pertaining thereto.

17          B.  Reports.  The right to receive from Unit Operator
18      or from Sub-Operator copies of all reports to any govern-
19      mental agency, reports of crude oil runs and stocks, inven-
20      tory reports, well logs, engineering and geological data
21      and all other information pertaining to operations here-
22      under.  All such reports and information shall be limited
23      to factual and not interpretative data, unless accomplished
24      by or charged to the Parties.  The cost of gathering and
25      furnishing information not ordinarily furnished by Unit
26      Operator or Sub-Operator to the Parties shall be charged
27      to the Party who requests the information.

28                         ARTICLE VII

29              UNIT OPERATOR AND SUB-OPERATORS

BOOK **0551** PAGE **019**

BOOK **0550** PAGE **503**

designated as Sub-Operators:

    A.  Atlantic Richfield Company, as to the North McArthur River Platform and Pipelines.

    B.  Marathon Oil Company, as to the Dolly Varden Platform and Pipelines and Trading Bay Unit Production Facility and Pipelines.

    C.  Union Oil Company of California, as to the McArthur River Platform and Pipelines.

    7.3  <u>Resignation or Removal of Unit Operator and Selection of Successor</u>.  Unit Operator may resign or be removed for good cause and a successor Unit Operator shall be selected as provided in numbered Paragraphs 5 and 6 of the Unit Agreement.

    7.4  <u>Resignation or Removal of Sub-Operators and Selection of Successors</u>.  Any Sub-Operator shall have the right to resign at any time, but such resignation shall not become effective so as to release such Sub-Operator from its duties and obligations and terminate its rights as such for a period of six months after notice of intention to resign has been served by a Sub-Operator on all Parties, unless a new Sub-Operator shall have been selected and approved and shall have taken over and assumed the duties and obligations of that Sub-Operator prior to the expiration of said period.

    In all instances of resignation or removal, until a successor Sub-Operator is selected and approved as hereinafter provided, the Parties shall be jointly responsible for performance of the duties of that Sub-Operator, and shall not later than 30 days before such resignation or removal becomes effective appoint a common agent to represent them in any action to be taken hereunder.

BOOK **0551** PAGE **020**    BOOK **0550** PAGE **504**

1   Any Sub-Operator may, upon default or failure in the

2   performance of its duties or obligations hereunder be subject

3   to removal by a vote representing eighty-five per cent (85%)

4   or more of the voting power of the Parties in the Hemlock WIPA.

5   Such removal shall be effective upon notice thereof to the Parties.

6   The resignation or removal of a Sub-Operator under this

7   Agreement shall not terminate its right, title, or interest as

8   the owner of a Working Interest or other interest in Unitized

9   Substances, but upon the resignation or removal of a Sub-Oper-

10  ator becoming effective such Sub-Operator shall deliver possession

11  of all equipment, materials, and appurtenances used in conduct-

12  ing the Unit operations and owned by the Parties to the new

13  duly qualified successor Sub-Operator or to the owners thereof

14  if no such new Sub-Operator is elected, to be used for the pur-

15  pose of conducting Unit operations hereunder.  Nothing herein

16  shall be construed as authorizing removal of any material,

17  equipment and appurtenances needed for the preservation of any

18  wells.

19  Whenever the Sub-Operator shall resign, or shall be

20  removed as hereinabove provided, or a change of a Sub-Operator

21  is negotiated by the Parties, the Parties in the Hemlock WIPA

22  shall, by a vote of eighty-five per cent (85%) or more of their

23  voting power, select a successor Sub-Operator.  Such selection

24  shall not become effective until a Sub-Operator so selected

25  shall accept in writing the duties and responsibilities of

26  Sub-Operator.

27  ARTICLE VIII

28  AUTHORITIES AND DUTIES OF

29  UNIT OPERATOR AND SUB-OPERATORS

BOOK **0551** PAGE **021**          BOOK **0550** PAGE **505**

1  subcommittees in accordance with plans and procedures

2  approved as herein provided.  Unit Operator shall be res-

3  ponsible for submitting all required reports to the State

4  of Alaska and other regulatory authorities and shall, subject

5  to Subsection 4.2N, represent the Parties at hearings or

6  other meetings held by any regulatory bodies pertaining

7  to operations hereunder.

8      Unit Operator shall keep advised of daily activities

9  being carried out within or for the benefit of the Unit

10  Area; make recommendations of its own or submit those of

11  any Party, Committee or Sub-Committee to the Parties;

12  coordinate transportation, communication and other oper-

13  ations and services among the various Sub-Operators, plat-

14  forms, pipelines, and shore sites; and carry out any other

15  duties or assignments given to Unit Operator by the Parties.

16      B.  Records.  Unit Operator shall be responsible for

17  keeping correct books, accounts and records of Unit oper-

18  ations, coordinating any accounting work being done by

19  various Sub-Operators, and sending to each Party, in

20  accordance with the Accounting Procedure in Exhibit "C",

21  a statement incorporating cost and production accounting.

22      C.  Reports.  Unit Operator shall furnish reports of

23  Unit operations as required by the Parties.

24  8.2  Sub-Operators.

25      A.  General Duties.  Pursuant to the provisions of

26  this Agreement, Sub-Operators shall have the exclusive

27  right and duty to conduct Unit operations according to

28  plans and procedures as specified by the Parties and

29  to do all things necessary and consistent therewith,

BOOK **0551** PAGE **022**          BOOK **0550** PAGE **506**

1    and shall prepare or assist in the preparation of any and

2    all applications, reports, or other documents required

3    by any governmental agency.

4         B.   Records and Reports.   Each Sub-Operator shall

5    keep correct books, accounts and records and shall furnish

6    the Parties with periodic reports of operations conducted

7    by it pursuant to this Agreement.

8         C.   Wells Drilled, Deepened or Worked Over by Sub-

9    Operator.

10        All wells drilled by Sub-Operators through independent

11   contractors shall be at not more than the usual rates pre-

12   vailing in the area. A Sub-Operator may employ its own

13   tools and equipment, but the charge therefor shall be at

14   actual cost, but not to exceed the prevailing rate in the

15   area, and the work shall be performed by that Sub-Operator

16   under terms and conditions customary in the area in con-

17   tracts of independent contractors doing work of a similar

18   nature.

19   8.3   Unit Operator and Sub-Operators.

20        A.   Workmanlike Conduct.   Unit Operator and each

21   Sub-Operator shall conduct all Unit operations in a good

22   and workmanlike manner.   Unit Operator and Sub-Operators

23   shall not be liable to the Parties for damages, unless

24   such damages result from their gross negligence or willful

25   misconduct.

26        B.   Liens and Encumbrances.   Unit Operator and each

27   Sub-Operator shall endeavor to see that the lands and

28   leases in the Unit Area are kept free from all liens and

29   encumbrances occasioned by Unit operations, except the

ㅁ₮ 03 4 T 2 ᴾᴳ 023          ㅁ₮ 0 3 4 T 2 ᴾᴳ ^33

BOOK 0551 PAGE 023          BOOK 0550 PAGE 507

1    ations shall be the employees of that party employing
2    same, and their selection, hours of labor, compensation,
3    and all other matters relating to their employment shall
4    be determined by such party.

5        D.    Expenditures.   Operator and Sub-Operators are
6    authorized to make single expenditures not in excess of
7    Twenty-Five Thousand Dollars ($25,000.00) without prior
8    approval of the Parties.  If an emergency occurs, Operator
9    or any Sub-Operator may immediately make or incur such
10   expenditures as in its opinion are required to deal with
11   the emergency.  Operator or Sub-Operator shall report to
12   the Parties as promptly as possible the nature of the
13   emergency and the action taken.

14                        ARTICLE IX

15       DETERMINATION OF WORKING INTEREST PARTICIPATING

16          AREAS AND BASIC PARTICIPATING INTERESTS

17       9.1   Hemlock WIPA and BPI.   The initial determination of
18   the WIPA and BPI for the Hemlock WIPA, as shown on Appendices
19   "A-1" and "B-1", respectively, have been made by the Parties.
20   Specified Redeterminations for the Hemlock WIPA shall be made
21   effective as of July 1, 1968 (First Redetermination), January 1,
22   1970 (Second Redetermination), July 1, 1971 (Third Redetermination)
23   and January 1, 1973 (Fourth Redetermination).

24       9.2   Initial Determination of WIPA.   Upon the request of
25   any Party, representatives of the Parties shall meet for the
26   purpose of making the initial determination of a WIPA for each
27   other Pool heretofore or hereafter discovered which is capable
28   of producing Unitized Substances.  Each such WIPA shall be deter-
29   mined in accordance with sound engineering principles by unan-

                          and shall include all of each

BOOK **0551** PAGE **024**    BOOK **0550** PAGE **508**

1  Substances from that Pool.  Each such WIPA and its effective
2  date shall be shown on Appendix "A" hereto.

3      9.3  Determination of Initial BPI.  Upon the initial deter-
4  mination of each WIPA, representatives of the Parties in that
5  WIPA shall meet for the purpose of determining each Party's
6  initial BPI in each Tract within that WIPA as provided in
7  Subsection 1.A of Exhibit "A".  Each such BPI, each Party's
8  total BPI in that WIPA, and the effective date thereof shall
9  be shown on Appendix "B".

10     9.4  Redeterminations of WIPA and BPI.

11         A.  Specified Redeterminations.  Specified Redeter-
12     minations, referred to as First Redetermination, Second
13     Redetermination, and Third Redetermination, respectively,
14     of the WIPA and BPI of each WIPA, other than the Hemlock
15     WIPA, shall be made effective as of one and one-half years,
16     three years, and four and one-half years subsequent to the
17     effective date of the initial determination of that WIPA.

18         B.  Subsequent Redeterminations.  Subsequent
19     Redeterminations, including those of the Hemlock WIPA
20     and BPI, shall be made thereafter not more than once
21     each calendar quarter upon the joint request of two
22     or more Parties to the Unit Operator and not more than
23     once each twelve months if such request is made by a
24     single Party, and shall be made only if based upon
25     information and data obtained from the Drilling, Deepen-
26     ing, or Plugging Back of a well subsequent to the last
27     prior redetermination.  Only Parties in a WIPA shall
28     be entitled to request a redetermination of the BPI in
29     that WIPA.

BOOK **0550** PAGE **509**

BOOK **0551** PAGE **025**

1   any WIPA lands excluded from the Unit Area shall continue
2   to be subject to the terms and conditions of this Agree-
3   ment and as among the Parties hereto shall continue to
4   be a portion of the WIPA and no redetermination of Acre
5   Feet of WIPA Pay in any such lands shall be made except as
6   the result of information and data obtained from the Drill-
7   ing, Deepening or Plugging Back of a well in the then
8   Unit Area.

9      9.5  Effective Date.  Each initial determination and redeter-
10  mination shall be effective as of 7:00 A.M. Alaska Standard Time
11  on its effective date.  Each initial determination and all Sub-
12  sequent Redeterminations shall be effective as of such time the
13  first day of the month of the request therefor.

14      9.6  Manner of Redetermination of WIPA and BPI.

15      A.  WIPA.  Within thirty (30) days after each of the
16  dates provided for in Sections 9.1, 9.4, and 9.5 for each
17  Specified Redetermination and any Subsequent Redetermination
18  of any WIPA, representatives of the Parties shall meet
19  for the purpose of reviewing the information and data
20  available as of the particular effective date and re-
21  determining that WIPA in the same manner as provided for
22  its initial determination in Section 9.2.  Appendix "A"
23  shall be revised to reflect any such redetermination
24  and its effective date.

25      B.  BPI.  Within thirty (30) days after each of
26  the dates provided for in Sections 9.1, 9.4, and 9.5 for
27  each Specified Redetermination and any Subsequent
28  Redetermination of the BPI in a WIPA, representatives
29  of the Parties in that WIPA shall meet for the purpose

1   made as provided in Subsection 1.B of Exhibit "A".

2   Upon such redetermination Appendix "B" shall be

3   revised to reflect such redetermination of each

4   BPI in that WIPA, each Party's total BPI in that

5   WIPA, and the effective date thereof, and appropriate

6   adjustments will be made as provided in Article XI.

7       9.7  Arbitration.  In the event the Parties fail, for a

8   period of at least thirty (30) days after any meeting called

9   pursuant to Sections 9.2, 9.3, or 9.6 has convened, to make

10  any determination or redetermination for which that meeting

11  has been called, any Party who may be directly affected by

12  the determination or redetermination may request in writing

13  that the matter be submitted to arbitration, and, unless all

14  such requests are withdrawn, such determination or redetermin-

15  ation shall be made by arbitration in accordance with the rules

16  of the American Arbitration Association, and the award of the

17  arbitrator, absent collusion or fraud, shall be conclusive

18  and binding upon the Parties.  The Parties shall choose, in

19  accordance with the applicable voting procedure set forth for

20  this Article IX, as arbitrator one of the following consulting

21  firms, including successor firms, which continues in existence

22  and accepts appointment hereunder as arbitrator; J. J. Arps,

23  Babson & Burns, Core Laboratories, Inc., DeGolyer & McNaughton,

24  H. J. Gruy & Associates, James A. Lewis Engineering, Inc., or

25  any other mutually agreeable firm; provided, if the Parties are

26  unable to select an arbitrator in accordance with the applicable

27  voting procedure, or if no firm which is selected accepts

28  appointment hereunder as arbitrator, then a consulting firm of

29  appropriate professional acumen and integrity shall be appointed

1  arbitrator acting hereunder, and the Parties and arbitrator

2  shall cooperate and act expeditiously, time being of the

3  essence of the reference to arbitration hereunder, to the end

4  that the award of the arbitrator shall issue not later than

5  sixty (60) days after it commences its duties under this Section

6  9.7.

7       The arbitration procedures hereinabove provided shall

8  apply only to such parameters or factors as to which the Parties

9  are unable to agree and such arbitrator shall make a final decis-

10  ion on the matters submitted to it for arbitration which are

11  within the scope of its authority.

12       All costs of arbitration shall be borne by the Parties in

13  the relevant WIPA, in proportion to their respective BPI thereby

14  determined.

15                           ARTICLE X

16              APPORTIONMENT OF COSTS AND OWNERSHIP

17                   OF PRODUCTION AND PROPERTY

18       10.1   Apportionment and Allocation of Production for Royalty

19  Purposes.   Production for royalty purposes shall be allocated to

20  each Tract of Unitized Land on the basis provided in the Unit

21  Agreement and shall be paid by the Unit Operator to the State of

22  Alaska from Production received from the Parties for this purpose

23  pursuant to Subsection 10.2B.

24       10.2   Apportionment and Ownership Within a WIPA.   For each

25  WIPA the apportionment of Costs and ownership of Production and

26  property among the Parties in that WIPA shall be upon the follow-

27  ing bases:

28           A.   Costs .   All costs incurred in the development and

29           operation of that WIPA for or in connection with Production

BOOK **0551** PAGE **028**        BOOK **0550** PAGE **512**

1   determined as of the time such Costs are incurred; subject,
2   however, to adjustments in accordance with Subsections
3   11.1A and 11.2A.

4        B.  Production.  The Production from a WIPA shall be
5   allocated separately to the Parties therein on the basis
6   of their respective BPI within that WIPA.  Each Party
7   receiving such Production shall pay to the Unit Operator,
8   who shall in turn pay to the State of Alaska that propor-
9   tionate part thereof representing the Royalty Share, or
10  the amount received from the sale thereof if the State
11  elects not to take in kind, as defined and calculated in
12  the manner set forth in Exhibit "A" to this Agreement.
13  In agreeing to this method of allocation, it is intended
14  and agreed by the Parties that any difference in the total
15  royalty rate applicable to the Production from any WIPA
16  as opposed to what the total royalty rate applicable to
17  that Production would have been if the State had accepted
18  the method of allocation (BPI) adopted by the Parties
19  will accrue to the Parties in that WIPA, as a burden
20  or as a benefit, as the case may be in the same propor-
21  tion in which Production is allocated to such Parties
22  on the basis of BPI.

23       C.  Property.  All materials, equipment and other
24  property, whether real or personal, the cost of which
25  is chargeable as Costs and which are acquired in connec-
26  tion with the development and operation of that WIPA,
27  or the proceeds from the sale thereof, shall be owned by
28  the Parties in that WIPA upon the basis of their respective
29  total BPI within that WIPA; subject, however, to adjust-

BOOK **0551** PAGE **029**    BOOK **0550** PAGE **513**

ARTICLE XI

INITIAL AND FUTURE ADJUSTMENTS OF

COSTS, PRODUCTION, AND PROPERTY

11.1 Adjustments On Initial Determination and Specified Re-
determinations of WIPA or BPI.  Adjustments of Costs, Production and
property on the initial determination and Specified Redeterminations
of a WIPA or BPI shall be accomplished in the following manner:

A.  Costs.  Within sixty (60) days after the
Parties in a WIPA have completed the initial determin-
ation, and within sixty (60) days after each Specified
Redetermination of BPI as set forth in Article IX and
Exhibit "A" to this Agreement, Unit Operator and each
Sub-Operator shall furnish the Parties in that WIPA
with revised billings showing all Costs incurred and
paid by it in the development and operation of that
WIPA prior to the effective date of that initial deter-
mination or Specified Redetermination.  All such billings
shall show the portion of these Costs to be borne by
each Party upon the basis of its determined or redetermined
BPI and the adjustment required between this amount and
that actually paid by such Party.  Upon receipt of each
such billing, each Party who has paid less than its
determined or redetermined BPI share shall promptly pay
in cash the amount of the adjustment required, together
with interest thereon at the rate of one-half of one per
cent (1/2 of 1%) per month from the month during which
each portion of the Costs was paid.  Each such payment
shall be made to Unit Operator who shall distribute
the same to those Parties entitled thereto upon the

BK 0347 PG 030

BOOK **0551** PAGE **030**          BOOK **0550** PAGE **514**

B. _Production_. Within thirty (30) days after each
such initial determination and within thirty (30) days
after each Specified Redetermination, Unit Operator shall
furnish each Party in the WIPA a statement which sets
forth:   (1)  the amounts of the EPI and BPI shares of
Production actually taken by each Party; (2) the amounts
of the EPI and BPI shares of Production each Party was
formerly entitled to take; and (3) the amounts of Production
that each Party was entitled to take on the basis of the in-
itially determined or redetermined EPI and BPI.   If,
as a result of the revision of BPI, it is shown that a
Party has been allocated more than its revised EPI share
of Production, then that Party shall owe those Parties
who have been allocated less than their revised EPI share
of Production for the Production allocated in excess of
such revised EPI share.  A Party's failure to take or
otherwise dispose of its proportionate share of Production
shall be disregarded in computing such adjustments.  Each
owing Party shall have the option of making such adjust-
ments immediately in cash or out of not less than twenty
per cent (20%) of such Party's BPI share of future Pro-
duction to the end that such adjustment shall be completed
not later than three (3) years after the effective date
of the relevant determination or redetermination.  Such
adjustments shall be made solely on the basis of volume
and any adjustment out of future Production not completed
at that time shall be completed immediately in cash.
In the event such Party has no BPI as a result of such
revision, such adjustment shall immediately be made in

RF 0347 G031    RF 03G12PG 1

BOOK 0551 PAGE 031      BOOK 0550 PAGE 515

1    Party will receive its EPI share of Production or the

2    value thereof.

3        Whenever such adjustments are made in cash, the value

4    shall be the Market Value of the Production as of the effec-

5    tive date of the relevant determination or redetermination.

6        C.  Property.  As of each of the effective dates of

7    the initial determination and of each Specified Redeter-

8    mination, all materials, equipment and other property,

9    whether real or personal, the cost of which was chargeable

10   as Costs and which were acquired in connection with the

11   development or operation of that WIPA, or the proceeds

12   from the sale of any such materials, equipment or other

13   property, shall be owned by the Parties upon the determined

14   or redetermined basis, subject to adjustment as provided

15   in this Agreement.

16   11.2  Adjustments on Subsequent Redeterminations. Adjustments

17   of Costs, Production, and property on any Subsequent Redetermination

18   of a WIPA or BPI shall be accomplished in the following manner:

19       A.  Costs.  Within sixty (60) days after the Parties in

20   a WIPA have completed a Subsequent Redetermination of BPI,

21   Unit Operator and each Sub-Operator involved shall furnish

22   the Parties in that WIPA with a billing showing all Costs in-

23   curred and paid by it in the development of that WIPA prior

24   to the effective date of that Subsequent Redetermination,

25   less the Costs of any well which has been abandoned, and not

26   including "Operating" costs as defined in Exhibit "C".  All

27   such billings shall show the portion of such costs to be borne

28   by each Party upon the basis of its redetermined BPI and the

29   adjustment required between this amount and that actually

BOOK **0551** PAGE **032**          BOOK **0550** PAGE **516**

1   shall promptly pay in cash the amount of the adjustment re-

2   quired.  Depreciation on such costs classified as tangible

3   and intangible (in conformity with accounting procedures gen-

4   erally accepted in the industry) shall be computed at the

5   following rates for each month from the month during which

6   the property represented by such costs was usable:

7       (1)  one-half of one per cent (1/2 of 1%) per month for

8           a cumulative total of one hundred (100) months, and

9       (2)  zero per cent (0%) per month in excess of said

10          cumulative total.

11  Each such payment shall be made to Unit Operator who shall

12  distribute the same to those Parties entitled thereto upon

13  the basis of the advances made by such latter Parties for

14  the account of the Parties who have paid less than their re-

15  determined BPI share.

16      B.  Production.  There shall be no adjustment of Produc-

17  tion prior to the effective date of any Subsequent Redetermin-

18  ation as a result of such redetermination.  Production sub-

19  sequent to the effective date of each Subsequent Redetermin-

20  ation shall be adjusted in the manner provided for adjust-

21  ments after the initial determination or Specified Redeter-

22  minations in Subsection 11.1B.  Statements relating to Pro-

23  duction which Unit Operator is required to furnish shall be

24  limited to the period subsequent to the effective date of the

25  relevant Subsequent Redetermination.

26      C.  Property.  As of the effective date of any Subsequent

27  Redetermination, all materials, equipment and other property,

28  whether real or personal, the cost of which was chargeable

29  as Costs and which were acquired in connection with the de-

BOOK **0551** PAGE **033**    BOOK **0550** PAGE **517**

1  Redetermination, shall be owned by the Parties upon the

2  redetermined basis, subject to adjustment as provided in

3  this Agreement.

4                            ARTICLE XII

5                        PLANS OF DEVELOPMENT

6       12.1  Wells and Projects Included.  Each plan for the

7  development and operation of the Unit Area which is submitted

8  by Unit Operator to the Director in accordance with the Unit

9  Agreement shall make provision only for such Drilling, Deepening

10 and Plugging Back operations and such other projects as have been

11 approved by the Parties as provided herein.

12      12.2  Notice of Proposed Plan.  At least thirty (30) days

13 before submitting any such proposed plan to the Director, Unit

14 Operator shall give each Party written notice thereof, together

15 with a copy of the proposed plan.  Within fifteen (15) days after

16 receipt of the notice and plan, each Party shall advise Unit

17 Operator of its approval or suggested revisions in those portions

18 of the plan as to which it is entitled to vote pursuant to Article

19 V.  If the plan receives the vote of approval required in Article

20 V of this Agreement, then Unit Operator shall file the plan with

21 the Director.  If the plan fails to obtain approval, Unit Oper-

22 ator will endeavor to make revisions that meet with approval of

23 the Parties.

24      12.3  Cessation of Operations under Plan.  If any such

25 plan as approved by the Director provides for the cessation of

26 any Drilling or other operations therein provided for on the

27 happening of a contingency and if such contingency occurs, Sub-

28 Operator shall promptly cease such Drilling or other operations

29 and shall not incur any additional Costs in connection therewith

BOOK 0551 PAGE 034        BOOK 0550 PAGE 518

ARTICLE XIII
DRILLING, DEEPENING, PLUGGING BACK OR ABANDONMENT
OF
EXPLORATORY, DEVELOPMENT AND INJECTION WELLS

13.1   General Provisions for Exploratory, Development and Injection Wells.

A.   General.   The Drilling, Deepening, Plugging Back or abandoning of a well within the Unit Area shall be conducted only in accordance with the provisions of this Article XIII, except as provided in Article XIV and Article XVI.   For the purposes of this Article XIII, reference to Parties shall mean all Parties to this Agreement in the case of Exploratory Wells and all Parties in the relevant WIPA in the case of Development and Injection Wells.

B.   Sub-Operator to Conduct Operations.   All Drilling, Deepening, Plugging Back, and abandoning operations shall be conducted by the designated Sub-Operator; provided, however, if such operations are to be conducted from a facility for which no Sub-Operator has been designated, the Parties participating in the Costs thereof shall designate the Sub-Operator.

C.   Notice of Proposed Operations.   Any Party may propose the Drilling, Deepening or Plugging Back or abandoning of a well by giving each of the other Parties written notice which, except in the case of abandoning operations, shall specify the surface location, bottom hole location (which location shall conform to any applicable spacing pattern theretofore adopted or then being followed or an authorized exception thereto), depth and

BOOK **0551** PAGE **035**          BOOK **0550** PAGE **519**

D. Response to Notice. Within thirty (30) days
after receipt of such notice, each Party shall advise
all other Parties, in writing, whether or not it
approves and desires to participate in such operations.
If the Parties approve such operations, then the pro-
posed operations shall be conducted by the designated
Sub-Operator. If any Party fails to respond to such
notice within said thirty (30) day period, it shall be
deemed to have failed to approve such proposed oper-
ation and to have elected not to participate therein.

Notwithstanding the provisions of the foregoing
paragraph, if a drilling rig has suspended operations
awaiting approval of redrilling, Deepening, Plugging
Back or abandoning of a well, then the Parties receiving
such notice shall have forty-eight (48) hours (exclusive
of Saturdays, Sundays and legal holidays) after receipt
thereof within which to notify the Parties giving such
notice whether they approve and desire to participate
in the proposed operations. All such notices given
under this paragraph shall be by telephone, telegraph
or telewriter.

E. Fewer Than All Parties. Whenever all Parties
entitled to participate in approved operations fail to
agree to participate, then within fifteen (15) days
after expiration of said thirty (30) days' notice per-
iod or within twenty-four (24) hours (exclusive of
Saturdays, Sundays and legal holidays) after expiration
of said forty-eight (48) hour notice period, each such
Party who desires to participate in the approved oper-

BOOK 0551 PAGE 036       BOOK 0550 PAGE 520

1     election to participate in such approved operations.

2     Failure to give such notice shall be deemed an election

3     not to participate.

4         Unless otherwise agreed by the Parties, the entire

5     cost, risk, liability and expense of the Drilling,

6     Deepening, or Plugging Back of a Development or Explor-

7     atory Well by fewer than all the Parties shall be borne

8     by the Parties comprising the Drilling Party in propor-

9     tion to their respective interests in such operation

10    as hereinafter provided.

11        No operations by fewer than all Parties shall be

12    conducted in such a manner as to interfere or conflict

13    with any other Unit operations, except as provided in

14    Article XIV.

15        F.  Abandonment of Non-Productive Well.  In the

16    event the proposed operation is the abandonment of a

17    non-productive well other than a Hemlock WIPA well,

18    then the notice required in Subsection 13.1C shall also

19    be given to the Parties in the Hemlock WIPA.  If the

20    Parties in the Hemlock WIPA give notice of election,

21    in the manner provided in Subsection 13.1D, to take over

22    said well and if the Parties participating in the Costs of

23    said well approve the proposed abandonment, then the Par-

24    ties in the Hemlock WIPA shall take over said well upon

25    such terms and conditions as may be agreed, otherwise said

26    well shall be abandoned as provided in Subsection 13.1D.

27        G.  Use of Equipment.  In the case of any Plugging

28    Back or Deepening operation, the Drilling Party shall

29    purchase, at salvage value, all casing, tubing and

1    Deepen or Plug Back a well as an Exploratory Well, then

2    it shall have the right to do so under the provisions of

3    this Article XIII.

4         B.   Drilling from Floating Platforms.  The Drilling

5    of an Exploratory Well from a floating platform or drill-

6    ing barge shall be outside the scope of this Agreement,

7    but except as provided in the last paragraph of Subsection

8    13.1E, nothing herein contained shall be deemed to pre-

9    vent the Drilling of such a well on a Tract by a Party

10   owning a Working Interest therein.

11        C.   Operations and Participation.  The Drilling,

12   Deepening or Plugging Back of an Exploratory Well from

13   any facility other than a floating platform or drilling

14   barge shall be accomplished in the following manner:

15        In the event the proposed operation receives the

16   approval of the Parties as provided in Subsection 13.1D

17   or 13.1E, then each owner of a Working Interest in the

18   Tract in which such operation is to be conducted shall

19   have the right to participate in proportion to its

20   Working Interest in that Tract.  Unless one or more

21   of the Owners of Working Interests in that Tract elect

22   to conduct such operations at its sole cost, risk and

23   expense as provided in Subsection 13.1E, all Parties

24   shall have the right to participate in such operations

25   in proportion to their respective BPI in the Hemlock

26   WIPA, in accordance with the provisions of Subsection

27   13.1E.

28        Notwithstanding the provisions of this Subsection

29   13.2C, no approval of the Parties shall be required for

BOOK 0551 PAGE 038     BOOK 0550 PAGE 522

1  in the Tract in which the bottom hole location is proposed.

2  13.3  Development Wells.

3  　　A.  Right to Drill.  If any Party desires to Drill,

4  Deepen, or Plug Back a well as a Development Well, then

5  it shall have the right to do so under the provisions

6  of this Article XIII.

7  　　B.  Operations and Participation.  The Drilling,

8  Deepening or Plugging Back of a Development Well shall

9  be accomplished in the following manner:

10  　　In the event the proposed operation receives the

11  approval of the Parties as provided in Subsection 13.1D

12  or 13.1E, each Party in that WIPA shall have the right

13  to participate therein in proportion to its BPI in that

14  WIPA.

15  13.4  Relinquishment and Reversion of Interests.

16  　　A.  Operations by Less than All Parties.  In order

17  for the Drilling Party to receive the benefits of this

18  Section 13.4, the proposed operations shall be commenced

19  within one hundred and twenty (120) days after the

20  expiration of the notice period provided in Subsection

21  13.1D or 13.1E, whichever is the later date.  Each Drill-

22  ing Party shall participate in the proposed operations

23  in the proportion that its BPI bears to the total BPI

24  of all Drilling Parties in the relevant WIPA.

25  　　B.  Relinquishment of Interest by Non-Drilling Party.

26  When a well which is Drilled, Deepened or Plugged Back

27  by less than all Parties entitled to participate therein,

28  is completed as a producer of Unitized Substances, each

29  Non-Drilling Party shall be deemed to have relinquished

BOOK 0551 PAGE 039     BOOK 0550 PAGE 523

1   Burdens in respect of Production from said well, in accord-
2   ance with Section 21.2.
3           C.   Reversion of Relinquished Interest.   The oper-
4   ating rights and Working Interests relinquished by a
5   Non-Drilling Party shall revert to it at such time as the
6   Market Value of that Non-Drilling Party's EPI share of
7   the Production obtained from the well after such relinquish-
8   ment (after deducting from such Market Value all taxes
9   upon or measured by Production and all Lease Burdens other
10  than the State's Royalty Share on said portion thereof)
11  shall equal the total of the following:
12              (1)   One hundred per cent (100%) of that por-
13              tion of the Costs incurred in operating the
14              well (including the portion of costs of acqui-
15              sition or use of platforms, pipelines or other
16              facilities attributable to such operations by less
17              than all Parties, but excluding the Costs provided
18              for in Subsection 13.4C(2)) that would have been
19              charged to such Non-Drilling Party had all Parties
20              entitled thereto participated therein; and
21              (2)   Six hundred per cent (600%) in the case
22              of an Exploratory Well, or four hundred per cent
23              (400%) in the case of a Development Well, of that
24              portion of the Costs incurred by Drilling Party in
25              the Drilling, Deepening, or Plugging Back of said
26              well, through and including the wellhead connections,
27              that would have been chargeable to such Non-Drill-
28              ing Party had all Parties entitled thereto partici-
29              pated therein.

1    upon such terms and conditions as may be agreed.  Unless

2    at the direction of the Parties the well is to be taken over

3    for use in Unit operations, the Sub-Operator shall plug and

4    abandon the well for the account of the Parties owning a Work-

5    ing Interest therein.

6        As used in this Section 13.5, "well" shall be deemed

7    to apply separately to each Pool from which that well is then

8    producing or has produced, and the value of the salvable

9    material and equipment therein shall be attributed in propor-

10   tion to the ownership thereof.

11       13.6  Injection Wells.  The Costs of Drilling, Deepening,

12   Plugging Back, abandoning, or taking over a well as an Injec-

13   tion Well shall be borne by all the parties in the WIPA for

14   which the well is to be used for the purpose of disposal or pres-

15   sure maintenance or secondary recovery operations.  All parties

16   in the relevant WIPA shall bear such Costs according to their

17   respective BPI in that WIPA.

18                        ARTICLE XIV

19                        REQUIRED WELLS

20       14. 1  Definition.  For the purposes of this Article, a

21   well shall be deemed a required well if the Drilling thereof

22   is required by the final order of an authorized representative

23   of the Department of Natural Resources.  Such an order shall

24   be deemed final upon expiration of the time allowed for appeal

25   therefrom without the commencement of appropriate appeal pro-

26   ceedings, or, if such proceedings are commenced within said

27   time, upon the final disposition of the appeal.  Whenever a

28   Party receives any such order, it shall promptly mail a copy

29   thereof to each of the other Parties; if any such order is

BOOK 0550 PAGE 525

BOOK 0551 PAGE 041

1    ship of the well, the operating rights and Working Interest

2    therein, the materials and equipment in or pertaining

3    to the well, the Production therefrom and the Costs

4    of operating the well as otherwise provided in this

5    Agreement.

6    13.5   Abandonment of Producing Wells.   No well which is

7    producing or has once produced, shall be abandoned without approv-

8    al of the Parties then owning a Working Interest therein.   If

9    such approval is not obtained, then the Parties not desiring

10   to abandon shall pay to such other Party the latter Party's

11   proportionate share of the fair market value of the salvable

12   material and equipment in and on such well determined at the

13   time such abandonment is proposed, less such latter Party's esti-

14   mated share of the cost of abandonment.   Upon receipt of said sum,

15   the Party desiring to abandon said well shall assign to the other

16   Parties, without warranty of title, all of its operating rights

17   and Working Interest in the well and all subsequent Production

18   therefrom, as to the Pool from which said well is then producing,

19   or has once produced, but not as to any other Pool and all of its

20   interest in the material and equipment in and on said well.   If

21   such assignment or conveyance shall run in favor of more than one

22   Party hereto, the interest covered thereby shall be shared by

23   such Parties in the proportion that the interest of each Party

24   assignee bears to the interest of all Parties assignee.

25       In the event the abandonment is of a well other than a

26   Hemlock WIPA well, the Party proposing such abandonment shall

27   give the notice required in Subsection 13.1C to the Parties

28   in the Hemlock WIPA.   If the Parties in the Hemlock WIPA

29   give notice of election, in the matter provided in Subsection

BOOK **0551** PAGE **042**        BOOK **0550** PAGE **526**

1   prompt written notice of the result thereof.

2        14.2   Election to Drill.  Any Party desiring to Drill, or

3   participate in the Drilling of, a required well shall give to

4   the other Parties written notice thereof as provided in Sub-

5   section 13.1C or within such lesser time as may be required

6   by the order.  If such notice is given, the Parties electing

7   to participate as provided in Subsections 13.1D or 13.1E shall

8   designate a Sub-Operator in the manner provided in Subsection

9   13.1B for the Drilling of that well.  Subject to the provisions

10   of Section 16.3, the designated Sub-Operator shall Drill the

11   required well for the account of such Parties, who shall bear

12   all Costs incurred therein; provided, however, that if the re-

13   quired well is a Development Well, it shall not be drilled un-

14   less it receives the approval of the Parties in the relevant

15   WIPA.  The rights and obligations of such Parties with respect

16   to the ownership of such well, the operating rights therein, the

17   Production therefrom and the bearing of Costs incurred therein

18   shall be the same as if the well had been Drilled for the account

19   of such Parties under Article XIII either as a Development Well

20   or Exploratory Well, as the case may be.

21        14.3   Alternatives to Drilling.  If no Party elects to

22   Drill a required well within the period allowed for such election

23   or if such election is made but approval to drill is not obtained

24   from the Parties as provided under Section 14.2, and if any of

25   the following alternatives is available, the first such alter-

26   native which is available shall be followed:

27        A.   Compensatory Royalties.  If compensatory royal-

28        ties may be paid in lieu of Drilling the well and if

29        payment thereof receives, within said period, the

BOOK 0551 PAGE 043    BOOK 0550 PAGE 527

1    pay such compensatory royalties for the account of said

2    Parties; or

3    B.   Contraction.   If the Drilling of the well may

4    be avoided, without other penalty, by contraction of the

5    Unit Area, Unit Operator shall make a reasonable effort

6    to effect such contraction with the approval of the

7    Director in the manner provided in numbered Paragraph

8    2 of the Unit Agreement.

9    14.4   Required Drilling.   If none of the foregoing alter-

10   natives is available, the required well shall be drilled under

11   whichever of the following provisions is applicable:

12   A.   Development Well.   If the required well is a

13   Development Well, it shall be Drilled by the Sub-Operator

14   designated in the manner provided in Section 14.2 for the

15   account of all Parties in the WIPA in which the well is

16   Drilled; or

17   B.   Exploratory Well.   If the required well is an

18   Exploratory Well, it shall be Drilled by the Sub-Operator

19   designated by and for the account of the Parties in pro-

20   portion to their respective Surface Acreage in the Unit

21   Area.

22                        ARTICLE XV

23        ESTABLISHMENT, REVISIONS AND CONSOLIDATION

24        OF ROYALTY INTEREST PARTICIPATING AREAS

25   15.1   General.   All RIPA shall be established, revised

26   or consolidated from time to time as provided in numbered Para-

27   graph 11 of the Unit Agreement and in accordance with the pro-

28   cedure set forth in this Article XV.

29   15.2   Procedure.   Whenever a Sub-Operator obtains infor-

BOOK **0551** PAGE **044**

BOOK **0550** PAGE **528**

1  Operator, in turn, shall furnish all available data as it
2  may have relative thereto, along with Unit Operator's proposal
3  as to such establishment, revision or consolidation, to each
4  of the Parties in the applicable WIPA. Within fifteen (15)
5  days following receipt of such data and proposal, each Party
6  shall advise Unit Operator in writing of its approval or
7  objections to such proposal. If the proposal receives the
8  approval of such Parties, then Unit Operator shall promptly
9  prepare and file with the Director the necessary documents
10 and data supporting such establishment, revision or consol-
11 idation. The failure of any Party to advise Unit Operator
12 of its position shall be regarded as a vote against the
13 proposal submitted. If the proposal does not receive the
14 approval of such Parties, then Unit Operator shall submit
15 to the Parties a revised proposal taking into consideration
16 the written comments made as to the initial proposal.
17 If such revised proposal fails to receive the approval of
18 such Parties, then Unit Operator shall file with the Director
19 a proposal that reflects the position of the greatest percen-
20 tage of interest of the Parties within the applicable WIPA.

21      15.3  Revised Proposal. If any such proposal filed by
22 Unit Operator with the Director is rejected or requested to
23 be revised, then Unit Operator shall submit a revised proposal
24 to the Parties in the WIPA involved for their approval in
25 accordance with the procedure set forth above. Any Party
26 may submit its objections or comments to the Director as to
27 any proposal filed by the Unit Operator with the Director.  .

28                          ARTICLE XVI

29              PLATFORMS AND PRODUCTION FACILITIES

ʙᴏᴏᴋ 0551 ᴘᴀɢᴇ 045          ʙᴏᴏᴋ 0550 ᴘᴀɢᴇ 529

1  production facilities referred to in Section 7.2 for the primary
2  purpose of the development and operation of the Hemlock WIPA.
3  The Parties further agreed that the Costs thereof would be in-
4  itially shared on the basis provided in Appendix "B-1", subject
5  to the right to audit and adjustments as herein provided.

6      16.2  Costs.  All cost and expenses incurred in connection
7  with the design, construction and installation of the said plat-
8  forms, pipelines and production facilities to the extent that
9  said production facilities are used solely for or allocated to
10  the Trading Bay Unit, shall be deemed Costs for the purposes
11  of this Agreement.

12     16.3  Use of Wells, Platforms, or Production Facilities.
13  No well, platform, or production facility (including a pipe-
14  line) shall be used for other than that upon which ownership
15  thereof is based without the approval of the Parties owning
16  such well, platform, or production facility, as provided in
17  Subsection 5.3D.  Upon such use, a fair and equitable apportion-
18  ment of risks and liabilities, investment, and operating and
19  other costs shall be made between the Parties therefor.  Such
20  use shall include but not be limited to the Drilling of wells,
21  multiple completion of wells and the production, transportation
22  and handling of Unitized Substances.

23                      ARTICLE XVII
24      CONSTRUCTION OF CERTAIN PLATFORMS, PIPELINES AND
25                    OTHER FACILITIES
26     17.1  General.  The construction of any platforms, pipeline,
27  or other facilities not provided for in Section 16.1 and not re-
28  lated to secondary recovery or pressure maintenance programs,
29  the cost of which exceeds One Million Five Hundred Thousand

BOOK **0551** PAGE **046**          BOOK **0550** PAGE **530**

"Such Construction", shall be conducted in or for the benefit
of the Unit Area only in accordance with the provisions of
this Article XVII. For the purposes of this Article XVII,
reference to Parties shall mean all Parties in the WIPA
to be served by the proposed platform, pipeline, or other
facility.

     17.2  Sub-Operator to Conduct Operations.  Such Con-
struction shall be conducted by the Sub-Operator designated
by the Parties participating in the Costs thereof.

     17.3  Notice of Proposed Construction.  Any Party may
propose Such Construction by giving each of the other Parties
written notice specifying the location, contemplated service,
design, specifications, proposed Sub-Operator, and estimated
Costs of Such Construction.

     17.4  Response to Notice.  Within sixty (60) days after
receipt of such notice each Party shall advise all other
Parties, in writing, whether or not it approves Such Construc-
tion and whether or not it desires to participate in Such
Construction.  If any Party fails to respond to such notice
within said sixty (60) day period, it shall be deemed to have
failed to approve Such Construction and to have elected not
to participate therein.

     If the Parties approve Such Construction in the manner
provided in Subsection 5.3E, then Such Construction shall
be conducted by the designated Sub-Operator.

     17.5  Participation.  In the event Such Construction
receives the approval of the Parties as provided in Section
17.4, each Party shall have the right to participate therein
in proportion to its BPI in the WIPA to be served.  Unless

BOOK 0551 PAGE 047          BOOK 0550 PAGE 531

1  Participating Party (as hereinafter defined) in proportion to
2  their respective interests in Such Construction as herein-
3  after provided.  The Party or Parties electing to participate
4  in Such Construction shall be referred to in this Article
5  XVII as "Participating Party".

6       17.6  Relinquishment and Reversion of Interests.

7           A.   Such Construction By Less Than All Parties.   In
8       order for the Participating Party to receive the benefits
9       of this Section 17.6, Such Construction shall be com-
10      menced within one (1) year after the expiration of the
11      period provided in Section 17.4.  Each Participating
12      Party shall participate in Such Construction in the
13      proportion that its BPI bears to the total BPI of all
14      Participating Parties in the relevant WIPA.

15          B.   Non-Ownership and Relinquishment of Interest.
16      When any Party who is entitled to participate in Such
17      Construction elects not to participate therein, such
18      Party referred to in this Article XVII as "Non-Partici-
19      pating Party", it shall be deemed to have no interest
20      in and shall not be entitled to the use of the platform,
21      pipeline, or other facility constructed and, in the
22      case of a platform, to have relinquished all of its
23      operating rights and Working Interest in and Production
24      from all wells drilled from that platform and completed
25      in the WIPA for which that platform was constructed.

26          C.   Acquisition of an Interest and Reversion of
27      Relinquished Interest.  Within thirty (30) days after
28      the pipeline or other facility is put into service or,
29      in the case of a platform, within thirty (30) days

BOOK **0551** PAGE **048**      BOOK **0550** PAGE **532**

1    Party a statement of the estimated Costs of Such
2    Construction and Drilling.  Within sixty (60) days
3    after receipt of such statement, each Non-Participating
4    Party may elect to pay to the Sub-Operator who con-
5    ducted Such Construction an amount of money equal to
6    the total of the following:

7        (1)  One hundred per cent (100%) of that portion
8            of the Costs incurred in operating the
9            pipeline, other facility, or platform and well
10           thereon that would have been charged to such
11           Non-Participating Party had it participated
12           in Such Construction;

13       (2)  One hundred thirty-five per cent (135%) of
14           that portion of the Costs incurred and
15           committed in Such Construction and the Costs of
16           Drilling a well or wells, if Drilled from the
17           facility that would have been charged to such
18           Non-Participating Party had it participated
19           therein; and

20       (3)  Interest at the rate of one-half of one
21           per cent (1/2 of 1%) per month on such
22           amounts computed from the month during
23           which each portion of such Costs was paid.

24       If a Non-Participating Party has elected to make
25   the payment hereinabove provided, and does so within
26   thirty (30) days after such election, such Non-Par-
27   ticipating Party shall immediately have that interest
28   in that platform, pipeline or other facility as it
29   would have had if it had participated in the construction

BK03'T2PG0'49                    P''3GT2PG259

BOOK **0551** PAGE **049**

BOOK **0550** PAGE **533**

1    D.   Payment by Sub-Operator.  All payments received

2    by Sub-Operator from a Non-Participating Party pursuant

3    to Subsection 17.6C shall be paid promptly to the Par-

4    ticipating Parties in the proportions in which they

5    shared the Costs of Such Construction and Drilling.

6              ARTICLE XVIII

7         RIGHT TO TAKE IN KIND AND FAILURE

8         TO TAKE IN KIND - - UNDERLIFTING

9    18.1   Taking in Kind.  Each Party shall currently take in

10   kind or separately dispose of its share of Production (and only

11   its share, but its share shall include any Production said Party

12   is then making up as the result of its underlift pursuant to

13   this Article XVIII).  Each such Party shall have the right to

14   construct, maintain, and operate all necessary facilities for

15   that purpose, provided that they are so constructed, maintained,

16   and operated as not to interfere with Unit operations.  Any

17   extra expenditures incurred by reason of the delivery in kind

18   of any portion of the Production shall be borne by the receiving

19   Party.  If a royalty owner has the right to take in kind a share

20   of Production and fails to do so, those Parties taking Production

21   shall take the Royalty Share of Production in the manner provided

22   in Article X.  On all purchases or sales each Party shall exe-

23   cute any division order or contract of sale pertaining to its

24   interest.

25   18.2   Underlifting of Liquid Production.

26        A.   General.  Notwithstanding the ownership of

27        Production set forth in this Agreement, in the event

28        any Party fails to take or otherwise dispose of its

29        share of oil or other liquid hydrocarbons (liquid pro-

BOOK **0551** PAGE **050**          BOOK **0550** PAGE **534**

liquid production from gas wells when such liquid pro-
duction is available; provided, however, a gas well shall
not be produced primarily to obtain liquid production.
Gas production will not be taken into account in the recov-
ery or recoupment of liquid production.

The procedures set forth in this Article XVIII
for underlifting and for the recovery or recoupment
of underlifted liquid production shall apply separately
to each WIPA and shall be computed on the basis of
volume without regard to the value thereof.

B.   Underlifted Party.   In the event any Party
fails to take or otherwise dispose of its proportionate
share of "Available Production" (as defined in Subsection
18.2C hereof) during any calendar quarter, said Party shall
be deemed to have "underlifted" and such Party shall be
hereinafter referred to as an "Underlifted Party".   When-
ever any Party has not taken its share of liquid production
solely as a result of a Redetermination of BPI, as provided
in Article XI hereof, that Party shall not be deemed to
have "underlifted" and the provisions of this Article XVIII
shall not affect the adjustment of Production under Article
XI.

C.   Available Production.   Not less than forty-five
(45) days prior to the beginning of each calendar quarter,
Unit Operator shall advise in writing those Parties in the
applicable WIPA of the total estimated quantity of
liquid production therefrom which can be delivered to
the Parties during the next calendar quarter.   Such esti-
mated quantity of liquid production for each such partic-

1 for that period of time as established for the particular

2 WIPA by the Parties therein, in accordance with sound

3 petroleum engineering practice. When none of the Parties

4 takes its full share of Available Production as originally

5 determined by Unit Operator for any calendar quarter, the

6 total Available Production for such quarter shall be re-

7 duced retroactively to such amount as would allow the

8 Party taking the highest percentage of its share to receive

9 credit for having taken 100% of its share. Unit Operator,

10 by notice to the Parties, shall revise the amount of

11 Available Production in the event unforeseen physical

12 occurrences alter the WIPA's capacity to produce.

13  D. Nominations. Within fifteen (15) days after

14 receipt of notification of Available Production for a

15 given period, each Party in that WIPA shall nominate in

16 writing to Unit Operator the quantity of liquid production

17 equivalent to all or any part of its share of Available

18 Production which it desires to take during such period.

19 Any Underlifted Party desiring to make up a portion or

20 all of the volume it is underlifted, shall also nominate

21 the volume it wants to make up during the next succeeding

22 calendar quarter. A Party failing to nominate shall be

23 deemed to have nominated zero quantity.

24  E. Recovery or Recoupment of Underlifted Liquid

25 Production. Excess productive capacity (herein sometimes

26 referred to as "Excess Capacity") is defined as the amount

27 by which the Available Production exceeds the total amount

28 of liquid production (excluding any being recovered or

29 recouped as provided in this subsection) nominated by all

BOOK 0550 PAGE 536

BOOK 0551 PAGE 052

such capacity will be allotted to that Party as herein pro-
vided.

   In the event an Underlifted Party has nominated to
utilize any Excess Capacity and during the two succeeding
calendar quarters period Excess Capacity did not exist
or was insufficient to permit that Underlifted Party to
recover or recoup the full amount of its underlifted
liquid production, such Party shall have the right to
recover or recoup its underlifted production out of ten per
cent (10%) of Available Production in addition to any Excess
Capacity, as above provided, to the extent required for
recovery or recoupment by the Underlifted Party.

   If more than one Party elects to recover or recoup
at the same time, they shall share the available Excess
Capacity and/or the ten per cent (10%) of liquid produc-
tion in proportion to their respective BPI's. When an
Underlifted Party has recovered or recouped the full
amount of its liquid production underlift, that Party's
share of liquid production shall thereupon be its BPI
share.

   No Party shall be deemed an Underlifted Party due
to a reduction in its share of Available Production pur-
suant to this Subsection 18.2.

   F.   Rate of Liquid Production.   Unit Operator shall
timely advise all Parties of the nominations received for
each quarter and shall establish a rate of liquid pro-
duction equal to the total of the volumes so nominated,
not to exceed the maximum efficient rate of production

BOOK 0551 PAGE 053

BOOK 0550 PAGE 537

XXII hereof.

Further in any calendar quarter during which a Party is recovering or recouping its underlifted liquid production out of the ten per cent (10%) of Available Production, a percentage of all Costs, equivalent to the percentage of liquid production taken for recovery or recoupment of underlifted liquid production out of said ten per cent (10%) of Available Production shall be borne by each such Party in proportion to the volume of liquid production so taken by that Party for recovery or recoupment. No adjustment in Costs, except taxes measured by production, shall be made for the use of Excess Capacity. Lease Burdens shall be borne as provided for in Article XXI hereof.

18.3   Underlifting or Balancing of Gas Production.

A.   General.   Notwithstanding the ownership of Production set forth in this Agreement, in the event any Party fails to take or otherwise dispose of its share of natural gas (gas production), the other Parties shall be entitled to take their own and such Party's shares of gas production pursuant to this Section 18.3.   These provisions shall be applicable to gas well gas and to casinghead gas when such gas production is available; provided, however, an oil well shall not be produced primarily to obtain gas production.   Liquid production will not be taken into account in the balancing of gas production.

The procedures set forth in this Article XVIII for underlifting or balancing of underlifted gas pro-

впо 0361 гро 054                    пр 0. , 72 ро 264

BOOK.**0551** PAGE.**054**            BOOK.**0550** PAGE.**538**

пр 00027 гро 739

пр 00028 гро 054

1    The term "accounting period" as used in this Section

2    18.3 shall mean a calendar quarter or such other period

3    as may be otherwise agreed by the Parties.

4        B.   Repressuring, Recycling or Other Secondary

5    Recovery Operations.  In the event gas production is

6    available in any WIPA, and such gas production may be

7    utilized in repressuring, recycling, or other secondary

8    recovery operations in that WIPA or any other WIPA,

9    it is agreed that the Parties owning such gas pro-

10   duction shall give first consideration to the use of

11   such gas production for such operations upon such terms

12   as may be acceptable to the Parties; provided, however,

13   in the event more than one WIPA, other than the WIPA

14   from which the gas production is obtained, desires such

15   production, the Hemlock WIPA, if involved, shall have

16   preference.

17       C.   Underlifted Party.  In the event any Party fails

18   to take or otherwise dispose of its proportionate share

19   of gas production during any accounting period, said

20   Party shall be deemed to have "underlifted" and such

21   Party shall be hereinafter referred to as an "Underlifted

22   Party" during that period.  Whenever any Party has not

23   taken its share of gas production solely as a result of

24   a Redetermination of BPI, as provided in Article XI

25   hereof, that Party shall not be deemed to have "under-

26   lifted" and the provisions of this Article XVIII shall

27   not affect the adjustment of Production under Article

28   XI.

29       D.   Overlifted Party.  In the event any Party fails

BOOK 0551 PAGE 055

BOOK 0550 PAGE 539

1   during such period to take or otherwise dispose of such

2   Party's proportionate share of gas production.  Each such

3   Party taking more than its share of gas production shall

4   be deemed to have "overlifted" and shall be hereinafter

5   referred to as an "Overlifted Party" during that period.

6   Each Party desiring to take more than its share of gas

7   production shall be entitled to take the gas production

8   not being taken by the Underlifted Party in the propor-

9   tion that its BPI bears to the BPI of the Overlifted

10   Parties.

11      E.   Gas Production Account.  Unit Operator or any

12   party selected by the Parties shall maintain and furnish

13   a statement of a gas production account which shall show

14   the amount each Party has underlifted or overlifted

15   relative to the cumulative gas production from the WIPA.

16      F.   Balancing.  If an Underlifted Party desires to

17   take more than its share of gas production in order to

18   balance its gas production account, that Party shall so

19   advise Unit Operator, who shall use its best efforts to

20   reduce the portion of gas production being taken by all

21   Overlifted Parties to the extent necessary to enable the

22   Underlifted Party to take such amounts sufficient to

23   balance its gas production account within one year from

24   the date of its request.

25      In the event an Underlifted Party is unable to

26   balance its gas production account within said one year,

27   then that Underlifted Party shall be entitled to in-

28   crease its take of gas production up to ten per cent

29   (10%).of the Overlifted Parties' share of current gas

BOOK 0551 PAGE 056

BOOK 0550 PAGE 540

1   to balance their gas production accounts at the same

2   time, then each of such Underlifted Parties shall be

3   entitled to take the proportion of such ten per cent

4   (10%) portion of the current gas production of the

5   Overlifted Parties that their respective volumes of

6   underlifted gas production bear to the total of such

7   volumes.

8       Without prior approval of the Parties, no Sub-

9   Operator shall produce any gas well in excess of the

10  maximum efficient rate of gas production established

11  for the wells in a WIPA by the Parties therein.

12      G.   Allocation of Costs.   Except as to Lease Burdens

13  and taxes measured by production, no adjustment shall

14  be made in Costs when a Party is underlifting or over-

15  lifting.   Lease Burdens shall be borne as provided in

16  Article XXI hereof and taxes measured by production

17  shall be borne by the Parties in proportion to their

18  respective gas production.

19      18.4   Indemnity.   In the event any Party or Parties is

20  underlifted and any such action causes the rate of production

21  hereunder to be reduced, then said Party or Parties shall be

22  solely responsible to the State of Alaska and any other royalty

23  owner or overriding royalty owner for, and hold the other Par-

24  ties harmless and indemnify them against any and all claims

25  whatsoever which arise as a result of such failure to take.

26                      ARTICLE XIX

27                      UNIT EXPENSE

28      19.1   Basis of Charge to Parties.   All Costs incurred

29  for the benefit of a WIPA initially shall be paid by Unit

RF 0361 2P-957          PK 036 2PG267

BOOK 0551 PAGE 057          BOOK 0550 PAGE 541

1    ticles XIII, XVII, and XVIII. All charges, credits and accounting
2    shall be in accordance with Exhibit "C".

3        19.2  Budgets.  As soon as practical after the effective
4    date hereof, Unit Operator shall prepare in consultation with
5    each Sub-Operator and the other Parties and furnish to the
6    Parties a proposed program and a budget of estimated Costs
7    for the remainder of the calendar year.  In the same manner,
8    Unit Operator shall prepare on or before the first day of
9    each September thereafter the annual program and budget for
10   the ensuing calendar year.  Following the submission of
11   each such program and budget and upon at least thirty (30)
12   days' advance written notice which shall include the agenda
13   for the meeting, Unit Operator shall call a meeting to be
14   held not later than November 1st of each year.  At such meet-
15   ing, the representatives of the Parties shall confer with
16   respect thereto and shall endeavor to tentatively approve
17   such program and budget after making such modifications as
18   may be necessary; provided, however, that such tentative
19   approval shall not alone constitute authority for the making
20   of such expenditures, which shall be made only in accordance
21   with the remaining provisions of this Agreement.  A budget shall
22   set forth the estimated Costs by semiannual periods.  Budgets
23   shall be estimates only, and shall be adjusted or corrected
24   by the relevant Parties whenever an adjustment or correction
25   is proper.  A copy of each budget and adjusted budget shall
26   promptly be furnished to each Party.  Each program and budget
27   shall show that portion of such program and budget applicable
28   to or allocated to each WIPA.

29       19.3  Advance Billings.  Unit Operator and each Sub-

BOOK **0551** PAGE **058**          BOOK **0550** PAGE **542**

1  any month, an itemized estimate thereof for the succeeding
2  month, with a request for payment in advance.  Within fifteen
3  (15) days thereafter, each Party shall pay to Unit Operator
4  or Sub-Operators its share of such estimate.  Adjustments
5  between estimated and actual Costs shall be made by Unit
6  Operator and Sub-Operators at the close of each calendar month,
7  and the accounts of such Parties shall be adjusted accordingly.

8      19.4  Commingling of Funds.  No funds received by Unit
9  Operator or any Sub-Operator under this Agreement need be
10  segregated or maintained by it as a separate fund, but may
11  be commingled with its own funds.

12     19.5  Lien of Unit Operator and Sub-Operator.  Each Party
13  grants to Unit Operator and the Sub-Operators a lien upon its
14  oil and gas rights in each Tract, its share of Production, and
15  its interest in all Unit property, as security for payment of
16  its share of Costs, together with interest thereon at the rate
17  of six per cent (6%) per annum.  Unit Operator and each Sub-
18  Operator shall have the right to bring suit to enforce collec-
19  tion of such indebtedness with or without seeking foreclosure
20  of the lien.  In addition, upon default by any Party in the
21  payment of its share of Costs, Unit Operator and each Sub-
22  Operator shall have the right to collect from the purchaser
23  the proceeds from the sale of such Party's share of Production
24  until the amount owed by such Party, plus interest as afore-
25  said, has been paid.  Each purchaser shall be entitled to rely
26  upon Unit Operator's or Sub-Operators' written statement con-
27  cerning the amount of any default.

28                    ARTICLE XX

29                      TITLES

BOOK 0551 PAGE 059     BOOK 0550 PAGE 543

1  and hereby agrees to indemnify and hold harmless the other Par-

2  ties from any loss due to failure, in whole or in part, of its

3  title to any such interest, except failure of title arising out

4  of Unit Operations; provided that such indemnity shall be limited

5  to an amount equal to the net value that has been received from

6  the sale or receipt of Unitized Substances attributed to the

7  interest as to which title failed.  Each failure of title

8  will be deemed to be effective, insofar as this Agreement is

9  concerned, as of the first day of the calendar month in which

10  such failure is finally determined, and there shall be no

11  retroactive allocation of Costs or retroactive allocation of

12  Unitized Substances or the proceeds therefrom, as a result of

13  title failure.

14      20.2  Failure Because of Unit Operations.  The failure of

15  title to any Working Interest in any Tract by reason of Unit

16  operations, including non-production from such Tract, shall not

17  change the BPI of the Party whose title failed in relation to

18  the BPI of the other Parties at the time of the title failure.

19                          ARTICLE XXI

20                   RENTALS AND LEASE BURDENS

21      21.1  Rentals.  Each Party shall be obligated to pay,

22  or cause to be paid, any and all rentals and other sums (other

23  than Lease Burdens) payable upon or in respect of its Working

24  Interests, subject, however, to the right of each Party to

25  surrender any of its Working Interests in accordance with

26  Article XXIV.  Upon request, each Party shall furnish to

27  Unit Operator satisfactory evidence of the making of

28  such payments.  However, no Party shall be liable to any other

29  Party for unintentional failure to make any such payments pro-

BOOK 0551 PAGE 060      BOOK 0550 PAGE 544

1  for that portion of the Lease Burdens constituting the Royalty

2  Share due the State of Alaska in respect of Production or the

3  proceeds thereof allocated under the Unit Agreement to each

4  Tract in each RIPA in which it owns a Working Interest, in

5  accordance with Article X.   Each Party shall be obligated

6  to pay, or cause to be paid, all other Lease Burdens as to each

7  Tract in which it owns a Working Interest, and shall be liable

8  for any additional Costs occasioned thereby.   Each Party en-

9  titled to receive the Production from a well completed as a

10  producer but not included in a RIPA shall pay, or cause to be

11  paid, all Lease Burdens payable in respect of such Production.

12        21.3  Payments to be Borne by Parties.   All payments

13  made pursuant to this Article XXI shall be borne by the Party

14  responsible for such payments in accordance with this Agreement,

15  except payments made by Unit Operator or a Sub-Operator acting

16  in that capacity.

17                            ARTICLE XXII

18                               TAXES

19        22.1  Taxes Upon Unit Property and Operations.   All taxes

20  assessed or levied upon Unit property or operations under this

21  Agreement, except income taxes, taxes measured by Production

22  and taxes upon Lease Burdens which are payable by the owners

23  thereof, shall be paid by Unit Operator or each Sub-Operator

24  as and when due and payable.

25        All such taxes shall be charged to and borne by the

26  Parties in proportion to their respective BPI's.

27        22.2  Other Taxes.   Each Party shall pay or cause to

28  be paid all taxes imposed upon or in respect of the production

29  or handling of its share of Unitized Substances.

BOOK 0551 PAGE 061        BOOK 0550 PAGE 545

1    in the materials and equipment in any well, or of any interest
2    in platforms, pipelines or other facilities, or in the event
3    of the reversion of any relinquished interest as in this Agree-
4    ment provided, the taxes above mentioned assessed against
5    the interest transferred or reverted for the taxable period
6    in which such transfer or reversion occurs shall be apportioned
7    between such Parties so that each shall bear the percentage
8    of such taxes which is proportionate to that portion of the
9    taxable period during which it owned such interest.

10       22.4  Notices and Returns.  Each Party shall promptly
11   furnish Unit Operator or the applicable Sub-Operator with
12   copies of notices, assessments, levies or tax statements
13   received by it pertaining to the taxes to be paid by Unit
14   Operator or that Sub-Operator.  Unit Operator and each Sub-
15   Operator shall make such returns, reports and statements
16   as may be required by law in connection with any taxes above
17   provided to be paid by it, shall furnish copies to the Parties
18   upon request, and shall notify the Parties of any tax which
19   it does not propose to pay before such tax becomes delinquent.
20                         ARTICLE XXIII
21                           INSURANCE
22       23.1  Required Insurance.  Unit Operator or Sub-Operators
23   where applicable shall procure and maintain the following
24   insurance for the protection of all Parties hereto and the
25   premiums therefor shall be charged as Costs under this Agree-
26   ment.  The insurance coverage may be altered from time to time
27   as conditions warrant subject to approval of the Parties.
28          A.  Unit Operator shall carry:
29             1.  General Liability Insurance and Marine

PE05GT2 162          PE05GT2 272

BOOK **0551** PAGE **062**          BOOK **0550** PAGE **546**

1    a combined single limit of at least $500,000
2    per occurrence.
3        2.   All Risk Physical Damage Insurance, if
4    readily available, including Debris Removal,
5    and Cost of Control of Well Insurance, with
6    a deductible of at least $100,000 per occurrence.
7    B.   Unit Operator and Sub-Operators shall carry:
8    Workmen's Compensation and Employers' Liability
9    to cover all operations including marine oper-
10   ations (and liability for transportation, wages,
11   maintenance and cure to a master or a member
12   of a crew of any vessel) conducted under this
13   Agreement with an Employers' Liability limit
14   of at least $500,000.  Such insurance shall
15   contain a provision wherein carrier waives its
16   right of subrogation against the Parties hereto.
17       23.2   Individual Insurance.  Any Party may procure and
18   maintain at its own cost and expense such other insurance as
19   it shall determine and any such insurance shall inure solely
20   for the benefit of such Party procuring the same; provided,
21   however, that each such insurance policy shall contain a waiver
22   on the part of the insurance carrier of all rights, by subro-
23   gation or otherwise, against each Party not named as an insured
24   in such policy or if such waiver is not secured the insured
25   shall indemnify and hold harmless each Party not named as an
26   insured in such policy against any claim of the insurance carrier
27   arising against such Party by subrogation or otherwise.
28       23.3   Contractors' Insurance.  Unit Operator and Sub-
29   Operators shall require all contractors engaged in operations

BOOK 0551 PAGE 063        BOOK 0550 PAGE 547

1   insurance in such amounts as is deemed necessary by the Unit
2   Operator or Sub-Operators. All such insurance shall contain
3   a waiver of subrogation by the carrier as to each Party not named
4   as an insured therein.

5       23.4  Notice of Losses and Claims.  Unit Operator and
6   Sub-Operators shall notify the other Parties as soon as
7   practicable after the occurrence of any accident involving
8   either damage to property or injuries to or death of persons.

9                       ARTICLE XXIV

10          RELEASE FROM OBLIGATIONS AND SURRENDER

11      24.1  Surrender or Release Within a WIPA.  A Working In-
12  terest in a WIPA shall not be surrendered except with the consent
13  of all Parties in such WIPA.  However, a Party who owns a Work-
14  ing Interest in a WIPA and who is not at the time committed to
15  participate in the Drilling, Deepening or Plugging Back of a
16  Well in such WIPA may be relieved of further obligations with
17  respect to such WIPA as then constituted by executing and de-
18  livering to Unit Operator an assignment conveying to all other
19  Parties in such WIPA, proportionately to such other Parties'
20  respective BPI's as among themselves, all Working Interests
21  owned by such Party in the WIPA, together with the entire
22  interest of such Party in any and all wells, materials, equip-
23  ment and other property in or pertaining to such WIPA.

24      24.2  Procedure on Surrender Outside a WIPA.  Whenever a
25  Party desires to surrender a Working Interest in any tract
26  which is not in a WIPA, such Party shall give to all other
27  Parties written notice thereof describing such Working In-
28  terest.  The Parties receiving such notice, or any of them,
29  shall have the right at their option to take from the Party

1   the notice of the desire to surrender.  If such election is
2   made as above provided, the Party or Parties taking the assign-
3   ment (which shall be taken by them in proportion to the Surface
4   Acreage of their Working Interests among themselves in the Unit
5   Area) shall pay to the assigning Party its share of the salvage
6   value of any wells owned by the Parties and then located on the
7   land covered by such Working Interest, which payment shall be
8   made on receipt of the assignment.  If no Party elects to take
9   such assignment within such thirty (30) day period, then the
10  Party or Parties owning such Working Interest may surrender the
11  same if surrender thereof can be made in accordance with the
12  Unit Agreement.

13       24.3  Accrued Obligations.  A Party making an assignment
14  or surrender in accordance with Section 24.1 or 24.2 shall not
15  be relieved of its liability for any obligation accrued hereunder
16  at the time the assignment or surrender is made, or of obligation
17  to bear its share of the Costs incurred in any Drilling, Deepen-
18  ing or Plugging Back operation in which such Party has elected
19  to participate prior to the making of such assignment or surren-
20  der, except to the extent that the Party or Parties receiving such
21  assignment shall assume, with the approval of the Parties, any
22  and all obligations of the assigning Party hereunder and under
23  the Unit Agreement.

24                      ARTICLE XXV

25                    FORCE   MAJEURE

26       25.1  Force Majeure.  The obligations of Unit Operator
27  and each Sub-Operator hereunder shall be suspended to the
28  extent that, and only so long as, performance thereof is pre-
29  vented, in whole or in part, by acts of God, fire, action of

BOOK **0551** PAGE **065**    BOOK **0550** PAGE **549**

1  differences with workmen, unavoidable accidents, acts of civil

2  or military authorities, acts of the public enemy, restrictions

3  or restraints imposed by law or by regulation or order of gov-

4  ernmental authority, whether Federal, state, or local, inabil-

5  ity to obtain necessary rights of access, uncontrollable delays

6  in transportation, inability to obtain necessary materials in

7  open market, or any other cause reasonably beyond control of

8  Unit Operator and Sub-Operators whether or not similar to any

9  cause above enumerated.  No Party shall be required against its

10  will to adjust or settle any labor dispute.  Whenever perfor-

11  mance of obligations is prevented by any such cause, Unit

12  Operator and each Sub-Operator shall give notice thereof to

13  the other Parties as promptly as reasonably possible.

14                          ARTICLE XXVI

15                            NOTICES

16      26.1  Giving and Receipt.  Except as otherwise specified

17  herein, any notice, consent, or statement herein provided or

18  permitted shall be deemed to have been properly served when

19  sent by mail (air mail if out of state) or telegram to the

20  address of the representative of each Party as furnished to

21  Unit Operator in accordance with Article V and received by

22  the Party.  A notice given under any provision hereof shall

23  be deemed given only when received by the Party to whom such

24  notice is directed, except that any notice given by United

25  States certified or registered mail, or by telegram, properly

26  addressed to the Party to whom given with all postage and

27  charges prepaid, shall be deemed given to and received by

28  the Party to whom directed seventy-two (72) hours after

BOOK 0551 PAGE 066

BOOK 0550 PAGE 551

1    hereby elects to be excluded from the application of Subchapter
2    K of Chapter 1 of Subtitle A of the Internal Revenue Code of
3    1954, or such portion or portions thereof as may be permitted
4    or authorized by the Secretary of the Treasury of the United
5    States or his delegate insofar as such Subchapter or any por-
6    tion or portions thereof may be applicable to the Parties.
7    If any present or future income tax laws of the State of Alaska
8    contain provisions similar to those contained in the Subchap-
9    ter of the Internal Revenue Code of 1954 above referred to
10   under which a similar election is permitted, each of the Parties
11   hereby elects to be excluded from the application of such laws.
12   Accordingly, each Party hereby authorizes and directs Unit
13   Operator to execute such an election or elections on its be-
14   half and file the same with the proper administrative office
15   or agency.  If requested by Unit Operator, each Party agrees
16   to execute and join in such instruments as are necessary to
17   make such elections effective.

18                        ARTICLE XXIX

19                   EFFECTIVE DATE AND TERM

20        29.1  Effective Date.  This Agreement shall be effective
21   as of the effective date of the Unit Agreement.

22        29.2  Term.  This Agreement shall continue in effect so
23   long as the Unit Agreement remains in effect and thereafter
24   until:  (a)  all wells have been plugged and abandoned or
25   otherwise disposed of, (b) all Unit property acquired for
26   the joint account has been disposed of in accordance with
27   the instructions of the Parties, and (c) there has been a
28   final accounting.

29                        ARTICLE XXX

1   hereby elects to be excluded from the application of Subchapter

2   K of Chapter 1 of Subtitle A of the Internal Revenue Code of

3   1954, or such portion or portions thereof as may be permitted

4   or authorized by the Secretary of the Treasury of the United

5   States or his delegate insofar as such Subchapter or any por-

6   tion or portions thereof may be applicable to the Parties.

7   If any present or future income tax laws of the State of Alaska

8   contain provisions similar to those contained in the Subchap-

9   ter of the Internal Revenue Code of 1954 above referred to

10  under which a similar election is permitted, each of the Parties

11  hereby elects to be excluded from the application of such laws.

12  Accordingly, each Party hereby authorizes and directs Unit

13  Operator to execute such an election or elections on its be-

14  half and file the same with the proper administrative office

15  or agency.  If requested by Unit Operator, each Party agrees

16  to execute and join in such instruments as are necessary to

17  make such elections effective.

18                    ARTICLE XXIX

19            EFFECTIVE DATE AND TERM

20      29.1  Effective Date.  This Agreement shall be effective

21  as of the effective date of the Unit Agreement.

22      29.2  Term.  This Agreement shall continue in effect so

23  long as the Unit Agreement remains in effect and thereafter

24  until:  (a)  all wells have been plugged and abandoned or

25  otherwise disposed of, (b) all Unit property acquired for

26  the joint account has been disposed of in accordance with

27  the instructions of the Parties, and (c) there has been a

28  final accounting.

BOOK 0551 PAGE 068

BOOK 0550 PAGE 552

Sub-Operators agree to comply with all of the provisions of

Section 202(1) to (7), inclusive, of Executive Order 11246,

as amended (30 FR 12319), which are hereby incorporated by

reference in this Agreement.

Unit Operator and Sub-Operators agree to insert the

foregoing provision in all subcontracts hereunder, except

subcontracts for standard commercial supplies or raw mater-

ials.

## ARTICLE XXXI

### OTHER PROVISIONS

31.1  Audits.  An audit shall be made of Unit Operator and

Sub-Operator's records and books of account pertaining to oper-

ations under this Agreement whenever the making of such audit is

requested by any two or more Parties in the affected WIPA, except

that neither Unit Operator nor a Sub-Operator shall be audited

more often than once each year, except upon the resignation or

removal of such Unit Operator or Sub-Operator.  Such audit shall

be made by auditors in the employ of the Parties desiring to

participate therein, and the allowance to be made to each Party

furnishing an auditor shall be determined by the approval of

such Parties, and paid by such Parties in proportion to their

respective participations among themselves in Costs incurred dur-

ing the period covered by the audit.

31.2  Laws and Regulations.  This Agreement shall be

subject to all applicable laws and regulations, and shall

be interpreted in accordance with the laws of the State of

Alaska.

31.3  Additional Burdens.  In the event that any Party

ᴿᴷ 3ԿT2ᴾᴳ069                    7Ū3ԿT2ᴾᴳ279

BOOK **0551** PAGE **069**          BOOK **0550** PAGE **553**

1   other burden or charge, the Party which has created or sub-

2   sequently creates any such additional burden or charge shall

3   hold the other Parties to this Agreement harmless from such

4   additional burdens and charges, and shall satisfy and dis-

5   charge such burdens and charges out of its own funds.  As

6   security for the performance of the obligations created by

7   this paragraph, the Parties entitled to be held harmless

8   shall have a lien to secure the performance of the obligations

9   created by this Section 31.3.  Such lien shall exist upon

10  the interests shown in said Exhibit "B" to be owned by the

11  Party charged with performing such obligation.

12      31.4  Successors and Assigns.  The provisions of this

13  Agreement shall be covenants running with the lands, leases,

14  and interests covered hereby, and shall be binding upon and

15  inure to the benefit of the legal representatives, successors

16  and assigns of the Parties hereto.

17                    ARTICLE XXXII

18                    EXECUTION

19      32.1  Counterparts.  this Agreement may be executed in

20  counterparts and all such counterparts taken together shall

21  be deemed to constitute one and the same instrument.

22      32.2  Ratification.  This Agreement may be executed

23  by the execution and deliveryof a good and sufficient in-

24  strument of ratification, adopting and entering into this

25  Agreement.  Such ratification shall have the same effect as

26

27

28

at  3412 PG 070        PG U 3 °  2 PG 280

BOOK 0551 PAGE 070      BOOK 0550 PAGE 554

1   if the Party executing it had executed this Agreement or a

2   counterpart hereof.

3       IN WITNESS WHEREOF, the Parties hereto have caused this

4   Agreement to be executed as of the date first herein written.

5                       UNIT OPERATOR, SUB-OPERATOR and PARTY

6                       UNION OIL COMPANY OF CALIFORNIA

7

8                       By _____
                            ITS ATTORNEY-IN-FACT

9                       By _____

10

11                      SUB-OPERATOR and PARTY

12                      MARATHON OIL COMPANY

13                      By _____
                            R. E. McMILLEN, VICE PRESIDENT

14                      By _____
                            J. F. Brucklacher
15  K 9AIA I                 Assistant Secretary
16  RECORDING            SUB-OPERATOR and PARTY
17  DISTRICT             ATLANTIC RICHFIELD COMPANY

18
                        By _____
19                          E. M. Benson, Jr., Vice-President

20                      By _____
                            Mary C. Drayer, Assistant Secretary
21
                                    PARTIES
22
                        PAN AMERICAN PETROLEUM CORPORATION
23

24                      By _____

25
                        By _____
26

27                      PHILLIPS PETROLEUM COMPANY

28      AUG 25 1967     By _____

BOOK **0551** PAGE **071**

RE 3472 PG 071

RE 3472 PG 281

TRADING BAY UNIT
DUTIES OF UNIT OPERATOR

ROBERT T. AND......

JAN 1969
BOOK **0550** PAGE **555**

ESTABLISHED IN
UNIT ORGANIZATION PLAN
DECEMBER 14, 1966

0027 PG 756

Keeps abreast of day to day activities of sub-committees and
sub-operators to insure that activities are in compliance with
plans and procedures approved by the Management Committee and
in accordance with the Agreements.

Anticipates, detects and defines problems that require Management
Committee action and consults with Management Committee representa-
tives by telephone poll, letter ballot or request a meeting of the
Management Committee as is appropriate.

Coordinates accounting work done by various sub-operators and
prepares combined statements incorporating cost and production
accounting.

Makes recommendations to the Management Committee of tasks to be
done by sub-committees.

0028 PG 071

Represents the Unit to the State and other regulatory bodies at
hearings and other occasions and submits to regulatory authorities
reports, etc. originated by sub-operators.

Provides liaison between sub-committees and sub-operators to
Management Committee if desired but sub-operators and sub-committees
are directly responsible to the Management Committee.

Coordinates, under plans approved by the Management Committee,
transportation, communications and other operations and services
among the various sub-operators, platforms, pipelines, and shore
sites.

ESTABLISHED IN DRAFT #2
UNIT OPERATING AGREEMENT

BOOK 0551 PAGE 072

PT 03GT2 PG 072          PT 03GT2 PG 282

Article V - page 1                                    BOOK 0550 PAGE 556

Maintains a control of participants' representatives and alternates
and their addresses, calls and chairs meetings.

Article V - page 3

Advises working interest owners of all poll vote results.

Article VI

Provides non-operators with copies of reports to all governmental
agencies, reports of crude oil runs and stocks, inventory reports,
well logs, etc.; coordinates the activities of sub-operators and
sub-committee; reports to State and other regulatory bodies; repre-
sents working interest owners at hearings; keeps advised on daily
activities and make recommendations as required; coordinates
transportation, communications and other operations and services
among the sub-operator's platforms, pipelines and shore facilities
and carries out any other duties or assignments given by the other
working interest owners; coordinates accounting work being done by
the various sub-operators and sends each party a statement of costs
and production.

Article IX - page 2

Receives requests for redeterminations of WIPA.

Article X - page 1

Collects monthly royalties on production from the working interest
owners, pay royalties to the State and calculates royalty differences
and dispenses to or collects from the various working interest owners.

Article XI - page 1

Furnishes working interest owners WIPA statements showing redeterminations
of EPI and VPI.

Article XII

BOOK 0551 PAGE 073

CR 03612 PG 073          CR 03612 PG 283

BOOK 0550 PAGE 557

Article XIV - page 2

Pays all compensatory royalties in lieu of drilling wells; effects
contraction of the Unit to avoid drilling of wells.

Article XV - page 1

Furnishes information and recommendations relative to revisions
or consolidations of RIPA's. If recommendations are approved by
working interest owners, prepares and files with State necessary
data supporting changes. If recommendations fail to receive ap-
proval of working interest owners, files a recommendation with
the State which reflects the greatest percentage of working
interest owners within the applicable WIPA.

Underlifting and Overlifting

Article XVII - page 2

Advises working interest owners in applicable WIPA of
available liquid production for each quarter and advises
of any revisions.

Article XVII - page 3

Receives nominations for available production from working
interest owners.

Article XVII - page 4

Advises working interest owners of the nominations received
and establishes a rate of liquid products equal to the volume
nominated.

Article XVII - page 6

Maintains statements of underlifting and overlifting for
gas and attempts to balance over and unders.

Article XVIII - page 1

BOOK 0551 PAGE 074

PR 03G12 PG 074                    PR M3G12 PG 284

BOOK 0550 PAGE 558

Article XXVII - page 1

Prepares and files election to be excluded from partnerships in
the State of Alaska and the U.S. Internal Revenue Code of 1954.

ESTABLISHED IN
UNIT AGREEMENT

Page 3

Revises Exhibits A and B whenever changes occur in the unit
area or at the request of a regulatory body.  Prepares notices
of proposed expansions or contractions and files with the State
of Alaska.

Page 11

Files plans of development and operation with the State of
Alaska for specified periods of time.

Page 18

Arranges for State of Alaska to take oil in kind if so desired.

Page 21

Takes appropriate and adequate measures to prevent drainage of
unitized substances or pays compensatory royalty as approved
by the State of Alaska.

Page 28

Appears before State of Alaska in behalf of all working interest
owners in regard to all interests affected.

ᵖ𝚈 Ũ3ᵍ̃Ĩ2ᴾᴳ075

ᵖ𝚈 Ũ3ᵍ̃Ĩ2ᴾᴳ285

BOOK 0550 PAGE 559
BOOK 0551 PAGE 075

ᵗᵗ 00276760
Schedule I

UNION OIL COMPANY - OPERATOR

STATEMENT OF BPI BARRELS (OWED)/DUE AS OF JUNE 1, 1970
2ND SPECIFIED REDETERMINATION - HEMLOCK WIPA, TRADING BAY UNIT

| ntic field | Marathon | Pan American | Phillips | Skelly | Standard | Union | TOTAL |
|---|---|---|---|---|---|---|---|
| 2,846.18 | 26,838,486.71 | 1,284,518.34 | 1,284,518.34 | 1,284,518.34 | 270,500.76 | 26,838,486.66 | 67,603,875.3 |
| 4,127.04 | 27,683,786.95 | 946,454.25 | 946,454.25 | 946,454.25 | 202,811.64 | 27,683,786.95 | 67,603,875.3 |
| 3,719.14) | 845,300.24 | (338,064.09) | (338,064.09) | (338,064.09) | (67,689.12) | 845,300.29 | -0- |
| -0- | 48.61 | -0- | -0- | -0- | (97.21) | 48.60 | -0- |
| 3,719.14) | 845,348.85 | (338,064.09) | (338,064.09) | (338,064.09) | (67,786.33) | 845,348.89 | -0- |

BOOK 0551 PAGE 0 iu

BOOK 0550 PAGE 560

**union**

UNION OIL COMPANY - OPERATOR

SCHEDULE 2

STATEMENT OF EPI BARRELS (OWED)/DUE AS OF JUNE 1, 1970
2ND SPECIFIED REDETERMINATION - HEMLOCK WIPA, TRADING BAY UNIT

| ntic field | Marathon | Pan American | Phillips | Skelly | Standard | Union | TOTAL |
|---|---|---|---|---|---|---|---|
| ,037.57 | 23,484,732.57 | 1,123,756.26 | 1,123,756.26 | 1,123,756.26 | 236,619.80 | 23,484,732.59 | 59,153,391.3 |
| ,861.16 | 24,223,313.58 | 828,147.60 | 828,147.60 | 828,147.60 | 177,460.19 | 24,223,313.58 | 59,153,391.3 |
| .176.41) | 738,581.01 | (295,608.66) | (295,608.66) | (295,608.66) | (59,159.61) | 738,580.99 | -0- |
| -0- | 41.64 | -0- | -0- | -0- | (83.29) | 41.65 | -0- |
| .176.41) | 738,622.65 | (295,608.66) | (295,608.66) | (295,608.66) | (59,242.90) | 738,622.64 | -0- |

PY 03421 2 PG 077    BOOK 0551 PAGE 077

BOOK 0550 PAGE 561

002 / PG 762    03421 2 PG 281

Schedule I

PY 0028 PG 077

## TRADING BAY UNIT - COOK INLET, ALASKA
## UNION OIL COMPANY OF CALIFORNIA - OPERATOR
## REDETERMINATION OF EQUITY - INCEPTION THROUGH 9/30/68
## EXPENDITURES (EXCLUDING PRODUCTION TAXES)

| | As Billed Inception - 9/30/68 % | As Billed Amount | Union Oil | Marathon | Atlantic Richfield | Total |
|---|---|---|---|---|---|---|
| | 17.0600 | $ 18,910,353 | $21,098,460 | $23,269,587 | $18,301,692 | $ 63,469,739 |
| | 37.2175 | 41,254,165 | 2,813,124 | 2,614,760 | 2,764,614 | 8,192,498 |
| | 1.9700 | 2,183,669 | 843,810 | 2,997,784 | - | 3,841,594 |
| | 1.9700 | 2,183,669 | 10,384,466 | 8,000,239 | 6,461,543 | 24,846,248 |
| | 1.9700 | 2,183,669 | 271,068 | 545,971 | 724,077 | 1,541,116 |
| | 1.9700 | 2,183,669 | 552,313 | 839,669 | 286,569 | 1,678,551 |
| | | | 95,000 | - | - | 95,000 |
| | | | 7,367 | - | - | 7,367 |
| | | | - | 172,420 | - | 172,420 |
| urance roup | .6250 | 692,789 | 3,038,912 | 2,300,832 | 1,661,871 | 7,001,615 |
| | 37.2175 | 41,254,165 | | | | |
| lif. | 100.0000 | $110,846,148 | $39,904,520 | $40,741,262 | $30,200,366 | $110,846,148 |

| Redetermined Equity % | Amount | Cost Adjustment | Purchased Insurance Adjustment Sched. II | Total cost Adjustment |
|---|---|---|---|---|
| 12.6 | $ 13,966,614 | $(4,943,739) | $(322,548) | $(5,266,287) |
| 39.7 | 44,005,921 | 2,751,756 | 170,556 | 2,922,312 |
| 1.9 | 2,106,077 | (77,592) | - | (77,592) |
| 1.9 | 2,106,077 | (77,592) | - | (82,9..) |
| 1.9 | 2,106,077 | (77,592) | (5,390) | (77,592) |
| 1.9 | 2,106,077 | (77,592) | (5,390) | (82,982) |
| 39.4 | 443,384 | (249,405) | (7,784) | (257,189) |
| 39.7 | 44,005,921 | 2,751,756 | 170,556 | 2,922,312 |
| 100.0 | $110,846,148 | $ - | $ - | $ - |

PK 003GT2 PG0    PK 003GT2 PG28

BOOK 0551 PAGE 078

BOOK 0550 PAGE 562

002/PG763

Schedule II

UNION OIL COMPANY OF CALIFORNIA - OPERATOR
REDETERMINATION OF EQUITY - INCEPTION THROUGH 9/30/68
INSURANCE

| | Cost | Interest | Total | Total Participation |
|---|---|---|---|---|
| 26, 1968 | $3,155,484 | $158,007 | $3,313,491 | 96.060% |
| 26, 1969 | 3,540,520 | 17,703 | 3,558,223 | 95.435 |
| | $6,696,004 | $175,710 | $6,871,714 | |

**August 25, 1967 to July 26, 1968**

| | As Billed % (*) | As Billed Amount | Revised % (*) | Revised Amount | Adjustment |
|---|---|---|---|---|---|
| | 17.7597 | $ 588,466 | 13.0978 | $ 433,994 | $(154,472) |
| | 38.7440 | 1,283,779 | 41.2682 | 1,367,418 | 83,639 |
| | 2.0508 | 67,953 | 1.9750 | 65,442 | (2,511) |
| | 2.0508 | 67,953 | 1.9750 | 65,442 | (2,511) |
| | .6507 | 21,561 | .4158 | 13,777 | (7,784) |
| | 38.7440 | 1,283,779 | 41.2682 | 1,367,418 | 83,639 |
| | 100.0000 | $3,313,491 | 100.0000 | $3,313,491 | $ - |

**July 26, 1968 to July 26, 1969**

| | As Billed % (*) | As Billed Amount | Revised % (*) | Revised Amount | Adjustment | Total Adjustment 8/25/67 -7/26/69 |
|---|---|---|---|---|---|---|
| | 17.8760 | $ 636,067 | 13.1524 | $ 467,991 | $(168,076) | $(322,548) |
| | 38.9978 | 1,387,629 | 41.4405 | 1,474,546 | 86,917 | 170,556 |
| | 2.0642 | 73,449 | 1.9833 | 70,570 | (2,879) | (5,390) |
| | 2.0642 | 73,449 | 1.9833 | 70,570 | (2,879) | (5,390) |
| | - | | - | - | - | (7,784) |
| | 38.9978 | 1,387,629 | 41.4405 | 1,474,546 | 86,917 | 170,556 |
| | 100.0000 | $3,558,223 | 100.0000 | $3,558,223 | $ - | $ - |

(*) adjusted to reflect the proportionate individual interest of the owners purchasing insurance.

**UNION**

UNION OIL COMPANY - OPERATOR

Schedule III

STATEMENT OF DIESEL BARRELS (OWED)/DUE AS OF JUNE 1, 1970
2ND SPECIFIED REDETERMINATION-HEMLOCK WIPA, TRADING BAY UNIT

| | Marathon | Pan American | Phillips | Skelly | Standard | Union | TOTAL |
|---|---|---|---|---|---|---|---|
| .26 | 23,712.15 | 1,085.37 | 1,085.37 | 1,085.37 | 253.44 | 23,813.04 | 59,374.00 |
| .86 | 24,313.65 | 831.24 | 831.24 | 831.24 | 178.12 | 24,313.65 | 59,374.00 |
| .40) | 601.50 | (254.13) | (254.13) | (254.13) | (75.32) | 500.61 | -0- |

BOOK 0551 PAGE 080    BOOK 0550 PAGE 564

SCHEDULE IV

TRADING BAY OFFSET REALLOCATED UNIT

| Total Shipment Barrels | Total Diesel Recovery | Net Oil Run | Total EPI Barrels |
|---|---|---|---|
| 17,777,157.00 | 16,800,800.00 | 17,760,357.00 | 15,540,312.38 |
| 2,310,411.00 | 4,208.00 | 2,306,203.00 | 2,017,927.61 |
| 2,420,852.00 | 4,815.00 | 2,416,037.00 | 2,114,032.37 |
| 1,937,190.00 | 1,385.00 | 1,935,805.00 | 1,693,829.37 |
| 1,883,448.00 | -0- | 1,883,448.00 | 1,648,017.00 |
| 2,253,013.00 | 4,453.00 | 2,248,560.00 | 1,967,490.00 |
| 2,572,539.00 | 2,220.00 | 2,570,319.00 | 2,249,029.12 |
| 2,863,090.00 | 4,380.00 | 2,858,710.00 | 2,501,371.25 |
| 2,450,703.00 | 2,959.00 | 2,447,744.00 | 2,141,776.00 |
| 2,393,949.00 | 3,604.00 | 2,390,345.00 | 2,091,551.88 |
| 2,754,198.00 | 2,428.00 | 2,751,770.00 | 2,407,798.75 |
| 2,897,159.00 | 3,636.00 | 2,893,523.00 | 2,531,832.63 |
| 2,959,592.00 | 3,011.00 | 2,956,580.91 | 2,587,008.38 |
| 2,988,489.02 | 2,319.00 | 2,986,170.00 | 2,612,898.75 |
| 2,673,888.02 | (533.00) | 2,674,421.02 | 2,340,118.38 |
| 3,117,541.38 | 2,208.00 | 3,115,333.38 | 2,725,916.71 |
| 2,756,628.59 | 700.00 | 2,755,928.59 | 2,411,437.86 |
| 2,916,896.45 | -0- | 2,916,896.45 | 1,552,284.39 |
| 2,686,816.88 | 781.00 | 2,685,907.10 | 2,350,168.71 |
| 3,049,816.88 | -0- | 3,049,816.88 | 2,668,589.77 |
| 67,663,249.42 | 52,374.00 | 57,603,875.33 | 59,153,391.31 |

BOOK 0551 PAGE 081

BOOK 0550 PAGE 565

℃Ɛ 0027 PG 766

℃Ɛ 0029 PG 081

SCHEDULE V

2 N D   S P E C I F I E D   R E D E T E R M I N A T I O N          T R A D I N G   B A Y   U N I T

TOTAL BPI BARRELS EXCLUDING DIESEL

| | ARCO | MARATHON | PAN AM | PHILLIPS | SKELLY | STANDARD | UNION |
|---|---|---|---|---|---|---|---|
| 10/68 | 3,379,795.91 | 6,609,960.86 | 349,879.03 | 349,879.03 | 349,879.03 | 111,002.28 | 6,609,960.86 |
| 11/68 | 267,519.55 | 963,070.37 | 35,054.29 | 35,054.29 | 35,054.29 | 7,379.84 | 963,070.37 |
| 12/68 | 285,817.18 | 997,823.28 | 42,280.65 | 42,280.65 | 42,280.65 | 7,731.31 | 997,823.28 |
| 2/69 | 231,909.44 | 793,680.05 | 36,780.30 | 36,780.30 | 36,780.30 | 6,194.56 | 793,680.05 |
| 3/69 | 225,637.07 | 772,213.68 | 35,785.51 | 35,785.51 | 35,785.51 | 6,027.05 | 772,213.68 |
| 4/69 | 249,327.49 | 921,909.60 | 42,732.64 | 42,732.64 | 42,732.64 | 7,295.39 | 921,909.60 |
| 5/69 | 307,924.22 | 1,053,830.79 | 48,836.06 | 48,836.06 | 48,836.06 | 8,147.87 | 1,172,071.10 |
| 6/69 | 342,473.46 | 1,172,071.10 | 54,315.49 | 54,315.49 | 54,315.49 | 9,147.87 | 1,172,071.10 |
| 7/69 | 293,239.74 | 1,003,575.03 | 46,507.14 | 46,507.14 | 46,507.14 | 7,832.78 | 1,003,575.03 |
| 8/69 | 286,363.34 | 980,041.44 | 45,416.56 | 45,416.56 | 45,416.56 | 7,649.10 | 980,041.44 |
| 9/69 | 329,662.05 | 1,128,225.70 | 52,283.63 | 52,283.63 | 52,283.63 | 8,805.66 | 1,128,225.70 |
| 10/69 | 346,644.05 | 1,186,344.43 | 54,976.94 | 54,976.94 | 54,976.94 | 9,259.27 | 1,186,344.43 |
| 11/69 | 354,198.40 | 1,208,198.21 | 56,175.04 | 56,175.04 | 56,175.04 | 9,461.06 | 1,212,198.12 |
| 12/69 | 388,530.57 | 1,208,936.00 | 56,737.23 | 56,737.23 | 56,737.23 | 9,555.74 | 1,208,936.00 |
| 1/70 | 387,791.05 | 1,062,814.91 | 50,814.00 | 50,814.00 | 50,814.00 | 9,558.15 | 1,062,814.91 |
| 2/70 | 451,723.33 | 1,238,033.49 | 59,191.33 | 59,191.33 | 59,191.33 | 9,969.08 | 1,238,033.49 |
| 3/70 | 399,609.36 | 1,095,206.52 | 52,362.71 | 52,362.71 | 52,362.71 | 8,818.05 | 1,095,206.53 |
| 4/70 | 422,949.99 | 1,159,174.56 | 55,421.03 | 55,421.03 | 55,421.03 | 9,334.24 | 1,159,174.57 |
| 5/70 | 389,456.53 | 1,067,379.49 | 51,032.23 | 51,032.23 | 51,032.23 | 8,594.90 | 1,067,379.49 |
| | 442,221.45 | 1,233,997.21 | 57,941.23 | 57,941.23 | 57,941.23 | 9,759.41 | 1,211,997.22 |
| | 9,802,846.18 | 26,838,486.71 | 1,284,518.34 | 1,284,518.34 | 1,284,518.34 | 270,500.76 | 26,838,486.66 |

| | ARCO | MARATHON | PAN AM | PHILLIPS | SKELLY | STANDARD | UNION |
|---|---|---|---|---|---|---|---|
| | 13.6% | 40.95% | 1.4% | 1.4% | 1.4% | .3% | 40.95 % |
| on | 9,194,127.04 | 27,683,786.95 | 946,454.25 | 946,454.25 | 946,454.25 | 202,811.64 | 27,683,786.95 |

| | ARCO | MARATHON | PAN AM | PHILLIPS | SKELLY | STANDARD | UNION |
|---|---|---|---|---|---|---|---|
| tion ru 5/31/70 | 9,194,127.04 | 27,683,786.95 | 946,454.25 | 946,454.25 | 946,454.25 | 202,811.64 | 27,683,786.95 |
| | 9,802,846.18 | 26,838,486.66 | 1,284,518.34 | 1,284,518.34 | 1,284,518.34 | 270,500.76 | 26,838,486.66 |
| dination 6/1/70 | (608,719.14) | 845,300.24 | (338,064.09) | (338,064.09) | (338,064.09) | (67,689.12) | 845,300.29 |

| | ARCO | MARATHON | PAN AM | PHILLIPS | SKELLY | STANDARD | UNION |
|---|---|---|---|---|---|---|---|
| | 8,074.86 | 24,313.65 | 831.24 | 831.24 | 831.24 | 178.12 | 24,311.65 |
| | 8,339.26 | 23,722.15 | 1,085.37 | 1,085.37 | 1,085.37 | 253.44 | 23,813.04 |
| | (264.40) | 601.50 | (254.13) | (254.13) | (254.13) | (75.32) | 500.61 |

SCHEDULE VI

BOOK 0551 PAGE 082

BOOK 0550 PAGE 566

## T R A D I N G   B A Y   U N I T

### 2 N D   S P E C I F I E D   R E D E T E R M I N A T I O N

#### TOTAL EPT BARRELS

| | ARCO | MARATHON | PAN AM | PHILLIPS | SKELLY | STANDARD | UNION |
|---|---|---|---|---|---|---|---|
| 10/68 | 2,934,650.35 | 5,798,951.92 | 303,790.91 | 303,790.91 | 303,790.91 | 96,385.46 | 5,798,951.92 |
| 11/68 | 234,039.04 | 842,716.09 | 30,666.96 | 30,666.96 | 31,666.96 | 6,455.51 | 842,716.09 |
| 12/68 | 255,351.16 | 866,986.41 | 39,292.48 | 39,292.48 | 39,292.48 | 6,830.95 | 866,986.41 |
| 1/69 | 204,106.98 | 693,872.61 | 32,176.96 | 32,176.96 | 32,176.96 | 5,446.28 | 693,872.62 |
| 2/69 | 198,581.48 | 675,108.32 | 31,306.67 | 31,306.67 | 31,306.67 | 5,298.87 | 675,108.32 |
| 3/69 | 237,093.93 | 805,971.41 | 37,375.56 | 37,375.56 | 37,375.56 | 6,326.57 | 805,971.41 |
| 4/69 | 301,010.17 | 921,307.95 | 42,723.84 | 42,723.84 | 42,723.84 | 7,231.55 | 921,307.93 |
| 5/69 | 301,424.84 | 1,024,675.42 | 47,517.48 | 47,517.48 | 47,517.48 | 8,043.14 | 1,024,675.41 |
| 6/69 | 258,089.26 | 986,677.38 | 47,686.40 | 47,686.40 | 47,686.40 | 6,886.77 | 986,677.49 |
| 7/69 | 252,039.85 | 856,794.86 | 39,732.32 | 39,732.32 | 39,732.32 | 6,725.36 | 856,794.85 |
| 8/69 | 290,142.27 | 986,347.33 | 45,739.92 | 45,739.92 | 45,739.92 | 7,742.05 | 986,347.34 |
| 9/69 | 305,092.56 | 1,037,155.33 | 48,096.14 | 48,096.14 | 48,096.14 | 8,140.99 | 1,037,155.13 |
| 10/69 | 311,738.71 | 1,059,759.23 | 49,144.29 | 49,144.29 | 49,144.29 | 8,318.33 | 1,059,759.24 |
| 11/69 | 331,258.32 | 1,057,283.64 | 49,636.12 | 49,636.12 | 49,636.12 | 8,401.50 | 1,057,283.48 |
| 12/69 | 395,189.40 | 1,083,306.71 | 44,454.23 | 44,454.23 | 44,454.23 | 7,524.09 | 1,929,986.64 |
| 1/70 | 349,596.30 | 958,329.93 | 51,783.08 | 51,783.08 | 51,783.08 | 8,764.65 | 958,329.94 |
| 2/70 | 370,017.20 | 1,014,303.44 | 45,809.06 | 45,809.06 | 45,809.06 | 7,754.51 | 1,014,303.44 |
| 3/70 | 340,715.38 | 933,980.70 | 48,484.61 | 48,484.61 | 48,484.61 | 8,206.48 | 933,980.70 |
| 4/70 | 386,878.44 | 1,060,524.41 | 44,645.15 | 44,645.15 | 44,645.15 | 7,556.48 | 1,060,524.42 |
| 5/70 | | | 50,694.08 | 50,694.08 | 50,694.08 | 8,580.26 | |
| | 8,576,037.57 | 23,484,732.57 | 1,123,756.26 | 1,123,756.26 | 1,123,756.26 | 236,619.80 | 23,484,732.59 |

Bbls.

| | ARCO | MARATHON | PAN AM | PHILLIPS | SKELLY | STANDARD | UNION |
|---|---|---|---|---|---|---|---|
| % | 11.9% | 35.83125% | 1.22500% | 1.22500% | 1.22500% | .26250% | 35.83125% |
| | 8,044,861.16 | 24,223,313.58 | 828,147.60 | 828,147.60 | 828,147.60 | 177,460.19 | 24,223,313.58 |

| | ARCO | MARATHON | PAN AM | PHILLIPS | SKELLY | STANDARD | UNION |
|---|---|---|---|---|---|---|---|
| | 8,044,861.16 | 24,223,313.58 | 828,147.60 | 828,147.60 | 828,147.60 | 177,460.19 | 24,223,313.58 |
| | 8,576,037.57 | 23,484,732.57 | 1,123,756.26 | 1,123,756.26 | 1,123,756.26 | 236,619.80 | 23,484,732.59 |
| | (531,176.41) | 738,581.01 | (295,608.66) | (295,608.66) | (295,608.66) | (59,159.61) | 738,580.99 |

BOOK 0550 PAGE 567

BOOK 0551 PAGE 083

TRADING BAY UNIT
HEMLOCK WIPA
STATEMENT OF OWNERSHIP OF OIL ENTERING COOK INLET
PIPELINE FROM WEST FORELAND ONSHORE STORAGE

| ntic ield Co. | Marathon Oil Co. | Pan American Petro. Corp. | Phillips Petro. Corp. | Sinclair Oil & Gas Co. | Skelly Oil Co. | Standard Oil of Cal. | Union Oil Co. of Calif. | Total |
|---|---|---|---|---|---|---|---|---|
| 17.0600 | 37.2175 | 1.9700 | 1.9700 | 1.9700 | 1.9700 | 0.6250 | 37.2175 | 00.0000 |
| 14.8131 | 32.6511 | 1.7105 | 1.7105 | 1.7105 | 1.7105 | 0.5427 | 32.6511 | 87.5000 |
| 12.6000 | 39.7000 | 1.9000 | 1.9000 | 1.9000 | 1.9000 | 0.4000 | 39.7000 | 100.0 |
| 11.0231 | 34.7391 | 1.6622 | 1.6622 | 1.6622 | 1.6622 | .3499 | 34.7391 | 87.5000 |
| .972.42 | 15,210.79 | 805.14 | 805.14 | 805.14 | 805.14 | 255.44 | 15,210.79 | 40,870.00 |
| .703.57 | 125,884.10 | 6,663.31 | 6,663.31 | 6,663.31 | 6,663.31 | 2,113.99 | 125,884.10 | 338,239.00 |
| .292.09 | 131,531.10 | 6,962.22 | 6,962.22 | 6,962.22 | 6,962.22 | 2,208.63 | 131,531.10 | 353,412.00 |
| .529.41 | 269,487.46 | 14,264.53 | 14,264.53 | 14,264.53 | 14,264.53 | 4,525.55 | 269,487.46 | 724,088.00 |
| .938.23 | 252,926.78 | 13,387.94 | 13,387.94 | 13,387.94 | 13,387.94 | 4,247.45 | 252,926.78 | 679,591.00 |
| .853.98 | 488,352.04 | 25,849.49 | 25,849.49 | 25,849.49 | 25,849.49 | 8,200.98 | 488,352.04 | 1,312,157.00 |
| .847.91 | 562,512.00 | 29,774.93 | 29,774.93 | 29,774.93 | 29,774.93 | 9,446.37 | 562,512.00 | 1,511,418.00 |
| .295.80 | 683,475.20 | 36,177.77 | 36,177.77 | 36,177.77 | 36,177.77 | 11,477.72 | 683,475.20 | 1,836,435.00 |
| .612.63 | 795,426.18 | 42,103.57 | 42,103.57 | 42,103.57 | 42,103.57 | 13,357.73 | 795,426.18 | 2,137,237.00 |
| .855.40 | 848,313.36 | 44,903.00 | 44,903.00 | 44,903.00 | 44,903.00 | 14,245.88 | 848,313.36 | 2,279,340.00 |
| .485.66 | 884,593.36 | 46,823.37 | 46,823.37 | 46,823.37 | 46,823.37 | 14,855.14 | 884,593.36 | 2,376,8? |
| .045.15 | 746,193.74 | 39,497.60 | 39,497.60 | 39,497.60 | 39,497.60 | 12,530.97 | 746,193.74 | 2,004,9b |
| .350.71 | 812,307.29 | 42,997.12 | 42,997.12 | 42,997.12 | 42,997.12 | 13,641.23 | 812,307.29 | 2,182,595.00 |
| .782.96 | 6,616,213.40 | 350,209.99 | 350,209.99 | 350,209.99 | 350,209.99 | 111,107.28 | 6,616,213.40 | 17,777,157.00 |
| ,921.79 | 7,057,531.33 | 337,765.98 | 337,765.98 | 337,765.98 | 337,765.98 | 71,108.63 | 7,057,531.33 | 17,777,157.00 |

PK 0361 2 PG 084
BOOK 0551 PAGE 084
VOL 0361 2 PG 294
BOOK 0550 PAGE 568
VOL 0027 PG 769
VOL 0028 PG 084

TRADING BAY UNIT
HEMLOCK WIPA
STATEMENT OF OWNERSHIP OF OIL ENTERING COOK INLET
PIPELINE FROM WEST FORELAND ONSHORE STORAGE (CONT'D)

Page 2 of 2

| ntic ield Co. | Marathon Oil Co. | Pan American Petro. Corp. | Phillips Petro.Corp. | Sinclair Oil & Gas Co. | Skelly Oil Co. | Standard Oil of Cal. | Union Oil Co. of Calif. | Total |
|---|---|---|---|---|---|---|---|---|
| 1,859.44 | 5,798,951.92 | 303,790.91 | 303,790.91 | 303,790.91 | 303,790.91 | 96,385.46 | 5,798,951.92 | 15,540,312.38 |
| 866.08 | 6,252.54 | 330.96 | 330.96 | 330.96 | 330.96 | 105.00 | 6,252.54 | 16,800.00 |
| 1,725.52 | 5,805,204.46 | 304,121.87 | 304,121.87 | 304,121.87 | 304,121.87 | 96,490.46 | 5,805,204.46 | 15,557,112.38 |
| 7,741.91 | 6,169,788.19 | 295,212.65 | 295,212.65 | 295,212.65 | 295,212.65 | 62,143.49 | 6,169,788.19 | 15,540,312.38 |
| 2,116.80 | 6,669.60 | 319.20 | 319.20 | 319.20 | 319.20 | 67.20 | 6,669.60 | 16,800 |
| 9,858.71 | 6,176,457.79 | 295,531.85 | 295,531.85 | 295,531.85 | 295,531.85 | 62,210.69 | 6,176,457.79 | 15,557,112.38 |
| 3,866.81 | 371,253.33 | (8,590.02) | (8,590.02) | (8,590.02) | (8,590.02) | (34,279.77) | 371,253.33 | |

ᵣₑ O B  12 ᵖᵍ 0 8 5          ᵣₑ ᵤ  ᵷ 1 2 ᵖᵍ 2 9 5

BOOK 0551 PAGE 085

EXHIBIT "A"                    BOOK 0550 PAGE 569
TO UNIT OPERATING AGREEMENT
TRADING BAY UNIT
COOK INLET, ALASKA

METHODS OF CALCULATION

1.    MANNER OF DETERMINATION OF BPI

    A.    Initial Determination of BPI.   Upon the initial

        determination of each WIPA, each Party's BPI (in

        each Tract within that WIPA) shall be determined

        by multiplying that Party's Gross Working Interest

        (GWI) in each Tract within that WIPA by the ratio

        that the portion of Surface Acreage of that Tract

        within WIPA bears to the total Surface Acreage

        within that WIPA, or upon any other basis unani-

        mously agreed upon by the Parties in that WIPA.

    B.    Redetermination of BPI.   Redetermination of each

        Party's BPI (in each Tract within a WIPA) shall

        be made as provided in Article IX of this Agreement

        by multiplying each Party's GWI in each Tract by

        the ratio that the Acre-Feet of WIPA Pay within

        that Tract bear to the total Acre-Feet of WIPA

        Pay within that WIPA or upon any other basis unan-

        imously agreed upon by the Parties in that WIPA

        and shall be made in accordance with sound engin-

        eering principles upon unanimous agreement of the

        Parties in that WIPA.

2.    DETERMINATION OF ROYALTY SHARE

    The Royalty Share of each Party in a WIPA, shall be defined

    and calculated in the following manner:

    A.    Theoretical Royalty.   Determine each Party's

        BPI (in each Tract within that WIPA) in the manner

B.    Actual Royalty.    Calculate the amount of Production

from each RIPA within that WIPA due as royalty for

the month under consideration under numbered Par-

agraph 12 of the Unit Agreement.    Calculate the

percentage of total Production from the WIPA during

that month that is represented by each royalty

amount so calculated.    The sum of these percentages

shall equal the Actual Royalty for that WIPA.

3.    ROYALTY CORRECTION FACTOR

Calculate the Royalty Correction Factor (RCF) for the WIPA

for the month under consideration by subtracting the Actual

Royalty from the Theoretical Royalty.    If Actual Royalty

is the larger figure of the two, a negative number will

result.    Whenever occurring, this negative sign shall be

applied in subsequent calculations in which RCF is a factor.

4.    EFFECTIVE PARTICIPATING INTEREST (EPI)

AND ROYALTY SHARE

Determine each Party's Effective Participating Interest

(EPI) for the month under consideration in each Tract

within that WIPA by adding the RCF for the WIPA to the

Net Working Interest (NWI) of each such Tract and mul-

tiplying each of the resulting sums times that Party's

BPI in that particular Tract.    Each Party's EPI for

each Tract is then subtracted from that Party's BPI

for each such Tract and the resulting percentage is

multiplied times the total monthly Production from the

WIPA.    This final figure is defined as the Royalty Share

of the Production required to be paid to the Unit Oper-

..... from the Production allocated to that Party's

BOOK 0551 PAGE 087        BOOK 0550 PAGE 571

1   for that month.

2  5.  EXAMPLE CALCULATIONS

3   An example of the above calculations is found in Exhibit "B"

4   wherein hypothetical figures have been applied to a hypo-

5   thetical WIPA, based upon an acre-foot allocation within

6   the WIPA.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BOOK 0551 PAGE 088        BOOK 0550 PAGE 572



TRADING BAY
UNIT BOUNDARY

"G" SANDS
WORKING INTEREST
PARTICIPATING AREA

T10N - R13W

T9N - R14W                                      T9N - R13W

T8N - R14W

APPENDIX    "A-3"
TO
UNIT OPERATING AGREEMENT
TRADING BAY UNIT



TRADING BAY
UNIT BOUNDARY

HEMLOCK
WORKING INTEREST
PARTICIPATING AREA

APPENDIX    "A-1"
(REV. AS OF:    6-1-70)
TO
UNIT OPERATING AGREEMENT
TRADING BAY UNIT
COOK INLET, ALASKA

APPENDIX "A-2"

TO

UNIT OPERATING AGREEMENT

BOOK 0551 PAGE 091          BOOK 0550 PAGE 575



TRADING BAY
UNIT BOUNDARY

WEST FORELAND
WORKING INTEREST
PARTICIPATING AREA

APPENDIX   "A-2"

TO



APPENDIX "A-1"
(REV. AS OF: 11-1-68)
TO
UNIT OPERATING AGREEMENT
TRADING BAY UNIT
COOK INLET, ALASKA



TRADING BAY
UNIT BOUNDARY

HEMLOCK
WORKING INTEREST
PARTICIPATING AREA

APPENDIX  "A-2"

TO

UNIT OPERATING AGREEMENT

TRADING BAY UNIT



APPENDIX "A-I"

TO

UNIT OPERATING AGREEMENT

TRADING BAY UNIT

吃03引丁2PG0  5          吃63引丁2PG3  5

BOOK **0351** PAGE **095**

BOOK **0550** PAGE **579**

EXHIBIT "B"
TO UNIT OPERATING AGREEMENT
TRADING BAY UNIT
COOK INLET, ALASKA

Hypothetical Example
of the Calculations Described in Exhibit "A"
(Based on Acre-Feet WIPA Participation)

Order of Figures Within Each Tract:
Tract Name
Tract Royalty Rate
Working Interest Owners and Respective GWI in Tract
Acre-Feet of WIPA Pay within Tract
Tract Surface Acreage within WIPA

Order of Figures Within Each RIPA:
RIPA Number
Production from RIPA during month under consideration
RIPA Surface Acreage within respective tracts



EXHIBIT "B"
TO UNIT OPERATING AGREEMENT
TRADING BAY UNIT
COOK INLET, ALASKA

Theoretical Royalty Calculation

| (1) Tract | (2) Ac-Ft of WIPA Pay within Tract / Total Ac-Ft of WIPA Pay | (3) Tract BPI (%) | (4) Working-Interest Owner | (5) GWI (%) | (6) Party's Tract BPI (3) x (5) (%) | (7) Tract Royalty Rate (%) | Perc of Pro as The Det Ro (6) |
|---|---|---|---|---|---|---|---|
| A | 2,000 / 50,000 | 4 | Atlantic | 100 | 4 | 12.5 | 0 |
| B | 6,000 / 50,000 | 12 | Marathon Union | 50 50 | 6 6 | 5.0 | 0 |
| C | 25,000 / 50,000 | 50 | Marathon Union | 50 50 | 25 25 | 12.5 | |
| D | 15,000 / 50,000 | 30 | Shell Atlantic Standard | 33.3 33.3 33.3 | 10 10 10 | 12.5 | |
| E | 2,000 / 50,000 | 4 | Pan Am Phillips Skelly Sinclair | 25 25 25 | 1 1 1 1 | 12.5 | |
| WIPA Theoretical Royalty | | | | | | | 1 |

18759J2000/4·          9603J82005/5·

BOOK 0551 PAGE 097
BOOK 0550 PAGE 581

EXHIBIT "B"
UNIT OPERATING AGREEMENT
TRADING BAY UNIT
COOK INLET, ALASKA

Actual Royalty Calculation

| (1) RIPA | (2) Tract Ratio | | (3) RIPA Production Allocated to Tract By Unit Agreement (1) x RIPA Production (Bbl.) | (4) Tract Royalty Rate (%) | (5) Royalty Due Under Paragraph 12 of Unit Agreement (Bbl.) | (6) Percent of Total WIPA Production Due as Royalty |
|---|---|---|---|---|---|---|
| 1 | A – | $\frac{80}{160}$ Ac $\frac{80}{160}$ Ac | 20,000 | 12.5 | 2,500 | 1.250 |
| | B – | $\frac{80}{160}$ | 20,000 | 5.0 | 1,000 | .500 |
| 2 | B – | $\frac{40}{160}$ | 20,000 | 5.0 | 1,000 | .500 |
| | C – | $\frac{120}{160}$ | 60,000 | 12.5 | 7,500 | 3.750 |
| 3 | D – | $\frac{160}{160}$ | 50,000 | 12.5 | 6,250 | 3.125 |
| 4 | D – | $\frac{160}{160}$ | 30,000 | 12.5 | 3,750 | 1.875 |
| | | | | | | 11.000 |

WIPA Actual Royalty

Royalty Correction Factor Calculation

RCF = Theoretical Royalty (÷) Actual Royalty
RCF = 11.6% - 11.0%
RCF = 0.6%

BOOK 0551 PAGE 098    BOOK 0550 PAGE 582

EXHIBIT "B"
TO UNIT OPERATING AGREEMENT
TRADING BAY UNIT
COOK INLET, ALASKA

EPI and Royalty Share Calculation

| (1) Party | (2) Tract | (3) Party's Tract BPI (%) | (4) Tract NWI (%) | (5) Tract NWI RCF (%) | (6) Party's Tract EPI (3) x (5) (%) | (7) Percentage of Production Due As Royalty (3) - (6) (%) | (8) Royal (7) x NIPA ( |
|---|---|---|---|---|---|---|---|
| Atlantic | A | 4 | 87.5 | 88.1 | 3.524 | 00.476 | |
| Atlantic | D | 10 | 87.5 | 88.1 | 8.810 | 01.190 | |
| Marathon | B | 6 | 95.0 | 95.6 | 5.736 | 00.264 | |
| Marathon | C | 25 | 87.5 | 88.1 | 22.025 | 02.975 | |
| Pan Am | E | 1 | 87.5 | 88.1 | 0.881 | 00.119 | |
| Phillips | E | 1 | 87.5 | 88.1 | 0.881 | 00.119 | |
| Shell | E | 1 | 87.5 | 88.1 | 0.881 | 00.119 | |
| Shell | D | 10 | 87.5 | 88.1 | 8.810 | 01.190 | |
| Sinclair | E | 1 | 87.5 | 88.1 | 0.881 | 00.119 | |
| Skelly | E | 1 | 87.5 | 88.1 | 0.881 | 00.119 | |
| Standard | D | 10 | 87.5 | 88.1 | 8.810 | 01.190 | |
| Union | B | 6 | 95.0 | 95.6 | 5.736 | 00.264 | |
| Union | C | 25 | 87.5 | 88.1 | 22.025 | 02.975 | |
| | | | | | 89.000 | 11.000 | |

2

BOOK 0551 PAGE 099

BOOK 0550 PAGE 583

APPENDIX "B-1" (3rd REVISION*)
TO
UNIT OPERATING AGREEMENT
TRADING BAY UNIT
COOK INLET, ALASKA

BASIC PARTICIPATING INTERESTS FOR THE HEMLOCK WORKING INTEREST PARTICIPATING AREA
REVISED JULY 1, 1971

| TRACT NO. | ATLANTIC RICHFIELD COMPANY | MARATHON OIL COMPANY | AMOCO PRODUCTION COMPANY | PHILLIPS PETROLEUM COMPANY | GETTY SHELLEY OIL COMPANY | CHEVRON STANDARD OIL COMPANY OF CALIFORNIA | UNION OIL COMPANY OF CALIFORNIA | TRACT TOTAL |
|---|---|---|---|---|---|---|---|---|
| 2 | 0.63% | | 1.26% | 1.26% | 1.26% | 0.63% | | 5.04% |
| 3 | | 15.30% | | | | | 15.30% | 30.60% |
| 6 | .07% | | .14% | .14% | .14% | .07% | | 0.56% |
| 9 | 0.60% | | | | | 0.30% | | 0.90% |
| 10 | | 13.40% | | | | | 13.40% | 26.80% |
| 11 | | 12.25% | | | | | 12.25% | 24.50% |
| 14 | 5.60% | | | | | | | 5.60% |
| 17 | 6.00% | | | | | | | 6.00% |
| TOTAL | 12.90% | 40.95% | 1.40% | 1.40% | 1.40% | 1.00% | 40.95% | 100.00% |

EFFECTIVE 7-1-71

*Revised to reflect transfer of 50% of Atlantic Richfield's interest in Tracts #2 and #6 to Standard Oil Company of California

BOOK 0551 PAGE 100    BOOK 0550 PAGE 584

APPENDIX "B-1"
TO
UNIT OPERATING AGREEMENT
TRADING BAY UNIT
COOK INLET, ALASKA

BASIC PARTICIPATING INTERESTS FOR THE HEMLOCK WORKING INTEREST PARTICIPATING AR

| TRACT NO. | ATLANTIC RICHFIELD COMPANY | MARATHON OIL COMPANY | PAN AMERICAN PETROLEUM CORPORATION | PHILLIPS PETROLEUM COMPANY | SHELL OIL COMPANY | SINCLAIR OIL & GAS COMPANY | SKELLY OIL COMPANY | STANDARD OIL COMPANY OF CALIFORNIA |
|---|---|---|---|---|---|---|---|---|
| 2 / 3 / 6 | | 16.2950% | 1.9450% | 1.9450% | | 1.9450% | 1.9450% | |
| 9 / 10 / 11 / 12 | 0.1065% | 0.0250% | 0.0250% | 0.0250% | 0.1065% | 0.0250% | 0.0250% | 0.1065% |
| 13 / 14 / 17 / 18 | 0.5185% / 7.2500% / 5.5400% / 3.0200% | 8.0000% / 8.4475% / 4.4750% | | | 0.5185% | | | 0.5185% |
| TOTAL | 16.4350% | 37.2175% | 1.9700% | 1.9700% | 0.6250% | 1.9700% | 1.9700% | 0.6250% |

EFFECTIVE 2-27-67

The Pool for which the Hemlock Working Interest Participating Area has been established is described as that Pool the tops and bottoms of which are identified at the indicated measured subsea depth in the following wells:

| | Top | Bottom |
|---|---|---|
| Grayling No. 1A Well : | 9341 feet | 9874 feet |
| North Redoubt State No. 1 Well : | 9478 feet | 9982 feet |
| Kustatan No. 1A Well : | 9439 feet | not reached |
| West Foreland Unit No. 3 Well : | 9054 feet | 9541 feet |
| McArthur State No. 1 Well : | 9630 feet | 10150 feet |

BOOK 0351 PAGE 101

BOOK 0550 PAGE 585

APPENDIX "B-1" (2nd Revision)
TO
UNIT OPERATING AGREEMENT
TRADING BAY UNIT
COOK INLET, ALASKA

BASIC PARTICIPATING INTERESTS FOR THE HEMLOCK WORKING INTEREST PARTICIPATING AREA
REVISED JUNE 1, 1970

| TRACT NO. | ATLANTIC RICHFIELD COMPANY | MARATHON OIL COMPANY | PAN AMERICAN PETROLEUM CORPORATION | PHILLIPS PETROLEUM COMPANY | SKELLY OIL COMPANY | STANDARD OIL COMPANY OF CALIFORNIA | UNION OIL COMPANY OF CALIFORNIA | TRACT TOTAL |
|---|---|---|---|---|---|---|---|---|
| 2 | 1.26% | 15.30% | 1.26% | 1.26% | 1.26% | | 15.30% | 5.04% |
| 3 | .14% | | .14% | .14% | .14% | | | 30.60% |
| 6 | 0.60% | | | | | 0.30% | | 0.56% |
| 9 | | | | | | | | 0.90% |
| 10 | | 13.40% | | | | | 13.40% | 26.80% |
| 11 | | 12.25% | | | | | 12.25% | 24.50% |
| 14 | 5.60% | | | | | | | 5.60% |
| 17 | 6.00% | | | | | | | 6.00% |
| TOTAL | 13.60% | 40.95% | 1.40% | 1.40% | 1.40% | 0.30% | 40.95% | 100.00% |

EFFECTIVE 6-1-70

BOOK **0551** PAGE **102**        BOOK **0550** PAGE **586**

APPENDIX "B-1" (revised)
TO
UNIT OPERATING AGREEMENT
TRADING BAY UNIT
COOK INLET, ALASKA

BASIC PARTICIPATING INTERESTS FOR THE HEMLOCK WORKING INTEREST PARTICIPATING AREA
REVISED NOVEMBER 1, 1968

| TRACT NO. | ATLANTIC RICHFIELD COMPANY | MARATHON OIL COMPANY | PAN AMERICAN PETROLEUM CORPORATION | PHILLIPS PETROLEUM COMPANY | SINCLAIR OIL & GAS COMPANY | SKELLY OIL COMPANY | STANDARD OIL COMPANY OF CALIFORNIA | UN COM CAL |
|---|---|---|---|---|---|---|---|---|
| 2 | | 15.40% | 1.60% | 1.60% | 1.60% | 1.60% | | |
| 3 | | | | | | | | |
| 6 | 0.60% | | 0.30% | 0.30% | 0.30% | 0.30% | 0.30% | |
| 9 | | | | | | | | 0.30% |
| 10 | | | | | | | | |
| 11 | 0.20% | 12.60% | | | | | 0.10% | |
| 12 | 4.30% | 11.60% | | | | | | |
| 13 | 7.10% | 0.10% | | | | | | |
| 14 | 0.40% | | | | | | | |
| 17 | | | | | | | | |
| 18 | | | | | | | | |
| **TOTAL** | 12.60% | 39.70% | 1.90% | 1.90% | 1.90% | 1.90% | 0.40% | |

EFFECTIVE 11-1-68

The Pool for which the Hemlock Working Interest Participating Area has been established is described in Appendix "B-1".

BOOK 0551 PAGE 103          BOOK 0550 PAGE 587

APPENDIX "B-2"
TO
UNIT OPERATING AGREEMENT
TRADING BAY UNIT
COOK INLET, ALASKA

BASIC PARTICIPATING INTERESTS FOR THE HEMLOCK WORKING INTEREST PARTICIPATING AREA
REVISED NOVEMBER 1, 1968

| TRACT NO. | ATLANTIC RICHFIELD COMPANY | MARATHON OIL COMPANY | PAN AMERICAN PETROLEUM CORPORATION | PHILLIPS PETROLEUM COMPANY | SINCLAIR OIL & GAS COMPANY | SKELLY OIL COMPANY | STANDARD OIL COMPANY OF CALIFORNIA | UNI- COMP. CALI |
|---|---|---|---|---|---|---|---|---|
| 2 | | 15.40% | 1.60% | 1.60% | 1.60% | 1.60% | 0.30% | 1 |
| 6 | 0.60% | | 0.30% | 0.30% | 0.30% | 0.30% | | 1 |
| 9 | | | | | | | 0.10% | 1 |
| 10 | | 12.60% | | | | | | |
| 11 | | 11.60% | | | | | | |
| 12 | | 0.10% | | | | | | |
| 13 | 0.20% | | | | | | | |
| 14 | 4.30% | | | | | | | |
| 17 | 7.10% | | | | | | | |
| 18 | 0.40% | | | | | | | |
| TOTAL | 12.60% | 39.70% | 1.90% | 1.90% | 1.90% | 1.90% | 0.40% | 3 |

EFFECTIVE 11-1-68

The Pool for which the Hemlock Working Interest Participating Area has been established is described in Appendix "B-1".

BOOK 0551 PAGE 104        BOOK 0550 PAGE 588

APPENDIX "B-2"
TO
UNIT OPERATING AGREEMENT
TRADING BAY UNIT
COOK INLET, ALASKA

BASIC PARTICIPATING INTEREST FOR THE WEST FORELAND WORKING INTEREST PARTICIPATING AREA
EFFECTIVE DATE 3-1-70

| TRACT NO. | ATLANTIC RICHFIELD COMPANY | MARATHON OIL COMPANY | UNION OIL COMPANY OF CALIFORNIA | TRACT TOTAL |
|---|---|---|---|---|
| 3 | | 16.0% | 16.0% | 32.0% |
| 10 | | 3.0% | 3.0% | 6.0% |
| 11 | | 30.0% | 30.0% | 60.0% |
| 14 | 2.0% | | | 2.0% |
| | | 49.% | 49.% | 2.0% |

ᴼᴲ ᴊᴳᵀ2ᴾᴳ105        ᴼᴲﾚ3 ﾚ2ᴾᴳ315

BOOK **0551** PAGE **105**

BOOK **0550** PAGE **589**

1    EXHIBIT "C"

2    ACCOUNTING PROCEDURE

3

4        Attached to and made a part of Trading Bay Unit Operating Agreement,

5    Cook Inlet, Alaska hereinafter referred to as "Agreement."

6        The purpose of this Accounting Procedure is to establish equitable

7    methods for determining charges and credits applicable to operations

8    under the Agreement.  The Parties agree, however, that if at any time,

9    or from time to time, any of such methods prove unfair or inequitable to

10   Operator or Non-Operator, the Parties will meet and in good faith endeavor

11   to agree on changes in methods deemed necessary to correct any unfairness

12   or inequity.

13                SECTION I. GENERAL PROVISIONS

14   1.  DEFINITIONS

15       "Property" as used herein shall mean the real and personal property

16       subject to the Agreement.

17       "Operator" as used herein shall mean Unit Operator designated pursuant

18       to the Agreement when acting in that capacity.  It shall also refer to

19       any Party when acting in the capacity of Sub-Operator pursuant to the

20       Agreement.

21       "Non-Operator" as used herein shall mean any Party when acting in a

22       capacity other than Operator or Sub-Operator pursuant to the Agreement.

23       "Controllable Material" as used herein shall mean material generally

24       classified as controllable material by the Operator.  Lists shall be

25       furnished to Non-Operator upon request.

26   2.  RECORDS

27       Operator shall at all times maintain and keep true and correct records

28       of the production and disposition of all oil, gas, and other hydrocarbon

29       substances and of all costs and expenditures incurred, as well as all