UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE


IN RE:                          .    Chapter 11
                                .
PACIFIC ENERGY RESOURCES LTD.   .    Case No. 09-10785(KJC)
*et al.*,                         .    (Jointly Administered)
                                .
                                .    April 19, 2010
                                .    3:00 p.m.
            Debtors.            .    (Wilmington)
                                .


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE KEVIN J. CAREY
UNITED STATES BANKRUPTCY COURT JUDGE

<u>Appearances</u>:

For the Debtors:            James E. O'Neill, Esq.
                            Maxim B. Litvak, Esq.
                            Pachulski, Stang, Ziehl & Jones LLP

For Union Oil:              David A. Crichlow, Esq.
                            Karen B. Dine, Esq.
                            Pillsbury, Winthrop, Shaw,
                            Pittman, LLP

                            Norman M. Monhait, Esq.
                            Rosenthal, Monhait & Goddess, P.A.

For the Committee:          James C. Carignan, Esq.
                            Pepper Hamilton, LLP

For Silver Point:           Torey B. Chambers, Esq.
                            Kellan Grant, Esq.
                            Sundeep S. Sidhu, Esq.
                            Skadden, Arps, Slate, Meagher
                            & Flom, LLP

For Cook Inlet Pipeline:    Douglas N. Candeub, Esq.
                            Morris James, LLP

<u>VIA TELEPHONE</u>:

For the Committee:_____Katherine C. Piper, Esq.
_____Steptoe & Johnson, LLP

Audio Operator:              Al Lugano

Transcriptionist:            Jennifer Ryan Enslen
                             43 Bay Boulevard
                             Newark, DE 19702
                             (302) 836-1905

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

3

**INDEX**

|                                          | DIRECT | CROSS | RECROSS |
|------------------------------------------|--------|-------|---------|
| WITNESS FOR THE DEBTOR:                   |        |       |         |
| GERALD TYWONIUK                          |        | 56    |         |

|                                          | ADMITTED |
|------------------------------------------|----------|
| EXHIBITS:                                |          |
| EXHIBIT M1 - Invoices from CIPL to PERL  | 63       |
| EXHIBIT M2 - Alignment Agreement         | 63       |

1          THE CLERK: All rise.  You may be seated.

2          THE COURT: Afternoon, everyone.

3          MR. O'NEILL: Good afternoon, Your Honor.  James

4     O'Neill, Pachulski, Stang, Ziehl & Jones appearing today with

5     my partner Max Litvak on behalf of Pacific Energy Resources.

6     And Your Honor, I'll go through the agenda quickly.  Items

7     number 1 through 7 on the agenda are continued to our next

8     omnibus date, which is May 19th at 2 p.m.  Item number 8 is

9     the Debtors' motion to approve the settlement agreement of

10    NAE Adversary, and the Court has entered an order on that

11    item already.  Item number 9 is the Debtors' exclusivity

12    extension request.  And we did file a certificate of no

13    objection with respect to that.  I'm not sure whether the

14    Court has had an opportunity to review that item.

15         THE COURT: I have.  And I've held it along with the

16    other CNO'd items at 11, 12, and 13, because they just raised

17    for me, the four taken together, I guess what's an obvious

18    question.  And that is, where is the case going?  I mean the

19    noises are, you know, we're headed toward a plan.  But I'd

20    like to drill down a little bit on that, and find out where

21    the parties stand and whether they really think they're going

22    to get that far or not.

23         MR. O'NEILL: Well Your Honor, Mr. Litvak can give

24    the Court a brief update.  I do know we have some items later

25    on the calendar today which are important to consider when

1    considering the overall global picture.  But Mr. Litvak will

2    give you an update.

3            MR. LITVAK: Good afternoon, Your Honor.  Good to

4    see you again.  We, from the Debtors' perspective, Your

5    Honor, we are moving towards proposing liquidating plans both

6    for, there are two key estates here that remain.  There's

7    Pacific Energy Alaska Operating, PEAO, and Pacific Energy

8    Resources, Limited, PERL.  And there are distinct creditor

9    constituents as to both of those estates.  As to PEAO, as Mr.

10   O'Neill mentioned, the administrative claims, the objections

11   to the administrative claims, which are set before the Court

12   today are a big reason why we haven't proposed a plan as to

13   that estate.  And frankly, Your Honor, that's the reason why

14   we haven't proposed a joint plan for both estates.  We feel

15   like we need to address once and for all whether these

16   claims, which on Union's side add up to at least $240

17   million, that's asserted as administrative, that will be part

18   of my presentation which you'll hear when we get to it.  But

19   the point is that if any of those claims are allowed in any

20   material way, then there won't be, the Debtors will not have

21   the financial wherewithal to propose a plan, pay those

22   administrative expenses at PEAO.  As to PERL, as far as I

23   know, it's just, we wanted to have a single plan that covers

24   both, a joint plan.  And so as soon as those issues on the

25   administrative claims, or on PEAO are resolved, then we would

1  be in position to propose a joint plan.  We just didn't want

2  to incur the expense of putting that all together without

3  knowing, without having any certainty on the administrative

4  claims.

5        THE COURT: Okay.

6        MR. LITVAK: And in the meantime, Your Honor, I know

7  the Committee is anxious to get geared up and going with

8  potential avoidance claims.  So those were the other motions

9  that are set for hearing.

10        THE COURT: And let me jump ahead to that, if I may,

11  and ask with respect to which estate these avoidance actions,

12  why or is it more than one?

13        MR. CARIGNAN: Thank you and may it please the

14  Court, James Carignan of Pepper Hamilton appearing today on

15  behalf of the Committee.  The bulk of them are with Pacific

16  Energy Resources, but there's also several million, not

17  accounting for defenses, in preference claims that would also

18  lie with Alaska, Your Honor.

19        THE COURT: And if I understand the applications

20  correctly, the recoveries - - I'll put it this way, the

21  claims, the secured claims of the pre-petition and DIP

22  lenders are subordinated to the recoveries under the

23  avoidance actions.  Is that correct?

24        MR. CARIGNAN: That's correct, Your Honor.  Pursuant

25  to an agreement that was reached among the parties in

1   connection with the latest of the sale motions.

2          THE COURT: Okay.  Now, does that mean that the

3   secured parties would be entitled to any portion of the

4   proceeds on account of their secured claims?

5          MR. LITVAK: No, Your Honor.  Just to clarify.  The

6   secured claims have been completely resolved as part of the

7   last sale of the bulk of the Debtors' Beta assets, what we've

8   referred to as the Beta assets.  Those are the California

9   offshore assets.  When the Court approved that sale, I think

10  it was late last year, then that was a complete and final

11  resolution of all issues involving the DIP lenders/pre-

12  petition lenders/secured lenders.  With the only exception

13  being a defined specific set of excluded assets.  And

14  avoidance claims are not within that exclusion.

15         THE COURT: Okay.  And if I remember that was a very

16  large hit that was taken by the secured parties in connection

17  with that arrangement.  Correct?

18         MR. LITVAK: Yes, Your Honor.

19         THE COURT: Yeah.  Not to stir up old wounds.

20         MS. PIPER (Telephonic): Your Honor?

21         THE COURT: Yes.

22         MS. PIPER (Telephonic): This is Katherine Piper of

23  Steptoe & Johnson on behalf of the Committee.  I just wanted

24  to reiterate what Mr. Litvak reported to the Court.  We have

25  actively been in discussions about where the case is going

1    and moving towards the proposal of a plan of liquidation.

2    And we are anxiously awaiting the results of the various

3    administrative claim matters.  And in an effort to save

4    costs, thought the best path here would be to get through

5    those resolutions in order to propose a joint plan of

6    liquidation at the appropriate time.

7            THE COURT: All right.  Thank you.  I've signed the

8    order extending the Debtors' exclusive period.

9            MR. LITVAK: Thank you, Your Honor.

10           THE COURT: Does anyone else wish to be heard in

11   connection with the three Committee motions?  I hear no

12   response.  I've reviewed those pleadings, and with the

13   responses that have given today I'm satisfied that the

14   Committee is entitled to that relief, and I've signed all

15   three orders.

16           MR. CARIGNAN: Thank you, Your Honor.

17           MR. LITVAK: Your Honor, as the remaining matters on

18   the agenda, I'd like to and we've discussed with the other

19   parties, taking these a little bit out of order.  Or at least

20   in the order of importance from the estate's perspective.

21   Your Honor, if we could take item 15 ahead of item 14.  Item

22   15 is Union Oil Company's administrative claim.  Your Honor,

23   would you like to hear from the claimant first, or would you

24   like to hear the Debtors' position?

25           THE COURT: Well, I mean, the remaining, except for

1    the claims objections, the remaining matters on today do bear

2    some relation to each other.

3          MR. LITVAK: Yes, Your Honor.

4          THE COURT: I guess, specifically with respect to

5    the Union Oil administrative claim and the Cook Inlet

6    Pipeline Company administrative claim, the parties have said,

7    you know, they intend to present today legal argument plus

8    proffers to the extent necessary.  So my first question with

9    respect to both of those things is are there any undisputed

10   facts with respect to either claim?

11         MR. LITVAK: Your Honor, from the Debtors'

12   perspective, we do have a witness here, Gerry Tywoniuk, he's

13   the acting CEO of the Debtors.  I have him here not because

14   there are disputed facts, per say, as to either of those

15   claims, but just to establish the evidentiary record to the

16   extent that the Court needs it.  I'm not aware of any facts

17   in dispute.  I think it's more of an issue of applying the

18   facts to the law.  So from the Debtors' perspective, it's

19   largely legal argument.  Both as to Union and Cook Inlet

20   Pipeline.

21         MR. CANDEUB: Your Honor, Doug Candeub, Morris

22   James, on behalf of Cook Inlet Pipeline.  I have no idea

23   about anything about the facts of the Union Oil situation.

24   I'm here for the Cook Inlet admin claim motion.  And I do

25   have a witness here, flew in from Texas, who's available.  I

1    don't know whether there are undisputed facts.  There very

2    well may be.  We didn't get to the point of trying to work

3    out a stipulation of fact, or going over all of the facts

4    that we might need to consider to present.  And so given that

5    we had set this date in advance that our witnesses we're

6    going to be available, it seemed, frankly, the easier route

7    to present our proffers and have the witnesses available.  So

8    it's a non issue to say that there are no, there's no

9    dispute.

10        THE COURT: Easier for who?  All right.  Thank you,

11   Mr. Candeub.

12        MR. CANDEUB: I understand, Your Honor.

13        MR. CRICHLOW: Your Honor, David Crichlow,

14   Pillsbury, Winthrop, Shaw, Pittman on behalf of Union Oil.

15   Good to see you again, Your Honor.

16        THE COURT: Welcome.

17        MR. CRICHLOW: Your Honor, our position on behalf of

18   Union Oil is that all of the facts, if you look at the

19   pleading, are related to the procedural posture of this case.

20   Some pleadings that have happened in this case.  And what it

21   boils down to in sum and substance is a legal question about

22   whether the estate has received any benefit and whether

23   certain claims are contingent or simply unliquidated as

24   opposed to being contingent.  We believe those are expressly

25   legal positions that Your Honor can decide as a matter of

1    law, and we did have a conversation with the Debtors' counsel

2    who informed me that he was thinking about putting on a

3    witness.  And I expressed Union's position that we were going

4    to have no witness here, and if the witness was merely going

5    to go through the procedural posture of the case, and facts,

6    and testify that the Debtor believes it received no benefit,

7    that that was a question that we would object to because we

8    think that's ultimately a legal conclusion.  The other facts

9    that they have asserted and that we have asserted in the

10   case, I don't believe there's any dispute with respect to.

11   Thank you, Your Honor.

12        THE COURT: Well, okay.  Well here's how the

13   exercise will go from the Court's standpoint.  You know, I

14   mean, if you, if the parties have witnesses that they want to

15   put, they're welcome to do that.  But you know, if, what the

16   Court will be left with then is the exercise of having to

17   cull through the papers to determine in fact that there are

18   no disputed facts.  What the parties risk there is if there

19   are, I guess I fall back on who has the burden.  Or I bring

20   you back for an evidentiary hearing.  And I wouldn't decide

21   that now.  I'd have to wait until I took everything in, and

22   then go from there.  If there really are - - I'll put it this

23   way.  If there are, if all the facts really are undisputed,

24   I'd just as soon have a stipulation.  But I don't know, if

25   the parties want to go forward today with witnesses, I'm

1    prepared to hear them.

2         MR. LITVAK: Thank you, Your Honor.  I think from

3    the Debtors' perspective, given that our witness is here, and

4    again, I don't expect there to be disputed issues of fact,

5    but I think we can very quickly run through his proffer.

6         THE COURT: Okay.

7         MR. LITVAK: And then to the extent that Mr. Candeub

8    or for that matter Union's counsel would like to cross

9    examine him, then they can do that.  Also I would expect that

10   to be short.  The idea was to try and move things along as

11   quickly as possible and focus things on the legal issues

12   which I think are the key issues for the Court's

13   determination.

14        THE COURT: Okay.  So you said you wanted to proceed

15   first with the Union Oil administrative expense - -

16        MR. LITVAK: Yes, Your Honor.  And by the way, the

17   other matters on the agenda, 16, 17 and 18, have been

18   continued.  So the only other thing that we would be, that we

19   would like to push to the end of the calendar today is item

20   19.

21        THE COURT: It's the - -

22        MR. LITVAK: Yeah.

23        THE COURT: - - cross motions for summary judgment.

24        MR. LITVAK: The cross motions for summary judgment

25   in the adversary proceeding.

1           THE COURT: Okay.  Well, I have a hearing set for 4,

2    to let's get started.

3           MR. LITVAK: Thank you, Your Honor.  Would you like

4    to hear the Debtors' presentation first on Union, or would

5    you like to hear from the claimant?

6           THE COURT: Well normally I would start with the

7    claimants.  But if counsel agreed to go the other way around,

8    I'm okay with that too.

9           MR. CRICHLOW: No, we don't agree, Your Honor.

10          THE COURT: All right.

11          MR. CRICHLOW: Thank you, Your Honor.  It's David

12   Crichlow again on behalf of Union Oil Company.  And I

13   appreciate, and just for the record, no we have not agreed to

14   take this issue out of step.  As the claimant, we would

15   prefer to present our case and the dispute from our

16   perspective first.  And I'm sure the Debtor is going to have

17   its time to be heard.  Your Honor, I am going, I've been

18   before you before, and I know Your Honor has heard quite a

19   bit about the Trading Bay Unit and the Trading Bay Field and

20   issues in the Cook Inlet Pipeline area of Alaska, so unless

21   Your Honor tells me otherwise, I am going to assume, as I

22   have in the past, that you are familiar with the papers and

23   familiar with some of the facts that are at issue here and

24   get into the heart of the argument.  Is that, would that be

25   appropriate, Your Honor?

1           THE COURT: I believe it would be.

2           MR. CRICHLOW: Okay.  Thank you.  Essentially, Union

3   rises today to file a claim for two distinct different

4   treatments set up for administrative claims status and they

5   are in relation to part of what we have called the joint

6   interest billings that represent the actual and necessary

7   costs of preserving the Trading Bay Unit and the Trading Bay

8   Field and at the time preserving whatever value had been left

9   in this estate by doing so.  And we have another claim, as

10  Your Honor has probably noted, for abandonment costs and

11  remediation costs that we believe are not contingent, but

12  certain to occur, and at this point are unliquidated.  But

13  the question will become at what time the Court, from our

14  perspective, what time the Court needs to estimate such

15  claims.  And we believe that is a hearing that may require

16  evidence, but it's not for today.

17          THE COURT: Yeah.  And you've asked that I actually

18  wait making a determination on that part until a plan

19  evolves, or until, if the case is converted.

20          MR. CRICHLOW: Yeah.  We believe that's right, Your

21  Honor, because otherwise we find ourselves in the awkward

22  position of because of an arbitrary bar date in, within which

23  time we had to file any claims for administrative status, we

24  filed those claims to protect our clients' interest, but we

25  wind up getting penalized by someone saying, Well, the claims

1    are unliquidated, it's impossible to tell at this point.  It

2    very well may be that those claims become liquidated by the

3    time a plan is proposed or not.  But we will see.  And I do

4    think that the defendants, the Debtors' objection is a bit

5    premature.  But I'll get to that secondarily.  First I want

6    to talk about the JIBs and the payment.  And as Your Honor

7    knows that Union not only continued to preserve the oil

8    fields in the post-petition period all the way up through the

9    abandonment on, in September of last year, but it generated

10   over 12 million in proceeds, which currently is being held in

11   escrow pending the outcome of the adversary proceeding.  Much

12   of which you will hear about later.  Without the maintenance

13   represented in the costs for the joint interest billings, for

14   which Union has been paid nothing, the wells in the fields

15   would have ceased to function, and they would have been

16   rendered worthless.  By noting that, the Debtors, by noting

17   that they informed Union that they had no intention of paying

18   their TBU and TBF obligations, they're asserting indirectly

19   that the JIB claim did not arise from transactions with the

20   Debtor-in-Possession, and therefore we have no basis for an

21   administrative claim.  That cannot be true.  In fact, the,

22   you know, the case law that we've looked at, and this is one

23   of the things I want to spend some time talking about,

24   because there's been a lot of case law sent back and forth,

25   and parties talking about contribution claims and the like,

1    and when they are and are not granted an administrative

2    claim, and I'd like to urge the Court that in reading our

3    papers, and particularly in looking at the jurisprudence,

4    because I do think this is ultimately a question of law, that

5    you have to recognize that your typical environmental cleanup

6    claim, and the claim for contribution which involves the

7    normal equitable rights of contribution and a common law

8    right of equity where two parties that are unrelated may have

9    similar obligations to an environmental agency with respect

10   to cleanup or the like, and you turn around and say, Well,

11   are they entitled to a contribution claim.  Here the

12   corporate foundation of what's going on is very different.

13   These are not separate entities.  These are, this is a joint

14   venture with two working interests.  So it's not one party

15   going after a third party for contribution.  So in some

16   respects, when we get to the abandonment claim, contribution

17   is probably an ill-advised term, and we used it.  It's more

18   of an entitlement to payment pursuant to the contractual

19   relationships in the corporate function.  But nevertheless,

20   the JIBs are something altogether different.  Those are

21   actual payments that were made.  We're not talking about

22   services or some intangible benefit that you can't touch,

23   feel, or get your arms around, these are actual payments that

24   were made, $22 million worth of payments post-petition,

25   actually more than that pre-petition, and 12 million in

1   proceeds which we were able to generate by continuing to

2   maintain, operate, and do the lifts required to make the

3   plan, the fields functional.  So the question that would be

4   logical, and I would assume you would want, is what actual

5   benefit occurred to the estate.  And I believe that the

6   generation of the lift proceeds, any amounts Union spent to

7   maintain and preserve PEAO's working interest in both TBU and

8   the TBF actually gave the Debtors the opportunity they needed

9   to market the estates assets.  Benefitting the estate.  And

10  how do we know it benefitted the estate?  Because they

11  vigorously opposed every effort Union made to try to stop

12  doing it.  There's no question that Union was contractually

13  obligated to continue those payments and to continue to

14  maintain and operate those fields if they were not able to

15  get out of it, if the Debtor was not able to abandon it, if

16  we were not able to pursue our rights by moving to lift the

17  stay.  Yet at every time we filed our notice, and tried to

18  enforce our lien rights, the Debtors opposed it.  We got an

19  order escrowing the $12 million in proceeds.  We had motions

20  to compel abandonment adjourned so that the Debtors could

21  continue to market the assets.  And we were, you know, fought

22  at every level when we tried to assert these rights at any

23  point sooner, up and until the Debtors realized that they

24  could not extract the value that they were looking for in a

25  sale, and decided to abandon the property.  There is no

1    question in my mind, and I don't think realistically the

2    Debtors can say that there was no benefit that they received.

3    And in fact the jurisprudence looking at situations analogous

4    to this, and I will confess that it's difficult to find a

5    situation directly on point, because as I said, you're

6    looking at the nature of the corporate structure here, and

7    it's a venture.  It's really one entity with two different

8    working interests.  But when you look at the case law that

9    talks about allowing administrative claims in other areas for

10   maintenance and operation, for repair and storage costs of

11   leased equipment, for example, when the lessor is doing that,

12   they have been permitted administrative claim status because

13   there is a finding that it benefitted the estate not to spend

14   money to maintain leased equipment.  I think the same

15   situation is analogous here.  You know, on repairs and the

16   like on the leases.  Because not spending money on repairs

17   benefitted the estate by allowing it to use money saved

18   elsewhere.  Here, while some may argue that some of the money

19   was, you know, essentially frozen pursuant to an escrow

20   agreement, there's no question that having that money stay

21   within the estate, escrowed or not, you know, allowed them to

22   more effectively market the property and allowed a benefit to

23   the estate, if for no other reason, that there may have been

24   some people who felt that a settlement was possible and that

25   money may not leave.  In fact, some people may feel that way

1    today, and we'll find out later.

2            THE COURT: Well, let me make two comments so far.

3            MR. CRICHLOW: Sure.

4            THE COURT: The first is, I've had the same argument

5    that you're making about preservation of assets, which the

6    cases that talk about it are, I think, strictly either all or

7    almost all in the real estate property lease context.  And I

8    have not in the past, despite invitations to do so, extended

9    that, by analogy, to any other context.  Secondly, with

10   respect to the escrow, depending upon the outcome, I guess,

11   of the cross motions for summary judgment, and/or ultimate

12   trial on the issue, as it turns out, it doesn't look like the

13   Debtor is going to get the benefit of that either.  It will

14   either go to you or to Silver Point, I guess.  So it seems to

15   me at this point the Debtor won't get any benefit.  I will

16   tell you, though, it's, you know, this question does come up

17   in different situations, and it just points out the tension

18   between what's supposed to be an administrative expense in

19   terms of what parties are entitled and should be able to rely

20   upon in its dealings with the Debtor post-petition, and

21   weighed against that, the fact that there's no, I'll put it

22   this way, despite all the processes that have been through,

23   there appears to be absolutely no tangible benefit to the

24   estate at the end of the day.  But it seems to me, and this

25   is unfortunately where statutory construction gets fuzzy.  I

1   will agree with you.  It seems unfair that the Debtor should

2   have been able to do the things that you're recounted with

3   respect to resisting each and every of Union's efforts to get

4   the expenses paid or to get to the asset, and at the end of

5   the day say, We owe you nothing, at least in the way of an

6   administrative claim.  I mean, I just, as I'm sure the Debtor

7   knows, just doesn't sit right.

8        MR. CRICHLOW: Right.  Well, Your Honor, thanks for

9   making that observation.  I assure you that my client would

10  feel the precise same way.  And I think you have hit on one

11  of the distinctions between the cases that you've seen in the

12  real property and the leasing area where you have extended an

13  administrative claim in the case here.  I think in most of

14  the cases I've seen, and I acknowledge that this is a unique

15  case, and we don't see a lot of jurisprudence that is

16  precisely on point here, but what we have seen is that in the

17  cases where you and other judges have failed to extend that

18  right outside of the real estate rubric, if we take a case,

19  for example, like Broadfoot (phonetic), that the Debtors rely

20  on significantly in their objection, what you are seeing

21  there is beyond just an intangible benefit.  It is some

22  benefit where a party is required to provide some service, or

23  they have a right under an executory contract to do

24  something.  They either do it, and they did not need to do

25  it, and there is an arguable claim as to whether or not it

1    benefitted the estate.  You do not see cases where someone is

2    obligated pursuant to contract to make physical, monetary

3    payments, which is what happened here, and contributed $22

4    million to the estate, where, you know, PEAO in fact used the

5    fields from March 9th to September 2nd.  Unlike the Debtor in

6    Broadpoint (phonetic) who could stand up in court and say,

7    Well, we had a right to, you know, receive these, you know,

8    television service transmissions, but we didn't need them.

9    We only used them for 17 days, we didn't use them after that.

10   And what the Court did there was they said, That is

11   absolutely right.  Whether it was a benefit or not, or it

12   could have been a benefit, the Debtor did not use it.  It was

13   no benefit to the estate.  But during the first 17 days, you

14   did.  And there we are going to give, we are going to give

15   the creditor an administrative claim.  And I think that is

16   the tension you're talking about.  Here, PEAO, in addition to

17   what you said, and no one can deny, objected to us moving to

18   lift the stay, consistently adjourned and asked this Court

19   the right to delay, you know, abandoning the property

20   pursuant to a validly filed motion to compel abandonment by

21   Union so that it could market the asset.  They stood here and

22   told Your Honor, We need to do this.  In other words, if you

23   compel us to abandon right now, we're not going to be able to

24   market the assets, we won't be able to realize value.  We

25   think this is in the best interest.  Did they use those

1    words?  I'm not suggesting they did.  We can go back to the

2    transcripts and find out whether they did or did not.

3         THE COURT: Oh, please no.

4         MR. CRICHLOW: Okay.  Implicitly in that argument

5    however, Your Honor, it has to be an acknowledgment that this

6    is for some benefit of the estate.  It certainly was clear

7    that it was going to be to the detriment of Union.  There had

8    to be a showing of why they were going to do that, and Your

9    Honor, my position is with respect to the fact that they had

10   a captive joint venture partner that had to carry the weight,

11   and basically was effectively forced to finance or invest in

12   this company while it tried to get itself on its feet, that

13   enabled them to do what they wanted to do.  Had they sold the

14   property, I don't think anybody would be standing here

15   suggesting that we did not provide a benefit.

16        THE COURT: What, as a matter of curiosity, has

17   happened to that interest?

18        MR. CRICHLOW: To - -

19        THE COURT: The Debtors' now abandoned interest.

20        MR. CRICHLOW: You know, that's an interesting

21   point.  Because we made the point in our paper that while

22   they trumpet that they no longer have an interest in the

23   property, we think that's a little bit of a misnomer, because

24   the interest has effectively been abandoned to the corporate

25   shell.  So we think they still have an ownership interest.

1    Now with respect to abandonment, if you can bear with me a

2    second and let me jump just a little bit forward before I get

3    into the abandonment, you know, exposure that Union has,

4    which is significant, and to which they are entitled an

5    administrative claim, we believe.  Or we would respectfully

6    suggest.  We believe that that abandonment, if you go back to

7    my earlier analogy of what's different here, is not a common

8    law, equitable right which makes sense as a policy measure,

9    to go after an unrelated party when there is a question about

10   whether the two parties could be liable for ongoing or future

11   remediation costs.  Or abandonment/cleanup costs.  That makes

12   sense.  It seems fair that joint tortfeasors ought to be able

13   to get contribution from one another.  This is very, very

14   different.  By abandoning the property, effectively when you

15   look at Alaska law and what that means, as we've pointed out

16   in our paper, my view is that's effectively like confessing a

17   judgment.  Because there are consequences of abandonment.

18   The minute the abandonment happens, two things occur under

19   Alaska law, and it's not uncommon under CIRCLA law.  The

20   Debtor cannot abandon its responsibilities for future cleanup

21   and the abandonment and plugging of those well sites.  They

22   don't dispute that in their papers.  That's not the issue.

23   There's an issue about whether the claim is contingent.  They

24   don't dispute that.  Everyone in the title chain is liable

25   and responsible for that cleanup if it doesn't occur.  That

1    means Union is responsible for it, and the Debtor is

2    responsible for it.  They have abandoned.  The minute they

3    abandon, that is a responsibility that exists immediately.

4    It's not an if it will occur, it is going to occur.  So that

5    leaves us with the question of, so what does that mean?

6    We've provided an estimate of over $200 million that my

7    client has performed and used third party engineering sources

8    to come up with.  And my understanding is that those are

9    reports that the Debtor is aware of, and has actually seen.

10   But whether that's the ultimate number or not is largely

11   irrelevant.  The question then becomes, are we asking, as you

12   do in a CIRCLA matter, for a contribution from a third party

13   that maybe, you know, at the very end contingent because, for

14   example, in the cases they cited where a city was responsible

15   and the debtor was responsible, but the city in the first

16   instance had to do the cleanup, and at the end of the day the

17   federal regulators may not have ever needed to go to the

18   debtor for satisfaction of a cleanup judgment.  This is very

19   different.  We're not looking to assess who's responsible

20   under the law of equity, or under common law.  We're looking

21   to assess who's responsible based on the contractual

22   relationships and ownership split that we have in a single

23   entity, special purpose joint venture.  It is not two

24   parties.  This is more tantamount to if a parent company did

25   business with a sub, and they had an environmental cleanup

1    obligation, they're not so much looking for, and I'm air

2    quoting here, "contribution" in the sense of common law

3    equity, they're looking for the entitled payment.  The

4    entitled payment that they are entitled to receive pursuant

5    to the ownership interests and whatever private agreements

6    they had with their sub.  And here in a joint venture, that's

7    exactly what we would expect.  The Debtor would be obligated

8    to pay their 46% interest.  We don't have to guess what their

9    responsibility is, because it's not arising out of a common

10   law equitable principle.  It's arising out of a contractual

11   agreement that they've entered into and that they are fully

12   responsible for.  And I think that is the tension we see when

13   you look at other jurisprudence that's talking about what a

14   federal regulatory agency can do with a Debtor post fact,

15   when there are other - - key word here - - potentially

16   responsible parties.  Here it's one entity.  We know who the

17   responsible party is going to be for the cleanup.  It would

18   be different if we were Alaska, now making this argument and

19   suggesting that we had the claim dead set against the Debtor,

20   because they could stand up and say, Well, wait.  That's

21   contingent because you don't know whether Union will satisfy

22   this cleanup obligation fully, and you may not have to come

23   after us.  We're not Alaska.  We're a 51% ownership party in

24   a special purpose joint venture.  We're looking for the

25   obligation to be paid by our financial partner.  This is not

1   the same as the other cases.  And that is why we spent so

2   much time on the RNI case.  Because I think the RNI case was

3   the only case that spent a lot of  time going through the

4   Code and drawing the distinction between what is a contingent

5   case and what is an unliquidated case.  And why under the

6   Code there is really a difference.  And why, you know, if we

7   read this, or we viewed this the way the Debtor viewed it, I

8   think you'd read, you know, the requirements in 502(c), as

9   we've said before, out of the Bankruptcy Code.  You know,

10  that section provides that there shall be estimated, for

11  purposes of allowance under this section, any contingent or

12  unliquidated claim.  The fixing or liquidation of which, as

13  the case would be, would unduly delay the administration of

14  the case.  That or is an important disjunctive distinction.

15  Here, there is no doubt the claim is unliquidated.  Is the

16  claim contingent?  I would respectfully submit to the Court

17  that this Debtor has already confessed to judgment.  This

18  Debtor said, We have to abandon.  We are abandoning.  That

19  means they have the ongoing right to pay for the cleanup and

20  they cannot put it at Union's feet and expect us to pay

21  without satisfying their obligations.  That would be, Your

22  Honor said something just doesn't sit right.  I think that is

23  beyond not sitting right.  I think that is not countenanced

24  by the Code or any of the current bankruptcy jurisprudence.

25  And I would draw your attention to the RNI case and the

1  argument herewith.  And I don't think this turns on a factual

2  issue.  I think this turns on legal issues.  Thank you, Your

3  Honor.

4          THE COURT: Thank you.

5          MR. LITVAK: Max Litvak for the Debtors, Your Honor.

6  I just want to go through each claim, lay it out a little bit

7  more for the Court, give you our position on it.  Try to keep

8  this short and concise.  Union has two types of

9  administrative claims.  It's got a $22 million claim for

10  joint interest billings or operational expenses incurred on

11  the post-petition basis between the petition date and the

12  date of abandonment on September 2nd, 2009.  And separate and

13  apart from that, Your Honor, they have a claim of at least

14  $200 million for future decommissioning costs relating to

15  Trading Bay none of which have yet been incurred or paid.

16  Both claims were filed against just the one Debtor entity,

17  PEAO.  And as I mentioned before, both claims need to be

18  resolved in order for PEAO to propose a confirmable plan in

19  this case.  PEAO does not have nearly enough cash to satisfy

20  a $22 million claim, administrative claim, much less a $200

21  million administrative claim.  Your Honor, I know you're well

22  aware of it, but there are only two elements under 3rd Circuit

23  law for an administrative claim.  And that is that you need a

24  post-petition transaction with the Debtor.  That's one.  And

25  two, you need an actual, not a potential, or hypothetical, or

1    speculative benefit, but an actual benefit to the estate.

2          THE COURT: See, under these circumstances, the rule

3    of law, really, you're asking me to, I don't know, write for

4    the first time, but at least for these purposes memorialize,

5    is one that says if the Debtor actually receives no tangible

6    benefit, there's no administrative claim.  Despite the fact

7    that I think Mr. Crichlow's recounting of the scenario about

8    how the Debtor opposed Union moving forward to assert its

9    rights, at every turn, you know, kept them from being able to

10   either get relief from stay, or to otherwise put dollars in

11   their pockets from expenses that, in essence, as they

12   complained regularly, and I did hear them, had to continue to

13   pay.  It doesn't seem fair to me.

14         MR. LITVAK: Well, Your Honor, I think, I know

15   exactly where you're coming from.  And if Union were an

16   independent, third party, that the Debtors basically

17   stretched out so that the Debtors could have the potential of

18   effectuating a sale, I'd agree with you.  But that's not the

19   situation here.  Union is not an independent, innocent, third

20   party vendor.

21         THE COURT: They're your partner in a joint venture.

22   But I'm not sure why this changes things.

23         MR. LITVAK: Well, for one thing, they don't want

24   the property back.  Your Honor, you asked what happened to

25   the property upon abandonment.  They certainly don't want it

1    back.  So from our perspective, the stay relief motion, that

2    was really posturing.  They were setting us up for this

3    claim.  And I do want, I do take issue with Mr. Crichlow on

4    at least one aspect of his recitation of the facts, or the

5    procedural posture.  Union wanted us to effectuate a sale of

6    our interests in Trading Bay almost as much as we did.

7             THE COURT: Well - -

8             MR. LITVAK: They played along, Your Honor.

9             THE COURT:  - - they wanted a, look, they wanted a

10   joint venture partner who was going to begin to pick up their

11   share of the expenses.  That I - -

12            MR. LITVAK: Exactly.

13            THE COURT: I understand that.

14            MR. LITVAK: Exactly.  That's where they're coming

15   from.  And in fact, they consented to continuances.  We filed

16   the motion to abandon on June 16th.  The case was commenced in

17   early March.  And it was set for hearing.  And yes, we did

18   continue out the hearing a couple of times.  Union objected

19   to our motion to abandon.

20            THE COURT: When did they file their lift stay

21   motion?

22            MR. LITVAK: It was a few weeks into the case.  It

23   wasn't that far into the case.

24            UNIDENTIFIED SPEAKER: Your Honor, it was March 23rd.

25            UNIDENTIFIED SPEAKER: March 23rd.

1          THE COURT: Yeah.  And then it got to hearing where

2    I told them no, and as parties often do, they took that as a

3    message from the Court they weren't going to make any

4    progress.  At least in the near term.

5          MR. LITVAK: Right.

6          THE COURT: So I mean, there's an argument on the

7    other side there, too.  Not that Mr. Crichlow needs me to put

8    words in his mouth.

9          MR. LITVAK: The other thing I would point out, Your

10   Honor, is we never asked Union to incur these expenses.  So I

11   mention the first element is having a post-petition

12   transaction with the Debtor.  Yes, we opposed their request

13   for stay relief.  But that doesn't mean we then asked them to

14   incur these expenses.  The reality is they would have

15   incurred them anyway.  And in fact, they've incurred them

16   since we've abandoned the property.  They're, Union is not in

17   a position where they can incur half the expenses.  They

18   either have to incur all of the expenses, or they don't incur

19   the expenses.  But it's entirely their choice.  We never put

20   it them, You have to extend credit, you have to make these

21   payments on a post-petition basis.

22         THE COURT: Well, you know, I don't know this, but I

23   assume they're a solvent company.  So the consequences of not

24   paying these expenses, I think, that would be visited upon

25   them are much different than the ones visited upon the

1    Debtor.

2           MR. LITVAK: That's true, Your Honor.  But you

3    raised an issue of fairness, and I'm telling you the Debtors'

4    position is we have not done anything to prejudice Union.  At

5    the end of the day.  Whether they had gotten stay relief or

6    not, they would be in the exact same position that they are

7    today.  They knew what they were doing.  They knew that we

8    were not going to pay this.  We had stopped paying these

9    joint interest billings months prior to the petition date.

10   They had worked up a $29 million asserted claim against this

11   estate, pre-petition.  That was after taking into account the

12   proceeds, the oil proceeds that they were receiving at that

13   time.  So this property is operating at a heavy, heavy loss.

14   So I think - -

15          THE COURT: Nobody seems to dispute that.

16          MR. LITVAK: Exactly, Your Honor.  And the chances

17   of us effectuating a sale, I think we said it all along

18   throughout the case, were, it was a long shot.  We almost got

19   there.  I had to convince Your Honor to approve the sale

20   contingent on a financing, I don't know if you remember that.

21          THE COURT: You know, there were lots of things I

22   would consider to be unique.

23          MR. LITVAK: This is a very unique case.

24          THE COURT: In connection with sales and

25   abandonments, and unabandonments.

1              MR. LITVAK: Exactly, Your Honor.  So on this one,

2     Union, they would have incurred the same expenses that they

3     did, and they have continued to incur those expenses post-

4     abandonment.  They wanted us to sell this asset as much as we

5     did, because they wanted a solvent partner to also share in

6     these obligations.  And that's what we, we tried to get them

7     there.  It would have benefitted the estate if we could have

8     got them there.  We didn't.  And it would have benefitted

9     them just as much.  So to say that there is somehow, to say

10    that the estate did something that then resulted in Union

11    having an administrative expense I think stretches

12    credibility.  And You Honor, we cited two cases in our papers

13    that Union has tried to distinguish, but really they're

14    directly on point.  One is the Broadfoot or the Subscription

15    Television case that Mr. Crichlow mentioned at 789 F.2d 1530.

16    It's 11th Circuit decision from 1986, and I'm going to quote

17    from it briefly.  "That which is thought to have some

18    potential benefit, in that it makes a business more saleable,

19    may be a benefit, but is too speculative to be allowed as an

20    actual and necessary cost and expense of preserving the

21    estate."  That's what we have here.  We have the potential to

22    score a sale.  Which would have benefitted the estate and it

23    would have benefitted Union too.  We didn't get there.  So

24    there's no actual benefit, and they cannot have an

25    administrative expense claim.

1          THE COURT: Well, what then could Union have done

2    that it did not do to protect itself?

3          MR. LITVAK: If it didn't want to incur the expense

4    because there was a risk that the estate would challenge the

5    administrative claim or would not have the ability to pay it,

6    they shouldn't have paid it.  If that really made a

7    difference to them.  They knew going in that we had no

8    ability to pay these claims short of a sale, and yet they

9    incurred them anyway.  And in fact, they've continued to

10   incur them.  Because they're protecting their own interest,

11   they're not looking out for the estate.

12         THE COURT: Well, I don't want to move into an issue

13   that may be relevant to the cross motions for summary

14   judgment, but aren't they legally obligated to pay all of the

15   expenses?  Apart from the agreement between the joint venture

16   partners?

17         MR. LITVAK: Your Honor, what we're talking about

18   are operational expenses.  They're the operator.  Union is

19   the one that decides which operational expenses to incur.

20         THE COURT: Well - -

21         MR. LITVAK: They could have shut this thing down.

22   I mean, it is a loser.  Even on a post-petition basis, $22

23   million is the claim, there are only $12 million in proceeds.

24   22 million is the allocated share according to Union that's

25   payable by PEAO, and yet it's, there are only $12 million of

1   allocated proceeds.  So it is operating at a heavy negative.

2   I can't speak to Union's business judgment in terms of why

3   they want to continue to operate this field.  Or that unit,

4   the Trading Bay Unit or Trading Bay Field.  But it is their

5   decision, Your Honor, and they've decided to continue to

6   incur those expenses.  Your Honor, that's the $22 million

7   joint interest billing claim.  Separate and apart from that,

8   and I think Your Honor, this claim really, it stretches

9   credibility to even assert it as an administrative claim.

10  The decommissioning, the abandonment and remediation costs

11  associated with this property.

12       THE COURT: Mr. Litvak, let me just tell you, I

13  think I understand the parties' respective arguments on that

14  claim.  And given the time, my inclination is to move on.  I

15  don't know whether you're going to put a witness on in

16  connection with this, or whether you've decided to forgo

17  that.  But we've got other things to do, and I do understand

18  the distinctions and the arguments both parties are making

19  here.  And I tend to agree with you that the one that the

20  Union here is making is clever, and gives me a little pause

21  and a chance to think about it.  I haven't made up my mind on

22  which way to go.  I mean, the Debtor is making a classic

23  contingent argument here, and I understand that.

24       MR. LITVAK: And it's a two step argument that I

25  just want to highlight for you, and then we'll move on, Your

1   Honor.  The admin claim on decommissioning, we're saying that

2   Union is not entitled to an admin claim.  Okay?  That's the

3   first argument.  And that's just because they never, they

4   didn't incur the expenses during the post petition period.

5   They have yet to be incurred.  The property continues to

6   operate and so forth.  We are making a second argument just

7   to be clear.  Not only are we asking for the decommissioning

8   to be disallowed as an administrative claim, we're also

9   asking for it to be disallowed.  Disallowed as a general

10  unsecured claim.  And that is specifically the 502(e)

11  contingent claim argument, Your Honor.  Okay?  And I can't

12  let this go by.  I have to point this out to Your Honor.  But

13  the RNI case that Union spent so much time arguing about,

14  both in its papers and today, is very clear about this issue.

15  That a contribution claim is by its very nature contingent

16  until it's actually paid by the co-debtor.  So that's the

17  only issue here.  They agree, at least for purposes of their

18  papers, maybe I'm hearing something different today, but for

19  purposes of their papers they agree that they have a claim of

20  a co, that they are a co-debtor as to the state.  The state

21  of Alaska.  And that it's a claim for reimbursement.  But

22  it's still a contingent claim, because they haven't paid any

23  of it.  They haven't paid any of it to the state, and we have

24  duplicative claims from the state.

25          THE COURT: I think I decided, I know the parties

1    cited Insilco, but I think it was in Exide.  I think I

2    sustained an objection to a claim with respect to expenses

3    that were going to have - - they were cleanup expenses in

4    that case to have to be incurred, but had not been spent - -

5            MR. LITVAK: Yes, Your Honor.

6            THE COURT:  - - and therefore could not qualify for

7    administrative expense status.

8            MR. LITVAK: That was Insilco.  Maybe it was Exide

9    as well, but it was - -

10           THE COURT: No.  Look, you know, I said the other

11   day I've now been on the bench long enough that some of these

12   cases are running together, and it's scary because I've got a

13   few years to go.  I remember the issue, not always sure which

14   case I decided it in.

15           MR. LITVAK: So Your Honor, just to be clear.  The

16   22 million, we want the administrative claim disallowed.  But

17   we're not nearly, we're not asking you to disallow it as a

18   general unsecured claim at this time.  Okay.  On the

19   decommissioning, we are asking you to allow, disallow it as

20   an administrative claim, but we'd also like you to go one

21   step further under 502(e), and disallow it as an

22   administrative claim as well.  Your Honor, I do have the

23   witness here.  I'd like to make the evidentiary presentation

24   just so that we have it on the record.  It won't take but a

25   few minutes.

1           THE COURT: Go ahead.

2           MR. LITVAK: Your Honor, Gerald Tywoniuk is here and

3    if called to testify would testify as follows.  He would

4    testify that he is the acting CEO and Chief Financial Officer

5    of Pacific Energy Resources, or PERL, one of the Debtors.

6    That he is also acting CEO and Chief Financial Officer at the

7    various Pacific Energy subsidiaries.  Has been Chief

8    Financial Officer since August 13, 2008.  That in his

9    capacity as an officer of the Debtors, he's familiar with the

10   Debtors' day-to-day business affairs and the assets of these

11   estates, and that he's played an active role in the Debtors'

12   restructuring efforts in these cases, including the marketing

13   and attempted sale of the Debtors' interests in Trading Bay.

14   He would testify that as of the petition date, PEAO and Union

15   shared working interests in certain oil and gas properties in

16   Alaska, including the Trading Bay Field and Trading Bay Unit

17   in Cook Inlet, Alaska.  That these properties were leased

18   from the state of Alaska.  He would testify that Union has

19   been and continues to be the operator at Trading Bay, and

20   that as of the petition date PEAO was a party to various

21   contracts with Union setting forth the relationship of the

22   parties with respect to Trading Bay.  He would testify that

23   consistent with the terms of these agreements, Union, both

24   before and after the petition date, issued joint interest

25   billings detailing what Union claimed were PEAO's share of

1    operating expenses associated with Trading Bay.  Union

2    asserts that PEAO's outstanding obligations to Union as of

3    the petition date total approximately $29.5 million net of

4    pre-petition production realized by Union, and that the

5    outstanding post-petition balances total, approximately $22.2

6    million, for a combined total of $51.3 million.

7    Approximately.  He would testify that PEAO ceased to pay

8    Union's joint interest billings, except out of the proceeds

9    of oil production, well in advance of the petition date.

10   That the Debtor has also communicated to Union, both prior to

11   the petition date and during these cases, that the Debtors

12   did not intend to fund the ongoing obligations associated

13   with Trading Bay.  He would testify that Trading Bay has been

14   operating at a significant loss for some time prior to the

15   petition date and that PEAO filed a motion abandoning its

16   interest in Trading Bay on June 16th, to which Union objected.

17   The hearing was, the hearing on the abandonment motion was

18   continued for some time, and with Union's concurrence, in

19   order to allow the Debtors to complete their efforts to sell

20   PEAO's interest in Trading Bay.  He would testify that

21   ultimately no sale could be consummated and the property was

22   abandoned by order of this Court on September 2, 2009.  He

23   would further testify that PEAO has taken no action on a

24   post-petition basis to request or encourage Union to incur

25   any expenses associated with Trading Bay.  Further, he would

1    testify that PEAO has realized no actual benefit to date from

2    post-petition operations at Trading Bay.  As for

3    decommissioning obligations, he would testify that Trading

4    Bay remains in operation.  As such, he is not aware of any

5    decommissioning obligations that could have been incurred or

6    paid by Union as of PEAO's abandonment of the property on

7    September 2nd, 2009 or to this day.  He would further testify

8    that PEAO took no action whatsoever to incur decommissioning

9    obligations on a post-petition basis.  And he would testify

10   that he is aware that the state has asserted general

11   unsecured claims for decommissioning obligations relating to

12   Trading Bay that are duplicative of Union's claims.  He would

13   conclude by testifying that if allowed, PEAO does not have

14   nearly enough cash to pay an administrative claim of $22

15   million on account of unpaid, post-petition, joint interest

16   billings, much less 200 million on account of Union's alleged

17   decommissioning obligations.  That would conclude the

18   Debtors' presentation, Your Honor, on the Union

19   administrative claims.

20          THE COURT: Does anyone wish to cross examine Mr.

21   Tywoniuk?  I hear no response.  Thank you.

22          MR. CRICHLOW: Your Honor, it's David Crichlow,

23   Pillsbury, Winthrop, Shaw, Pittman, once again, on behalf of

24   Union Oil.  I have no need to cross examine the Debtors'

25   witness, but I do move to strike the portion of the proffer

1  that says that there would be testimony that the Debtor

2  received no actual benefits to date from Union on the basis

3  that that is a legal conclusion, not factual testimony, and I

4  have no other issue with the factual proffer that's been

5  offered.

6          THE COURT: I'm going to deny that motion.  It's

7  probably both a factual issue and a, something that will have

8  to be the subject of a legal conclusion.  But certainly, the

9  Debtor is competent to testify about whether something

10 benefitted it or not.  I may or may not give it weight

11 factually.

12         MR. CRICHLOW: Okay.  Your Honor, then the only

13 other thing I'd like to do, I have no cross examination, but

14 what I will do, since we have no witness here, and we were

15 informed on Wednesday evening before I was on my way to

16 Boise, Idaho in another case, that there was a possibility

17 that witnesses would be presented, is just reserve any right

18 that Union may have to the extent that Your Honor feels that

19 you need to decide this matter on the basis of either the

20 testimony proffered or an evidentiary record, to present a

21 witness if the Court is so inclined.

22         THE COURT: Well, usually what I do is I let the

23 parties decide what it is they'd like to give to me in the

24 way of a record.  But I'll leave you with your reservation.

25         MR. CRICHLOW: Thank you, Your Honor.

1          THE COURT: Thank you.  Now, is there agreement

2    about, from a document standpoint, what this record should

3    consist of?  Can we just say generally whatever is attached

4    to the pleadings?  Are the parties okay with that?  Or would

5    you like to specifically identify documents.

6          MR. CRICHLOW: Your Honor, I just got a head nod

7    from Mr. Litvak.  I think we would agree that whatever is

8    attached to the motion papers, the objection, the claim

9    objection itself, the parties would agree that that should be

10   the basis of the record, and I don't believe there's any

11   objection to the authenticity of any of the documents that

12   are attached.

13         MR. LITVAK: That's correct, Your Honor.

14         THE COURT: Okay.  And I take it, except for the one

15   dispute about actual benefit, at least I didn't hear anything

16   that told me there were undisputed facts involved here.  That

17   there were disputed facts here.

18         MR. LITVAK: Correct, Your Honor.

19         THE COURT: Okay.

20         MR. CRICHLOW: That is correct, Your Honor.

21         THE COURT: All right.  Thank you.  Okay.  Shall we

22   move to Cook Inlet?

23         MR. LITVAK: Yes, Your Honor.  Would you like to

24   hear from the claimant first?

25         THE COURT: I would.

1          MR. CANDEUB: Good afternoon again, Your Honor.

2     Doug Candeub for Cook Inlet Pipeline.  We are here on a

3     motion, Your Honor, for an administrative claim,

4     administrative expenses and claims and what I'd propose to do

5     is to, unless Your Honor feels otherwise, is just to begin

6     with a proffer of what our witness would say.

7          THE COURT: Go ahead.

8          MR. CANDEUB: Thank you.  Your Honor, I have with me

9     in the court Robert McMillin.  He is the Corporate Secretary

10    of Cook Inlet Pipeline Company.  He has been – -

11         THE COURT: Robert, I'm sorry.  Robert McMillin?

12         MR. CANDEUB: McMillin.

13         THE COURT: Thank you.

14         MR. CANDEUB: M-c, cap, m-i-l-l-i-n.  And he would

15    testify as follows.  That his the Corporate Secretary of Cook

16    Inlet Pipeline Company, or CIPL for short.  That he has been

17    in that position since 2008.  That CIPL is a pipeline common

18    carrier in Alaska in the Cook Inlet area, which carries oil

19    from production fields that are in the vicinity of it's inlet

20    down to the inlet on its pipelines, where the oil is then

21    loaded onto ships.  It is, as a common carrier, he would

22    testify, required to carry oil from anyone who wants to use

23    it.  He would testify that it is a heavily regulated company.

24    Regulated in particular by the state of Alaska.  And that its

25    pricing is set by the filing of tariffs.  It is a company

1    that provides service of carrying oil on its pipeline from

2    producers and storing the oil temporarily in tanks to be then

3    loaded onto the ships in the inlet.  He would testify that it

4    is a company that is 50% owned by the Debtor, Pacific Energy

5    Alaska Holdings, Inc., and - - I think it's Inc. - - but it's

6    PEAH, Pacific Energy Alaska Holdings.  And it is 50% owned by

7    Union oil of California.  And CIPL has, had - - pardon.  Take

8    a step back.  And PEAH acquired its interest in CIPL from

9    Forrest Oil in or about 2006, and their interests have

10   carried on from the Forrest Oil predecessor and from Forrest

11   Oil's predecessors in some cases going back in time.  CIPL

12   has, for some years, contracted out its physical pipeline

13   operations to another company that's, the company that's

14   operating the pipeline is Chevron Pipeline Company.  And that

15   goes back to I believe 1995.  And that, the work for

16   maintaining the operations includes maintaining the pipeline,

17   the safety issues, liaisons with the regulators of key

18   permits, office work, and so on.  The users of the pipeline

19   are principally Pacific Energy Resources, LLC and Union Oil,

20   and to a lesser degree Exxon.  The producers that are in the

21   vicinity of the Cook Inlet that load their oil on the

22   pipeline of CIPL are operated by, or have been operated by

23   either PERL, for short, Pacific Energy Resources, or Union

24   Oil.  The Exxon interest is one which is also operated by

25   Union Oil.  The operations in the vicinity of Cook Inlet that

1   use the pipeline have been ones which were either 100% owned

2   by Pacific Energy Resources or - - sorry.  Pardon me.  100%

3   operated by Pacific Energy Resources, or, and owned, owned

4   and operated, or are ones which were owned jointly by Pacific

5   Energy and Union Oil.  And those are the ones in Trading Bay

6   that are ones which by arrangements going back to 1991, I'm

7   sorry, 2001 under an alignment agreement, are ones for which

8   Union Oil would be obligated to pay the expenses at, of 53.2%

9   and Pacific Energy, or it's predecessor Forrest Oil, would

10  pay 46.8%.  That was, Your Honor, an alignment agreement

11  which is attached to our reply in support of our motion, and

12  Mr. McMillin would testify that that's a true and correct

13  copy of the alignment agreement.  The, for the assets, the

14  production assets for which PERL had an interest, an

15  ownership interest but which were operated by Union Oil, as

16  well as for all of the production facilities in the area, Mr.

17  McMillin would testify, they're all constantly metered, and

18  there's a constant availability of metering so that for those

19  which a company is, has contracted to another company to

20  operate, they would still, the operator would have an

21  obligation to provide the co-owner, at any time, the status

22  of the metering, because everybody who has an ownership

23  interest in oil up there wants to be able to assess how many

24  barrels belong to them.  So that PERL was always able to, to

25  Mr. McMillin's knowledge, be able to assess its ownership

1    interests in the oil and the things of which it co-owned but

2    which were operated by Union Oil.  Mr. McMillin would testify

3    that for, since the time that, beginning with the time when

4    Pacific Energy Resources acquired its interest in Forrest Oil

5    until sometime in 2008, payments were being made on invoices

6    consistently and without any problem.  Regardless of whether

7    the, whether the production was from a field owned by PERL

8    or, co-owned by PERL and operated by Union Oil.  Invoices

9    that were sent out by CIPL in advance had already done the

10   allocations of the 46.8% and the 53.2%, and that was done up

11   in, the allocations were done up in Alaska by office staff

12   when the metering was done, so that by the time the

13   information comes down to the billing people to send out the

14   bill, they already have the information on how much is to be

15   billed to Union Oil, how much should be billed to Pacific

16   Energy Resources.  And those bills were paid, as I said,

17   without any problem.  At some point in 2008, the Debtor

18   stopped its, or slowed down or stopped paying its invoices

19   across the board, because it didn't have the money to pay and

20   it didn't discriminate at that time between ownership, the

21   assets which were owned by itself versus those co-owned by

22   the Debtor and operated by Union Oil.  Post-petition, after

23   March 9th, as the oil continued to be loaded on the pipeline

24   and so that's the. . . (indiscernible) . . .provide it's

25   common carrier service of moving the oil along, billing

1   continued post-petition to the Debtor, to Pacific Energy

2   Resources, and they, the Debtor did ultimately pay the

3   billing that was based on the production from its own fields.

4   There were three bills that were sent post-petition covering

5   the periods March, April and May, and those were sent a month

6   later.  Those are the bills that were attached to the motion.

7   And Your Honor, I have an extra copy if Your Honor would

8   like, an extra set, but they're the same ones that are

9   attached to the motions.  Would Your Honor - -

10          THE COURT: Sure.

11          MR. CANDEUB: And - -

12          THE COURT: Thank you.

13          MR. CANDEUB: Mr. McMillin would testify that those

14  are the invoices that were sent to the Debtor post-petition.

15  That those were sent on or about the invoice date indicated

16  on them.  As Your Honor may see, the first two months are

17  ones which have positive dollar amounts.  The third is

18  actually a credit of 37 thousand, approximately.  And as Mr.

19  McMillin would explain, there are occasionally things that

20  occur which would lead, where there were some differences in

21  the billings from prior months.  In this case, there was a

22  volcano up in the Inlet area in March of 2009 which led to

23  some shutdown of the operations, and there was some . . .

24  (indiscernible) . . ., so at some point there was a credit

25  for that amount.  This is the June billing.  And so that the

1    billing amounts that are at issue were issued in, were for

2    time periods of March and April.  And as Mr. McMillin would

3    testify, and as is reflected in even the Debtors' response to

4    the motion, the Debtor did pay the portion of billing which

5    represented billing for the carrying of oil on the pipeline

6    from the production fields 100% owned by Pacific Energy.  And

7    that amount, as stated in the Debtors' response was,

8    $124,480.15.  So out of the original motion, the claim for

9    $643,693.35, Mr. McMillin would testify actually, because of

10   the amount that was paid by the Debtor in the ordinary

11   course, what was left is the $519,213.20.  Mr. McMillin would

12   testify that the billing was done in the ordinary course.

13   That payments were essentially in the ordinary course.  They

14   were certainly paid without any specific authorization from

15   the Court.  But because they were the normal expenses of

16   their operations.  Mr. McMillin would testify that from

17   CIPL's standpoint, there is no distinction between the

18   billing done for production from a field that's 100% owned by

19   Pacific Energy versus one that's partly owned by Pacific

20   Energy in terms of the billing goes out by prior agreement as

21   to percentages, and there was always that understanding to

22   pay.  Mr. McMillin would testify that there was no notice,

23   until sometime in June, when the Debtors filed their motion

24   to abandon assets in June of 2009, there was no notice to

25   them of an indication by Pacific Energy Resources that they

1    would not pay the post-petition bills.  And so that, from

2    CIPL's standpoint, this was a continuation of existing

3    practices that Pacific Energy Resources was fully aware of

4    that.  They were aware of the billing.  They received the

5    bills.  And not until, in June did they tell them they would

6    not pay for the post-petition services rendered.  And - - may

7    I take one moment, Your Honor, please?

8              THE COURT: You may.

9              MR. CANDEUB: Mr. McMillin would testify further

10   that the, that there was a clear - - apart from the fact that

11   this was a carry over of an existing practice and no notice

12   to them of any change, that there was also a clear benefit to

13   the estate insofar as they were carrying oil that belonged to

14   the Debtor, and the Debtor had known of the practice of, that

15   they were carrying it, and didn't advise them otherwise so

16   that in part, it could be inferred that there was, that they

17   considered it a benefit and also there was in fact a benefit,

18   because, Mr. McMillin would testify, because they were

19   providing the service of carrying the oil that was partly

20   owned by the Debtor over the pipeline.  And in storing it for

21   loading onto ships.  And that, I believe, is the end of our

22   proffer.  And Your Honor, I would reserve to make argument

23   after allowing the other side to address the proffer.

24             THE COURT: All right.  Does anyone wish to cross

25   examine Mr. McMillin?

1          MR. LITVAK: Your Honor, I don't wish to cross

2     examine Mr. McMillin, but I have an objection to a portion of

3     his proffer.  And that is to the extent that he testifies to

4     the purported understanding of Pacific Energy, or what was

5     known to Pacific Energy as opposed to Cook Inlet Energy.  I'm

6     sorry, Cook Inlet Pipeline.  Then I would ask that to be

7     stricken from the direct testimony.

8          THE COURT: Is there any response?

9          MR. CANDEUB: Your Honor, I'm not sure of the basis

10    for striking it.  This is what Mr. - -

11         THE COURT: Well, hearsay in part.

12         MR. CANDEUB: Well, but not from the, from what the

13    Debtor.  It's not hearsay from the Debtor.

14         MR. LITVAK: Hearsay and speculation, Your Honor.

15         THE COURT: Any response to that?  The question is

16    how does he know.

17         MR. CANDEUB: Okay.  Then in that respect, Your

18    Honor, he would testify that certainly he, as Corporate

19    Secretary, knows that, from the operations of the company

20    that - -

21         THE COURT: Which company?

22         MR. CANDEUB: His own company.  That Pacific Energy,

23    the pipeline and of the production fields as well, so that

24    the way, the manner in which the producers operated, that

25    Pacific Energy had notice about, knew about whatever was

1    going on with its own production.  Knew that it was receiving

2    the invoices, and that the oil was being carried.  And he can

3    further testify that he knows that no one from Pacific Energy

4    Resources contacted him or anyone at Cook Inlet Pipeline

5    until June.  And so therefore, is entitled to draw the

6    inference that they recognized the benefit.

7         THE COURT: Well, okay.  I'll allow it.  As drilled

8    down on that.  Do you wish to cross examine, Mr. Litvak?

9         MR. LITVAK: No, Your Honor.

10        THE COURT: All right.  Thank you.  Any further in

11   support of the motion?

12        MR. CANDEUB: Yes, Your Honor.  Your Honor, the

13   owner, the motion is made pursuant to 503(b) and also 363 for

14   authorizing Debtors to make payments in the ordinary course.

15   And this is a situation, Your Honor, where first of all under

16   the 363, that in fact the Debtor paid a portion of these

17   bills.  And there's no valid legal difference between the

18   portion that they paid and the portion that they didn't pay,

19   because CIPL is not Union Oil.  It is a company, a common

20   carrier that provides a pipeline service.  And it was sending

21   it's invoices out, and obviously they thought some of it was

22   an ordinary course expense, because they paid it.  So the

23   fact that they could sort of parse between it and decide to

24   pay some but not the rest, shouldn't be a basis for

25   disregarding the entirety of the bill, which is just straight

1   pricing from tariffs, as an ordinary course payment, this is

2   entitled to be paid.  In terms of 503(b), I'd submit that the

3   Debtors are incorrect in stating that the case law does not,

4   the case law requires post-petition transactions.  It's clear

5   that that's not the case, and we've cited in our papers Bill

6   Disco and White Motor and the Goody Family Clothing cases,

7   which, all which say if the Debtor continues to receive a

8   benefit under a pre-petition agreement, and they're aware

9   that they're receiving that benefit, and then, unless they

10  say something to the contrary, that they should be paying for

11  the reasonable value of those services.  And in this case, it

12  was not until June that the Debtors notified CIPL that they

13  were not interested in paying any further.  That they filed a

14  motion to abandon the assets.  So until that time, it was

15  reasonable, certainly, for CIPL to understand that this was

16  considered a benefit.  And to the extent that they needed to

17  consider it at all, the Court should objectively see that

18  that was the case, because they were continuing a practice

19  which the Debtors were allowing, and indeed paying part of

20  it.  And the benefit is one where they were carrying the oil,

21  it couldn't, there was no, no one could get any benefit from

22  that oil unless it got transported out, and shipped, and

23  sold.  And when it would get down to the Bay, to the Inlet,

24  the buyer would put it on the ship.  It was, generally it was

25  Tesoro that would buy the oil.  So it's not CIPL's issue as

1    to, you know, where the, the money goes to that the buyer

2    pays for the oil that they own, any more than, you know, if

3    there's a secured creditor involved that gets some of the

4    benefit, in any case, but that ultimately can benefit the

5    estate because the secured creditor is paid down.  If you, if

6    the Debtor had a contract with FedEx to send letters on FedEx

7    and we'll pay you at the end of the month.  And then they

8    came back later and said, You know, some of the letters we

9    sent didn't really get us what we wanted to achieve, so we're

10   not going to pay for those letters that you carried, you

11   would reject that as transparently not a viable argument.

12   Because here they're contracting with FedEx, FedEx isn't in a

13   position to inspect or inquire about every letter that's

14   carried and find out whether it's a benefit, and decide,

15   well, we're not going to carry your letters unless you

16   establish for us that it's a benefit to the estate.  And so

17   it is here.  CIPL, common carrier, was carrying oil that was

18   owned by the Debtor, or partly owned by the Debtor.  And

19   until told otherwise – - as they were in June, and they

20   stopped billing after that – - they were carrying on the

21   ordinary business of carrying oil down, as they are required

22   to do because they're a common carrier, and they're entitled

23   to be paid for it.

24              THE COURT: Thank you.

25              MR. CANDEUB: Thank you.

1          MR. LITVAK: Your Honor, Max Litvak for the Debtors.

2     I'll try to be brief.  In the analogy that counsel just used,

3     Debtors are not, CIPL is not like FedEx and the Debtors are

4     not like someone who dropped off some mail with FedEx.  Union

5     dropped off the mail.  That's the difference here.  That's

6     the distinction we're making.  It's Union that's the operator

7     as to Trading Bay.  It's Union that delivered the oil.

8     Without regard to whatever the course of dealing had been in

9     terms of invoicing as between the Debtors and Cook Inlet

10    Pipeline.  That doesn't mean that there is suddenly a

11    transaction with the Debtor on a post-petition basis.  Or for

12    that matter that there is any benefit to the estate.

13         THE COURT: Is the component of what the Debtor

14    calls the Union operated assets, the $519 thousand portion of

15    the claim, is that subsumed within the Union claim as well?

16    Or is that separate.

17         MR. LITVAK: No, it's not.

18         THE COURT: Okay.

19         MR. LITVAK: It's separate.  It's separate.  But our

20    position is, Your Honor, that - -

21         THE COURT: It doesn't matter any more.

22         MR. LITVAK: - - it doesn't matter.  Cook Inlet

23    Pipeline has a claim against Union for that amount.  Because

24    it was Union that actually delivered the oil and they were

25    the operator with respect to Trading Bay.  And that is the

1  amount in dispute, Your Honor.  It's 519 thousand.  The

2  Debtors have paid the portion that they did receive a benefit

3  from, because it related to their own operated assets.

4  Separate and apart from the 519 thousand, there was another

5  124 or so that the Debtors paid, because they did get a

6  direct benefit out of it.  And they're not trying to, we're

7  not trying to be cute.  This is really the Debtor taking the

8  position that they got no benefit out of these proceeds

9  because they didn't get any benefit out of Trading Bay, which

10  is the same objection that we've made to Union Oil.  And it

11  holds equally true with Cook Inlet Pipeline.  The other thing

12  that I would point out, Your Honor, is that the claim is

13  actually filed against the two key Debtors.  Both PEAO as

14  well as Pacific Energy Resources Limited, PERL, and the

15  Debtors' position is that that is improper, that PERL had no

16  interest whatsoever with respect to Trading Bay.  Even Union

17  has not asserted any claims against PERL.  And this claim

18  that's asserted by Cook Inlet Pipeline should be limited, to

19  the extent that it is allowed at all, and of course the

20  Debtors' position is that it should not be allowed, but to

21  the extent that it's allowed at all, it should be limited

22  only to PEAO.  Your Honor, I do have a brief proffer on this

23  point as well.

24          THE COURT: Okay.

25          MR. LITVAK: Your Honor, our witness is Gerry

1    Tywoniuk, and I will incorporate his experience in

2    relationship to the Debtors from the presentation and proffer

3    that I made with respect to the Union administrative claims.

4    As to the - -

5             MR. CANDEUB: Excuse me.  Your Honor?

6             THE COURT: Yes.

7             MR. CANDEUB: I wonder if I may interject with a,

8    sort of a rebuttal proffer with respect to an element of what

9    Mr. Litvak said?

10            THE COURT: You know, I will say the proffers are

11   becoming cumbersome.  The answer is no.  But thank you.

12            MR. LITVAK: Very, very briefly, Your Honor.  Mr.

13   Tywoniuk would testify, as part of his proffer, that Cook

14   Inlet Pipeline is owned by Union and Pacific Energy Alaska

15   Holdings, one of the Debtors.  And that although Union and

16   PEAH share a 50% ownership interest in Cook Inlet Pipeline,

17   the company's operations are controlled and managed by Union

18   through an affiliate.  He would further testify that PEAH

19   intends to bring a motion to abandon its interest in Cook

20   Inlet Pipeline.  He would testify that the pipeline company

21   owns a pipeline and terminal in Alaska.  That the Debtors

22   utilized these facilities for purposes of transporting oil

23   production to market from properties operated by PEAO.  And

24   that the Debtors have paid Cook Inlet Pipeline for all post-

25   petition pipeline charges incurred on account of production

1  from the PEAO operated assets.  He would testify further that

2  Union utilizes the facilities to transport the Cook Inlet

3  Pipeline facilities to transport oil production from Trading

4  Bay to market.  Union is the designated operator for Trading

5  Bay and makes decisions in terms of how and when to transport

6  the oil production therefrom.  He would testify that the

7  Debtors object to the portion of Cook Inlet Pipeline's claim

8  relating to the Union operated assets, which total

9  $519,213.20.  He would testify that Cook Inlet Pipeline

10  asserts this claim against both PEAO and PERL.  He would

11  testify that PERL never had any direct interest in Trading

12  Bay, and is not obligated to Cook Inlet Pipeline for any

13  relating to Trading Bay.  He would further testify that PEAO

14  has taken no action on a post-petition basis to request or

15  encourage Union to incur any expenses associated with Trading

16  Bay.  Further, he would testify that PEAO has realized no

17  actual benefit to date from post-petition operations at

18  Trading Bay, and that Cook Inlet Pipeline should assert its

19  claims relating to Trading Bay against Union and not PEAO.

20  That would be the conclusion of Mr. Tywoniuk's proffer.

21         THE COURT: All right.  Thank you.  Does anyone wish

22  to cross examine Mr. Tywoniuk?

23         MR. CANDEUB: I would like to cross examine him.

24         THE COURT: Very well.

25         **GERALD TYWONIUK, DEBTORS' WITNESS, SWORN**

1          THE CLERK: Please state your full name for the

2    record and spell it.

3          THE WITNESS: My name is Gerald Tywoniuk, t-y-w-o-n-

4    i-u-k.

5                          CROSS EXAMINATION

6    BY MR. CANDEUB:

7    Q.   Mr. Tywoniuk, are you familiar with the invoices that

8    were sent to CIPL to Pacific Energy Resources?

9    A.   Yes.

10   Q.   Did, were you in a position to see them as they came in

11   month-to-month?

12   A.   I saw the invoices moments before we paid them.

13   Q.   And when was that?

14   A.   Over the course of 2008, in particular, until a certain

15   date.  Pacific Energy Alaska Operating paid the invoices as

16   they, as they were then due.

17   Q.   And then, and did you see the ones post-petition as

18   well?  When they came in?

19   A.   Probably.

20   Q.   All right.  And then you're aware, no doubt, as they're

21   in the record - -

22          MR. CANDEUB: Actually, Your Honor.  If I may, I

23   left an extra copy.

24   BY MR. CANDEUB:

25   Q.   You're aware, are you not, that the invoices were

1  actually sent to Pacific Energy Resources Limited?

2  A.   Yes.  I'm not sure why that name appeared on the

3  invoice.  PEAO always paid them.

4  Q.   Mr. Tywoniuk, you never notified CIPL to change where

5  the invoicing was sent, did you?

6  A.   No.  Neither did CIPL indicate that the wrong entity was

7  paying.

8  Q.   Well, but whether another entity was paying for the

9  invoices that were sent to PERL, they were being paid on

10 behalf of the entity to whom the invoices were being sent.

11 And you never notified CIPL to change where the invoicing was

12 sent.  Is that right?

13 A.   Pacific Energy Alaska Operating owned the oil.  It paid

14 the invoices.

15 Q.   All right.  So it's been answered.  You've already

16 answered it.  There was no notice to CIPL to change where

17 they were sent.  And that continued throughout the entire

18 period of the invoicing.  Isn't that right, Mr. Tywoniuk?

19 There was no notice – -

20 A.   I don't know whether a notice was ever provided.

21 Q.   And do you know was it you or someone else who in June

22 advised CIPL that they were no longer going to be paying

23 invoices?

24 A.   The fact of the matter is there was very little oil

25 shipped between the petition date and the June date because

1   of the volcanic interruption.  There was only a few days

2   worth of shipments before Trading Bay shut in.

3   Q.   Well, are the amounts that were, or the amounts that are

4   reflected in the invoices.  But in any event, Mr. Tywoniuk,

5   was it you that notified CIPL that you were not going to be

6   paying invoices going forward, in June?

7   A.   I recall being on the phone with James Ramsey of Chevron

8   Pipeline, the President of CIPL, on a weekly basis after the

9   volcano went off on March the 22nd.  So he was very aware of

10  what was going on in the bankruptcy, because not only did he

11  provide an update as to the volcanic interruption effects on

12  CIPL's operations, but I would provide an update on the

13  bankruptcy side.

14  Q.   Okay.  And then - -

15  A.   And those started, those conversations started in early

16  April.

17  Q.   All right.  So then it was not until June that you said,

18  We're not going to be paying invoices anymore?

19  A.   No.  I would say it would have started in early April

20  when we had our first weekly call.

21  Q.   So you were having the weekly calls starting when?

22  A.   Starting in early April, 2009.  It was a two way dialog.

23  Him updating us on the impact of the volcano, me updating him

24  on the impact of the bankruptcy.

25  Q.   All right.  So, isn't it true that it wasn't until you

1   filed your motion to abandon in June that you told them,

2   We're not going to be paying anymore invoices?

3   A.   I don't think that's true.

4   Q.   Well, do you remember when it was, if at all, that you

5   said otherwise?

6   A.   Our first weekly conversation would have happened in

7   early April - -

8   Q.   Right.  But you didn't - -

9   A.   - - 2009.

10  Q.   - - say in your first weekly conversation, We're not

11  going to pay your invoices, did you?

12  A.   I would have provided an update on the bankruptcy

13  process, so I would imagine that we would have talked about

14  them.

15  Q.   Administrative claims and the fact that you pay

16  administrative claims, as you did.  Right?  You paid, in

17  fact, the invoices, a portion of these invoices.

18  A.   The first payments we would have made would have been

19  not until September, probably, because the first shipment out

20  of Cook Inlet Pipeline happened in August.

21  Q.   But the payments that you paid were under these invoices

22  from April and May.  From, I'm sorry, March and April.  Are

23  you aware of that Mr. Tywoniuk?  These are the only invoices

24  ever sent were March, April, and May invoices, and you paid a

25  portion of them.  That's represented in your papers.

1   A.   There was additional invoices in August, September time

2   frame as well.  And we paid for the 100% owned and operated

3   properties for all of those months.

4            MR. CANDEUB: Excuse me.

5   BY MR. CANDEUB:

6   Q.   Do you recall Mr. McMillin being on those conversations

7   as well?

8   A.   I don't recall one way or the other.  He could have

9   been, he could not have been.  It was, a lot of it was

10  operationally oriented.

11  Q.   Okay.

12           MR. CANDEUB: No further questions, Your Honor.

13           THE COURT: Is there any redirect?

14           MR. LITVAK: No, Your Honor.

15           THE COURT: All right.  Thank you, sir.  You may

16  step down.

17           THE WITNESS: Thank you.

18           THE COURT: Does the Debtor have anything further in

19  support of its objection?

20           MR. LITVAK: No, Your Honor.  We rest.

21           THE COURT: Okay.  Mr. Candeub, you may have the

22  opportunity for rebuttal now, if you would like.

23           MR. CANDEUB: Okay, Your Honor.  Thank you.  Mr.

24  McMillin, I can proffer it, and then if you want to have him

25  testify, fine.  Mr. McMillin would testify that there, in

1    fact, there was no notice, at any time, from the Debtors to

2    change the invoicing which was always directed to Pacific

3    Energy Resources Limited.  And that, he would testify that

4    they did not pay attention to where the check came from,

5    because it only mattered that they were getting paid having

6    been sent to Pacific Energy Resources when they did.  He

7    would testify that he was actually on at least most, if not

8    all of those same calls that Mr. Tywoniuk testified having

9    had with the president of CIPL, James Ramsey.  He would

10   testify that at no time during those calls was, did, in April

11   and on, did Mr. Tywoniuk say that they would cease to be

12   paying some portion of the billing, or any or all of the

13   billing that was being sent to CIPL.  He would testify that

14   the notice that the Debtors were not going to be paying the

15   bills in June came to someone else in CIPL and was not to

16   himself or Mr. Ramsey initially in the first place, and that

17   was in June.  And he would testify that there were no other

18   bills sent in August or September.  Or for that matter at

19   all, after June.

20             THE COURT: Does that conclude the proffer?

21             MR. CANDEUB: Yes, Your Honor.

22             THE COURT: Okay.  Does Debtor wish to cross examine

23   Mr. McMillin?

24             MR. LITVAK: No thank you, Your Honor.

25             THE COURT: All right.  Mr. Candeub and Mr. Litvak,

1    let me ask from a document standpoint, of what does this

2    record consist.  Are we again going to look to what was

3    attached to the pleadings?

4         MR. CANDEUB: Your Honor, we do submit as part of

5    our submission, the invoices which were attached to our

6    motion.

7         THE COURT: Okay.

8         MR. CANDEUB: And – -

9         THE COURT: Well, let's mark them, then M1 for

10   Movant 1.  Is there any objection to their admission?

11        MR. LITVAK: No objection, Your Honor.

12        THE COURT: Okay.  They're admitted without

13   objection.

14        MR. CANDEUB: And the alignment agreement which was

15   attached to our reply.

16        THE COURT: Any objection to that?

17        MR. LITVAK: Your Honor, it's irrelevant.  But aside

18   from that, if the Court wishes to just take it to the weight

19   of the document, that's fine.

20        THE COURT: Okay.  It's admitted without objection.

21   Does the Debtor have any documents it would like admitted?

22        MR. LITVAK: No, Your Honor.

23        THE COURT: Okay.  Mr. Candeub is Cook Inlet

24   asserting that it has any kind of contractual relationship

25   with PERL?

1          MR. CANDEUB: Yes, Your Honor.  I guess so.  The

2     alignment agreement provided that the billing was, as Cook

3     Inlet understood it, to send the billing to PERL, and that's

4     what they did.

5          THE COURT: Okay.

6          MR. CANDEUB: And that was the practice that was

7     carried on without interruption and without any comment

8     otherwise from the Debtors.

9          THE COURT: All right.  Thank you.

10          MR. LITVAK: And just on that point, Your Honor,

11     from the Debtors' perspective, the Cook Inlet Pipeline is not

12     a party to the alignment agreement.  They're not a third

13     party beneficiary of it.  It's an agreement between the

14     Debtor and Union.

15          THE COURT: Okay.  Thank you both.

16          MR. LITVAK: Thank you, Your Honor.

17          THE COURT: We're going to break now.  I'm going to

18     conduct the 4 o'clock hearing in Homebanc.  So I'll recess,

19     give the parties a moment to set up for that.  I do not

20     expect that hearing to be very long.  After it's concluded,

21     we'll proceed with the oral argument on the cross motions for

22     summary judgment.  Court will stand in recess.

23          MR. LITVAK: Thank you, Your Honor.

24          UNIDENTIFIED SPEAKER: Your Honor?

25          THE COURT: Yes, you may be excused.

1        UNIDENTIFIED SPEAKER: May I be excused?  Thank you.

2        THE COURT: Yes.

3     (Whereupon at 4:36 p.m. a recess was taken in the

4  hearing in this matter.)

5     (Whereupon at 5:14 p.m. the hearing in this matter

6  reconvened and the following proceedings were had:)

7        THE CLERK: All rise.  Please be seated.

8        THE COURT: Okay.  How much time had the parties

9  anticipated they would need for argument?

10       MR. CRICHLOW: Your Honor, I believe in light of the

11 time of the day, I can be efficient and do this argument in

12 20 minutes, 25 minutes.

13       MS. CHAMBERS: Your Honor, Torey Chambers on behalf

14 of Silver Point Finance.  I believe I can be even shorter

15 than that.

16       THE COURT: Gold stars for both of you.  Okay.

17 Let's proceed.

18       MR. CRICHLOW: Your Honor, David Crichlow again on

19 behalf of Union Oil Company.  Pillsbury, Winthrop, Shaw,

20 Pittman.  Your Honor, as you are aware, Union Oil Company

21 also filed, by way of an adversary proceeding, a lien

22 priority dispute action where we asked for a declaratory

23 judgment effectively on the priority of Union's liens and the

24 interest in the proceeds as a result of certain lifts in the

25 oil and gas production at the Trading Bay Unit and the

1   Trading Bay Field that occurred post-petition.  I am going to

2   be, I'm going to try to be quite efficient and brief in my

3   presentation.  As you are aware, that complaint has been the

4   subject of a motion for summary judgment by Union and a cross

5   motion for summary judgment by Silver Point, the Debtors' DIP

6   lenders.  And to simplify the matter as best I can, it simply

7   comes down to a legal interpretation.  I don't think there's

8   any dispute by Silver Point about the facts in issue with

9   respect to where Union filed its requisite financing

10  statements or real property filings, and whether they filed

11  it as a fixture filing or not, and what time they filed

12  compared to when Silver Point filed.  And at bottom is a

13  dispute over whether Union Oil holds a valid statutory lien

14  right under Alaska law that would put them first in time, and

15  first and prior to all others pursuant to a statutory lien

16  that I will talk about that is applicable only to the Trading

17  Bay Unit, because - -

18         THE COURT: And I will say, I think your arguments

19  with respect to the Trading Bay Unit are your stronger

20  arguments.

21         MR. CRICHLOW: Okay, Your Honor.  And then I will

22  try to go through those arguments quickly, and then as you

23  are aware, and I take it implicitly that you think these are

24  the areas that you probably want to hear from me more,

25  because you may think that the argument is a little weaker

1    here, is the argument with respect to how Alaska law would

2    treat the filings - - and this is true both with respect to

3    Trading Bay Unit, but I focused primarily on Trading Bay

4    Field, because hopefully Your Honor will agree, I think, that

5    the statutory lien really slams the door shut on Silver Point

6    with respect to the unit, because there's no question we are

7    unit operator there.  With respect to Trading Bay Field, I

8    will spend some time then, and I will try to take you

9    through, as briefly as I can, the Fullop decision, which is

10   something you may not have focused on clearly, but I will

11   talk about at length, because I think it is the only case in

12   the country that we have seen that has addressed the issue

13   squarely with respect to whether Article 9 or real estate law

14   applies to as extracted collateral in oil and mineral rights

15   law.  Okay?  And with that, I'm not going to go through the

16   facts.  I will assume, Your Honor is quite familiar, you are

17   aware that we operate pursuant to a unit operating agreement

18   at the Trading Bay Unit, and the Trading Bay Field has a

19   joint operating agreement as well.  Those operating agreement

20   were filed under real estate property law at the well heads

21   under, you know, the proper real estate laws as fixture

22   filings, among other things.  We believe that the filings

23   also complied with the requirements of UCC Article 9.  But

24   most importantly, what we know is that with respect to

25   Trading Bay Unit, and I'm going to focus on that for a

1   minute, there's, I think it is undisputed that Alaska law

2   governs this dispute.  And Alaska law provides a statutory

3   first priority, operators' lien in PEAO's working interests,

4   and in the lift proceeds from the TBU.  And there's been a

5   little bit of discussion about this Alaska law statute, and

6   some urging by my adversary for Your Honor to read, you know,

7   the terms as, you know, excluding the interest owners, and

8   any third parties that aren't interest owners.  And the

9   bottom line is, and I'll read the statute into the record,

10  the statute is clear on its face.  Alaska law provides, and I

11  quote, "The unit has a first and prior lien upon the

12  leasehold estate, and" – - we have emphasized this in our

13  paper - - "all other oil and gas rights."  And there is only

14  one exclusion.  "Exclusive of a land owner's royalty

15  interest.  And they have that right in and to each separately

16  owned tract.  The interests of the owners" - - and this is

17  key, this runs together - - "in and to unit production and

18  all equipment in the possession of the unit in order to

19  secure the payment of the amount of the unit expense charged

20  to and assessed against such separately owned tract."  Well,

21  that is exactly what we have tried to do here, Your Honor.

22  In the late Spring when PEAO began falling behind on its JIB

23  payments, Union exercised its lien rights under state law,

24  and under the operating agreements themselves, and it's

25  statutory lien right by informing Tesoro Alaska, which was

1    the purchaser of the TBU and TBF oil production, that it

2    should pay pursuant to the lien in the operating agreements,

3    directly to Union, payments that normally would be due from

4    Tesoro to PEAO on account of proceeds from the sale of PEAO's

5    share of the production.  That was followed all the way

6    through a period leading up to the petition.  As a result of

7    the sudden drop in oil prices, the TBU and the TBF operated

8    at a loss during the latter part of 2008.  And the payments

9    were less than PEAO's ongoing Trading Bay joint interest

10   billing obligations.  So as a consequence the standing JIB

11   balance went to 29 million as of the petition date.  And

12   after the petition date, as a result of several lifts and

13   Union's continuing to maintain and continuing to produce at

14   the site, there was a little more than $12 million in lift

15   proceeds that came.  And as we've all talked about earlier

16   today, and the Debtor has admitted, the Debtor informed us

17   that pursuant to their own DIP agreement, which provided

18   financing for the Debtors, and put a lien on all of the

19   Debtors assets, they were specifically not permitted to make

20   JIB payments to Union.  So PEAO stopped making post-petition

21   JIB payments.  As you know, we moved to lift the stay to

22   assert our rights.  And on April 28th, the Court entered an

23   order asking to put the $12 million into escrow with

24   everybody's rights being preserved.  Now, we assert that we

25   have a first lien right with respect to any of the JIBs or

1   any of the oil production as a result of anything that came

2   out of the Trading Bay Unit, because the first lien, as the

3   Court should be aware, is a legal term of art, meaning a lien

4   which takes priority or precedent over other charges or

5   encumbrances upon the same piece of property.  This is

6   basically a state law priming statute.  The UCC is irrelevant

7   here.  Any state is entitled, irrespective of the UCC and the

8   Alaska UCC, as we have pointed out in our papers, says this,

9   that the UCC is only applicable to the extent that there's

10  not another state law that has been put into place that would

11  give someone a higher priority.  That is exactly what the

12  Alaska statute does.  Now we have conceded that if you go and

13  look to Alaska case law interpreting that statute, you won't

14  find any.  But what we did do, is we took a look at the

15  lease, to see how that would be interpreted, and the leases

16  themselves give an interest in all oil and gas rights

17  including production.  So there's no question that this lease

18  applies to production rights.  And more importantly, we

19  found, the only case that interprets the exact identical

20  statute in another state.  Admittedly, this is not from

21  Alaska, but it's from Oklahoma, another oil and gas state.

22  And it's the Tcina case.  And Your Honor, I don't want to

23  spend a lot of time on it, but I would encourage you that in

24  addition to reading our papers, if you spend some time with

25  the case, you will see that the case is interpreting an

 1   identical statute, and in determining whether or not a unit

 2   operator – - and this is a unit operator that actually became

 3   a unit operator subsequent to a lien being granted to the

 4   Debtors' lenders.  And it says the following.  "In providing

 5   a first and prior lien against participating leases and

 6   interests for unit operating expenses, the legislature was

 7   protecting the neutral dependency of the participating

 8   lessees, leases and interests under the pay-as-you-go plan

 9   the legislature had provided for for unit operation."  We

10   have the same pay-as-you-go plan in effect in Alaska.  A

11   first and prior lien is absolutely essential to preserve the

12   fiscal integrity of he unit, and the unit - - particularly

13   since the unit must operate without profit to the unit, and

14   the unit cannot acquire, hold, or possess real or personal

15   property for its own account, but does so only as an agent

16   for several lessees.  Same situation we have in Alaska.  The

17   Court went on to say that, over objections from the lenders,

18   that a lien declared by a positive statute is not dependent

19   for its existence upon subsequent acts requisite to its

20   enforcement.  In declaring the lien to be a first and prior

21   lien in favor of the unit, the legislature intended to burden

22   the participating leases and interest from the inception of

23   the unit with the operating expenses that would be incurred

24   from time to time.  They also noted as an aside, and this is

25   important for the next part of my argument, that they believe

1   that a land record filing, reflecting approval of the unit

2   and the participation of particular leases or interests would

3   be sufficient perfection.  Which with respect to Trading Bay

4   Field, and the other, and TBU, which I'll get to in a second,

5   is exactly what we had at issue here.  Now, Silver Point

6   would like to urge that their lien could prime Union's, but

7   if that were true, the grant of a first and prior lien would

8   be meaningless.  There's assertion that all other oil and gas

9   rights includes, does not include the right to unit

10  production defies logic and common sense.  I mean, all means

11  all.  And they contend that because Union's lien is in the

12  interest of the owners, it does not apply to Silver Point.

13  However, Silver Point's interest would have to be, by

14  definition, derivative of that of the Debtors, and I don't

15  think they can have an interest that the Debtors would not

16  have.  So Your Honor, I think it is absolutely clear that by

17  statutory mandate with respect to any of the lift proceeds

18  related to Trading Bay Unit, there can be no question.  And

19  as a matter of law, Your Honor is certainly capable of

20  deciding that we have a first and prior lien that is

21  effective that primes all other liens.  The only thing I

22  would suggest, Your Honor, if you are interested, we've cited

23  the Alaska statute, and we have pointed out that the Tcina

24  case, and it's interpretation applies to an identical

25  statute.  We actually have the Oklahoma statute, and I have

1    copies for my adversaries.  And we also have a red line

2    against the Alaska statute to show that they are, in fact,

3    with a couple of, you know, these being changed out for

4    such's, they are the exact same statutory mandate.  And I

5    think it may be useful if Your Honor feels that you can pull

6    the statutes yourself, that's fine.  But if you want a copy,

7    I have copies if you'd like.

8              THE COURT: I'd be happy to take them.

9              MR. CRICHLOW: Okay, Your Honor.  May I approach?

10             THE COURT: You may.

11             MR. CRICHLOW: Okay.

12             THE COURT: Thank you.

13             MR. CRICHLOW: Your Honor, I just want the record to

14   reflect that I have handed up the official, from the Westlaw

15   site, Oklahoma statute, annotated, that applies to our

16   argument.  And I can represent as an officer of this court

17   that I've also handed you a document that red lines it

18   against the Alaska statute.  And the only changes you see,

19   and the only red line are literally the changes in words

20   between the two statutes.  And it is offered only as evidence

21   that the statutes are, for all meaningful purposes,

22   identical.  So that the Tcina decision can be taken in full

23   context.  Your Honor, with that, I will move on to the second

24   issue.  Which is, with respect to Trading Bay Field.  And

25   what I would tell you, Your Honor, I mentioned the Fullop

1    decision, and I'm going to cite it to you, because I'm not

2    going to spend any time with my own outline on my own

3    argument, because while I tried to summarize it, I actually

4    felt that the analysis in this case was best read back to you

5    and pointed out to Your Honor by reference.  It's 6 F.3d 422.

6    And effectively, the in re: Fullop Court had exactly before

7    it the precise issues that have been teed up so eloquently by

8    Silver Point here.  And before I read this case, I would

9    conceded that confess that I was under the impression that no

10   Court had really squarely dealt with this issue.  And when I

11   say this issue, the issue being what do you do with respect

12   to a situation where a unit owner has a security interest in

13   real property which involves oil and mineral rights, and

14   clearly those rights and that interest starts out as real

15   property, but as the oil is produced, and as it is extracted,

16   it becomes personal property.  And Silver Point made a point

17   that when it becomes as extracted collateral, the UCC

18   applies, and that Trading Bay Field and Trading Bay Unit's

19   UCC filings, their filings under UCC law would be inadequate.

20   We asserted that they were wrong for several reasons.  It's

21   in the brief, I won't repeat it.  But what I would like you

22   to know is that the Court in in re: Fullop, and it's not a 3rd

23   Circuit case, but it is decided in, on rehearing and

24   suggesting for rehearing.  Well, actually it was decided on

25   appeal in the 7th Circuit, and what happened there is a

1   Trustee, which was permitted to avoid all liens and security

2   interests that were un-perfected at the time of the

3   bankruptcy petition's filing, conceded that a bank had a

4   valid and perfected lien on oil and gas prior to its

5   extraction from the ground as those interests constituted

6   real property.  The Trustee contended that the bank's

7   perfected lien did not extend to the gas and oil upon its

8   extraction.  And the accounts created by its post-petition

9   sale.  And thus they said the bank's lien is subject to the

10  requirements of Article 9 of the Illinois Uniform Commercial

11  Code.  This was decided under Illinois law.  We have argued

12  here that this decision should turn on Alaska law, and have

13  pointed out that real estate fixture filings would suffice

14  under Article 9 and elsewhere.  But the Court stated that in

15  the appeal before it, the parties again raised an issue, and

16  this is a quote, "of what law governs the perfection of a

17  secured creditor's interest in oil extracted under an oil and

18  gas lease."  And the case goes on to point out that there are

19  several cases in the jurisprudence that suggest that the

20  extracted oil and gas constitute part of a working interest,

21  but nevertheless a personal property that's governed by UCC

22  Article 9.  And they acknowledge those cases and walk you

23  through them, but they reached this conclusion, and I'm

24  reading from page 428.  It says, "However, we reject the

25  Trustee's argument, as accepted by the Courts below, that

1    Article 9 provides the sole means of creating and perfecting

2    a secured creditor's interest in property."  He pointed out

3    that when the interest is in real property that involves

4    rents, issues, proceeds, and profits, that under real estate

5    law, a party can properly grant and perfect a security

6    interest, either pursuant to Article 9, or the lien may also

7    be granted under a rents and profits clause and a conveyance

8    of an interest in real property.  And perfected by the

9    secured creditor taking affirmative action to assert its

10   rights in the rents and profits.  Well, that's what we have

11   here.  We have a secured creditor that created a lien under a

12   rents and profits clause in a conveyance.  There's no

13   question, and when they say, rents and profits clause,

14   they're talking about rents, profits, and proceeds.  There's

15   no question, if you look at the TBJ operating agreement, or

16   the TBU operating agreement, which no one is disputing, that

17   there was an interest and a conveyance in proceeds.  They

18   were filed under real estate law, and we exercised those

19   rights, and the Court goes on to say that those rights can be

20   exercised outside of a foreclosure by notice of intent to

21   assert your lien rights.  We have done that by moving to lift

22   the stay.  And we filed notice prior to the petition date

23   that we were enforcing our lien rights.  There's no question.

24   What this Court has essentially said when faced with the

25   question of does Article 9 or does the real estate law apply

1    to as extracted collateral, they said it was both.  And it

2    says right in the summary, under Illinois law, two

3    alternative routes exist to grant and perfect the secured

4    creditor's interest in extracted oil.  One under Article 9 of

5    the UCC and one pursuant to rents and profit clauses and

6    conveyance of interest in real property.  This is the

7    definitive case looking at this issue.  And it recognizes

8    that the type of filings we have here, as real estate

9    conveyance filings, are appropriate to grant us a perfected

10   security interest.  The facts are undisputed that those

11   filings, under Alaska real property law, were made well in

12   advance of Silver Point's filings, and we are first in time

13   and first in right there.  And the only Court, in both

14   instances, with respect to both the statutory lien priority

15   and with respect to this issue of the tension in between the

16   UCC Article 9 requirements and the real estate law

17   requirements, there is a way where you look at – - and it's a

18   sensible way - - if a party takes interest in the oils and

19   minerals at the time when it is in the land, the mere fact

20   that it is extracted and proceeds result from it, does not

21   mean that there is any less of a priority as the oil moves

22   through the land and becomes proceeds.  And that's what

23   Fullop stands for.  Your Honor, I will take my leave now and

24   save the rest for rebuttal, but I would also suggest that

25   even if you were not to follow Fullop, under Alaska law, and

1   we've made this case in our paper, our real estate filings

2   themselves actually comply with UCC Article, the applicable

3   UCC Articles, and as filed put us well within the realm of

4   having a perfected security interest that is first in time

5   and first in right.

6           THE COURT: As a fixture filing.

7           MR. CRICHLOW: As a fixture filing.  That is

8   correct.  Because of Alaska state law.  But I think the

9   Fullop case defines and takes you through the most meaningful

10  and thoughtful discussion of why that is the case, and why

11  you can do it either way.  And at the end of the day, what it

12  comes down to is what a lot of lien priority disputes come

13  down to which is who was first in right.  And in this case it

14  is undisputably Union.  Your Honor, I'll take a seat and save

15  some time for rebuttal.

16          THE COURT: Thank you.

17          MR. CRICHLOW: Thank you.

18          MS. CHAMBERS: Good afternoon, Your Honor.  Torey

19  Chambers on behalf of Silver Point Finance.  This situation

20  is simple.  Silver Point's lien is superior to Union's lien

21  because Silver Point filed and perfected, first, under the

22  strict rules of Alaska's Article 9.  Union comes here and

23  attempts to distract this Court with complicated arguments to

24  avoid facing the fact that Union simply didn't comply with

25  the rules of Article 9.

1          THE COURT: Well, let me ask you this.  With respect

2     to the Trading Bay Unit, are you arguing that the Alaska

3     statute does not apply?

4          MS. CHAMBERS: Yes, Your Honor.

5          THE COURT: Okay.  Apart from your interpretation of

6     the specific language, you take the position first that it

7     doesn't apply at all.

8          MS. CHAMBERS: Yes, Your Honor.

9          THE COURT: Okay.

10         MS. CHAMBERS: As we've said in our briefs, the

11    plain language of the statute is that the unit operator has a

12    first and prior lien on the interest of the owner.

13    Specifically the statute, the Alaska statute, gives the unit

14    a lien on three separate and specific things.  One, the

15    leasehold estate and all other oil and gas rights in and to

16    the separately owned tract.  Two, the interests of owners in

17    and to the unit production.  And three, all equipment in

18    possession of the unit.  All we're concerned about here is

19    number two, the interest of the owners in and to the unit

20    production.  Unequivocally, Your Honor, Silver Point is not

21    an owner.  The Debtor is the owner.  Silver Point is a

22    creditor to the Debtor, and by its plain language, the

23    statute doesn't apply.  There would be no reason for the

24    Alaska legislature to specify that it only applied to owners

25    unless they intended to exclude non-owners.  Omissions in a

1   statute are considered exclusions under the law.  And Your

2   Honor, even if this Court finds that it is unclear or

3   ambiguous as to whether Alaska's statutory lien applies to a

4   creditor such as Silver Point, this Court must hold that it

5   does not apply.  Because statutory liens are in derogation of

6   a common law and should be strictly construed.  My esteemed

7   colleague goes on about the Tcina case.  Your Honor, it's

8   unequivocal here that we're dealing with Alaska law, not

9   Oklahoma law.  And as he, as Mr. Crichlow said, there's no

10  law on point in Alaska.  And I would submit that the Tcina

11  case is irrelevant.  As has been discussed a few minutes ago,

12  the statutory lien applies only to the unitized leases, and

13  therefore does not apply to the TBF. It is our argument,

14  however, that because the statutory lien applies to neither

15  the TBU nor the TBF, and that Union failed to follow the

16  tenets of Alaska's Article 9, Silver Point's lien is first

17  and has priority.  All of Union's filings prior to 2008 were

18  ineffective.  Either they failed to properly name the Debtor,

19  they failed to properly re-record after a change in Debtor,

20  or after the Debtor changed its name.  And even if Alaska's

21  Article 9 can somehow excuse those failures, rendering the

22  filings ineffective, in any event, Union's filings lapsed

23  after five years.  Since it's most recent filing prior to

24  2008 was in May of 2002, at the latest their filings lapsed

25  in May of 2007.  When Silver Point filed in August of 2007,

1    it was free and clear of all liens and was therefore the

2    first to file and register that lien under Article 9.

3    Article 9 requires very strict compliance.  The purpose

4    behind it is to ensure certainty for creditors, provide

5    notice to third parties about who holds liens on what

6    property, and to avoid confusion in this commercial world.

7    While we acknowledge that literal application may sound harsh

8    and may cause hardships, being able to rely on Article 9 is

9    much more important.  And there's abundant case law

10   explaining that.  Your Honor, my colleague spent sometime

11   discussing the in re: Fullop 7th Circuit case.  As he pointed

12   out, it's a 7th Circuit case based on Illinois law.  We are

13   neither in the 7th Circuit nor are we considering Illinois law

14   in this case.  That decision turned on the fact that the

15   contract gave the bank security interest in proceeds,

16   product, offspring, rents, and profits.  Proceeds is a term

17   of art under Article 9, and was specifically part of the

18   Fullop contract.  And you'll see, as you read that decision,

19   how important that was.  And the 7th Circuit explains that

20   pretty fully.  Here in the TBU OA and the TBF JOA, there is

21   no mention of proceeds, product, offspring, rents, or profit.

22   The only interest is in production.  Which is different, and

23   therefore we would submit that the in re: Fullop case is

24   distinguishable, different, and besides the fact its' in a

25   different, non-mandatory jurisdiction, and does not provide

1    any precedential value here.

2         THE COURT: Well, I do confess that when other

3    applicable authority is unavailable, I do tend to give some

4    weight to Court of Appeals decisions.

5         MS. CHAMBERS: Certainly, Your Honor.

6         THE COURT: And I think they would tell you that I

7    probably should, too.

8         MS. CHAMBERS: Certainly, Your Honor.  Also if

9    you're thinking of this in the context of Article 9 and the

10   real property laws, allowing someone to register a lien under

11   the real property laws and not under Article 9 really weakens

12   the effect of Article 9.  And all of those things I talked

13   about in terms of being able to rely on it, and being able to

14   have certainty in a commercial world, and being, having

15   publicly available information for others to access about who

16   holds liens and on what property.  So allowing a real

17   property registration, I think, creates even more confusion

18   and undermines the purpose of Article 9.  Your Honor, with

19   that, I will rest on the details that are in the briefs.

20   Thank you.

21        THE COURT: Thank you.

22        MR. LITVAK: Your Honor, Max Litvak for the Debtors.

23   Just wanted to give the Debtors' position very quickly.  We

24   did file a joinder, Your Honor, and do join in Silver Point's

25   position.  Also wanted to point out to the Court as we've

1   mentioned in our joinder, but I want to highlight it for you,

2   that the estate, the Debtors, the estate, did negotiate for a

3   $2 million carve out as part of the final DIP financing order

4   in this case.  And as such that to the extent that the Court

5   finds that Silver Point is correct, and Union is incorrect

6   with respect to their respective seniority in these lift

7   proceeds, that the first $2 million, which Your Honor, has

8   actually been reduced to 1.6.  Because the 2 million was a

9   combination of this adversary proceeding and another

10  adversary proceeding involving a company called Era.  That

11  one has been settled.  Resulted in a $400 thousand

12  distribution to the estate.  So the estate's benefit here, to

13  the extent that the Court finds that Silver Point is

14  victorious on this point, would be a $1.6 million

15  distribution.  We did submit a declaration, which is

16  uncontested, Your Honor, of Gerald Tywoniuk, who testifies

17  that, this is to the Court's question, The proceeds

18  associated with Trading Bay Field, as opposed to Trading Bay

19  Unit, total, out of the 12.3 million or so that's held in the

20  segregated account, the proceeds allocable to Trading Bay

21  Field total $1,853,448.  The other point that I would make,

22  Your Honor, is that to the extent that the Court finds that

23  Silver Point has the senior lien here, and that by virtue of

24  the DIP financing order the estate is entitled to $1.6

25  million out of the first monies that are available on account

1   of that senior lien, that that money is going to, excuse me,

2   Your Honor, is going to go to the estate, separate and apart

3   from whatever Union administrative claims may be asserted.

4   And I just want to make that clear, Your Honor.  That from

5   our perspective, this is a carve out.  Essentially it is a

6   gift from the senior lenders to the estate.  To the extent

7   they prevail on this issue, which is really an inter-creditor

8   dispute.  It has nothing to do with whether or not Union has

9   a valid administrative claim.  Okay.  That's going to be our

10   position on that, and I just wanted to highlight that for the

11   Court.  Thank you, Your Honor.

12           THE COURT: So are you telling me, Mr. Litvak, you

13   think that the funds would be unavailable for payment of

14   administrative claims?

15           MR. LITVAK: No, what I'm saying, Your Honor, is

16   that Your Honor should not treat that as a the benefit that

17   Union has conveyed upon the estate.

18           THE COURT: Okay.

19           MR. LITVAK: Because it is no different than Silver

20   Point deciding to give us 1.6 million out of some other

21   separate piece of collateral.  It has nothing to do with

22   Union's administrative claims.

23           THE COURT: I understand.

24           MR. LITVAK: But to the extent they're allowed,

25   separate and apart from that issue, then certainly those

1   would be available.

2          THE COURT: Okay.

3          MR. LITVAK: Thank you, Your Honor.

4          THE COURT: Thank you.  Briefly.

5          MR. CRICHLOW: I will be.  It still sounds like a

6   benefit to me.  But I finished that, I put that one to bed.

7   Now I will quickly address my adversary's comments.  One of

8   the things I want to address, rather than just simply getting

9   in a rebuttal, one of the things that was said that I agree

10  with is that the 7th Circuit case found persuasive and when

11  they say, rents and profits, she is correct.  They found the

12  term proceeds persuasive and the Courts are looking at

13  whether you are taking an interest in the proceeds, in

14  addition to just the real property, because that's what

15  happens in oil and mineral cases.  Where she is incorrect,

16  and demonstrably incorrect, is when she states that nothing

17  in the Trading Bay Field or Trading Bay Unit operating

18  agreements convey an interest.  I will point Your Honor to

19  §11.4 of the Trading Bay Field joint operating agreement, and

20  I will confess to you that the same provision exists in the

21  Trading Bay Unit joint operating agreement.  And it is

22  entitled Lien of Operator.  And this is what was filed in the

23  real estate filings as a fixture filing, which under Alaska

24  law does not lapse after five years.  It says, Each party

25  grants to the operator a lien upon its working interests in

1    the area, and its interests in all property as security for

2    payment of its share of costs, together with interests

3    thereon at the rate of 12% per annum.  Etcetera.  And I am

4    omitting language now.  It picks up and says, In addition,

5    upon default by any party in the payment of its share of

6    costs, operator shall have the right to collect from the

7    purchaser the proceeds from the sale of such party's share of

8    production until the amount owed by such party, plus interest

9    as aforesaid, has been paid.  As I said earlier, that puts us

10   squarely within the analysis of Fullop.  I won't regurgitate

11   anything that was said in that decision.  I agree with Your

12   Honor, where you are struggling to find authority,

13   particularly since, you know, this jurisdiction's law does

14   not apply.  It's undisputed that it is a state law issue.

15   It's Alaska law.  One should look to the decisions of the

16   circuit.  And that case was argued before no less of a

17   respected judge than Judge Easterbrook who opined on that.

18   And I think she is absolutely correct when she said what they

19   were persuaded by was the real property filings dealt with

20   proceeds.  Under Alaska law, I think we're still fine.

21   Alaska law allows a mortgagee, whose mortgage includes rents

22   and profits clause, and proceeds, to demand the subject

23   rents, and profits, and proceeds upon the mortgage's default.

24   As I said, the TBF JOA, which is the Trading Bay Field Joint

25   Operating Agreement, has this provision in §11.4 that

1   provides for it.  On the petition date, most of the oil that

2   resulted in the lift proceeds to begin with was still in

3   place, and therefore, at the time of the petition of real

4   property, and the petition date is the proper date from which

5   to decide priority.  And finally, even if Alaska UCC law

6   applies, Union would still enjoy priority over Silver Point

7   because it filed in the proper place of filing under Alaska

8   law.  They filed the TBU OA and the TBF JOA, which are the

9   joint operating agreements, and the lien notice, and the 2008

10  fixture filing in the recording district where the land and

11  the well heads are located.  That is required under Alaska

12  statute cited in our papers.  Union's filings were mortgages,

13  which are effective as financing statements under the UCC,

14  under Alaska law.  They do not lapse until satisfied,

15  released, or otherwise terminate.  It does not need to be

16  renewed every five years.  And that is made clear in Alaska

17  Statute §45.29, 515(g), which is also cited in our papers.

18  The final thing is that what's ironic here is that there are

19  complaints about technical defects in the filings.  Which

20  honestly I don't view, with no disrespect to my adversaries,

21  as serious argument.  And I think they can't be for this

22  reason.  It is uncontroverted that Silver Point was aware of

23  the existing liens that Union had filed.  They mentioned them

24  in the DIP, in the DIP agreement that they signed.  They were

25  fully aware, at - - well, the credit agreement.  Let me

1  rephrase that.  In the credit agreement it's clear that they

2  were aware of the filings and the fact that Union had these

3  liens out there.  What we have disagreed about is whose liens

4  were perfected first, and who has a priority.  While I think

5  that might have been a legitimate dispute, I think it is not

6  a realistic dispute on behalf of Silver Point, because I

7  think the record is clear and the law in Alaska is clear, and

8  the jurisprudence interpreting the law is quite clear.  That

9  under the circumstances we have here, both with respect to

10  the statutory lien with respect to the Unit, and with respect

11  to the real property filings that are equivalent to financing

12  statements and what Fullop has to say about the tension

13  between Article 9 and real property law on as extracted

14  collateral, it does not make a difference if the real estate

15  filings are sufficient and they create a lien in rents,

16  profits, and proceeds.  We are fine with the real estate

17  filings, and as there is no question who was first to file

18  and who was first to perfect here.  And it was Union.  I

19  think as a result, the Court's escrow order should be lifted,

20  judgement should be granted in Union's favor, and the monies

21  turned over to Union.  Thank you, Your Honor.

22        THE COURT: All right.  Thank you.  Well, you're

23  both movants, and you're both respondents.  So Ms. Chambers,

24  if you'd like the last word, I will let you have it.

25        MS. CHAMBERS: Thank you, Your Honor.  I'll be very

1    brief.  First, with respect to the section of the TBF JOA

2    that Mr. Crichlow just quoted, he's, it says, The operator

3    shall have the right to collect from the purchaser the

4    proceeds from the sale of such party's share of production.

5    In this case, Your Honor, the proceeds are not held by the

6    purchaser.  But in fact, they have been escrowed at the

7    direction of this Court.  Also Your Honor, the statutory − −

8         THE COURT: Although I don't know what the specific

9    terms of the order say, but I'm sure it was my intention that

10   by moving, by changing the character − − put it this way.  By

11   putting the money into escrow, I did not intend that the

12   character of the fund be changed, but that all parties have

13   the same rights they would have had otherwise.  It was simply

14   meant to keep the asset from being dissipated.

15        MS. CHAMBERS: Yes, Your Honor.  I'd like to add

16   that the statutory lien does not specify anything about

17   proceeds either.  It's exclusive to production with respect

18   to the clause that we're talking about.  Also, with respect

19   to notice, yes, Silver Point was aware of Union's filings.

20   Silver Point was also aware that Union's filings were

21   deficient under Article 9.  And with that, thank you.

22        THE COURT: All right.  Thank you.  Is there

23   anything further for today?

24        MR. LITVAK: No, Your Honor.

25        THE COURT: Okay.  I'll issue a decision in due

1    course.   Thank you all very much.   That concludes this

2    hearing.   Court is adjourned.

3         (Whereupon at 5:54 p.m. the hearing in this matter was

4    concluded for this date.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18              I, Jennifer Ryan Enslen, approved transcriber for

19    the United States Courts, certify that the foregoing is a

20    correct transcript from the electronic sound recording of the

21    proceedings in the above entitled matter.

22

23    _/s/Jennifer Ryan Enslen_                    __July 22, 2010__
      Jennifer Ryan Enslen
24    43 Bay Boulevard
      Newark, DE 19702
25    (302)836-1905